# EXHIBIT D

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE,<br><br>                        Plaintiff,<br><br>       v.<br><br>BANK OF AMERICA, NA; JP MORGAN<br>CHASE BANK, NA; and JOHN DOE.<br><br>                        Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: HUDSON COUNTY<br><br>DOCKET NO. HUD-L-531-18<br><br>CIVIL ACTION<br><br>**NOTICE OF MOTION TO DISMISS<br>PLAINTIFF'S COMPLAINT PURSUANT<br>TO *RULES* 4:6-2(e)**<br><br>Return Date:  August 17, 2018 |

To:    Adrian J. Johnson, Esq.
       JOHNSON & ASSOCIATES, P.C.
       280 Amboy Avenue
       Suite 3
       Metuchen, New Jersey 08840
       *Attorneys for Plaintiff*

PLEASE TAKE NOTICE that Defendant Bank of America, N.A., will apply to this

Court, on motion returnable on **August 17, 2018 at 9:00 AM** or as soon thereafter as counsel

may be heard, for the entry of an Order, pursuant to *Rule* 4:6-2(e), dismissing the Complaint filed

by Plaintiff Viola Moore, against Defendant Bank of America, N.A.;

PLEASE TAKE FURTHER NOTICE that pursuant to R. 1:6-2, Defendant Bank of

America, N.A. shall rely upon the enclosed letter brief and certification of Daniel C. Fleming;

PLEASE TAKE FURTHER NOTICE that pursuant to R. 1:6-2, a proposed form of

Order is submitted herewith;

PLEASE TAKE FURTHER NOTICE that pursuant to R. 1:6-2(d), the moving party waives oral argument unless opposition is filed;

PLEASE TAKE FURTHER NOTICE that the discovery end date is January 27, 2019. No pretrial conference, arbitration date or trial has been scheduled.


Wong Fleming, P.C.
*Attorneys for Defendant Bank of America, N.A.*


DATED:  July 30, 2018              By:  */s/ Daniel C. Fleming*
                                        Daniel C. Fleming

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE, <br><br>                Plaintiff, <br><br>     v. <br><br> BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. <br><br>                Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: HUDSON COUNTY <br><br> DOCKET NO. HUD-L-531-18 <br><br> CIVIL ACTION <br><br> **ORDER DISMISSING PLAINTIFF VIOLA MOORE'S COMPLAINT AGAINST DEFENDANT BANK OF AMERICA, N.A.** <br><br> Return Date:  August 17, 2018 |

**THIS MATTER** having been opened to the Court by Defendant Bank of America, N.A., Wong Fleming, attorneys for Defendant Bank of America, N.A. appearing, on notice to Adrian J. Johnson, Johnson & Associates, attorneys for Plaintiff Viola Moore for an Order, pursuant to *Rule* 4:6-2(e), dismissing Plaintiff's Complaint, with prejudice; and the Court having considered the papers submitted in support of the motion and any opposition thereto, and having determined that good cause exists to grant the relief requested;

**IT IS** on this _____ day of _____, 2018,

**ORDERED** as follows:

1.      Defendant Bank of America, N.A.'s Motion to Dismiss Plaintiff's Complaint with prejudice is granted.

2.      Plaintiff's Complaint against Defendant Bank of America, N.A., is hereby Dismissed with prejudice pursuant to *Rule* 4:6-2(e).

     3.      A copy of this Order shall be served upon counsel of record with seven (7) days of receipt thereof by movant's counsel.

_____
, J.S.C.

This motion was ___opposed ___ unopposed.

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION: HUDSON COUNTY |
| Plaintiff, | |
| v. | DOCKET NO. HUD-L-531-18 |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | CIVIL ACTION |
| Defendants. | **CERTIFICATION OF DANIEL C. FLEMING IN SUPPORT OF MOTION TO DISMISS** |

I, Daniel C. Fleming, of full age, hereby certify to the following:

1.      I am a partner with the law firm of Wong Fleming.  In that capacity, I am the attorney primarily responsible for the representation of Defendant Bank of America, N.A. in this matter and, as such, I am fully familiar with the underlying facts and procedural posture of this litigation.

2.      In support of Bank of America, N.A.'s Motion to Dismiss, I attach a true and correct copy of the following exhibits:

| Exh. | Name |
|---|---|
| **1** | Deposit Agreement |
| **2** | Mortgage |

I certify that the forgoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  July 30, 2018                                  */s/ Daniel Fleming*
                                                                  Daniel Fleming

# EXHIBIT 1

# Deposit Agreement and Disclosures

*Effective February 6, 2015*



**Bank of America**

bankofamerica.com

Bank of America, N.A. Member FDIC.
Applies in all states.

©2015 Bank of America Corporation



91-11-2000B (02/15)         29495



# Table of Contents

**Welcome to Bank of America** ... 1
How to Get Started ... 1
How to Access Your Account ... 1

**The Agreement for Your Account** ... 1
Binding Contract ... 1
Changes to This Agreement ... 2
Closing an Account ... 2
Governing Law ... 2

**Explanation of Some Terms** ... 3

**Information About You and Your Account** ... 3
Information You Give Us ... 3
Identification ... 3
Bank of America's Privacy Policy for Consumers ... 4
Sharing Information with Affiliates ... 4
Credit Reports and Other Inquiries ... 4
Disclosing Information About You and Your Account ... 4
Telephone Calls: Calling, Monitoring and Recording ... 5
Release of Information ... 5

**Account Ownership** ... 5
Some General Terms ... 5
Some Basic Terms for Joint Accounts ... 5
Some Basic Terms for "Payable on Death" Accounts ... 6
Some Basic Terms for Business and Other Non-Personal Accounts ... 6
Transferring Ownership ... 6

**Checking and Savings Accounts** ... 7
Types of Accounts ... 7
Eligibility for NOW Accounts ... 7
Demand Deposit Accounts ... 7
How We Calculate Interest on Interest Bearing Checking and Savings Accounts ... 7
Combined Balance Service ... 8
Limits on Linking Accounts ... 8
Limits on Withdrawals and Transfers from Savings Accounts ... 8

**Time Deposit or CD Account** ... 9
Types of CDs ... 9
How We Calculate Interest on CDs ... 9
Disbursing Interest ... 9
CDs That Automatically Renew ... 10
CDs That Do Not Automatically Renew ... 10

Grace Period ... 10
Deposits to a CD ... 10
Early Withdrawals ... 10
Closing or Redeeming a CD ... 10

**Information About Fees and Charging Your Account** ... 11

**Insufficient Funds – Overdrafts and Returned Items** ... 12
Overdrafts and Declined or Returned Items ... 12
Overdraft Protection Plans ... 14

**Processing and Posting Orders** ... 15
Processing Transactions and Posting Orders ... 15
Posting Orders ... 15
Changing Posting Orders ... 15
Posting Order Determined at End of Day ... 16
Overdraft Fees ... 16
Certain Transactions Made After Business Day Ends ... 16

**Processing Deposits and Cashed Items** ... 17
Cashing Items or Accepting Items for Deposit ... 17
Checks Lost in the Collection Process ... 17
Collection Items ... 17
Demand Drafts and Remotely Created Checks ... 18
Deposit Preparation and Acceptance ... 18
Deposit Error Correction ... 18
Encoding Deposits ... 18
Endorsing Checks ... 18
Identifying the Account for Your Deposit ... 19
Overpayments and Reversals ... 19
Returned Items ... 19
Substitute Checks ... 19
Third-Party Endorsements ... 20

**When Funds are Available for Withdrawal and Deposit Holds** ... 20
Your Ability to Withdraw Funds ... 20
Longer Delays May Apply ... 20
Special Rules for New Accounts ... 21
Government Checks, Cashier's Checks and Other Special Types of Checks ... 21
Cash Withdrawal Limitation ... 21
Holds on Other Funds ... 21

**Processing Withdrawals** ... 21
Cashing Checks for You ... 21
Cashing or Accepting Your Checks for Others ... 22
Checks with Legends or Restrictions ... 22

Collection Items ... 22
Check Stock and Ink ... 22
Converting Checks to Electronic Debits ... 22
Examining Checks ... 22
Items Resulting from Voluntary Disclosure ... 22
Large Cash Withdrawals ... 23
Paying Checks and Other Items ... 23
Stale-Dated and Postdated Checks ... 23
Substitute Checks, Indemnified Copies, Images and Image Replacement Copies ... 23
Unpaid Items ... 23

**Substitute Checks and Your Rights** ... 24

**Notices, Statements and Other Communications** ... 25
General Terms for Notices, Statements and Other Communications ... 25
Notices ... 25
Statements ... 25
Check Image, Safekeeping and Enclosure Services ... 26
Your Address and Change of Address ... 26

**Actions You Can Take to Help Protect Your Account** ... 27

**Reporting Problems** ... 28
Your Responsibility ... 28
What Are Problems and Unauthorized Transactions ... 28
Reviewing Your Account Statements ... 28
We Are Not Liable If You Fail To Report Promptly ... 29
When Confirmation and Other Assistance Our Investigation and Maximum Liability ... 29
Business Insurance ... 29
Opening a New Account ... 29

**Foreign Items and Foreign Currency** ... 30
What is a Foreign Item ... 30
Be Cautious About Accepting Foreign Items ... 30
Wires Sent to a Foreign Currency Account ... 30
You May Not Write Foreign Currency Checks ... 30
Processing and Collecting Foreign Items ... 30

**Other Terms and Services** ... 31
Account Changes ... 31
Automatic Transfer Service ... 31
Check and Deposit Slip Forms ... 32
Check Copies ... 32
Compliance ... 32

Conflicting Demands and Disputes ... 33
Converting an Account ... 33
Cutoff Time for Receipt of Orders ... 33
Death or Incompetence ... 33
Facsimile Signature ... 33
Deposit Insurance – Bank Assessment for Business Accounts ... 34
Fingerprint ... 34
"Freezing" Your Account ... 34
Indemnification and Limitation of Liability ... 34
Legal Process – Subpoena and Levy ... 35
Multiple Signatures Not Required ... 35
Notice of Withdrawal ... 35
Powers of Attorney; Appointment and Payment to Agents ... 36
Records ... 36
Right of Setoff ... 36
Sample of Your Signature ... 36
Stop Payment Orders and Postdating Orders ... 36
Subaccounts ... 37
Unclaimed Property – Accounts Presumed Abandoned or Inactive ... 38
Verification of Transactions and Right to Reverse Transactions ... 38
Waiver, Severability, and Change of Law by Agreement ... 38

**Electronic Banking Services** ... 39
Types of Electronic Banking Services ... 39
Access ID ... 39
Electronic Banking Disclosures ... 40

**ATM Safety Tips and Safeguarding Your Account Information** ... 43

**Funds Transfer Services** ... 43
Remittance Transfers ... 44
Sending Funds Transfers ... 45
Receiving Funds Transfers ... 45
ACH Debits and Credits ... 45

**Tax Information** ... 45

**Resolving Claims** ... 46
What does "Claim" Mean? ... 46
How Claims on Personal Accounts will be Resolved ... 46
How Claims on Business Accounts will be Resolved ... 46
Judicial Reference ... 47
Arbitration ... 47
Limitation and Non-Severability ... 48
Rules of Interpretation ... 48
Jurisdiction and Venue ... 48

# Welcome to Bank of America

Thank you for opening and keeping an account with us.

Please read this entire agreement carefully so you understand your rights and obligations for your deposit account and deposit relationship with us and keep it in a convenient place for future reference.

In this agreement, "Bank of America", "Bank", "we", "us" and "our" means Bank of America, N.A. "You" and "Your" means each and every owner of the account and each and every other person with authority to withdraw funds from the account or otherwise operate the account.

Our accounts and services are generally available through all of our channels - in our banking centers, through telephone banking and online. However, some accounts and services may not be available at all times, in all locations, or through all channels.

## How to Get Started

After you open your account, please consider these optional services. They can help you manage your finances.

- **Debit card** – use your debit card to pay for purchases at merchants that accept debit cards, to make deposits at Bank of America ATMs, and to withdraw cash from ATMs, or other source of income deposited electronically into your checking or savings account.
- **Online Banking** – helps you manage and keep better track of your finances. Here are some of the things you can do using Online Banking:
  - Check your account balances and review transaction history.
  - Transfer funds between your accounts or to other Bank of America customers' accounts.
  - Receive your statements and posted checks online, then review or print them at your convenience.
  - Reorder checks and change your address.
- **Online Bill Pay service** – pay your bills electronically.
- **Online Alerts** – provide an electronic notice through email or text message about account activity, such as when a direct deposit posts or when your balance drops below an amount you set.
- **Scheduled Savings Transfers** – helps make saving easier

by automatically transferring money from your checking account to your savings account.

- **Keep the Change®** – helps you grow your savings by automatically transferring money from your personal checking to your savings with each eligible debit card purchase.
- **Overdraft Protection Service** from another linked account, such as your savings or credit card account – helps you avoid overdrafts and declined or returned checks and other items by automatically transferring available funds from your linked account to your checking account.

## How to Access Your Account

You can access your account and get information about our accounts and services:

- At our **banking centers** and at **Bank of America ATMs.**
- Through our **Online Banking Service** at: www.bankofamerica.com
- By calling **customer service** at the number on your account statement.

You can locate our nearest banking center or ATM on our website at www.bankofamerica.com.

# The Agreement for Your Account

## Binding Contract

This Deposit Agreement and Disclosures, the applicable Schedule of Fees, the signature card and other account opening documents for your account are part of the binding contract between you and us (this "Agreement") for your deposit account and your deposit relationship with us. They contain the terms of our agreement with you. Please read all of these documents carefully.

This Deposit Agreement and Disclosures also summarizes certain laws and regulations that apply to common transactions, provides some disclosures for deposit accounts required by federal law, and establishes terms that cover some transactions or situations that the law either does not cover or allows us to change by this contract. The Schedule of Fees lists our accounts and account fees.

When you complete our account opening documents (as an example, you sign our signature card), request an account, or keep your account open, you acknowledge that you have

reviewed and understand the terms of this Agreement and you agree to be governed by these terms. You understand that these terms, as we may change or supplement them periodically, are a binding contract between you and us for your deposit account and your deposit relationship.

Our deposit relationship with you is that of debtor and creditor. This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary or special relationship between us. We owe you only a duty of ordinary care. Our internal policies and procedures are solely for our own purposes and do not impose on us a higher standard of care than otherwise would apply by law without such policies or procedures.

We give this Agreement to you when you open your account. You may obtain additional copies of this Agreement at a banking center or by calling the number on your statement.

## Changes to This Agreement

We may change this Agreement at any time. We may add new terms. We may delete or amend existing terms. We may add new accounts and services and discontinue existing accounts or services. We may convert existing accounts and services into new accounts and services.

We ordinarily send you advance notice of an adverse change to this Agreement. However, we may make changes without prior notice unless otherwise required by law. We may, but do not have to, notify you of changes that we make for security reasons or that we believe are either beneficial or not adverse to you.

When we change this Agreement, the then-current version of this Agreement supersedes all prior versions and governs your account.

If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. If you do not agree with a change, you may close your account as provided in this Agreement.

See the *Notices, Statements and Other Communications* section for information about how we provide notice.

## Closing an Account

You or we may close your checking or savings account at any time without advance notice, except that we may require you to give us seven days advance notice when you intend to close your savings or interest bearing checking account by withdrawing your funds. See *Notice of Withdrawal* in the *Other Terms and Services* section. You or we may close your time deposit account at maturity without advance notice.

If your account reaches a zero balance, or you apply for an account but never deposit funds into it, we may either keep the account open or close the account without notice.

Sometimes after an account is closed, we receive a deposit for credit to the account or a check or other item for payment from the account. If this happens, we may at our option and without any liability to you: either return the deposit, check or other item; or we may reopen the account and post the deposit, check or other item for you, even if this overdraws your account and causes you to incur overdraft fees.

Sometimes after an account which had funds in it is closed, and while we are still holding the funds from the account, we receive a withdrawal request, check or other item for payment from the account. We may refuse the withdrawal request and return the check or other item. We are not liable for any losses or damages that may result from refusing the withdrawal or dishonoring the check or other item, even if we are still holding funds that would cover the withdrawal, check or other item.

If your account is overdrawn when closed, you agree to pay immediately all amounts you owe us. If your account had funds in it when closed, we may:

- hold the funds for your pick up or to pay outstanding or expected items or claims;
- deposit the funds in another of your accounts with us or our records for the account;
- mail the funds to any of you by check at the address in our records for the account.

If your account earned interest before it closed, your funds stop earning interest when the account is closed, even if we continue to hold the funds. As an example, if we mail funds from an interest bearing account to you by check, then your funds do not earn interest, even if the check is returned to us or is not cashed.

This Agreement continues to govern matters related to your account even after your account closes.

## Governing Law

This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state where your account is located. However, your rights and obligations for Remittance Transfers shall be governed by and interpreted as described in the *Funds Transfer Services* section. We ordinarily maintain your account at the banking center where we open your account. However, we may transfer your account to another banking center in the same state or in a different state. If state and federal law are inconsistent, or if state law is preempted by federal law, federal law governs.

# Explanation of Some Terms

## Definitions

Please keep in mind the following definitions as you review the Agreement.

**Annual Percentage Yield (APY)** is a percentage rate reflecting the total amount of interest paid on the account, based on the interest rate and frequency of compounding.

**Average daily balance** for a statement cycle – we take the balance that we determine is in the account for each day in the statement cycle, add those balances together, and then divide that sum by the number of days in the statement cycle.

**Bank of America, Bank, we, us** and **our** mean Bank of America, N.A.

**Banking Center** means a branch of Bank of America.

**Business days** – our business days are Monday through Friday, excluding bank holidays. Hours of the business day for a banking center are available at that banking center.

**Collected balance** is the ledger balance for the account minus that portion of funds deposited for which we have not received credit based on the availability schedule we apply to the account. We ordinarily apply the availability schedule provided to us by the Federal Reserve Bank to determine the time that we receive credit for deposited funds.

**Item** includes all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image or a photocopy of any of the foregoing. An item also includes any written document created or authorized in connection with any instruction you give to us for the fact that it has not been signed. Item may also include a cash-in ticket and a deposit adjustment. Item may also include a check, draft, warrant, or other item deposited to your account, including a deposited item that was returned unpaid.

**Minimum daily balance** – the lowest balance that we determine is in the account during a statement cycle.

**You** and **your** means each and every owner of the account and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account.

## Headings and Interpretation

We include section and paragraph headings in this Agreement to help you find terms and provisions. The headings are for convenience or reference only. They do not limit the term or provision.

Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

In some sections we give examples. The examples cover some, but not all, of the situations or items that are covered by the section.

# Information About You and Your Account

## Information You Give Us

When you open a deposit account with us, you give us information about yourself and confirm that it is correct. We enter the information into our records. We may rely on that information until you notify us of a change and we have had a reasonable time to act on the new information.

## Identification

Federal law, including the USA PATRIOT Act, requires all financial institutions to obtain, verify and record information that identifies each customer who opens an account with that financial institution.

When you apply for an account, we will ask for your legal name, address, date of birth and your Tax Identification Number (TIN). We may require one or more forms of unexpired photo identification. We may validate the information you provide to us to ensure we have a reasonable assurance of your identity. We may contact you for additional information. If your account is funded before we verify your information, you may not have access to your funds. If we are not able to verify your identity to our satisfaction, we will not open your account or we may close the account if it was previously funded.

## Bank of America's Privacy Policy for Consumers

Our privacy policy for consumers is described in our publication, *U.S. Consumer Privacy Notice*. We provide our privacy policy to consumers who open a personal account with us. The privacy policy describes our policy on handling customer information and describes the situations when we may disclose information, including some examples.

You can also review our privacy practices on our website at www.bankofamerica.com/privacy.

## Sharing Information with Affiliates

**Accounts Held by Consumers** We may share information that we have about you and your accounts among the Bank of America family of companies. Please refer to our publication, *U.S. Consumer Privacy Notice*, for information about the categories of information we may share among the Bank of America family of companies and how you may tell us not to share certain types of information among our family of companies.

**Accounts Held by Businesses** We may share information about our experiences with you with Bank of America Corporation and its subsidiaries and affiliated companies ("Bank of America Affiliates") and selected third parties. We may also share information that you have provided to us on applications or that we receive from outside sources among the Bank of America Affiliates. However, individuals may tell us not to share information about them from applications or outside sources compiled for purposes of determining eligibility for credit, insurance or other services by either calling us at 1.888.341.5000 or by notifying us at www.bankofamerica.com/privacy.

## Credit Reports and Other Inquiries

We may make any inquiries that we consider appropriate to help us verify your identity and determine if we should open, maintain, collect or close your account. This may include verification of employment and credit reports or other reports from account information services and credit reporting agencies.

If you ask, we will tell you whether we requested a credit report and, if we did request a report, we will tell you the name, address and telephone number of the reporting agency.

## Disclosing Information About You and Your Account

This section applies to both business and personal accounts. We may disclose information about your accounts to credit reporting agencies and to other persons or agencies who, in our judgment, have a legitimate purpose for obtaining information.

From time to time, subject to any applicable financial privacy laws or other laws or regulations, we may provide information on you and your accounts:

• where it is necessary for completing transactions;

• to account information services, such as ChexSystems, Inc.;

• to anyone who we reasonably believe is conducting a legitimate credit inquiry, including inquiries to verify the existence or condition of an account for a third party such as a lender, merchant or credit bureau;

• in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance;

• in connection with collection of indebtedness or to report losses incurred by us;

• in compliance with any agreement between us and a professional, regulatory or disciplinary body;

• in connection with potential sales of business businesses;

• to service providers who help us meet your needs by assisting us in providing or offering our products or services; and

• to other third parties as is described in our publication *U.S. Consumer Privacy Notice* or as required under applicable law or regulation.

In the event of a conflict between the terms of this section and the terms of our *U.S. Consumer Privacy Notice*, the terms of our *U.S. Consumer Privacy Notice* governs.

**Account Information Services** If we close your account because of your unsatisfactory handling, we generally report to account information services such as ChexSystems, Inc. your name, address, Taxpayer Identification Number (TIN), driver's license number and the date and reason we closed the account. The account information service may supply this information to others. This may adversely impact your ability to establish an account at any financial institution for up to five years from the date of the report.

4

3

## Telephone Calls: Calling, Monitoring and Recording

When you give a telephone number directly to us, or place a telephone call to us, you authorize us to place calls to you at that number. You understand that a "telephone number" includes a cell phone number and "calls" include both telephone calls and text messages to or from your phone or cell phone. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your account. When we place calls to you, we may use automatic dialers and artificial, text, or prerecorded messages.

You authorize us to monitor and to record, telephone conversations and other electronic communications between you and us and our representatives for reasonable business purposes, including security and quality assurance. We will not remind you that we may be monitoring or recording a call at the outset of the call unless required by law to do so.

You consent and agree in advance to these terms and conditions.

### Release of Information

You can obtain information about your account by many methods, including at a banking center, by telephone, by mail and through Online Banking. We believe we have adopted reasonable security measures for each method, but we cannot ensure against unauthorized inquiries or intrusions. You agree that we are not responsible for the release of information to anyone who has gained possession of your ATM card, debit card or other code or access device or who has learned your identifying characteristics such as personal identification number (PIN), account number or social security number, even if you have not authorized them to obtain the information.

# Account Ownership

## Some General Terms

When you open an account, we may rely on information you give us and we maintain in our records. We determine the type and ownership of the account from this information. When you ask us to make a change to this information or your account, and we agree to the change, the change is not effective until we have had a reasonable time to act on the new information. As an example, if you ask us to change the signers on your account, your requested change is not effective until we have a reasonable time to act on it. If we ask you to give us additional documents or information, and you do not do so promptly, we may close your account.

When we accept a deposit to an account or permit a withdrawal or payment from an account, we may rely upon the form of the account and the terms of this Agreement at the time we process the transaction. We do not have to inquire about the source or ownership of any funds we receive for deposit or about the application of any withdrawal or payment from an account. When we permit a withdrawal or payment from an account at the request of any signer, or the agent of any signer, in accordance with the terms of this Agreement, the withdrawal or payment is a complete release and discharge of the Bank from all claims regarding the withdrawal or payment.

If you instruct us to open an account in the names, of two or more people, and we do so, but later determine that one or more of them have not completed our account opening documents or other requirements, you agree to hold us harmless for reliance on your instruction. We may in our discretion for all purposes and circumstances (including determining ownership of the account following the death of any person in whose name the account was opened) either treat the account as being owned by all persons in whose names the account was opened or treat the account as being owned solely by the persons who have signed or completed our account opening documents or other requirements. If we treat the account as owned by all persons in whose names the account was opened, we may permit the non-signing person to withdraw funds or take other action on the account without any liability to you.

We may open an account without regard to whether you are married and without regard to whether the funds on deposit are your community or separate property. We may require you to close the account in order to remove a co-owner, terminate a joint ownership or change a payable on death or trust designation.

## Some Basic Terms for Joint Accounts

If more than one person's name appears in the title of an account without a fiduciary, beneficiary or other designation, then the account is a joint account. All persons whose names appear on the account are co-owners of the account, regardless of whose money is deposited in the account.

Each co-owner acts as the agent of each other co-owner. Each co-owner authorizes each other co-owner to operate the account without the consent or approval of any other co-owner. We may act and rely on the instructions of one co-owner without liability to any other co-owner. As examples, one co-owner may without the consent or approval of the others:

- add additional interests as co-owners;

- deposit funds and withdraw or transfer part or all of the funds in the account;

- endorse for deposit to the joint account on behalf of any other co-owner an item payable to another co-owner;

- instruct us to stop payment on a check or other item that another co-owner wrote on the account;

- obtain an ATM card or a debit card;

- draw upon an overdraft or other line of credit connected to the account;

- obtain information about the account, including transactions conducted by other co-owners;

- pledge the account as security for any debts; and

- close the account.

Each co-owner is jointly and severally liable to us for all fees, charges and other amounts owed to us on, and all costs, losses and liabilities related to, this Agreement or the account.

All joint accounts are presumed to be joint accounts with the right of survivorship, unless the applicable state law does not permit this presumption or we have agreed with you in writing that the account is owned in another capacity. **Right of survivorship means that when a co-owner dies, the funds in the account belongs to the surviving co-owner(s)**, subject to our right to charge the account for any amount the deceased co-owner or a surviving co-owner owes us. The rights of survivorship continue between surviving co-owners. The applicable state law may impose requirements that must be met to create a joint account with right of survivorship. You are solely responsible for meeting these requirements.

## Some Basic Terms for "Payable on Death" Accounts

For an individual or joint account, you may choose to make your account payable on your death to one or more payable on death ("POD") beneficiaries. You can make your account a POD account by instructing us to list each POD beneficiary on the account, complying with applicable state law. The applicable state law usually imposes requirements that must be met to create a POD account. As an example, you may have to include certain words or letters in the account title to create a POD account, such as: "payable on death," "POD," "in trust for," "ITF," "as trustee for," "ATF," "transfer on death," "TOD," or "Totten Trust." You are solely responsible for meeting these requirements. We may treat an account which names a POD beneficiary as a POD account. However, if the applicable requirements are not met, we may treat your account as though there is no POD beneficiary.

During your lifetime, a POD account belongs to you. You may close the account, remove or add one or more POD beneficiaries, change the account type or ownership, and withdraw all or part of the funds in the account. When the account owner or last co-owner dies, we may pay any funds remaining in the account to the then surviving (if any) POD beneficiary(ies), subject to our right to charge the account for any amount a deceased owner, co-owner or POD beneficiary owes us. We may distribute the account balance, subject to any bank claims, to such beneficiaries payable to one or all surviving beneficiaries jointly, or payable individually, in equal shares, to each surviving beneficiary. A POD beneficiary does not acquire an interest in the account until after the death of the account owner or the last co-owner. A POD beneficiary may acquire an interest in the account at that time but only if the POD beneficiary is alive.

## Some Basic Terms for Business and Other Non-Personal Accounts

If the account owner is a corporation, unincorporated association, limited liability company, limited liability partnership, fiduciary, partnership, sole proprietorship or other entity holding an account in any capacity other than an individual capacity, each person signing the signature card or completing other account opening requirements represents and agrees that they:

- are fully authorized to execute all documents or otherwise complete our requirements in their stated capacity;

- have furnished all documents or other information necessary to demonstrate that authority; and

- will furnish other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any resolution affecting the account that is not on our form or that appears to us to be incomplete or improperly executed.

## Transferring Ownership

Your account is for your use only. It is non-transferable and non-negotiable. Ownership of your account is transferable only on our records with our consent.

- You may not grant, transfer or assign any of your rights to your account without our written consent.

- Even if we consent, we may require that you close the account and that the new account owner open a new account in their name.

- We may refuse to acknowledge or accept your attempted pledge or assignment of your account or any interest in it, including a notice of security interest.

# Checking and Savings Accounts

## Types of Accounts

We offer several different types of checking and savings accounts for personal and business customers.

- The Personal Schedule of Fees describes our personal accounts and lists applicable fees.

- The Business Schedule of Fees describes our business accounts (other than Commercial accounts) and lists applicable fees. The Business Schedule of Fees does not apply to Commercial accounts.

## Eligibility for NOW Accounts

NOW accounts are commonly called interest checking accounts. Federal law provides that NOW accounts may only be opened and used by the following customers:

- Individuals (including sole proprietors),

- certain nonprofit organizations,

- federal, state or local governmental entities, and

- fiduciaries (such as a bank trust department) where one or more individuals hold the entire beneficial interest in the funds.

If we believe that you are not eligible to own a NOW account, we may either close the account or convert it to another type of account. When we refer in this agreement to checking accounts, the reference includes NOW accounts.

## Demand Deposit Accounts

Demand deposit accounts are commonly called checking accounts. All types of customers can open a demand deposit account. Most demand deposit accounts do not earn interest. We do offer an interest bearing demand deposit account to business customers. Please ask us for details.

When we refer in this agreement to checking accounts, the reference includes demand deposit accounts.

## How We Calculate Interest on Interest Bearing Checking and Savings Accounts

If you have an interest bearing checking or savings account, then please note the following.

- Your funds earn a variable rate. Your interest rate and annual percentage yield ("APY") may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.

- We compound and credit interest to your account monthly.

- We use the daily balance method to calculate the interest on your account. The daily rate is 1/365—or in a leap year we may use 1/366— of the interest rate.

- For personal checking accounts and personal and business savings accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day.

- For business checking accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine applies for reserves applicable generally to transaction accounts under the rules of the Federal Reserve).

- For Public Service Trust Accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine is required to offset service charges).

- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item no later than the business day on which we receive credit for the non-cash item.

Some checking and savings accounts do not earn interest. The checking and savings accounts that earn interest are described in the Schedule of Fees lists the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine is required to offset service charges). We set interest rates at our discretion. The interest rate and APY we offer on the same type of account may be higher or lower based on the specific customer, account location or channel through which the account is opened. As an example, an account opened through our Online Banking channel may earn a different rate (either higher or lower) than the same type of account opened in a banking center or by mail. We may also consider your relationship with us in setting interest rates on your account, such as whether you have other accounts with us, your balances with us in your other accounts and how you use services that we offer with accounts.

We occasionally offer interest rate bonuses and other special promotions as account incentives to various customers. These offers do not apply to all accounts, customers, locations or methods of account opening.

You may obtain current interest rates for your account by calling us at the number for customer service on your statement or by asking a banking center associate.

**Balance Tiers** The daily interest rate we pay on some accounts depends on the tier into which the balance in the account falls. A tier is a range of account balances. If you have one of these accounts, your balance earns the interest rate and APY in effect that day for the balance tier associated with your end-of-day balance. We may set the rate for each tier in any amount. The interest rate for one tier may be the same rate, or a higher or lower rate, than the rate for a lower tier. We may change the tiers that apply to an account at any time without notice. Different tiers apply to different types of accounts.

## Combined Balance Service

With some checking accounts you can designate your checking account as your primary checking account and then link many of your other accounts to it for pricing. When you link another account for pricing, you can use the balances in the other account to help you meet the combined balance required to avoid the monthly maintenance fee on your primary checking account. The Schedule of Fees lists the required combined balance for each checking account to which the service applies and the types of accounts that can be linked for pricing.

You must tell us what other accounts you want us to link to your checking account for pricing. We do not link your other accounts for pricing unless you tell us to do so. An account can only be linked for pricing to one checking account at a time. To determine what accounts are linked for pricing, please call.

When an existing account is closed and a new account is opened to replace the existing account, we do not automatically link the new account to your checking account for pricing, even if the existing account was linked. You must tell us to link the new account for pricing.

When we calculate a balance or combined balance, we may ignore accrued interest, funds subject to a hold of any type, and each loan or line of credit that is in default. For each linked account, the period of time that we use as the basis for calculating the balance may not be the same as the basis for the balance in the linked account that we use to determine the balance in the linked account may be different from the statement cycle for the primary checking account.

You still need to meet the balance requirements, if applicable, in each linked account to avoid the monthly maintenance fees on those accounts.

You understand that any statement for your primary checking account may include information about each linked account, including the account name, number and balance. We may make this information available to each owner and signer of any linked account. We may also send you a single combined statement that reports activity for your checking account and each deposit account linked to that account, instead of separate statements

for each account. See Combined Statements in the Statements and Notices section.

## Limits on Linking Accounts

Some restrictions apply to what accounts can be linked to checking for pricing, including the following. You can generally link accounts that are located in the same state as your checking account. In some states you can also link accounts located in different states. You may only link an account to one checking account at a time. At least one of the owners of the linked account must also be an owner of the checking account. You may not link personal and business accounts together. You may not link a loan or line of credit that is in default.

We may in our discretion place other restrictions on what accounts can be linked.

## Limits on Withdrawals and Transfers from Savings Accounts

This Agreement and federal law impose limits on the number of certain types of withdrawals and transfers you can make each month from a savings account. Please note that these limits do not apply to withdrawals and transfers you make at one of our banking centers, by mail or at an ATM.

You can make no more than a total of six transactions each monthly statement cycle (or each month if you have a quarterly statement cycle) from among the following:

- Preauthorized transfers from your savings account (including transfers for overdraft protection),

- Telephone transfers or other electronic transmissions from your savings account,

- Online banking transfers or bill payment transfers from your savings account,

- Transfers by check, draft or debit card, if allowed on your savings account.

We count a transaction on the date that we post it to your savings account. This date may be different from the date you authorize, transfer or write the transaction, which means a transaction made during one statement cycle may not be counted until a later statement cycle.

If you exceed the transaction limits on more than an occasional basis, we may review your privileges on that account or we may convert your savings account to another type of account, such as a checking account. Your funds may no longer earn interest after we convert your account.

When you use our Online Banking bill payment service, we recommend that you do not use a savings account as your bill payment account because of these limits on transfers.

Note: Even if you make no more than 6 transactions, a fee may still apply to some withdrawals or transfers. Please see the Schedule of Fees for your account.

## Time Deposit or CD Account

When you open a time deposit account, you agree to leave your funds in the account until the maturity date of the account. We often refer to a time deposit account as a "CD" or a "Certificate of Deposit", even though we do not issue a "certificate".

This Agreement applies to CDs you open under your Individual Retirement Account (IRA) or Coverdell Education Savings Account (CESA) plans. Please see the Traditional/Roth Individual Retirement Custodial Accounts and Disclosure Statements and the Coverdell Education Savings Custodial Account and Disclosure Statement for additional terms of these plans.

A time deposit account is neither transferable nor negotiable.

### Types of CDs

We offer several different types of CDs for personal and business customers.

The Personal Schedule of Fees describes our personal CDs.

The Business Schedule of Fees describes our business CDs.

### How we Calculate Interest on CDs

Your funds earn interest during the term of the time deposit account. We calculate interest as follows:

* Time deposits earn interest at a fixed rate except for Opt-Up® CDs and Variable Rate IRAs. Fixed rate means that the interest rate that we apply to your account on the day we open it will not change for the term of the account.

* For an Opt-Up CD, your interest rate and annual percentage yield may change. The interest rate that we apply to it on the day that we open your Opt-Up CD remains fixed throughout the term of your Opt-Up CD unless you exercise your one time option to reset the interest rate. This reset option is described in the Schedule of Fees.

* For a Variable Rate IRA, your funds earn a variable rate. Your interest rate and annual percentage yield may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.

* For terms of 27 days or less, we credit interest to your account at maturity. For terms of 28 days or more, we compound interest monthly and we credit interest to your account monthly and at maturity or disburse it to

you according to the interest disbursement option you select.

* We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the ledger balance that we determine is in the account each day. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.

* When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item on the business day the deposit is received. Deposits you give us on a weekend or bank holiday are treated as received the next business day.

* The annual percentage yield for your account assumes that interest will remain on deposit until maturity. A withdrawal will reduce earnings.

We generally set interest rates for new time deposit accounts based on the type of CD, the amount you deposit, and the term you select. Rates for new accounts may change daily. We pay interest only in whole cents.

We may also set interest rates based on a specific account or customer, or based on the location or channel through which we open the account. This means that the interest rate and APY we offer on the same type of CD may be higher or lower based on the specific customer, location or method of account opening. For example, a CD opened through our Online Banking channel, may earn a different rate (either higher or lower) than the same type of CD opened in a banking center or by mail. We may offer interest rate bonuses and other special promotions to specific customers or accounts. Interest rate bonuses and other special promotional offers may not apply to all customers, locations or methods of account opening.

You may obtain current rates by calling us at the number for customer service on your statement or by asking a banking center associate.

### Disbursing Interest

You may choose to have us credit your interest to your account. With this option, we reinvest the interest in your account monthly and at maturity.

Alternatively, you may have us regularly disburse the interest from your account by having us credit the interest to a Bank of America checking or savings account or by having us mail a check for the interest.

Depending on the term of your account, disbursement options include monthly, quarterly, semi-annually, annually on the anniversary date, and at maturity.

### CDs That Automatically Renew

Unless your account information states that your time deposit does not automatically renew, we automatically renew your account by reinvesting your funds. We reinvest both principal and interest, unless you elected to have your interest disbursed. (See Disbursing Interest in this chapter.)

When we automatically renew your CD, the term for the reinvested CD is the same length as the previous term of your account unless we notify you that we are changing the term of the CD. For time deposits with a fixed interest rate, the interest rate and APY for any renewal term is based on the rate we offer on the first day of the new term for the type of CD.

At maturity and term of the reinvested deposit. Unless specifically stated otherwise, any bonus or special promotion we are offering will not apply to automatically renewing accounts.

If at any maturity date we no longer offer time deposit accounts of the same term and type, we may reinvest your funds in a time deposit that we believe offers similar features.

### CDs That Do Not Automatically Renew

Some time deposit accounts do not automatically renew. If your account information states that your time deposit does not automatically renew, then your account does not earn interest after its maturity date.

### Grace Period

The grace period begins on the first day after the maturity date. The grace period is one calendar day for terms of seven through 27 days and seven calendar days for terms of 28 days or more. You may make a deposit or withdrawal, or change the length of the term, once during the grace period and, if you take one of these actions, the grace period ends on that day. If the last day of the grace period is a non-business day (a weekend or bank holiday), then the grace period ends on the last business day before that non-business day. We may pay interest during the grace period based on the rate we offer on the first day of the new term for the type of CD, amount, and term of the deposit.

### Deposits to a CD

You may make an additional deposit to your account during its grace period. Otherwise, for all CDs except Variable Rate IRAs you may not make deposits during the term of the CD.

You may not make a deposit to a time deposit account by wire or automated clearinghouse (ACH) transfer.

### Early Withdrawals

You have contracted to keep your funds on deposit for the stated term. You may not withdraw all or part of a time deposit account except as provided in this Agreement.

At our discretion, we may allow you to withdraw all or part of your funds at times other than the grace period. We withdraw interest before principal. Each time we permit you to make an early withdrawal of principal, we may charge you an early withdrawal penalty. If your account has not earned enough interest to cover an early withdrawal penalty, we deduct any interest first and take the remainder of the penalty from your principal. We calculate all early withdrawal penalties on the principal amount withdrawn at the interest rate in effect on the account on the withdrawal date. The early withdrawal penalty is:

* For CDs with terms of less than 90 days, the greater of all interest earned on the amount withdrawn or an amount equal to seven days interest on the amount withdrawn;

* For CDs with terms of 90 days up to 12 months, the penalty is an amount equal to 90 days interest on the amount withdrawn;

* For CDs with terms of 12 months up to 60 months, the penalty is an amount equal to 180 days interest on the amount withdrawn; and

* For CDs with terms of 60 months or longer, the penalty is an amount equal to 365 days interest on the amount withdrawn.

Please note that the term of a CD is the specified period of time you agreed to leave your funds on deposit – not the time remaining until maturity of your CD.

We add to the early withdrawal penalty the amount of any cash bonuses we paid you when you opened or reinvested the account.

If we are required to pay an amount from your CD (e.g. levy or garnishment), we may charge you an early withdrawal penalty, calculated on the amount withdrawn from the CD.

An early withdrawal from an IRA may also be subject to additional federal tax (and possibly additional state and local taxes) if you are under age 59 1/2.

### Closing or Redeeming a CD

We may close or redeem an automatically renewable account at the end of the term. You may close or redeem your account during its grace period.

10

# Information About Fees and Charging Your Account

## Fees

You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.

**Account Fees** Your account is subject to the fees described in the Schedule of Fees that applies to your account.

- The Personal Schedule of Fees lists account fees that apply to your personal deposit accounts.

- The Business Schedule of Fees lists account fees that apply to our business deposit accounts except for Commercial accounts (the Business Schedule of Fees does not apply to Commercial accounts).

- The schedule that applies to your account is part of the binding contract between you and us.

The fees for many of our products and services may vary from state to state or between regions within a state. We charge account fees to you based on the state or region in which the banking center where we maintain your account is located. Account fees are not based on your state of residence or the state where you use or purchase the service. Your account fees and terms may differ from those of other customers with the same type of account, based on our assessment of your overall relationship with us.

**Fees for Other Services** In addition to checking, savings and CD accounts we also offer many other services, such as wire transfers, cashier's checks and bond redemption. You can get current information about these services and the fees that apply to them at a banking center or by calling us at the customer service number shown on your account statement. We may occasionally list fees for some of these services in the Schedule of Fees. Fees for these services may vary from state to state. The fees you pay for these services are those charged by us in the state where we sell you the service. We may change these fees at any time without notice.

**How We Set Fees** We set our fees based on many factors, including the value we offer, our competitive position, determination of misuse of an account by our customers, consideration of profit and the safety and soundness of the Bank. We may also consider costs in setting fees, but we do not set our fees based only or primarily on the direct or overall costs and expenses associated with providing the particular product or service involved.

**Calculating Balances** When we calculate an account balance or combined balance to determine whether a fee applies to the your account, we may use the balance that we determine is in each account. We may ignore any accrued interest and funds subject to a hold of any type. For a balance in an account linked to a checking account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account. If a loan or line of credit is linked, we may ignore each loan or line of credit that we determine is in default.

## Charging an Account

We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or any affiliates, except that this provision does not apply to any consumer credit covered by the Federal Truth in Lending law. We may make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts and other amounts you owe us.

We may use deposits you or others make to your account (including deposits of payroll and government benefits) to pay fees, overdrafts and other amounts you owe us.

Some government payments (such as Social Security, Supplemental Security Income, Veterans and other federal or state benefits) may be protected from attachment, levy, garnishment or other legal process under federal or state law. If such protections would otherwise apply to deductions we make for amounts you owe us, to the extent that you may do so by contract, you waive these protections and agree that we may use these funds to pay fees, overdrafts and other amounts you owe us under this Agreement.

# Insufficient Funds – Overdrafts and Returned Items

You can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions. We offer services that you can use to help you manage your account and help you avoid overdrafts, such as our Online Banking service and Online Alerts. Please see How to Get Started section in the Introduction.

We recommend that you enroll in one of the optional Overdraft Protection plans described below. These plans can help you avoid overdrafts and declined or returned items. While fees apply when you use an Overdraft Protection plan, the fees under the plan may be less expensive than the fees for overdrafts and declined or returned items.

## Overdrafts and Declined or Returned Items

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).

We pay overdrafts at our discretion, which means we do not guarantee that we will always pay every insufficient funds item. If we overdraw your account to pay items on one or more occasions, we are not obligated to continue paying future insufficient funds items. We may pay all, some, or none of your overdrafts, without notice to you. If we do not authorize and pay an overdraft, then we decline or return the transaction unpaid.

The Schedule of Fees for your account explains when we charge you fees for overdrafts and for declined or returned items and the dollar amount of the fees. Please review the Schedule of Fees for your account carefully.

If we overdraw your account, you agree to repay us immediately, without notice or demand from us. We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.

Sometimes funds in your account are not available to cover your checks and other items. When we determine that funds in your account are subject to a hold, dispute, or legal process, then these funds are not available to cover your checks and other items. We usually make this determination once at the end of the day when we process items. As examples of holds, holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions.

We may also treat as an insufficient funds item each fee that creates an overdraft and each deposited item returned to us unpaid that creates an overdraft.

For some business accounts, when your account is overdrawn, we also charge you interest on the overdraft amount. Please see the Schedule of Fees for your account.

What are "items"? Items include all orders and instructions for the payment, transfer, or withdrawal of funds from your account. As examples, items include a check, draft, image, substitute check, everyday non-recurring debit card transaction, recurring debit card transaction, ACH transaction, ATM transaction, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, and in-person payment, transfer or withdrawal instruction. For more examples, please review the definition of Items in the Explanation of Some Terms section.

What are everyday non-recurring debit card transactions and what are recurring debit card transactions? Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

## Extended Overdrawn Balance Charge

The Extended Overdrawn Balance Charge is an overdraft fee. This fee is in addition to Overdraft Item and NSF: Returned Item fees that may apply to your account for overdraft or returned item. This additional charge applies to your account when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by promptly covering your overdraft – deposit or transfer enough available funds to cover your overdraft, plus any fees we assessed, within the first 5 consecutive business days that your account is overdrawn.

Please see the Schedule of Fees for your account for more information about this fee.

## Personal Accounts - Overdraft Practices and Settings

We automatically apply our standard overdraft practices to personal accounts. We refer to this as our Standard Overdraft Setting. We also offer an optional Decline All Transactions overdraft setting.

With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. There is an exception for some ATM withdrawals. We may occasionally give you the opportunity at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal. Please note that overdraft fees can apply to these withdrawals. We tell you at our ATM when this is available. With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments. For more examples of other transactions, please review the definition of items.

Optional Decline All Transactions Overdraft Setting. This is an optional overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. Please note that returned item fees can apply to declined or returned transactions.

With either overdraft setting, your account might still become overdrawn. Here is an example of how that could occur. You want to use your debit card to make a purchase and a merchant asks us to authorize the transaction. We authorize the transaction because we determine you have enough available funds in your account at this time. However, we do not receive the debit card transaction from the merchant for processing and posting to your account that day. We do receive another transaction (such as a check you previously wrote) that we process and post that day and that other transaction reduces the available funds in your account below the amount of the debit card transaction. This means, unless you promptly trans-

fer or deposit enough available funds, when we receive the debit card transaction, it will overdraw your account.

With either overdraft setting, you may still incur fees for overdrafts and declined or returned items. Please review the Schedule of Fees for your account carefully.

## Business Accounts - Overdraft Practices and Settings

We automatically apply our standard business overdraft setting to business accounts. With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. For some business accounts, we offer an optional Decline All Transactions overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions.

With either overdraft setting, you may still incur overdrafts and fees for overdrafts and declined or returned items.

## Posting Orders

We determine the order in which we process and post deposits and other credits and checks and other items to your account. We may pay or authorize some items, and decline or return others, in any order we deem appropriate. When you do not have enough available funds to cover all of the items presented that day, some processing and posting orders can result in more insufficient funds items and more overdraft and returned item fees than other orders. We may choose our processing and posting orders regardless of whether additional fees result.

Please see the Processing and Posting Orders section for more information.

## Occurrences

An "occurrence" is a day during which your account has at least one overdraft item or returned item. The fee for each overdraft item and each returned item may vary based on the number of occurrences for your account during the current monthly statement cycle and preceding 12 monthly statement cycles. If we transfer your account to another banking center or convert it to a different type of account, your record of overdraft items and returned items continues to apply.

## Overdraft Protection Plans

We recommend that you enroll in one of the optional Overdraft Protection plans described below to help protect your account from overdrafts and declined or returned items. You can enroll in these plans. Please ask us whether your account is eligible. The fees under these plans may be less expensive than the fees for overdrafts and returned items.

The Schedule of Fees for your account explains the fees and other charges that apply to Overdraft Protection plans. Please review the Schedule of Fees for your account carefully.

Please note the following. Some of these Overdraft Protection plans are not available in all states. Only one plan can be linked to an account at a time. Some accounts are not eligible for these plans. Under some plans, we make transfers in a minimum amount so we might not make a transfer if you do not have at least the minimum transfer amount available under the plan. To link accounts under these plans, at least one of the owner(s) of the account must usually be an owner of the other account. Certain other restrictions apply.

Overdraft Protection from Another Deposit Account. This plan links your account to another Bank of America deposit account for overdraft protection. The other deposit account can be a second checking account or a savings account.

When you do not have enough available funds in your account to cover an item, we may automatically transfer funds from the available balance in your other deposit account to your account. We generally charge an overdraft protection transfer fee for each transfer. Funds you deposit into your other deposit account may not be available immediately for overdraft protection transfers. If you use your savings account for this service, each transfer counts as one of the six limited transactions you are allowed each month from your savings account. We cancel this Overdraft Protection plan if your account or the other deposit account is closed.

Please see the Schedule of Fees for your account for more information about overdraft protection from another deposit account.

Overdraft Protection from Your Credit Card. This plan links an eligible Bank of America credit card to your account for overdraft protection.

When you do not have enough available funds in your account to cover an item, we may automatically advance available funds from your linked credit card account and transfer the funds to your account. An advance is made under, and is subject to, the terms and conditions described in the applicable credit card agreement. We ordinarily do not make an advance if you are

in default under your credit card agreement or if the advance would cause you to exceed the amount of credit available for that type of transaction. As examples, we may decide not to advance funds from your credit card account if you fail to make a credit card payment by its due date or if you exceed any credit card limit on your credit card account. The funds advanced are subject to fees and finance charges under your credit card agreement. For some business accounts, we may also charge an additional Overdraft protection transfer fee to your account for each transfer.

Please see your credit card agreement for more information about overdraft protection from your credit card account.

Overdraft Protection from Your Line of Credit. This plan links an eligible Bank of America line of credit to your account for overdraft protection.

When you do not have enough available funds in your account to cover a check or other item, we may automatically advance funds from your linked line of credit and transfer the funds to your account. The advance is made under, and is subject to, the terms and conditions described in the line of credit agreement. We ordinarily make the advance as long as you are not in default under the line of credit agreement and as long as your account does not cause you to exceed the amount of your available credit on your line of credit. The funds advanced are subject to fees and finance charges under the line of credit agreement. We may also charge an additional Overdraft protection transfer fee to your account for each transfer.

Please see your line of credit agreement for more information about overdraft protection from your line of credit.

14

13

# Processing and Posting Orders

## Processing Transactions and Posting Orders

Posting transactions to your account impacts your account balance. Posting a credit increases your balance. Posting a debit or hold reduces your balance. Credits include teller deposits, direct deposits and credits we make. Holds include deposit holds, debit card authorizations, and holds related to cash withdrawals and electronic transfers. Debits include withdrawals, transfers, payments, checks, one-time and recurring debit card transactions, and fees.

We use automated systems to process transactions and then to post transactions to accounts. When we process multiple transactions for your account on the same day, you agree that we may in our discretion determine our posting orders for the transactions and that we may credit, authorize, accept, decline or return credits, debits and holds in any order at our option.

## Posting Orders

This section summarizes how we generally post some common transactions to your account.

We group the different types of transactions into categories. We use several different categories for holds, credits, and debits. Most categories include more than one transaction type.

After the end of the business day, our automated systems assign each transaction received for that day to a category. We generally post all transactions within a category, using the posting order or orders that apply to that category, before we post any transactions assigned to the next category.

We start with the balance in your account at the beginning of the business day, subtract holds from your balance, and make any adjustments from prior days. Next, we generally add credits to your balance and then subtract debits from your balance. Some, but not all, of our categories are shown below. For each debit category shown below, we list some common types of debits that we assign to the category and generally post them within the category.

- We add deposits and other credits to your balance.
- Then, we subtract from your balance in date and time order the types of debits listed in this paragraph, when our systems receive data and time information. If our systems do not receive data and time information, then we subtract the remaining debits in this category from your balance in order from the highest to lowest dollar amount.

Common debits in this category include:

- one-time and recurring debit card transactions;
- withdrawals made at our tellers and ATMs;
- one-time transfers made at ATMs, through our tellers, by telephone, and through Online Banking and Mobile Banking;
- checks you wrote that are cashed at our tellers; and
- wire transfers.

- Then, for other checks you wrote, we subtract from your balance checks with check numbers sequentially in check number order when our systems can read the check number. Next, checks without a check number that our systems can read are subtracted in order from highest to lowest dollar amount.

As an example, on the same business day we receive five checks that you wrote and were not cashed at a teller. Our systems can read three of the check numbers, which are #105, #112, and #115. The other two checks do not have check numbers that our systems can read. We subtract check #105 first, then #112, and then #115. Then, we subtract the two remaining checks in order from the highest to lowest dollar amount.

- Then, we subtract from your balance many other types of electronic debits in order from the highest to lowest dollar amount. These debits include: scheduled transfers, preauthorized or automatic payments that use your deposit account number (generally referred to as automated clearing house (ACH) debits), and Online Banking and Mobile Banking bill payments.

- Then, we subtract from your balance most fees (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

## Changing Posting Orders

You agree that we may determine in our discretion the orders in which we post transactions to your account.

You agree that we may determine our posting orders, the categories, the transactions within a category, the order among categories, and the posting orders within a category. We sometimes add or delete categories, change posting orders within categories and move transaction types among categories. You agree that we may in our discretion make these changes at any time without notice to you.

## Posting Orders Determined at End of Day

We review credits, debits and holds throughout the day. Regardless of when during the day we receive transactions for your account, you agree that we may treat them as if we received all transactions at the same time at the end of the business day.

During the day, we show some transactions as processing. As an example, we show some transactions as processing on the Account Details screen in Online Banking. Please note that transactions shown as processing have not been posted yet. The posting order for these transactions is determined at the end of the day, with the other transactions we receive for that day.

You should note that often we do not receive debits on the same day that you conduct them. As an example, when you use your debit card to pay for a purchase at a merchant and sign for the transaction, we usually receive an authorization request from the merchant the same day, but we might not receive the final debit card transaction for payment and posting until several days later.

We generally post credits and debits to your account, and report them on your statement, in a different order than the order in which you conduct them or we receive them.

## Overdraft Fees

We generally determine at the time we post a debit to your account whether it creates an overdraft and whether an overdraft or returned item fee applies. You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your balance, the transaction creates an overdraft when we post it to your account. You can avoid fees for overdrafts and returned items by making sure that your account always contains enough available funds to cover all of your transactions. When your account balance includes some funds that are subject to a hold, dispute or legal process, you should note that those funds are not available to cover your transactions.

We offer services to help you manage and keep track of your finances, such as Online Banking and Online Alerts. Please see "How to Get Started" at the beginning of this agreement.

Our posting orders can impact the number of overdraft fees we charge you when you do not have enough available funds to cover all of your transactions. When several debits arrive the same business day for payment from your account and you do not have enough available funds in your account to cover all of the debits we receive for that day, you understand that same posting orders can result in more overdrafts, and more fees for overdraft items and returned items, then if we had used other

posting orders. You agree that we may in our discretion choose our posting orders, and also change them from time to time, regardless of whether additional fees may result.

When your account balance includes some funds that are not available at the time that we post a debit, and you do not have enough available funds in your account to cover the debit, the debit results in an overdraft and we generally charge you an overdraft item fee or returned item fee for the debit. You should note that we do not show holds, or distinguish between available and unavailable funds in your account balance, on your statement so when you review your statement later, it might appear that you had enough available funds in your account to cover a debit for which we charged you a fee.

## Certain Transactions Made After Business Day Ends

During processing, we generally include in your account balance some transactions that you make after the business day cuts off, but before the end of the calendar day. These transactions are described below. This can impact fees that apply to your account. The credits can help you avoid overdrafts, returned items, and related fees. However, the debits can cause you to incur overdrafts, returned items, and related fees. You should note that we show these transactions on your statement as posting to your account on our next business day.

Credits. We generally add to your account balance the following credits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash deposited at one of our ATMs or banking centers; and
- Transfers to your account from another deposit account with us made at one of our ATMs or banking centers, through Online Banking, Mobile Banking, or by calling customer service.

Debits. We generally subtract from your account balance the following debits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash withdrawals made at one of our ATMs or banking centers; and
- Transfers from your account made at one of our ATMs or banking centers, through Online Banking, Mobile Banking, or by calling customer service.

15

16

# Processing Deposits and Cashed Items

We may forward deposits, cashed items and other transaction requests from an account to one of our processing centers. We may use the date that our processing center receives the transaction as the effective date of the transaction.

## Cashing Items or Accepting Items for Deposit

We may accept, for collection only, refuse, or return all or part of any deposit. If we accept checks or other items for deposit to your account or cash them, you are responsible for the checks and other items if there is a subsequent problem with them.

- If we cash a check or other item for you or credit it to your account and is not paid for any reason, we may charge your account for the amount of the check or other item, even if this causes your account to become overdrawn.

- We may accept a check or other item for deposit to your account from anyone. We do not have to question the authority of the person making the deposit.

- If your account is overdrawn, we may use the deposit to pay the overdraft and any fees you owe us.

- All deposits are subject to our subsequent verification and adjustment, even if you have already withdrawn all or part of the deposit unless you can prove our determination was erroneous.

- We may refuse to accept for deposit to your account items payable to another person.

- In receiving checks or other items for deposit or collection, we act only as your collecting agent and assume no responsibility beyond the exercise of ordinary care. We are not responsible for errors and delays made by others in the collection process.

- We may assess a charge for processing cash in a deposit.

- If other give us cash that we later determine to be counterfeit, we may charge your account for the amount we determine to be counterfeit.

- You will not knowingly deposit items into your account that do not have either a true original signature of the person on whose account it is drawn or an authorized mechanical reproduction of that person's signature.

**Deposit Slips** You should always use our personalized deposit slips with your preprinted name and account number. If you use a blank deposit slip from one of our banking centers, rather than your personalized deposit slip, we are not liable to you for errors that may result from your our hand encoding the account information.

**Checks, Cashier's Checks, and Similar Items** We cannot generally verify that checks, money orders, cashier's checks or similar items are authentic and valid at the time you ask us to cash them or accept them for deposit. If we cash, or accept for deposit, a check, money order, cashier's check or similar item and we later learn that the item is fraudulent, counterfeit or invalid for some other reason, we may charge your account for the amount of the item. This may occur even if the items were previously made available to you, or this causes your account to become overdrawn.

**Foreign Items** You should be especially cautious about accepting items drawn on banks located outside of the United States. See Foreign Items and Foreign Currency.

## Checks Lost in the Collection Process

When we cash a check for you or accept a check for deposit to your account, we are acting as your agent in collecting the check. We are not responsible if the check is lost or delayed in the collection process. We may charge your account for the amount of the check, even if this causes your account to become overdrawn, if a check is lost during the collection process or if the financial institution on which the check is drawn gives us a photocopy of the check or a debit slip representing the check.

A check that was lost may not be returned to us for some time. Despite any delay, we may charge your account when we receive either the returned check, a copy of the check, or a notice of return.

## Collection Items

We may accept certain items — such as certain securities and checks payable in foreign currencies or at foreign locations — on a collection basis only. We route and process collection items separately. We normally credit your account for collection items only after we receive payment for them. But if we do credit your account and then do not receive payment, we may debit your account for the amount of the item, even if this causes your account to become overdrawn.

We charge fees for processing collection items. Financial institutions in the collection process and the financial institution on which the collection item is drawn may also charge fees. If a financial institution requires payment of a fee before that institution will process the collection item, we may pay the fee and charge your account. A financial institution may subtract its fee from the amount of the payment we receive. You have to pay these fees even if the collection item is returned unpaid.

For our current collection fees, call us at the number for customer service shown on your statement, or ask a banking center associate.

## Demand Drafts and Remotely Created Checks

If you deposit a demand draft or remotely created check (an unsigned draft or a preauthorized check) into your account, you warrant and guarantee that the draft or remotely created check is authorized according to the terms on its face by the person identified as drawer. You agree to indemnify us from all loss, expense and liability related to a claim that such draft or check was not authorized by the persons on whose accounts it was drawn.

## Deposit Preparation and Acceptance

When you make deposits through our banking centers, including lobby boxes, ATMs, night depositories and other automated depositories, or by mail, we may use the method of delivery to our branch or processing center to determine when we accept the deposit, when you receive credit for the deposit, and whether deposit fees apply.

If we credit your account for a deposit and provide you with a receipt, we may use the amount shown on the deposit slip or otherwise specified by you. The amount of the credit is subject to subsequent verification by us and, after review, we may adjust your account for any errors.

Any of our employees or authorized agents may open and count any deposit that a teller did not count in front of you, including coin deposits, cash deposits, and cash deposit made thru the mail, a lobby box, a night depository, or other automated depository. You agree not to dispute that employee or agent's determination of the amount you delivered. We may treat these funds as not accepted by us for deposit until we have verified the amount.

If you make your deposit through a mechanical or automated depository such as an ATM or night depository, you agree to exercise due care in opening, closing and properly securing the depository.

If your deposit includes items that we do not accept for deposit, we may hold those items until claimed by you.

## Deposit Error Correction

When we accept your deposits, we may provisionally credit your account for the amount declared on the deposit slip, subject to later verification by us. You must ensure that the amount declared on the deposit slip is correct even if you did not prepare the deposit slip. If later we determine that the amounts declared on the deposit slip are incorrect, we may adjust (debit or credit) your account. We report adjustments on your account statement. However, if the error in completing the deposit slip was inadvertent and is less than our standard adjustment amount, we will not adjust the deposit unless you notify us of the error within one year of the date of your periodic statement that shows the deposit. After this notice period has passed without your bringing an error to our attention, the deposit amount indicated on the statement will be considered finally settled. That is, if the actual amount deposited was less than the amount declared on the deposit slip, the difference will become your property, and if the actual amount deposited was more than the amount declared on the deposit slip, the difference will become our property. We may change our standard adjustment amount from time to time without notice to you.

## Encoding Deposits

If you are a business client, you may ask us for permission to encode the MICR (Magnetic Ink Character Recognition) line of an item you deposit with us. If we permit this, you agree to follow the instructions we give you for preparing and encoding your deposits. If you make an encoding mistake that results in costs, losses or damages to us, you agree to reimburse us for our costs, losses and damages, including attorneys' fees. We may change this in favor of your account. We are not liable for any losses, fees, or damages you may incur when you encode your own items.

If our equipment is unable to read what we consider a significant number of your encoded items, we may refuse to accept some or all of your items and we may charge you fees for each item we do accept.

You must provide us with a replacement of a copy of each original check if the deposit is lost or destroyed. We are not liable to you if you are unable to do so.

## Endorsing Checks

We may endorse and/or collect items deposited to your account without your endorsement but may, at our option, require your personal endorsement prior to accepting an item for deposit. If you deposit items which bear the endorsement of more than one person or of persons who are not signers on the account, we may refuse the item or may require you to have their endorsement guaranteed before we accept an item.

We may accept for deposit checks payable to any signer on your account when endorsed by any other signer.

When you endorse checks that you ask us to cash or deposit, you must endorse only in the area within the last 1 1/2 inches from the trailing edge of the back of the check. You must also confine information that you place or have preprinted on the back of your checks to the same area. Otherwise, it may overlap into the area reserved for the banks' endorsements. The

18

17

trailing edge is the left side of the check when you look at it from the front.

If you endorse a check outside of that area, mark or otherwise obscure the other area or a prior endorsement or make an endorsement that is illegible or incomplete, we may refuse the item or we may accept such nonconforming endorsement and you agree to hold us harmless from any loss, delay, liability, claim or damage which may arise as a result.

It it becomes necessary for us to return one of your checks, your endorsement or information placed on the back of the check may interfere with the bank endorsements and cause delays in returning the item. You are liable for and agree to reimburse us for all claims, losses, and damages that result from late return of a check due to material entered on the back of the check that obscured or interfered with the depositary or another bank's endorsement.

**Identifying the Account for Your Deposit**

You must correctly identify the account to which you want funds deposited. We may credit a deposit to an account based solely on the account number listed on the deposit slip or other instruction to credit an account, even if the name on the deposit slip or other instruction differs from the name on the account.

You are responsible for any claim, loss or damage caused by your failure to properly identify the account to which a deposit is made or intended to be made.

**Overpayments and Reversals**

If funds to which you are not entitled are deposited to your account by mistake or otherwise, we may deduct these funds from your account, even if this causes your account to become overdrawn. If the funds were transferred from your account, we may reverse the transfer. We can do this without giving any prior notice or demand.

**Returned Items**

This section applies to items that you deposit or that we cash for you (a "cashed or deposited item") and includes items drawn on us as well as items drawn on other financial institutions. You are responsible for returned items.

If a cashed or deposited item is returned to us at any time for any reason by the bank on which it is drawn or any collecting bank, we may accept that return, pay the claiming party, and charge the item to your account without regard to whether we or the other bank finally paid the item or returned the item in accordance with any applicable midnight deadline or clearing-house rule. We may also deduct from your account any interest you may have provisionally earned on the item. We may charge

you a fee for each returned item. Different fees may apply to domestic and foreign items. We may debit your account for a returned item at any time on or after the day it is returned to us by electronic, automated clearinghouse ("ACH") or other means or on the day we receive notice that the item is being returned to us - whichever is earlier.

As an example: if an item deposited in your account has been paid by the bank on which it is drawn (including on us) and that item is later returned to us with a claim that the item was altered, forged, unauthorized, bears a forged or missing endorsement or should not have been paid for any reason, we may at our discretion charge the item against your account or place a hold on the amount of that item against your account until the claim is finally resolved. We may take these actions without prior notice to you and regardless of whether settlement with respect to such item is considered final.

We are not obligated to question the truth of the facts that are asserted, to assess the timeliness of the claim, to take any action to recover payment of a returned item, or to assert any defense. We not need to notify you in advance of our actions relating to the claim. If you do not have sufficient available funds to cover a returned item, we may overdraw your account. We are not liable to us if there are insufficient funds to pay your items because we withdraw funds from your account or in any way restrict your access to funds due to a hold or debit to your account in connection with a returned item. You agree to repay immediately an overdraft caused by a return of a cashed or deposited item.

In some cases, the financial institution on which the returned check or other item is drawn may send us an electronic notice of return, an indemnified copy of the original, an image replacement document ("IRD") or an image, instead of returning the item. We may act on, and you agree to be bound by, the electronic notice of return, or indemnified copy or IRD just as if the original item had been returned.

We may send the unpaid item back for collection a second time before notifying you, but we are not obligated to do so. You waive notice of dishonor and protest. You agree that we will have no obligation to notify you of any item that is being returned. However, if we receive advance notice from another financial institution that it is returning to us unpaid a check of $2,500 or more, we may send you a notice. We do not send a notice about returned checks of less than $2,500.

**Substitute Checks**

You agree that you will not cash or deposit "substitute checks" as defined by federal law or Image Replacement Documents ("IRD") that purport to be substitute checks and have not been previously endorsed by a bank. If you cash or deposit such an

item, you give us the same warranties and indemnities that we, as a reconverting bank, would give under applicable law or regulation and you agree to reimburse us for claims, losses, costs and damages we may incur. If you provide us with an electronic representation of a substitute check for deposit into your account instead of an original check, you agree to reimburse us for all claims, losses, costs and damages we incur because the substitute check resulting from the electronic representation does not meet applicable substitute check standards or causes duplicate payments.

**Third-Party Endorsements**

We may require that checks and other items you want to deposit or cash be endorsed by all parties to whom the items are payable. We may require verification of any endorsement through either an endorsement guarantee or personal identification.

# When Funds are Available for Withdrawal and Deposit Holds

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day of your deposit. However, in some cases we place a hold on funds that you deposit by check. A hold results in a delay in the availability of those funds. When we place a hold, you will have to wait a few days before being able to use the funds. When we decide to place a hold at the time you make your deposit, the teller or ATM gives you a notice that lets you know these funds are on hold. For ATM deposits, the hold notice is usually included on the ATM receipt. The hold notice will tell you know the date and the time when the funds will be available for you to use. In some cases, you will not get the hold notice from the teller or ATM, but later by mail. You can avoid holds by using direct deposit or wire transfers.

In many cases, we make funds from your deposited checks available to you sooner than we are able to collect the checks. This means that, from time to time, a deposited check may be returned unpaid after we made the funds available to you. Please keep in mind that even though we make funds from a deposited check available to you and you withdraw the funds, you are still responsible for problems with the deposit. If a check you deposited is returned to us unpaid for any reason, you will have to repay us and we may charge your account for the amount of the check, even if doing so overdraws your account.

While we generally apply our funds availability policy to deposits you make to savings accounts (including money market savings accounts), and to deposits you make using a mobile device, please note that our funds availability policy does not apply

to these deposits, and we may delay availability of funds from these deposits.

**Your Ability to Withdraw Funds**

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day we receive your deposit. Our policy is to make funds from electronic direct deposits available through the automated clearing house (ACH) and incoming wire transfers available to you on the day of the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays.

If you make a deposit on a business day that we are open at one of our banking centers before 2:00 p.m. local time, or at one of our ATMs before 5:00 p.m. local time in the state where we maintain your account, we consider that day to be the day of your deposit. However, if you make a deposit after such times, or on a day when we are not open or that is not a business day, we consider that the deposit was made on the next business day we are open. Some locations have different cutoff times.

**Longer Delays May Apply**

In some cases, we will not make all of the funds that you deposit by check available to you by the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, may be available no later than the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available by the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, we may delay the availability of funds you deposit by check for a longer period under the following circumstances:

• We believe a check you deposit will not be paid.
• You redeposit a check that has been returned unpaid.
• You have overdrawn your account repeatedly in the last six months.

• There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

**Special Rules for New Accounts**

If you are a new customer, the following special rules may apply during the first 30 days the account is open. Funds from electronic direct deposits to your account are available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks are available no later than the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you and deposited in person to one of our employees. The excess over $5,000 is available by the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit. Funds from all other check deposits are generally available by the fifth business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see *Longer Delays May Apply* above).

**Government Checks, Cashier's Checks and Other Special Types of Checks**

Our policy is to make funds from U.S. Treasury checks that are payable to you available no later than the first business day after the day of the deposit.

If you make the deposit in person to one of our employees, and meet the other conditions noted below, our policy is to make funds from the following types of deposits available no later than the first business day after the day of your deposit:

• State and local government checks that are payable to you and are deposited in an account in the same jurisdiction that issued the check.

• Cashier's, certified and teller's checks that are payable to you.

• Federal Reserve Bank checks, Federal Home Loan Bank checks and U.S. Postal Service money orders that are payable to you.

If you do not make your deposit in person to one of our employees (for example, if you mail the deposit), our policy is to make funds from these deposits available no later than the second business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see *Longer Delays May Apply* above).

**Cash-Withdrawal Limitation**

If we delay availability of your deposit, we place certain limitations on withdrawals in cash or by similar means. In general, $200 of a deposit is available for withdrawal in cash or by similar means no later than the first business day after the day of deposit. In addition, a total of $400 of other funds becoming available on a given day is available for withdrawal in cash or by similar means at or after 5:00 p.m. on that day. Any remaining funds will be available for withdrawal in cash or by similar means on the following business day.

Similar means include electronic payment, issuance of a cashier's or teller's check, certification of a check, or other irrevocable commitment to pay, such as a debit card transaction.

**Holds on Other Funds**

If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. In either case, we make these funds available in accordance with our policy described above for the type of check that was cashed or deposited.

# Processing Withdrawals

We may forward withdrawals and other transaction requests for an account to one of our processing centers. We may use the date that the processing center receives the transaction as the effective date of the transaction.

**Cashing Checks for You**

Check cashing services may not be available at some banking centers. We may occasionally refuse to cash a check written to you. If we do cash such a check and it is returned to us unpaid for any reason at any time, we may deduct the amount of the check from your account, even if this causes your account to become overdrawn, and we may charge you a fee.

We may cash checks payable to any signer on your account when endorsed by any other signer.

If you ask us to cash a check or other items for you, we may apply the proceeds of the check or other item to fees, overdrafts and other amounts you owe us.

**Cashing or Accepting Your Checks for Others**

When a person with a check or other item drawn on your account asks us to cash it or accept it for deposit, we may require identification satisfactory to us; charge them a fee for cashing the check; and require their fingerprint. We may also impose additional requirements. We may refuse to cash a check for a person who is not our loan or deposit customer.

If the person with your check fails or refuses to satisfy our requirements, we may refuse to cash the check or accept it for deposit. We are not liable to you for refusing to cash or accept the check, or for charging a check cashing fee.

When we cash your check, or accept it for deposit, we may do so without reviewing your account at that time to see whether you have enough available funds to cover the check.

**Checks with Legends or Restrictions**

Some customers print or write legends or restrictions on their checks. Sometimes the person to whom the check is payable prints or writes a legend or restriction on the check. Legends and restrictions include conditions, special or restrictive instructions, and other notations. Some examples are: "not valid after 90 days", "not valid over $1,000" or "paid in full". We may disregard legends and restrictions. We may pay the item even if the legend or restriction has not been met. We are not liable to you for any claims, costs, losses or damages that result from the placement of these legends or restrictions on your checks, or from our failure to abide by them.

**Collection Items**

When another financial institution submits to us for collection an item drawn on your account, we may charge the other financial institution a fee. When you do not have enough funds in your account for us to process a collection item drawn on your account, we may charge you an overdraft or returned item fee.

**Check Stock and Ink**

You agree to bear the risk of loss if you use check stock that contains defects, such as printing inaccuracies, faulty magnetic ink, faulty encoding, or duplicate serial numbers.

Checks you write may be converted into electronic images (truncated) during the check collection and return process. You also agree to bear the risk of loss if you elect to have your checks printed by a vendor that has not been approved by us; you use check stock or features (such as security features) that cause critical data to disappear or be obscured upon truncation; or you make your check out in a way (such as, using a lightly colored ink) that causes critical data to disappear or be obscured upon truncation.

**Converting Checks to Electronic Debits**

Some businesses convert checks that you give them into electronic debits (sometimes referred to as an electronic check) and then sends us an electronic debit for the transaction amount. When we receive the electronic debit, we charge it to your account. We may reverse the electronic debit to your account immediately after the business enters the transaction, so you may have a reduced right to stop payment and you may incur an overdraft if you do not have sufficient funds in your account to cover the amount of the check at the time you write the check or authorize the transaction. Since the check is not sent to us, we do not have a copy of your check. We use these electronic debits on your account statement. If the business uses your check to initiate an electronic debit at the point of sale, the business should give you notice of the conversion and return the voided check to you. You should treat the voided check with care because someone else who obtains possession of it could use the information to initiate additional debits against your account. A business that receives your check by mail and converts it to an electronic debit may give you notice of the conversion and destroy the original check.

**Examining Checks**

We receive checks in great volume. This and compliance with expected funds availability laws require us to use automated check processing procedures. Although we may visually review a sample of checks and other items from time to time, reasonable commercial standards do not require us to do so.

We select some checks for review based on certain criteria that change from time to time. This means that most checks are processed on the basis of the MICR (Magnetic Ink Character Recognition) line printed along the bottom edge of the check, and are not individually examined for dates, maker signatures, legends or endorsements. You agree that we will have exercised ordinary care if we examine only those items that we have identified according to the criteria that we may establish in our discretion for inspection.

If we do visually review any check or other item, we may disregard any restrictive instructions or notations, such as an instruction to permit withdrawals only upon more than one signature. We may return the item unpaid if, in our opinion, it does not bear a signature matching any specimen signature we have on file for your account. You agree, however, that we will not be

liable to you for honoring any check or other item bearing a signature that, in our sole opinion, resembles the specimen signature on file with us.

Since we do not individually examine most checks, it is critical for you to take care of your checks, promptly review your account statements, and immediately report any suspicious or unauthorized activity to us. You agree that automated processing of your checks is reasonable and that you accept responsibility for preventing and reporting forgeries, alterations, and other unauthorized uses of your checks or accounts. You agree that the exercise of ordinary care will not require us to detect forgeries or alterations that could not be detected by a person observing reasonable commercial standards.

Since some types of check fraud have become more difficult to detect, we may elect in some cases to make further inquiries about certain checks or other items that are presented for payment against your account. If we are unable to contact you, or take other steps, to determine with reasonable certainty that you authorized these payments, we may either pay the checks and other items or return them unpaid without any liability to you.

**Items Resulting from Voluntary Disclosure**

If you voluntarily disclose your account number to another person orally, electronically, in writing or by other means, you are deemed to authorize each item, including electronic debits, which result from your disclosure. We may pay these items and charge your account.

**Large Cash Withdrawals**

We may require reasonable advance notice for large cash withdrawals. We may also refuse to honor a request to withdraw funds in cash from your account or to cash a check (including a cashier's check or other official item) at a banking center if we believe that the amount is unreasonably large or that honoring the request would cause us an undue hardship or security risk. We may require that such withdrawals be made at one of our cash vaults by an armored courier, acceptable to us and at your sole risk and expense. We are not responsible for providing for your security in such transactions.

**Paying Checks and Other Items**

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, or on the day we receive notice that the item has been deposited for collection at another financial institution — whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item. We are required to determine your account balance only once during this time period.

When you deposit checks or other items that are drawn on another account with us, we may treat such items as presented to us for payment on the business day that they are received by our office that processes checks drawn on the other account.

**Stale-Dated and Postdated Checks**

If a stale-dated check — that is, a check dated more than six months in the past — is presented for payment against your account, we may pay the check and charge it to your account. If a postdated check — a check dated in the future — is presented for payment, we may pay the check and charge it to your account even if it is presented for payment before the date stated on the check. If you do not want us to pay a stale-dated or postdated check, you must place a stop payment order on it. See the Stop Payment Orders and Postdating Orders section.

**Substitute Checks, Indemnified Copies, Images and Image Replacement Copies**

In some cases, we may be sent an indemnified copy of your original check, an image replacement document (IRD), a substitute check or an image of your check, instead of the original item. We may act upon presentment of an IRD, indemnified copy, substitute check, or image of your check and pay these items against your account, just as if the original item had been presented.

**Unpaid Items**

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic notice of return and keep either the original, an image or a copy of the item in our records. If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

# Substitute Checks and Your Rights

The following provisions help explain some of the rights a consumer has under a federal law commonly referred to as Check 21. Check 21 was enacted to increase the efficiency of the U.S. check clearing system. The clearing system relies heavily on the physical transport of checks between banks. Check 21 allows banks to create substitute checks and present them to other banks instead of the original check. This reduces the transport of checks among banks and helps enable the electronic collection of checks.

**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are my rights regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**How do I make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at the telephone number listed on your account statement, or write to us at:

Bank of America
Attn: Research and Adjustments
P. O. Box 31580
Tampa, FL 33631-3580

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include—

* A description of why you have suffered a loss or the amount of your loss;

* An estimate of the amount of your loss;

* An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and

* A copy of the substitute check or the following information to help us identify the substitute check: your account number, the check number, the amount of the check and the date of the check.

## Notices, Statements and Other Communications

### General Terms for Notices, Statements and Other Communications

Please review promptly all notices, statements and other communications we send you. In this section "communications" means all notices, statements and other communications we send you.

We may provide communications in English. Many communications will be notices of change affecting your rights and obligations. If you have questions about any of them or difficulty reading English, please call us at the number for customer service on your statement.

We may:

• address communications to one account owner;

• provide communications in English, even though we may have given you account opening documents and disclosures in a language other than English;

• destroy communications that are sent to you and returned to us as being undeliverable, along with any accompanying checks and other items;

• authorize the Post Office or an agent to destroy communications, along with accompanying checks and other items, that the Post Office informs us are undeliverable; and

• stop sending communications to you until a new address is provided to us if one or more communications that we mail to you are returned to us as being undeliverable.

We are not responsible for communications, or for any checks or other accompanying items, lost while not in our possession.

If we receive communications that we sent to you and returned to us as being undeliverable, or mailed to the last address we have for you at a banking center, they are deemed to have been delivered to you at the time that they are available to you at the banking center.

**Electronic delivery of communications** We recommend that you use our Online Banking service and receive your communications electronically. When you use electronic or paperless delivery, we deliver communications by placing them in Online Banking. You can find your account statements, notices, and other eligible documents in Online Banking within the statements and documents area of your account details page. Communications currently available for electronic delivery are listed in the statements and documents area of Online Banking.

### Notices

When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you. In some cases, we may post a notice of a change in our banking offices or on our website. Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically. We may provide a notice as a message on your statement or as an insert with your statement.

If a notice of a change to this Agreement is returned to us as being undeliverable or if we stop sending notices to you because notices or statements we previously sent you were returned to us as being undeliverable, you understand that the notices are available to you through our banking centers. You agree to that method of delivery and that changes covered in these notices are still effective and binding on you.

A notice sent to any one owner is deemed notice to all account owners and is effective for all account owners.

### Statements

We provide you with a single statement when there is activity on your checking or savings account. When there is no activity on your account, we may choose not to provide a statement. You may generally obtain an additional copy of your statement for a fee.

We recommend that you use our Online Banking service and receive your statements electronically.

If your statement is received at one of our offices, we may mail it to you or destroy it, along with any accompanying checks and other items.

**For checking, money market savings and business savings accounts,** we provide you with a monthly statement. Statement cycles generally vary from 28 to 33 days and may end on different days during the month. A statement cycle can be shorter than monthly. As examples, a statement cycle may only be a few days in length for the first statement cycle after an account is opened or when a statement date is changed to link accounts for combined statements. If you want to know the actual length of any statement cycle, you may call us at the number for customer service on your statement.

**For Regular Savings accounts,** we provide you with a quarterly statement. If you have an electronic fund transfer (such as a direct deposit or an ATM withdrawal) to or from your account during any month, we provide a statement for that month.

**For analyzed business checking accounts,** you can elect to receive an additional monthly account analysis statement. This statement includes balance and float information, quantity of

services used during the period, fees and charges for these services and the earnings allowance, if any.

**For IRAs,** we provide you with a quarterly statement.

**Combined Statements** With combined statement service we provide a single statement that reports activity for all accounts linked for this service, instead of separate statements for each linked account.

Accounts with at least one common owner may be linked and reported on a combined statement, either automatically or at your request. When accounts are reported on a combined statement, you understand and agree that each owner and each signer of any linked account can review information about all linked accounts. As an example: If you own a checking account jointly with others and you link your individual savings account to this checking account for combined statement service, then each of the other owners and signers of the joint checking account can review information about both the checking account and your individual savings account. You should not link accounts for combined statement service that you do not want others to see.

You must generally request combined statement service and tell us what accounts you want us to link and report on a combined statement. In some cases, however, we may automatically send you a combined statement. As an example: we may automatically link accounts that have the same owners and provide a combined statement for those accounts.

We may restrict what accounts can be linked for a combined statement. Please note that combining accounts on a single statement does not mean they are also linked for pricing. To determine which accounts can be linked, or to link accounts, for combined statements or for combined balances (priced), please call us.

### Check Image, Safekeeping and Enclosure Services

For most accounts, we offer the following options regarding your canceled checks.

**Check Image Service** We provide with your statement an image of this front of each of your canceled checks that you post to your account during the statement cycle. We print images of your checks up to 10 images on a page. We do not return your canceled checks. In some states and for some business accounts we provide an image of the front and back of your canceled checks. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

We store copies of your canceled checks (usually on microfilm or as a digital image) and then destroy the checks. Copies of checks are generally available for seven years from the date

the checks are paid. See *Check Copies in Other Terms and Services*.

**Check Safekeeping Service** We report on your statement information about canceled checks (check number, amount and date posted) that posted to your account during the statement cycle. You do not receive your canceled checks with your account statement. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

If your canceled checks are returned to us, you automatically receive check safekeeping service. If you usually receive your checks with your statement but we are unable to return them because of circumstances beyond our reasonable control, we may convert your account to check safekeeping service.

We store copies of your canceled checks (usually on microfilm or digital image) and destroy the checks. Copies of the checks are generally available for seven years from the date the checks are paid. See *Check Copies in Other Terms and Services*.

If you use our check safekeeping service, we cannot provide a copy of a check that posted to your account, and you lose money as a result, we may cover the loss up to the amount of the check. However, we are not liable to you for consequential loss or damage of any kind.

**Check Enclosure Service** This service is no longer available for most accounts. We return with your statement canceled checks that we received and posted to your account during the statement cycle. We may also provide you with images of your canceled checks.

We may not return some of your canceled checks. For example, if a check that you write is converted into an image or electronic debit during the check collection process, your check is not sent to us and, as a result, we cannot return the check to you. In some cases, we may receive a substitute check (also called an image replacement check) instead of your check. We do not return substitute checks with your statement.

### Your Address and Change of Address

We may send notices, statements and other communications regarding your account to you at the electronic or street address we have in our records for your account.

You agree to notify us if you change your address. If the United States Post Office or one of its agents tells us that your address has changed:

• we may change your address on our records to the address specified by the Post Office; and

• we may send notices, statements and other communications regarding your account to that new address.

25

26

## Actions You Can Take to Help Protect Your Account

Your use is extremely important in helping to prevent the wrongful use of your account. Please consider the measures below to help you protect your account.

**Stay Informed** We offer several services you can use to help you keep track of your account on a daily basis. You can use our Online Banking service to review your accounts and Online Alerts to receive notice of account balances and activity. Please see the information about these services in How to Get Started.

**Be Cautious about Giving Out Your Personal Information.** We will not send you e-mails requesting personal information. If you receive an e-mail that seems to come from us and requests personal information, do not answer it. Instead, please contact us immediately at the number on your statement.

**Be Cautious about Accepting Checks, Money Orders and Cashier's Checks, especially from Strangers** You should be cautious about accepting checks, money orders and cashier's checks (especially, foreign checks) from strangers. Sometimes they are fraudulent or counterfeit. We cannot verify that a check, money order or cashier's check that purports to be issued by another company or financial institution is authentic, or has any value at all, when you give it to us and ask us to cash or deposit it.

We ordinarily make funds from a check you deposit (or we cash for you) available to you relatively soon. Sometimes we are able to collect the check or determine whether the check is any good. If the check is returned to us unpaid for any reason, you are still responsible for the check. We charge your account for, and you will have to repay us, the full amount of the returned check. A check may be returned because it 'bounces' or because the check is fraudulent, counterfeit or invalid for some other reason.

One way to help protect yourself is to take the check to the bank, company (such as Western Union) or service (such as the U.S. Postal Service) that issued it and redeem the check for cash. For more information on how to avoid being a victim of fraud, visit bankofamerica.com, or consult trusted organizations such as your local Better Business Bureau or the Federal Citizen Information Center. The following website is also a good resource – www.fakechecks.org.

**Review Statements and Report Suspected Problems Immediately** You must promptly review the notices, statements and other communications, along with any accompanying checks and other items, we send you. You must also report problems or unauthorized transactions to us immediately, by calling the number for customer service on your statement. See Reporting Problems.

**Identity Theft** Identity theft occurs when someone uses your personal information without your permission to take over your existing account or to open new accounts in your name. Identity theft often begins with the loss or theft of a wallet or purse. Criminals can also obtain your personal information by stealing money from your trash or sending fraudulent e-mails to you requesting your information.

You should destroy or shred account statements, checks, deposit slips and other documents with your personal information before you throw them away.

### Other Actions You Can Take

Here are some other actions you can take to help control your risk. This is by no means a complete list of preventive measures. You may want to take other or additional actions.

• Do not share your passwords, user numbers or Personal Identification Number (PIN) for Online Banking or your ATM or debit card.

• Call us if your check order or debit card does not arrive within 14 business days.

• Be cautious about giving someone your account number. If you give your account number to a third person and authorize that third person to initiate one or more transactions on your account, you may be liable for all transactions initiated by the third person even if you did not intend to authorize a particular transaction.

• Do not give anyone a pre-signed blank check. Do not give anyone permission to sign your name on a check.

• Do not preprint your driver's license or Social Security Number on your checks.

• Write checks in a dark colored permanent ink and fill in all blanks. Make sure the written and numeric amounts match, are readable and begin on the far left of the line so additional numbers or words cannot be added.

• Write and sign your checks clearly, because illegible checks are easier to forge.

• Use tamper resistant checks. If you do not order checks through us, ask your check vendor about tamper resistant checks.

• Store blank checks, deposit slips and statements in a safe place and audit your check stock frequently. When discarding, destroy them by shredding or other means so they cannot be copied or used. Call us immediately if any of these items are lost, stolen or missing.

• Use the same precautions that apply to your checks to your endorsement and signature stamps.

• Do not leave outgoing mail in an unlocked collection box or in your residence mailbox. Deposit outgoing mail in a locked Postal Service mail deposit box.

• Keep accurate records of your transactions and reconcile your statements as soon as they are made available to you. Pick up your mail everyday. When reviewing your statements, watch for:

 – Checks cashed out of sequence or made payable to cash

 – Use of a check number from a previously cleared item

 – Balance discrepancies or unexpected fluctuations

• Reconcile your account yourself. If you have authorized someone else to transact on your account and you do not reconcile your account yourself, someone other than an authorized signer should reconcile your accounts.

• Business customers should assign to different individuals responsibilities for: opening mail, reconciling bank statements, endorsing incoming checks, making deposits, reconciling accounts payable checks with vendor invoices, reconciling incoming checks against outstanding receivables and issuing checks.

## Reporting Problems

If you find that your records and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement. If you fail to notify us in a timely manner, your rights may be limited. This section does not apply to electronic fund transfers that are subject to Regulation E. If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the Funds Transfer Services section), these provisions supplement the specific agreement and provisions to the extent they are inconsistent.

**Your Responsibility**
You must exercise reasonable control over your statements, checks, deposit slips, endorsement and signature stamps, debit and ATM cards, Personal Identification Numbers and other access devices. It is your responsibility to keep them safe and secure and to promptly discover and report if any of them are missing in time to prevent misuse. You assume full responsibility for monitoring and reviewing the activity of your account, the work of your employees, agents and accountants, and any way they make of your account.

We may deny a claim for losses due to forged, altered or unauthorized transactions, items or signatures if you do not guard against improper access to your checks, statements, deposit slips, endorsement and signature stamps, and account information. We may also deny your claim if you do not monitor your account and report problems as provided in this section. Please review this Reporting Problems section carefully.

In some states we offer certain fraud prevention and detection products and services to business customers. If we have offered you one or more of these services, and you decline to use them or fail to implement them, or you fail to follow the procedures necessary for proper use of these products or services, or you fail to follow other precautions reasonable for your particular circumstances, you are precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

**What Are Problems and Unauthorized Transactions**
Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

**Reviewing Your Account Statements**
Your review of your statements, checks and other items is one of the best ways to help prevent the wrongful use of your account. You agree:

• to review your statements, checks and other items and reconcile them as soon as they are made available to you;

• that our statements provide sufficient information to determine the identification and authenticity of any transaction including, without limit, whether any are forged, altered or unauthorized if the statement includes the item number, amount and the date the item posted to your account;

• to report any problems or unauthorized transactions as soon as possible; and

- that 60 days after we send a statement and any accompanying items (or otherwise make them available) is the maximum reasonable amount of time for you to review your statement or items and report any problem or unauthorized transaction related to a matter shown on the statement or items. There are exceptions to this 60-day period. For forged, unauthorized or missing endorsements, you must notify us within the period specified by the state law applicable to your account. For substitute checks, you must notify us within 40 days to qualify for an expedited recredit. See section titled Substitute Checks and Your Rights.

## We Are Not Liable If You Fail To Report Promptly

Except as otherwise expressly provided elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:

- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and

- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

Except as otherwise expressly provided elsewhere in this agreement, we are not liable to you for subsequent unauthorized transactions on your account by the same person if you fail to report an unauthorized transaction on your account within 30 days (or such longer period as is specified in the state law applicable to your account) following the closing date of the statement containing information about the first unauthorized transaction.

## Written Confirmation and Other Assistance

If you report to us that an unauthorized transaction has occurred on your account, we may require you to confirm your report in writing. We may also require that you give us a statement, under penalty of perjury, about the facts and circumstances relating to your report and provide such other information and proof as we may reasonably request.

If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with appropriate law enforcement authorities.

If you fail or refuse to do these things, we will consider your failure or refusal to be your ratification of the defect in the statement or item, unauthorized transaction or other problem and your agreement that we can charge the full amount to your account.

## Our Investigation and Maximum Liability

We may take a reasonable period of time to investigate the facts and circumstances surrounding any claimed loss. We do not have to provisionally credit your account while we investigate.

Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit or the forgery, alteration or other unauthorized withdrawal, reduced in all cases by the amount of the loss that could have been avoided by your use of ordinary care.

We are not liable for any special or consequential losses or damages of any kind, including loss of profits and opportunity or for attorneys' fees incurred by you.

## Business Insurance

If your claim relates to a business account, you agree to pursue all rights you may have under any insurance coverage you maintain before making a claim against us in connection with any transaction involving your accounts. You will provide us with all reasonable information about your coverage, including the name of your insurance carrier, policy number, policy limits and applicable deductibles. Our liability is reduced by the amount of all insurance proceeds you receive or are entitled to receive. At our request, you agree to assign to us your rights under your insurance policy.

## Opening a New Account

If you or we suspect that your account is or may be compromised, we may recommend that you close your account and open a new account. If there are any unauthorized transactions on your account, we recommend that you close your account and open a new one. If we recommend that you close your account and you do not do so, we are not liable to you for subsequent losses or damages due to unauthorized transactions. When you open a new account, you are responsible for notifying any third parties that need to know your new account number.

# Foreign Items and Foreign Currency

## What Is a Foreign Item?

A foreign item is a check or other item in any currency (including United States dollars) that is drawn on a branch of a bank located outside of the United States. A foreign currency is any currency other than United States dollars. Some foreign items are payable in United States dollars. Some are payable in a foreign currency.

## Be Cautious About Accepting Foreign Items

You should be cautious about accepting foreign items because foreign items are not subject to United States laws or regulations. A foreign item may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the United States. If a foreign item is returned to us unpaid or there is some other problem with the foreign item, you are responsible for the item and you may incur a loss.

## Currency Exchange Rates

We may receive transactions related to your account or relationship with us for which we determine that it is appropriate to convert the transaction from a foreign currency to United States dollars or from United States dollars to a foreign currency. As an example, we receive a wire denominated in a foreign currency for credit to your account. When we decide to convert a transaction, we may determine in our discretion the currency exchange rate and then assign that currency exchange rate to your transaction without notice to you. You agree to this procedure and accept our determination of the currency exchange rate.

We may consider many factors in setting our currency exchange rates. Some of these factors are exchange rates set by others, our desired rates of return, market risk and credit risk. We are not liable to you if our currency exchange rates are different from rates: offered or reported by third parties; offered by us at a different time, at a different location or for a different transaction amount; or which involve different payment media (such as banknotes, checks and wire transfers). You acknowledge that:

- our currency exchange rates for retail and commercial transactions, and for transactions effected after our regular business hours or on weekends, are different (and usually less favorable to you) from the exchange rates for large inter-bank transactions effected during a business day (the rates reported in The Wall Street Journal or elsewhere are usually for large inter-bank transactions); ;

- currency exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from our rates; and

- currency exchange rates can be highly volatile and may change frequently during a day.

You assume all risks relating to or arising from fluctuations in the exchange rates between currencies.

## Wires Sent to a Foreign Currency Account

When you send a wire denominated in United States dollars to an account denominated in a foreign currency, an intermediary bank or the receiving bank may convert your wire into the applicable foreign currency and we may receive compensation in connection with any such conversion. When this occurs, the intermediary bank or the receiving bank determines in their discretion the currency exchange rate. We are not responsible for the exchange rate set by an intermediary bank or the receiving bank.

## You May Not Write Foreign Currency Checks

You may not write checks or give other withdrawal orders on your account, which order payment in a foreign currency. If we receive such a check or order, we may refuse to accept or process it without any liability to you.

## Processing and Collecting Foreign Items

We may refuse to accept a foreign item for deposit or collection. If we accept a foreign item for deposit or collection, we assume all the risks relating to or arising from: the collection process, a late return and changes in currency exchange rates. If we accept a foreign item for deposit or collection, we may decide to credit the value of the foreign item to your account until we receive the proceeds in cleared funds from the paying bank. However, if we so credit your account, the credit is provisional and we may reverse the credit at any time.

If we accept an item for deposit which we later determine to be a foreign item, we may decide that the item needs to be sent for collection. If so, we may reverse any credit given for the item and mail the foreign item to you at the address we have for your account statement. You may ask us to send the item for collection.

When we send a foreign item for collection, you understand that the foreign item is sent solely for you and at your risk and that we are not liable for any event in the collection process which is beyond our control. As examples, we are not liable for a default by any bank or agent involved in the collection

process or for the loss of the foreign item in transit. We may send the foreign item through a correspondent bank or directly to the paying bank. We may deduct our fees and the fees and charges assessed by the paying bank and any agents involved in the collection process from any amount collected or from your account.

If you request, we will try to determine the status of a collection. You agree to pay all fees and charges related to such a request. We may refuse your request if less than 30 business days have passed since we first processed the collection.

If a foreign item is returned to us unpaid for any reason at any time or is initially paid but then subsequently returned unpaid, we may charge your account for the foreign item and mail the foreign item to you at the address we have for your account statement. Even though the item is returned unpaid, we may charge you for our collection fees and for fees and charges assessed by the paying bank and any agents involved in the collection process.

When we credit your account for a foreign item, we use our applicable currency exchange rate on the day we credit the item to determine the amount of the credit. When we reverse a credit for a foreign item, we use our applicable currency exchange rate on the day we reverse the credit to determine the amount of the debit. Currency exchange rates are highly volatile and our rate on the day of the credit is likely to be different (sometimes very different) than our rate on the day of the debit. You understand and agree that this may result in a currency exchange loss to you.

## Other Terms and Services

### Account Changes

You must notify us of any change to your name or address. If you do not provide notice of change of address, we may send notices, statements and other correspondence to you at the address maintained on our records for your account and you agree to indemnify us and hold us harmless for doing so.

You agree to notify us in writing of any change in ownership of authorized signers of your account or if an owner or authorized signer on the account dies or is adjudicated incompetent.

If there is more than one owner and/or authorized signer on the account, any one account holder or authorized signer may request the account be closed without consent of any other account holder or authorized signer. Further, any one account holder may request, and we may, at our option, permit removal of any account holder or authorized signer without consent of any other account holder or authorized signer on the account.

You acknowledge that we may, but need not, require a new signature card to be completed before any change in ownership of authorized signers becomes effective and each time you open a new account, we may require a Taxpayer Identification Number certification(s). You also acknowledge that we may require you to close your account in the event of any change in ownership or change in the authorized signers.

After we receive notice of a change and all documents we require regarding the change, we may take a reasonable period of time to act on and implement the change to your account.

### Automatic Transfer Service

You may have funds transferred automatically from most Bank of America checking or savings accounts to another Bank of America checking or savings account or to pay a Bank of America loan or credit card account or safe deposit rental fee.

Federal regulation of this Agreement place limits on the number of automated transfers you may make from savings accounts each month. Please see "Limits on Withdrawals and Transfers from Savings Accounts." Certain other restrictions apply.

You must schedule transfers to pay a Bank of America loan for the due date each month. In most other cases, you may schedule transfers periodically on the dates and for the amounts that you specify. Transfers can only be made on a business day. If a scheduled transfer date falls on a weekend or bank holiday, we may make the transfer on the next business day. If we are unable to complete a transfer because you do not have enough available funds in your account, we may cancel this service.

### Check and Deposit Slip Forms

We offer checks, withdrawal forms and deposit slips in a number of styles and at various prices. We recommend that you use checks and other forms that we provide.

You are responsible for verifying the accuracy of all information on your checks and other forms, whether obtained through others or us. Our liability, if any, for any printing errors on checks or other forms obtained through us is limited to the cost of replacing the forms. We are not liable for any claims, costs, losses or damages you may incur when you use checks or other forms not obtained through us.

We may refuse to accept checks or other forms that you create or someone else provides that do not meet our then current specifications, even if they met our specifications at the time they were initially drawn. You may obtain a copy of our printing specifications by calling the telephone number on your statement or asking your account representative. These specifications include the magnetically encoded numbers, the size of the check and the weight, color and type of paper. If you create or obtain checks or other forms from someone else and our automated check processing systems are unable to read or process them, we may refuse to accept them and we may charge you a fee for each check or other item that we are unable to read or process through our automated systems.

### Check Copies

We generally keep a copy of each check we post to your account for seven years from the date the check posts to your account. We have no obligation to retain the original check.

We typically keep the copies on microfilm or as a digital image. If a copy is unavailable or of poor quality, we are not liable to you for any claim, cost, loss or damage of any kind. After seven years, we may destroy the copies.

**Requesting Copies.** You may request a copy of a canceled check by calling us at the number for customer service on your statement. To produce a copy, we need the account number, check number, exact amount of the check, and date the check was paid. This information is on your statement. Generally, we mail or make a copy available within seven business days. If we need more time, we will tell you. A fee may apply to each check copy. Please see the Schedule of Fees for your account.

If a check that you wrote was converted to an electronic debit, then the check was not sent to us for processing so we do not have a copy. We list these electronic debits on your account statement.

## Compliance

You agree to comply with applicable laws and regulations. You may not use your account or related services for any illegal transactions or activity, for example those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361, et. seq. You agree to indemnify us from every action, proceeding, claim, loss, cost and expense (including attorney's fees) suffered or incurred by us due to any U.S. or foreign government entity seizing, freezing or otherwise asserting or causing us to assert control over any account or funds in an account of yours (on ours) when purportedly caused by, or arising out of, your action or inaction. This will apply whether or not such action is ultimately determined to be authorized under the laws of the U.S. or its territories, or of any foreign jurisdiction. We are not required to inquire or determine the authority of any action taken by the U.S. or foreign government entity prior to acceding to any legal process initiated by it.

Please note that your agreement to comply with applicable laws and regulations includes United States economic sanctions laws and regulations, including regulations issued by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury, and Executive Orders issued by the President of the United States.

## Conflicting Demands and Disputes

We are not required to make payment from an account to a signer, a payee, a beneficiary of a trust account or Payable on Death (POD) account, or to any other person claiming an interest in any funds in the account:

- if we have actual knowledge of, or otherwise believe in good faith that there may be a bona fide dispute between the signers, beneficiaries, payees, or other persons concerning their rights to the account proceeds or funds; or

- if we are otherwise uncertain as to who is entitled to the account funds.

We may notify all signers, beneficiaries, payees, and other persons claiming an interest in the account of the dispute or uncertainty without liability to you.

We also may, at our option and without liability to you, take one or more of these actions:

- continue to rely on our current signature cards and other account documents;

- honor the competing claim upon receipt of evidence we deem satisfactory to justify such claim;

- freeze all or part of the funds until the dispute is resolved to our satisfaction.

- close the account and distribute the account balance, subject to any bank claims, to each claimant payable jointly, or payable individually in equal shares to each claimant;

- pay the funds into an appropriate court for resolution; or

- resolve to dispose any funds in the account to any person until such time as: a) all persons claiming an interest in the account consent in writing to a resolution of the dispute; or a court of proper jurisdiction authorizes or directs the payment; or the person with a conflicting claim withdraws his or her claim in writing.

You are liable for all expenses and fees we incur, including attorneys' fees, and we may charge them to your account.

### Converting an Account

We may convert your account to another type of account, revoke privileges or close your account:

- If you make frequent transactions on a savings account;

- If your account frequently has debits against uncollected funds;

- If your account has excessive deposit activity;

- If you use a personal account for business purposes; or

- when we consider it appropriate or necessary to do so.

If we discontinue your type of account, we may convert your account to another type of account. We may also convert your account to another type of account based on our evaluation how you use the account. If we convert your account, we will send you information about your new account.

### Cutoff Time for Receipt of Orders

Our cutoff time for receipt at a banking center of an order relating to your account is 10:00 p.m. local time or, if later, one hour after the banking center opens each business day. Orders include a stop payment order or postdating order, restraining order, writ of attachment or execution, levy, garnishment and any similar order.

The cutoff time relates to our obligation to pay or return checks and other items. If we receive an order before this cutoff time, we may review items presented for payment against your account on the previous business day to determine whether we need to return any of them to comply with the order. If we receive the order after the cutoff time, we may not review items presented on the previous business day.

For example, if you give us a stop payment order after our cutoff time and the item you want to stop was previously presented for payment or otherwise before we have the opportunity to act on your order, your order comes too late to stop payment on the item. Or, if we receive a levy before the cutoff time and you do not have enough funds in your account to cover both the levy and all items presented against your account the previous business day, we may return one or more items and apply the funds to the levy.

### Death or Incompetence

You agree to notify us promptly if any owner or authorized signer on your account dies or is declared incompetent by a court. Until we receive a notice of death or incompetency, we may act with respect to any account or service as if all owners, signers or other persons are alive and competent and we will not be liable for any actions or inactions taken on that basis.

If you give us instructions regarding your account, and you or another owner of the account subsequently dies or is declared incompetent, we may act on the instructions unless we receive written notice of death or incompetency prior to honoring such instructions.

When we receive a notice that an owner has died or been declared incompetent, we may place a hold on your account and refuse to accept deposits or permit withdrawals. We may hold any funds in your account until we know the identity of the successor.

If a deposit — including salary, pension, Social Security and Supplemental Security Income (SSI) — payable to the deceased owner is credited to the account after the date the deceased owner died, we may debit the account for the deposit and return it to the payer.

We may accept and comply with court orders, and take direction from court appointed personal representatives, guardians, or conservators from states other than where your account was opened or where the account, property or records are held. We reserve the right to require U.S. court documents for customers who reside outside of the U.S. at time of incompetence or death.

### Facsimile Signature

A facsimile signature can be a convenient method for signing or endorsing documents and other items. If you use a facsimile signature, you are responsible for any withdrawal from your account that bears or appears to us to bear a facsimile signature that resembles or purports to be the signature of a person authorized to withdraw funds. We will not be liable to you if use of the facsimile device (or similar device utilized to affix your signature) was unauthorized. You are responsible even if the

size, or color of the facsimile signature is different from that of any signature previously presented to us. We may pay the withdrawal and may charge your account for it. You agree to reimburse us (and we may charge your account) for all claims, costs, losses and damages, including attorneys' fees, that result from our payment of a withdrawal bearing either a facsimile that resembles or purports to bear your signature or a facsimile that we believe you authorized.

### Deposit Insurance — Bank Assessment for Business Accounts

For some business accounts, we may charge you an assessment related to deposit insurance, based in part on the assessment rate the FDIC charges us. The assessment may include deposit insurance charges, Financing Corporation (FICO) assessments and other fees, charges and assessments provided by law. The assessment rate is variable. We may change it in our discretion at any time without notice. The amount of the assessment will appear on your statement.

### Fingerprint

If a person to whom you draw your check asks us to cash the check, we may require them to place their fingerprint on the check. If they refuse to provide their fingerprint, we may refuse to cash the check. We have no liability to you for refusing to cash the check.

### "Freezing" Your Account

If we decide to close your account, we may freeze it. If we do this, we may in our discretion either accept or return deposits, checks and other items that we receive after we freeze your account without being liable to you.

If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze the funds in the account and in other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. If we do freeze your account funds, we will provide notice to you as soon as reasonably possible. We may not provide this notice to you prior to freezing the account if we believe that such notice could result in a security risk to us or to the owner of the funds in the account.

### Indemnification and Limitation of Liability

You agree to reimburse us for all claims, costs, losses and damages (including fees paid for collection) we may incur with respect to overdrafts or returned deposits in connection with your account.

We are not liable to you for errors that do not result in a financial loss to you. We may take any action authorized or permitted by this Agreement without being liable to you, even if such action causes you to incur fees, expenses or damages.

We are not liable to you for any claim, cost, loss or damage caused by an event that is beyond our reasonable control. In particular, we are not liable to you if circumstances beyond our reasonable control prevent us from, or delay us in, performing our obligations for a service, including acting on a payment order, crediting a funds transfer to your account, processing a transaction or crediting your account. Circumstances beyond our reasonable control include: a natural disaster; emergency conditions, such as fire, theft or labor dispute; a legal constraint or governmental action or inaction; the breakdown or failure of our equipment for any reason, including a loss of electric power; the breakdown of any private or common carrier communication or transmission facilities; any time-sharing supplier or any mail or courier service; the potential violation of any guideline, rule or regulation of any government authority; suspension of payments by another bank; or your act, omission, negligence or fault.

Except as limited by applicable law, we are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind.

Our liability for a claim will be limited to the face value of an item or transaction improperly dishonored or paid or the actual value of any deposits not properly credited or withdrawals not properly debited.

You agree that the amount of any claim you have against us in connection with any account or transaction with us, whether brought as a warranty, negligence, wrongful dishonor or other action, is subject to reduction to the extent that: 1) negligence or failure to use reasonable care on your part, or on the part of any of your agents or employees, contributed to the loss which is the basis of your claim; and 2) damages could not be avoided by your use of ordinary care.

Any loss recovery you obtain from third parties on a particular claim will reduce the amount of any obligations we may have to you on that claim and you will immediately notify us of any such recovery. You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss and to provide us information regarding coverage. Our liability to pay you a claim will be reduced by the amount of any insurance proceeds you receive or are entitled to receive in connection with the loss. If we reimburse you for a loss covered by insurance, you agree to assign us your rights under the insurance to the extent of your reimbursement.

33

34

## Legal Process – Subpoena and Levy

"Legal process" includes a writ of attachment, execution, garnishment, tax withholding order, levy, restraining order, subpoena, warrant, injunction, government agency request for information, search warrant, forfeiture or other similar order.

We may accept and comply with legal process: served in person, by mail, by facsimile transmission, or by other means; or served at locations other than the location where the account, property or records are held. You direct us not to contest the legal process. We may, but are not required to, send a notice to you of the legal process. We do not send a notice if we believe the law prohibits us from doing so.

We may hold and turn over funds or other property to the court or creditor as directed by the legal process, subject to our right of setoff and any security interest we have in the funds or other property. We do not pay interest on the funds during the period we hold them pursuant to legal process. If we hold or turn over funds, we may without any liability to you return checks and other items unpaid and refuse to permit withdrawals from your account. If the legal process applies to a time deposit account, we may charge the applicable early withdrawal penalty for funds taken from the time deposit.

We may charge your account a fee for each legal process. You agree to pay us for fees and expenses (including administrative expenses) that we incur in responding to any legal process related to your account, such as expenses for research and copying of documents. The fees and expenses may include attorneys' fees. We may deduct these fees and expenses from any of your accounts without prior notice to you.

If the legal process directs us to release information about one or more, but not all, accounts that are reported on a combined statement, we may release the entire combined statement, even though other accounts reported on the combined statement are not covered by the legal process. If the legal process requests information about more than one account, owners or signers, we may release information about all co-owners or signers, even though some or all of the other co-owners or signers are not covered by the legal process.

We may produce documents held at, or provide access to property that is located in, any of our facilities or any facility operated by third party on our behalf, even if the facility is not designated as the place to be searched in the legal process. We have no liability to you if we accept and comply with legal process as provided in this section or by law.

## Multiple Signatures Not Required

We may act on the oral or written instructions of any one signer on the account. Each signer may make withdrawals, write checks, transfer funds, stop payments, obtain ancillary services (e.g., electronic fund transfer services or wire transfers), and otherwise give us instructions regarding your account. We may require written authorization for some actions.

We do not assume a duty to enforce multiple signature requirements that you may agree upon among yourselves. If you indicate on your checks or signature card or other account documents that more than one signature is required for withdrawal, this indication is for your own internal procedures and is not binding on us.

We may disregard any instructions to permit withdrawals only upon more than one signature with respect to checks, electronic fund transfers or other debit/withdrawal requests. We may pay out funds from your account if the check, item, or other withdrawal or transfer instruction is signed or approved by any one of the persons authorized to sign on the account. We are not liable to you if we do this.

## Notice of Withdrawal

Federal regulations require us to retain the right to require all savings and all NOW account depositors to give seven days' written notice before making a withdrawal. It is unlikely, however, that we would require this notice.

## Powers of Attorney/Appointment and Payment to Agents

You may decide to appoint someone to act for you as your agent or attorney-in-fact ("agent") under a power of attorney. Please note that the form must be satisfactory to us in our discretion and unless prohibited by law, we may refuse, with or without cause, to honor powers of attorney that you grant to others.

For our customers' convenience we have a banking power of attorney form, which is available at many of our banking centers. If your state has a statutory form power of attorney, we also generally accept that form. We may, however, accept any form that we believe was executed by you and are instructions we receive under that form without any liability to you. You agree to reimburse us for all claims, costs, losses and damages that we incur in accepting and acting on any power of attorney form that we believe you executed.

We may pay any funds deposited in your account to your agent or upon the order of your agent. When we accept a power, we may continue to recognize the authority of your agent to act on your behalf without question until we receive written notice of revocation from you or notice of your death or incapacity and have had a reasonable time to act upon it. We will not be liable for action in accordance with the most current documentation if we have not received such notice.

We may require a separate form for each agent and for each account for which you want to grant power of attorney. We may require your agent to present the original form and refuse to act on a copy. In some cases, we may require that your agent confirm in an affidavit that the power has not been revoked or terminated or that you register the power with the appropriate recording authorities. We may restrict the types or sizes of transactions we permit your agent to conduct.

The authority of your agent to receive payments, transact on or otherwise make changes to your account generally terminates with your death or incapacity, unless the document creating such agency provides, in accordance with applicable law, that the agent's powers continue in spite of your incapacity.

## Records

We may, in our discretion retain records in any form including, without limit, paper, film, fiche, digitalized or other electronic medium. If we are not able to produce the original or a copy of your signature card or any other document relating to your account or service, our records (including our electronic records) will be deemed conclusive. If there is a discrepancy between your records and our records, our records will be deemed conclusive.

## Right of Setoff

We may take or setoff funds in any or all of your accounts with us and with our affiliates for direct, indirect and acquired obligations that you owe us, regardless of the source of funds in an account. This provision does not apply to IRA or tax-qualified retirement accounts, to consumer credit card obligations or where otherwise prohibited by law. Your accounts include both accounts you own individually and accounts you own jointly with others. Our setoff rights are in addition to other rights we have under this Agreement to take or charge funds in your account for obligations you owe us.

If the law imposes conditions or limits on our ability to take or setoff funds in your accounts, to the extent that you may do so by contract, you waive those conditions and limits and you authorize us to apply funds in any or all of your accounts with us and with our affiliates to obligations you owe us.

If you are a sole proprietor, we may charge any of your personal or business accounts. We may use funds held in your joint accounts to repay obligations on which any account owner is liable, whether jointly with another or individually. We may use

funds held in your individual accounts to repay your obligations to us, whether owed by you individually or jointly with another, including: obligations owed by you arising out of another joint account of which you are a joint owner, even if the obligations are not directly incurred by you; obligations on which you are secondarily liable; and any amounts for which we become liable to any governmental agency or department or any company as a result of recurring payments credited to any of your accounts after the death, legal incapacity or other termination of entitlement of the intended recipient of such funds.

If we take or setoff funds from a time deposit account, we may charge an early withdrawal penalty on the funds withdrawn.

We may take or setoff funds from your account before we pay checks or other items drawn on the account. We are not liable to you for dishonoring items where our action results in insufficient funds in your account to pay your checks and other items.

Some government payments may be protected from attachment, levy or other legal process under federal or state law. If such protections may apply, to the extent that you may do so by contract, you waive these protections and agree that we may take or setoff funds, including federal and state benefit payments, from your accounts to pay overdrafts, fees and other obligations you owe us.

This section does not limit or reduce our rights under applicable law to charge or setoff funds in your accounts with us for direct, indirect and acquired obligations you owe us.

## Sample of Your Signature

To determine the authenticity of your signature, we may refer to the signature card or to a check or other document upon which your signature appears. We may use an automated process to reproduce and retain your signature from a check upon which your signature appears.

If you create your own checks, or obtain them from someone else, you are responsible to verify your signature on a check by comparing it with a check that posted to your account, you are responsible for any losses that may result from your inability to use that check to verify your signature.

## Stop Payment Orders and Postdating Orders

**Stop Payment Orders.** If we have not already paid a check or other item drawn on your account, then at your request and risk, we may accept a stop payment order on it. You may not stop payment on a check you use as identification for the check you used as identification. You may not stop payment on a point of sale transaction or an ATM withdrawal or transfer.

35

36

**Postdating Orders** If you write and postdate a check (that is — you put a future date on the check), you may ask us not to pay the check before its date by giving us a stop payment order. Otherwise, we may pay it and charge it to your account even if it is presented for payment before its date.

If we receive a postdated check that is subject to a stop payment order, we may return the check with the designation "payment stopped" or "refer to maker."

**Placing Stop Payment Orders** We may accept a written or oral stop payment order from any person who has a right to stop payment order from this account. We may require you to complete a form authorizing the order. You must give us sufficient notice so that we have a reasonable opportunity both to verify that the item is unpaid and to not pay the item. We may charge you a fee for each stop payment order and each renewal of the order.

We use a computer system to identify items. Therefore, to place a stop payment order, we need the account number, the item number and the exact amount of the item — in dollars and cents. If you give us the wrong amount (even one penny off) or the wrong item number, we may pay the item. We may also require the date of the item, and the name of the person who signed or authorized the item, and the name of the party to whom the item was made payable. We may only use a portion of the required information to identify an item.

In some cases, we may pay an item even if an order is in effect. For example, if one of our banking centers, without notice of your request, pays a check that you have asked us to stop, we will pay the check.

A stop payment order generally expires after six months. However, we may, in our sole discretion, elect to honor a stop payment order for a longer period of time without notice to you. If you want the order to continue after six months, you must ask us to renew the order. Each request for a renewal is treated as a new order. If you want the order to expire in less than six months, you must cancel the order on or after the date you want it to expire. We may accept a written or oral instruction to cancel an order at any time. If we cancel an order or it is not renewed, we will have a reasonable opportunity to act on it. We cancel the order automatically when the account on which the item is drawn is closed. Please see Preauthorized Payments in the section entitled Electronic Banking Services for information about stopping a preauthorized (recurring) payment on a personal account.

If the item is presented to us for payment after the order expires, we may pay the item. If we pay an item subject to a valid and timely stop payment order, we may be liable to you

if you had a legal right to stop payment and you establish that you suffered a loss because of the payment. Our liability, if any, is limited to the actual loss suffered, up to the amount of the item. You must prove the loss to our satisfaction. We are not liable to you for any special, incidental or consequential loss or damage of any kind.

**Additional Information about Automated Clearing House (ACH) Stop Payment Orders** If we have not already paid an ACH debit from your account, then at your request and risk we may accept a stop payment order (on it). The stop payment order takes effect within three business days. If you give us oral instructions, we may require you to confirm them in writing. If you do not, we may require you to place an order authorizing the order, unless you place a recurring ACH debit in effect, indefinitely.

To place a stop payment order on an ACH debit, we may require you to provide us your name and telephone number, the type of account (checking or savings), and the other information used by the sender of the ACH debit, and the exact company name listed above under Placing Stop Payment Orders. You can obtain the company name used by your sender from your statement by looking at a prior ACH debit from this sender that posted to your account.

If you do not know the amount of the ACH debit, we may still be able to place the stop payment order, but it must apply to the entirety of the item. If you give us the wrong company name or the name of the sender, but this may stop all ACH items from this sender. If you give us the wrong company name or the sender changes the company name, we may pay the item.

You are responsible for notifying the sender of the ACH debit that you have revoked your previous authorization for ACH debits.

For more information on stopping a preauthorized payment on a personal account, see Preauthorized Payments in the section titled Electronic Banking Services.

**Subaccounts**

For regulatory accounting purposes, we may classify checking accounts (and any subaccounts): a checking subaccount and a savings subaccount. For interest bearing checking accounts, we calculate and pay interest at the same rate and on the same way on both subaccounts. For non-interest bearing checking accounts, we do not pay interest on either subaccount. We may transfer funds between these subaccounts. We record the subaccounts and any transfers between them on our internal accounting records only. Otherwise, the subaccounts are subject to the same terms as the checking and savings accounts described in this Agreement.

**Unclaimed Property – Accounts Presumed Abandoned or Inactive**

State and federal law and our policy govern when accounts are considered abandoned. The applicable state law is generally the state listed in the address for your account statement.

Your account is usually considered abandoned if you have not performed at least one of the following activities for the period of time specified in the applicable state's unclaimed property law: made a deposit or withdrawal, written to us about the account, or otherwise shown an interest in the account, such as asking us to keep the account active. You usually need to perform the activity. Therefore, bank charges and interest payments, and automatic deposits and withdrawals, are usually not considered activity.

We are required by the unclaimed property laws to turn over accounts considered abandoned to the applicable state. Before we turn over an abandoned account, we may send a notice to the address we are currently show for the account statement. We may not send this notice if mail is returned or previously sent to this address was returned. Unless prohibited by the applicable state law, we may charge to the account our costs and expenses of any notice, advertisement, payment and delivery of this account to the applicable state agency.

After we turn the funds over to the state, we have no further liability for the funds and you must apply to the appropriate state agency to reclaim your funds.

If we consider your account inactive, then (unless prohibited by federal law or the law of the state where we maintain your account) we may:

- charge dormant account fees on the account (in addition to regular monthly maintenance and other fees,

- stop sending statements on the account; and

- if the account received interest, stop paying interest on the account; and

- refuse to pay items drawn on or payable out of the account.

If you re-establish contact with us, we do not have to reimburse you for those fees and are not liable to you for any interest that would otherwise have accrued on your account.

**Verification of Transactions and Right to Reverse Transactions**

All transactions, including those for which we provide a receipt, are subject to subsequent verification and correction within our discretion. We do not verify all deposits at the time of receipt. We do not verify your deposit at the time of your deposit as not evidence that your deposit has been verified. We may reverse

or otherwise adjust any transaction (both credit and debit) that we believe we erroneously made to your account at any time without prior notice to you.

**Waiver, Severability, and Change of Law by Agreement**

**Waiver** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right, or any other right. No delay in enforcing our rights will affect your obligation to pay us fees and other amounts you owe us under this Agreement. If we waive a provision of this Agreement, the waiver applies only in the specific instance in which we decide to waive the provision and not to future situations or other provisions regardless of how similar they may be.

**Severability** A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

**Change of Law by Agreement** If any part of this Agreement is inconsistent with any applicable law, then to the extent the law can be amended or waived by contract, you and we agree that this Agreement governs and that this law is amended or waived by this Agreement.

# Electronic Banking Services

We offer a variety of electronic banking services for use with your deposit accounts. We describe some in this section and also provide certain disclosures that apply to use of electronic banking service with personal deposit accounts. We provide separate agreements to you that govern the terms of some services, including separate agreements for ATM and debit cards and Online and Mobile Banking services. Please review the following provisions and the separate agreement for the service.

## Types of Electronic Banking Services

### ATM and Debit Cards

We may issue you an ATM or debit card (either is called a "card") and a personal identification number (PIN) when you open your account. The terms that govern this service are in a separate agreement that you receive with your card. Please review that agreement carefully.

There are daily dollar limits for withdrawals and purchases. We provide your card limits to you as part of the separate agreement for card services. We may occasionally decide not to issue a card or code to a customer. We may suspend or terminate a card or code at any time without cause or notice.

The following information is a summary of how you can use your card. Some of these uses may not be available with every card or at every ATM or other terminal.

**At ATMs** You can use your card with linked accounts at participating ATMs to withdraw cash, transfer funds, and find out balances. At most ATMs that are prominently branded with the Bank of America name and logo, you can also use your card and PIN with linked accounts to make deposits and make payments to qualifying Bank of America credit cards and loans.

**At participating merchants** You can use your card with linked accounts at participating merchants to purchase goods and services. Some merchants may also permit you to withdraw cash from your checking account while making a purchase.

**Payments, Credits, and Transfers** You can send or receive electronic transfers from or to your accounts. We may do this by ACH (as a member of a national or local automated clearing house association) or other similar networks. Electronic transfers may take various forms, such as:

- Automatic electronic deposits to your account, such as payroll or benefits payments;
- Automatic onetime or repeating charges to your account for bill payments, sent by a merchant or other payee with your authorization. The merchant or other payee may ask you for bank number and account information from your check or a canceled check to create these orders; and
- A "check conversion" transfer, where a merchant or other payee uses a check that you have written to create an electronic transfer from your account. The merchant may either keep the check you wrote or return it to you.

**Online and Mobile Banking** Online and Mobile Banking services are governed by a separate agreement. You receive the agreement for the service at the time you enroll. You can use these services with linked accounts to view your accounts information, make deposits, transfer funds between your accounts and to the accounts of others, pay qualifying loans or credit cards, and make payments from your account to third parties. You can also enroll for these services on our website www.bankofamerica.com.

**Telephone Banking** You may use our automated telephone service system with an Access ID or speak to a telephone banker to get your account information, transfer funds between your accounts with us, and pay qualifying loans or credit cards.

### Access ID

An Access ID is a numeric code which, when used with a separate PIN number or passcode (plus, in some circumstances, another piece of identifying information called a "verbal verification code"), enables consumer and small business customers to do the following through our automated telephone system or in person at a banking center:

- obtain information about deposit and credit accounts that are linked to the Access ID
- transfer funds and make payments between linked accounts, and
- obtain other services such as stop payments, check reorders, and copies of checks and statements

You may request an Access ID and related security codes by calling customer service or at any banking center. Please note that Access IDs may not be available to customers in all states. In some states, individual account numbers, combined with additional security codes, may be required to obtain account information and transact other business.

Two activity levels are available for most accounts linked to your Access ID:

(1) Inquiry: Allows you to obtain account balances and transaction information.

(2) Financial: Allows you to obtain account information, transfer funds among accounts linked to the Access ID, and obtain certain other banking services.

When you first choose your Access ID, and when you subsequently open new accounts, we will link all your Bank of America accounts that are eligible, and assign the financial activity level to all accounts for which that activity level is available, unless you tell us otherwise. We may establish certain limits on the accounts that can be linked to your Access ID and that can have the financial activity level.

If you permit another person to use your Access ID or account number(s) and related code(s), you are responsible for all transactions conducted by that person (even if he or she exceeds your authorization), until you notify us that the person is no longer authorized so that we may block the codes and issue new ones.

You must review your periodic statements and promptly report to us any unauthorized funds transfers initiated through the use of your security codes or otherwise. You must also promptly notify us of any suspected loss or theft of your security codes. Failure to take these actions may affect the extent of your liability for any unauthorized transfers under federal banking regulations or other applicable laws.

**Small Business Access IDs** If you are a small business customer, to uniquely identify each person who initiates a request for banking services, you should establish a separate Access ID and related security codes for each person who determine needs access to your accounts. Your authorization (whether express or implied) for any individual to establish an Access ID shall constitute your authorization for the bank to provide account information to such individual and (unless Inquiry only access is selected) to transfer funds and conduct other banking transactions upon that person's request. Such authorization supersedes any resolution, signature card or other document filed with the bank that purports to limit authority over any of your accounts, whether currently on file or submitted or modified in the future, unless the Access ID authorization is expressly modified or revoked.

## Electronic Banking Disclosures

**Personal deposit accounts** Our Personal Schedule of Fees describes your personal deposit accounts. The following provisions apply to electronic fund transfers to or from personal deposit accounts (sometimes referred to as "consumer deposit

accounts") that are governed by Regulation E of the U.S. Federal Reserve Board. A personal deposit account is an account that is owned by a natural person and that is established primarily for personal, family, or household purposes.

**Business deposit accounts** Our Business Schedule of Fees describes our business deposit accounts. Business deposit accounts are accounts that are established primarily for business purposes. When you open one of our business deposit accounts, you represent and agree to that you are establishing it primarily for business purposes. The following provisions do not apply to business deposit accounts, although as a matter of practice we generally follow the error resolution procedures described below for business accounts. Please note that we are not required to follow these procedures for business accounts and that we may change our practice at any time without notice.

### Consumer's Liability for Unauthorized Transfers

Tell us AT ONCE if you believe your card or your personal identification number (PIN) or other code has been lost or stolen. Also, tell us AT ONCE if you believe that an electronic fund transfer has been made without your permission using information from your check, the best way to keep your possible losses down is to call us immediately.

Your losses could include all of the money in your account plus, if you have an overdraft protection plan linked to your account, all transfers from another account or any advances on a credit line.

If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission.

If you do NOT tell us within two business days after you learn of the loss or theft of your card or code, and we can prove we could have stopped someone from using your card or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us in writing within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time, if a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

**Note:** These liability rules are established by Regulation E. For personal deposit accounts, our liability policy regarding unauthorized debit card or ATM card transactions, and unauthorized Online Banking transactions may give you more protection, provided you report the transactions promptly. Please see the agreement you receive with your ATM or debit card and the Online Banking agreement.

40

39

You should never write your PIN on your card or carry the PIN with you. This reduces the possibility of someone using your card without your permission if it is lost or stolen.

If you give, or make reasonably available, your card, PIN or other access device or code to anyone, you may be liable for any use made of such until you advise us that such person is not authorized to use them.

Also, the state law applicable to your account may give you more time to report an unauthorized transaction or may give you more protection. For example, in Massachusetts, the two day and 60 day time limits for reporting unauthorized transactions do not apply and the $500 limit does not apply.

**Contact in Event of Unauthorized Transfer, and Lost or Stolen Card, PIN or Other Code**

If you believe your card, PIN or other code is lost or stolen, or learned by an unauthorized person, or that someone has transferred or may transfer money from your account without your permission, notify us immediately by calling the number listed below.

*Telephone:* 1.800.432.1000

You can also write to us at: Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85077-3137

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

If unauthorized activity occurs, you agree to cooperate during the investigation and to complete a Lost/Stolen Card and Fraud Claims Report or similar affidavit.

**Business Days** For purposes of these electronic banking disclosures, our business days are Monday through Friday, Weekends and bank holidays are not included.

**Documentation of Transfers**

*Receipts* You can usually get a receipt at the time you make any transfer to or from your account at an ATM or point of sale terminal. You may not get a receipt for small dollar transactions. Each transaction is subject to verification by us so the receipt is not final and our records will control if there is a conflict.

*Preauthorized Credits* If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at 1.800.432.1000 to find out whether or not the deposit has been made.

*Periodic Statements* We send you a monthly account statement unless there are no electronic fund transfers in a particular month. In any case, we send you a statement at least quarterly unless your account becomes inactive.

**Preauthorized Payments**

*Right to Stop Payment and Procedure for Doing So* If you have told us in advance to make regular payments out of your account or you have authorized someone to debit your account through the ACH system, you can stop any of these payments.

Here's how: Call us at 1.800.432.1000 or write to us at Bank of America Customer Service, P. O. Box 25118, Tampa, FL 33622.

You must notify us in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. We may charge you a fee for each stop payment order you give.

You must give us the identifying information we request.

You must notify the payee that you have withdrawn your authorization for the repeating electronic payments. If you authorized someone to debit your account through the ACH system, see *Stop Payment Orders and Postdating Orders* in the *Other Terms and Services* section for more information about ACH Stop Payment Orders. Stop payment orders for preauthorized (recurring) debit card transactions. You may be able to give us a specific expiration date for certain stop payment orders for preauthorized recurring transactions if you choose to do so.

*Notice of Varying Amounts* If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

*Liability for Failure to Stop Payment* If you order us to stop a preauthorized payment three business days or more before the transfer is scheduled, and we have given us all of the information we requested, and we do not stop the payment, we will be liable for your losses or damages directly caused by our failure to stop the payment.

**Liability for Failure to Make Transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:
• If, through no fault of ours, you do not have enough money in your account to make the transfer.
• If the transfer would go over the credit limit on your overdraft line.

• If the ATM where you are making the transfer does not have enough cash.
• If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transfer.
• If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
• If the funds are subject to legal process or other encumbrance restricting the transfer.
• If we consider your account to be inactive or dormant.
• If your card or code has been revoked due to inactivity or at our discretion.

There may be other exceptions stated in our agreement with you or permitted by law.

**Confidentiality – Account Information Disclosure** We will disclose information to third parties about your account or transfers you make as stated in the *Information about You and Your Account* section near the front of this Agreement.

**Fees**

*ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

*Other Fees* For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

**In Case of Errors or Questions about your Electronic Transfers**
Call or write us at the telephone number or address below, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt.

Call us at 1.800.432.1000 or write us at Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85077-3137.

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error or problem appeared. Please provide us with the following:
• Tell us your name and account number;
• Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information;

• Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point of sale, or foreign-initiated transactions, we may take up to 90 days (instead of 45) to investigate your complaint or question. For new accounts we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**Notice:** As part of the security system to help protect your card and PIN, we may use hidden cameras and other security devices to determine who is using a card at an ATM. You consent to this.

*Additional Information for Massachusetts customers:* Any documentation provided to you which indicates that an electronic fund transfer was made shall be admissible as evidence of the transfer and shall constitute prima facie proof that the transfer was made. And the limitation by you of certain electronic fund transfers from your account will effectively eliminate your ability to stop payment of the transfer. **UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, YOU MAY NOT STOP PAYMENT OF ELECTRONIC FUND TRANSFERS, THEREFORE, YOU SHOULD NOT EMPLOY ELECTRONIC ACCESS FOR PURCHASES OR SERVICES UNLESS YOU ARE SATISFIED THAT YOU WILL NOT NEED TO STOP PAYMENT.**

# ATM Safety Tips and Safeguarding Your Account Information

The suggestions that follow offer some simple tips on exercising care when using an ATM and on protecting your card and PIN. We advise you to always use common sense and be aware of your surroundings before, during and after any ATM use.

## Be Aware of Your Surroundings at ATMs

- Look around when you walk up to the ATM or exit the ATM. If you notice anyone or anything suspicious or that you deem unsafe, such as the lighting around the ATM not working, use another ATM or return later.
- When you enter or exit an ATM in an enclosed area, be sure you close the entry door completely. Do not open locked ATM vestibule doors for others or allow any unknown persons to enter the ATM area when you are making your transaction. Authorized customers should have their own access.
- When you use a drive-up ATM, be sure your passenger windows are closed and your doors are locked.
- If you must use an ATM at night, consider taking someone with you.
- The activity around Bank of America ATMs may be monitored or recorded by surveillance cameras.
- Contact the police or a security officer if you see any suspicious activity at the ATM.

## Protect Your Privacy

- While at the ATM, enter your PIN discreetly, shield the keypad with your hand or body. After completing your transaction, be sure to put away your card, cash and transaction record before exiting the ATM area. Count the cash later in your locked car or home.
- Do not leave your transaction record at the ATM. Keep your transaction record in a safe place, so you can compare it to your statement.

## Request Emergency Assistance

- If you need emergency assistance, call 911 from the nearest telephone. If you have a complaint about the security of a Bank of America ATM, call our Corporate Security Department at 1.800.622.7511.
- Report all crimes immediately to law enforcement. If you think you're being followed from an ATM, go to a busy area and immediately contact the police.

## Protect Your Card and PIN

- Always protect your card by keeping it in a safe place. If your card is lost or stolen, contact us immediately.
- Always protect your PIN. You should never write your PIN to anyone and you should never write your PIN anywhere, especially on your card. If you choose your own PIN, avoid using obvious numbers such as telephone numbers, addresses, or birth dates.
- Never give information about your card or PIN over the telephone, even if the caller is asking for this information, refuse and immediately contact us.
- Report a lost or stolen card immediately.

# Funds Transfer Services

The following provisions apply to funds transfers you send or receive through us, but do not apply to electronic fund transfers governed by Regulation E, Subpart A of the U.S. Federal Reserve Board and the Consumer Financial Protection Bureau. We provide separate agreements to you that govern the terms of some funds transfer services, including separate agreements for Online and Mobile Banking, telephone transfers, and funds transfers in the banking centers. If you have a specific agreement with us for these services, these provisions supplement that agreement to the extent these provisions are not inconsistent with the specific agreement.

The Uniform Commercial Code includes provisions relating to funds transfers. These provisions define the following terms: funds transfer, payment order and beneficiary. These terms are used here as they are defined in Article 4A of the Uniform Commercial Code – Funds Transfers as adopted by the state whose law applies to the account for which the funds transfer service is provided. In general: A funds transfer is the process of carrying out payment orders that lead to paying a beneficiary. The payment order is the set of instructions given to us to transfer funds. The beneficiary is the person or business who receives the final funds transfer.

In addition, funds transfers sent outside of the United States that are initiated by consumers primarily for personal, family or household purposes are governed by federal law (Remittance Transfers) (see below). Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide rights with respect to Remittance Transfers that may vary in certain ways from the terms and conditions set forth herein. Your rights with respect to Remittance Transfers, including disclosure, error resolution and cancellation rights, will be explained to you separately with each Remittance Transfer transaction you initiate, either orally or in writing.

In general, your and our rights and obligations under this Agreement are governed by and interpreted according to federal law and the law of the state where your account is located. However, Remittance Transfers shall be governed by federal law and, as applicable, the law of the State of New York. Funds transfers to your account or funded from your account or otherwise funded by you may involve one or more funds transfer systems, including, without limitation, Fedwire or Clearing House Interbank Payments System (CHIPS). Accordingly, notwithstanding anything to the contrary that may be provided elsewhere in this agreement, such transfers will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, Fedwire, the National Automated Clearing House Association, any regional association (each an "ACH"), and CHIPS. Funds transfers through Fedwire will be governed by, and subject to, Regulation J, Subpart B, and Uniform Commercial Code Article 4A incorporated by reference thereunder. Funds transfers through CHIPS are governed by and subject to, CHIPS Rules and Administrative Procedures and by the laws of the State of New York, including Article 4A of the New York Uniform Commercial Code, regardless of whether the payment message is part of a transfer that is a Remittance Transfer, except that in the case of an inconsistency between New York law and EFTA, EFTA shall govern.

We may charge fees for sending or receiving a funds transfer. We may deduct our fees from your account or from the amount of the transfer. Other financial institutions involved in the funds transfer may also charge fees. For current fees, call us at the number for customer service on your statement or ask a banking center associate.

## Remittance Transfers

The Bank may execute certain payment orders for you known as Remittance Transfers. A Remittance Transfer is a wire transfer initiated by a consumer primarily for personal, family or household purposes that is sent to a designated recipient in another country. Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide certain rights and obligations related to Remittance Transfers that may differ from rights and obligations that apply to other types of payment orders, including disclosure, cancellation and error resolution rights. To the extent the provisions of this Agreement are inconsistent with the oral or written disclosures provided to you for a Remittance Transfer, governed by section 919 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. section 1693o-1, the terms of the disclosures provided at the time of the Remittance Transfer shall govern. Notwithstanding anything to the contrary contained herein, rights and obligations

that apply to Remittance Transfers are as set forth in EFTA and, as applicable, as set forth in New York law.

## Sending Funds Transfers

You may subscribe to certain services we offer or you may give us other instructions to pay money or have another bank pay money to a beneficiary. This Sending Funds Transfers section applies to wire transfers and transfers we make between Bank of America accounts. It does not apply to automated clearing house (ACH) system funds transfer services.

You may give us payment orders for ACH system funds transfers only if you have a separate agreement with us for those services.

**Cutoff Times for Payment Orders.** We have cutoff times for processing payment orders. Cutoff times vary depending on the particular office of our bank and the type of payment order. We may treat payment orders we receive after a cutoff time as if we received them the next business day. We tell you our cutoff times upon request.

**Amending or Canceling Payment Orders.** You may not amend or cancel a payment order after we receive it. If you ask us to do this, we may make a reasonable effort to act on your request. But we are not liable to you if, for any reason, a payment order is not amended or canceled. You agree to reimburse us for any costs, losses or damages that we incur in connection with your request to amend or cancel a payment order.

**Inconsistency of Name or Number.** The beneficiary's bank may make payment to the beneficiary based solely on the account or other identifying number, even if the name on the payment order differs from the name on the account. We or an intermediary bank may send a payment order to an intermediary bank or beneficiary's bank based solely on the bank identifying number, even if the payment order indicates a different bank name.

**Sending Payment Orders.** We may select any intermediary bank, funds transfer system or means of transmittal to send your payment orders. Our selection may differ from that indicated in your instructions.

**Notice of Rejection.** We may reject payment orders. We notify you of any rejection orally, electronically or in writing. If we send written notices by mail, we do so by the end of the next business day.

We are not liable to you for the rejection or obligated to pay you interest for the period before you receive timely notice of rejection.

**Errors or Questions About Your Payment Orders.** We notify you about certain funds transfers by listing them on your account statement. In some cases, we also may notify you about electronic

43

44

cally, in writing or by a report produced through use of our information reporting services.

You must notify us, and give us a copy if you think a funds transfer shown on your statement or notice is incorrect. You must send us a written notice, including a statement of relevant facts, no later than 14 days after the date you receive the first notice or statement on which the problem or error appears.

If you fail to notify us within this 14-day period, we are not liable for any loss of interest because of an unauthorized or erroneous debit or because your statement or notice is incorrect. We are not required to compensate you, and we use such methods to correct or adjust your account for any loss of interest or interest equivalent.

**Calculations** Unless otherwise prohibited by law, if we are obligated to pay for loss of interest that results from our error or delay regarding your payment order, we calculate compensation as follows. We reflect the applicable value date or otherwise adjust the account under our account analysis procedure, to recalculate late earnings credits for the period involved. With a non-earnings, non-interest bearing account, we use a rate equal to the average of the Federal Funds rates set by the Federal Reserve Bank of New York, less a reserve factor. With a non-earnings, interest-bearing account, we use the rate applicable to the account. If we have a separate agreement with you specifying a different calculation method, we use that method instead.

## Receiving Funds Transfers

We may receive instructions to pay funds to your account. We may receive funds transfers directly from the sender, through a funds transfer system or through some other communications system. This includes wire transfers, ACH transfers that may be sent through an ACH system or processed directly to an account with us, and transfers between Bank of America accounts.

**ACH Provisional Payment Rule** Under ACH rules, funds transfers sent through an ACH are provisional and may be revoked prior to final settlement. You agree to these rules. If the funds transfer is revoked before final settlement, we may charge your account for the amount credited. The person who sent the payment order is considered not to have paid you. If this happens, we do not send a separate notice; we report the information on your account statement.

**Notice of Funds Transfer** We notify you that we have received funds transfers by listing them on your account statement. We provide statements to you by mail or through Online Banking. If you selected paperless delivery through Online Banking for your deposit account documents. If you use one of our information reporting services, you may receive notice through that service.

We are not obligated to send you a separate notice of each incoming funds transfer. While we generally do not provide such separate notices, we may do so, on occasion, in which case we send the notice within two business days after we credit your account.

We are not obligated to pay you interest for the period before you receive notice.

If you are expecting a funds transfer and want to find out if it has been credited to your account, call us at the number for customer service on your statement.

**Posting Your Customers' Payments** We credit to your account electronic payments (such as bill payments) that we receive from your customers. If you do not apply a payment to an account of your customer, you must promptly return the payment to us.

## ACH Debits and Credits

From time to time, originators that you authorize may send automated clearing house (ACH) credits or debits for your account. For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect. You agree that we may rely on the representations and warranties contained in these operating rules and either credit or debit your account, as indicated by the originator of the ACH transaction.

You should be careful about giving someone your account number to help prevent unauthorized transactions on your account. You must notify us immediately of unauthorized activity.

For information about stopping payment of an ACH transaction, see Stop Payment Orders and Postdating Orders in the Other Terms and Services section.

## Tax Information

In most instances we are required to report annually to you and to the Internal Revenue Service (IRS) interest payments that total $10 or more during the year on your deposit account with us. We may also be required to report this information to the appropriate state revenue authority.

When you open an account, we are required to obtain — and each U.S. citizen or resident alien must give us — a certified U.S. Taxpayer Identification Number (TIN) and information regarding backup withholding status. When you apply for an account, you certify that you have provided the correct TIN for the account holder and the correct backup withholding status.

For individual accounts, the TIN is your Social Security Number (SSN). For individual accounts with more than one owner, we report taxpayer information for the person listed first in our records. Resident aliens who do not qualify for Social Security should provide their Individual Taxpayer Identification Number (ITIN). For other accounts, the TIN is the owner's Employer Identification Number (EIN). If you do not give us a certified name and TIN, if the IRS notifies us that the name and TIN you give us is incorrect, or if the IRS notifies us that you failed to report all your interest and dividends on your tax return, we are required to backup withhold at the current backup withholding rate on interest paid to your account and pay it to the IRS. In some cases, a state and local tax authority may also require that we pay state and local backup withholding on interest paid to your account when we are required to pay backup withholding to the IRS. Backup withholding is not an additional tax. You may claim amounts withheld and paid to the IRS as a credit on your federal income tax return.

If you are a nonresident alien individual or entity, you are generally exempt from information reporting and backup withholding, with some exceptions (including Canadian residents and interest income effectively connected with the conduct of a trade or business in the United States). As an exempt foreign person or entity, you must provide the address of your permanent foreign residence or the entity's principal foreign office on the Form W8 that you give to us. For accounts with multiple owners, all owners must certify their status as foreign persons.

You must renew your status as an exempt foreign person or entity prior to the end of the third calendar year following the year in which you last certified your status. If you fail to renew your status by the last day of the fourth calendar year, your interest payments are subject to backup withholding. Some limited exemptions from this renewal process exist. If you become a U.S. citizen or resident after opening your account, you must notify us within 30 days and provide us with your certified name and TIN.

We comply with Foreign Account Tax Compliance Act (FATCA) as mandated by U.S. federal tax law. We will withhold on certain payments when required by such law.

For more information or to determine how this information applies to you, consult your U.S. tax advisor.

## Resolving Claims

If you and we are not able to resolve a claim ourselves, then you and we agree that the claim will be resolved as provided in this Resolving Claims section. This is a dispute resolution provision. Please read it carefully.

### What does "Claim" Mean?

Claim means any claim, dispute or controversy (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) by either you or us against the other, or against the employees or agents of the other, arising from or relating in any way to this deposit agreement (including any renewals, extensions or modifications) or the deposit relationship between us.

Claim does not include provisional or ancillary remedies from a court of competent jurisdiction, which either you or we may exercise without waiving the right to arbitration or reference.

### How Claims on Personal Accounts will be Resolved

You and we both agree that all Claims relating to a personal account will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a personal account is brought in a California state court, either you or we can elect to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below.

**JURY TRIAL WAIVER FOR PERSONAL ACCOUNTS FOR PERSONAL ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY. THIS IS A JURY TRIAL WAIVER.**

### How Claims on Business Accounts will be Resolved

You have the right to compel us at your option, and we have the right to compel you at our option, to resolve a Claim relating to a business account by binding arbitration. If neither you nor we decide to compel arbitration, then the Claim will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a business account is brought in a California state court, either you or we can elect to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below. The arbitration, judicial reference or trial by a judge will take place on an individual basis without resort to any form of class or representative action.

## CLASS ACTION AND JURY TRIAL WAIVER FOR BUSINESS ACCOUNTS

**FOR BUSINESS ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND: (1) THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY, AND (2) THAT THIS SECTION PRECLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS. THIS IS A CLASS ACTION WAIVER AND JURY TRIAL WAIVER.**

### Judicial Reference

A case sent to judicial reference is heard by a neutral individual (a "judicial referee"), but remains in the court system subject to the same rules of procedure, discovery and evidence and appeal as any court case. The judicial referee will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on a judicial referee, then the judicial referee will be appointed according to the procedure for appointment of a referee under California C.C.P. Section 640.

The judicial referee, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement.

Judicial reference will be governed by California C.C.P. Section 638 et seq. and the judicial referee will determine all issues in accordance with federal and California law and the California rules of evidence. The referee is empowered to provide all temporary or provisional remedies and to rule on any motion that would be authorized in pretrial or trial proceedings in court, including motions for summary judgment, or summary adjudication. The award that results from the decision of the referee will be entered as a judgment in the court that appointed this referee, in accordance with the provisions of California C.C.P. Sections 644(a) and 645. You and we both reserve the right to seek appellate review of any judgment or order to the same extent permitted in a court of law.

### Arbitration

This section on arbitration applies to business accounts and is subject to the provisions of the *Limitation and Non-Severability* section below.

Arbitration is a method of resolving disputes in front of one or more neutral individuals, instead of having a trial in court in front of a judge and/or jury. The arbitrator will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on an arbitrator, then you agree to choose one of the following Administrators within 10 days of our written notice that an agreement cannot be reached:

- JAMS Resolution Center
  1920 Main St., Suite 300
  Irvine, CA 92614
  www.jamsadr.com (800) 352-5267

- American Arbitration Association ("AAA")
  1633 Broadway, 10th Floor
  New York, NY 10019
  www.adr.org (212) 716-5800

If you do not choose the Administrator on a timely basis, we will select the Administrator and the Administrator will select the arbitrator using the Administrator's rules. If an Administrator cannot hear or refuses to hear the arbitration, then the arbitration will be handled by the alternative Administrator.

The arbitrator, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement, except that the arbitrator may not decide or resolve any Claim challenging the validity of the class action and jury trial waiver. The validity of the class action and jury trial waiver will be decided only by a judicial referee or a court.

After a decision is given by an arbitrator, and where the amount of the Claim exceeds $200,000, either you or we can appeal the arbitrator's decision to another arbitrator. If the amount of the Claim exceeds $1,000,000, either you or we can appeal the arbitrator's decision to a panel of three arbitrators. No decision may be appealed under this paragraph, unless the arbitrator that heard the matter first makes a finding that the Claim could reasonably have exceeded either $200,000 or $1,000,000. Any arbitrator who hears an appeal under this paragraph will be selected according to the rules of the Administrator.

The arbitration of any matter involves interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). The arbitrator will follow applicable substantive law to the extent consistent with the FAA. The arbitrator will give effect to the applicable statutes of limitation, and will dismiss barred claims. Arbitrations will be governed by the rules of the Administrator to the extent those rules do not conflict with this *Resolving Claims* section. In addition, you or we may submit a written request to the arbitrator to expand the scope of discovery normally allowable. At the timely request of either you or us, the arbitrator must provide a brief written explanation of the basis for the award.

Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA or under this Agreement.

### Limitation and Non-Severability

**For both personal and business accounts.** Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the validity and effect of the class action and jury trial waiver for business accounts and the jury trial waiver for personal accounts may be determined only by a court or judicial referee and not by an arbitrator. You and we both have the right to appeal the limitation or invalidation of the waiver.

**For business accounts.** Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the class action and jury trial waiver is material and essential to the arbitration of any disputes between you and us and is non-severable from the agreement to arbitrate Claims. If the class action and jury trial waiver is limited, voided or found unenforceable, then the agreement to arbitrate (except for this sentence) will be null and void with respect to such proceeding and this *Resolving Claims* section will be read as if the provisions regarding arbitration were not present. You and we both have the right to appeal the limitation or invalidation of the class action and jury trial waiver. You and we acknowledge and agree that under no circumstances will a class action be arbitrated.

### Rules of Interpretation

Except as provided in the *Limitation and Non-Severability* section above, if any portion of this *Resolving Claims* section is determined to be invalid or unenforceable, it will not invalidate the remaining portions of this section. If there is a conflict or inconsistency between this *Resolving Claims* section and other terms of this deposit agreement or the applicable rules of the Administrator, this *Resolving Claims* section will govern. If there is any conflict between this *Resolving Claims* section and any other dispute provision (whether it be for arbitration, reference or any other form of dispute resolution), this *Resolving Claims* section will prevail for Claims arising out of this deposit agreement or transactions contemplated by this deposit agreement.

### Jurisdiction and Venue

Any action or proceeding regarding your account or this deposit agreement must be brought in the state in which the banking center that maintains your account is located. You submit to the personal jurisdiction of that state. Note that any action or proceeding will be governed by and interpreted in accordance with the *Governing Law* section of this agreement.

If a Claim is submitted to arbitration and the state where that banking center is located is not reasonably convenient for you, then you and we will attempt to agree on another location. If you and we are unable to agree on another location, then the location will be determined by the Administrator or arbitrator.

*This panel intentionally left blank.*                    *This panel intentionally left blank.*

49

# EXHIBIT 2

Return To:
FIRST NATIONAL BANK OF ARIZONA
P. O. BOX 56604
PHOENIX, AZ 85082

Prepared By:
LEON RIDDICK
1760 OLD MEADOW RD. 3RD FLR
MCLEAN, VA 22102

Record & Return To:
Independence Abstract & Title Agency
1040 Kings Highway North
Suite 700
Cherry Hill, NJ 08034
(856) 779-0099

2005-38398

000042237          04/21/2005 11:01A
RECEIVED           BARBARA A. DONNELLY
AND                HUDSON COUNTY
RECORDED           REGISTER OF DEEDS
MTG                Receipt No. 248843

[Space Above This Line For Recording Data]

# MORTGAGE

MIN 1001355-4000021188-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    MARCH 11, 2005
together with all Riders to this document.

(B) "Borrower" is VIOLA MOORE.

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS

4000021188                          3274025440

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3031 1/01

-6A(NJ) (0005)
Page 1 of 15          VMP MORTGAGE FORMS - (800)521-7291          Initials VM

810  091707007  D2  001  002

(D) "Lender" is FIRST NATIONAL BANK OF ARIZONA

Lender is a CORPORATION
organized and existing under the laws of          UNITED STATES OF AMERICA
Lender's address is 1750 OLD MEADOW ROAD, 3RD FLR, MCLEAN, VA 22102

(E) "Note" means the promissory note signed by Borrower and dated          MARCH 11, 2005
The Note states that Borrower owes Lender THREE HUNDRED FIFTY THOUSAND AND NO/100
                                                                                   Dollars
(U.S. $350,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than          APRIL 1, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider      [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider             [ ] Planned Unit Development Rider  [X] 1-4 Family Rider
[ ] VA Rider                  [ ] Biweekly Payment Rider       [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

4000021188                        3274025440                  VM

-6A(NJ) (0005)                    Page 2 of 15                 Form 3031 1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                                    of                      HUDSON
[Type of Recording Jurisdiction]                         [Name of Recording Jurisdiction]
SEE ATTACHED LEGAL DESCRIPTION

Property Account Number: 090100209 00014                    which currently has the address of
77 EAST 21ST STREET                                                             [Street]
BAYONNE                                    [City], New Jersey     07002   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

4000021188                           3274025440

-6A(NJ) (0035)                          Page 5 of 15                      Form 3031 1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash, (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

1000023188                              3274025440                  Initials  _VM_

Co.  -6A(NJ) (0205)                     Page 4 of 15                 Form 3031 1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

4000021188                    3274025440

LOAN -6A (NJ) (0805)          Page 6 of 15          Form 3031 1/1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

4000021180                           3374025440

-6A(NJ) (0808)                Page 6 of 15                Form 3031 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days in a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

4008021188                    1271025440

-6A(NJ)                    Page 7 of 17                    Form 3031 1/01

*Independence Abstract & Title Agency*

6712 Washington Ave. Suite 201
Egg Harbor Twp., NJ 08234
Telephone: 609-645-8881 Fax: 609-645-7765
www.independenceabstract.com

Agents for
## *Fidelity National Title Insurance Company*

# SCHEDULE C
# LEGAL DESCRIPTION

**File Number:**   2005-38398IMR

ALL that certain lot, parcel or tract of land, situate and lying in the City of Bayonne, County of Hudson, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point in the northerly line of East 21st Street, distant 126.00 feet easterly from the intersection formed by the easterly line of Prospect Avenue with the northerly line of East 21st Street and running thence:

(1) N-42 degrees 20'East and parallel to Prospect Avenue a distance of 100.00 feet to a point, thence

(2) S-47 degrees 12'East and parallel to East 21st Street a distance of 24.77 feet to a point, thence

(3) S-42 degrees 20'West and parallel to Prospect Avenue a distance of 100.00 feet to a point in the northerly line of East 21st Street, thence

(4) N-47 degrees 12'West and along the northerly line of East 21st Street a distance of 24.77 feet to a point, said point being the point or place of beginning.

FOR INFORMATIONAL PURPOSES ONLY:  Commonly known as: 77 East 21st Street, Bayonne, NJ 07002.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 28 in Block 456 on the City of Bayonne Tax Map.

BB

BK=12754    PG=00042

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

4000021188                              3274025440                              _____ VM

SAINA (0001)                                                                    Form 3031 1/01

(h) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

4000021188                               3274025440

6A(NJ) (0005)                    Page 9 of 16                    Form 3031 1/01

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

4000021188                     3274025440                     Initials: [signature]

[illegible logo]                     Page 12 of 16                     Form 3033 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

4000021188                          3274075440

-6A(NJ)        Form 3031 1/01

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21. (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

4000021188                     3274025440              Initials: VM

-6A(NJ) (0005)                  Page 12 of 16                       Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

4000023108

-6A(NJ) (conr)

3270025440

Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____
Salvatore Carollo

_____(Seal)
VIOLA MOORE                    -Borrower

_____

_____(Seal)
                              -Borrower

_____(Seal)
               -Borrower

_____(Seal)
                              -Borrower

_____(Seal)
               -Borrower

_____(Seal)
                              -Borrower

_____(Seal)
               -Borrower

_____(Seal)
                              -Borrower

4000021188                    3274025440

SIMD -6A(NJ) (0005)           Page 14 of 15              Form 3031 1/01

STATE OF NEW JERSEY,                                    Hudson   County ss:

On this        11      day of   March 2005                    , before me, the subscriber,
personally appeared   VIOLA MOORE

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____
Notary Public

SALVATORE CAROLLO, ESQUIRE
ATTORNEY AT LAW
STATE OF NEW JERSEY

4000021188                    3274025440              Initials _____         Form 2031 1/01

-6A(NJ) (9905)               Page 15 of 15

BK=12754   PG=00050

# ADJUSTABLE RATE RIDER

## (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this  11th  day of 03/2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrowers Adjustable Rate Note (the "Note") to ("Lender") of the same date and covering the property described in the Security Instrument and located at:

### 77 EAST 21ST STREET, BAYONNE, NJ 07002

[Property Address]

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

**2.      INTEREST**

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   2.1250   %. The interest rate will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B)  Interest Rate Change Dates**

The interest rate I will pay may change on the 1st   day of   07/2005   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)  Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal

PayOption MTA ARM Rider
FE-5315 (0412)                          Page 1 of 5                                    10/04

4000021188

BK=12754  PG=00051

Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)   Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three and 9/20 percentage point(s) 3.4500 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.95 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.      PAYMENTS**

**(A)   Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on May 2005 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768 PHOENIX, AZ 85082-2768

or at a different place if required by the Note Holder.

**(B)   Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,315.66 unless adjusted under Section 3 (F).

**(C)   Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of 05/2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

PayOption MTA ARM Rider
FE-5315 (0412)                              Page 2 of 5                                      10/04

4000021188

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to  115.00  Percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current

**(G)  Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

PayOption MTA ARM Rider                          Page 3 of 5                                              10/04
FE-5315 (0412)

4000021188

(i)  **Interest Only Payment:**  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  **15 Year Amortized Payment:**  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if:

(a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider                      Page 4 of 5                                      10/04
FE-5315 (0412)

4000021188

BK=12754   PG=00054

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable

_____   (Seal)
VIOLA MOORE

_____   (Seal)

_____   (Seal)

_____   (Seal)

4000021188

PayOption MTA ARM Rider                 Page 5 of 5                          10/04
FE-5315 (0412)

BK=12754    PG=00055

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this    11TH    day of    MARCH, 2005
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to
FIRST NATIONAL BANK OF ARIZONA

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:

77 EAST 21ST STREET, BAYONNE, NJ 07002
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

4000021188                     3274025440

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials: 
Page 1 of 4
Form 3170 1/01
57R (0008)      VMP06S0      VMP MORTGAGE FORMS - (800)521-7291

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

4000021188                          3274025440

Initials: ___

(0006)-57R (0008)                   Page 2 of 4                    Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

4000021188                    3274025440

@~57R (0008)                  Page 3 of 4          Initials: _____   Form 3170 1/01

# WONG·FLEMING

ATTORNEYS AT LAW

DANIEL C. FLEMING
Member of  NY, NJ, PA, MD, OH, CA and DC Bars

dfleming@wongfleming.com

July 30, 2018

**VIA E-COURTS**
Honorable Francis B. Schultz
W.J. Brennan Courthouse
583 Newark Avenue, 4th Floor
Jersey City, New Jersey 07306

>    Re:    **Viola Moore v. Bank of America, N.A., et al.**
>           **Docket No. HUD-L-000531-18**

Dear Judge Schultz:

Please accept this letter brief in lieu of a more formal brief, in support of this Motion to

Dismiss filed by Defendant Bank of America, N.A., pursuant to R. 4:6-2(e).

### A.        SUMMARY OF ALLEGATIONS

Plaintiff, Viola Moore, is the owner of the property located at 77 East 21st Street,

Bayonne, NJ, 07002 which consisted of land and a building ("the property").  Compl. at Ex. B, ¶

2.  She used the property to obtain a mortgage loan from BANA.  Compl. ¶ 14, 48.  Plaintiff

maintained an insurance policy for the property.  Compl. Ex. B.  On July 11, 2015, the building

on Plaintiff's property was destroyed by a fire.  Compl. ¶ 48.  As a result, Plaintiff's insurer paid

out $295,000.00 to BANA, who held the funds in escrow.  Compl. ¶ 15; Compl. at Ex. B, ¶ 7.

On or around July 14, 2015, Plaintiff sought out the services of co-defendant Universal Sales

821 ALEXANDER ROAD, SUITE 200 ◆ P.O. BOX 3663 ◆ PRINCETON, NJ 08543-3663
TEL: (609) 951-9520 ◆ FAX: (609) 951-0270
**WWW.WONGFLEMING.COM**

CALIFORNIA  ◆  FLORIDA  ◆  GEORGIA  ◆  ILLINOIS  ◆  INDIANA  ◆  MICHIGAN
NEW JERSEY  ◆  NEW YORK  ◆  PENNSYLVANIA  ◆  TENNESSEE ◆ TEXAS ◆  WASHINGTON
ATTORNEYS ADMITTED SOLELY IN THE JURISDICTION WHERE LISTED OFFICE IS LOCATED, UNLESS OTHERWISE NOTED



Consultants, Inc. ("USI")[1] to reconstruct the burned-down building.  Compl. at Ex. B, ¶ 11.

Plaintiff entrusted USI to communicate and deal with BANA on her behalf.  Compl. at Ex. B, ¶¶

17, 21, 25.  BANA issued two checks for the insurance proceeds, one for $152,000.00 and the

other for $25,000.00.  Compl. ¶¶ 6-7; Compl. at Ex. A.  Each check was made payable to both

USI and Plaintiff.  Compl. ¶ 7; Compl. at Ex. A.  Although Plaintiff hired USI to reconstruct the

building, she claims that USI was not authorized to receive the insurance proceeds.  Compl. ¶ 25.

USI allegedly forged Plaintiff's endorsement on the back of both checks.  Compl. ¶¶ 8, 20, 96.

Co-defendant Chase Bank, N.A. ("Chase") paid USI for the checks upon their deposit.  Compl.

¶¶ 20-23, 29.  USI stole the insurance proceeds and failed to reconstruct the building.  Compl. ¶

80.

　　　　Plaintiff raises claims against BANA under UCC Sections 3-404 (Count I), 3-406 (Count

II), 3-420 (Count IV), 4-401 (Count V), and for breach of contract (Count VI), common law

fraud (Count VII), common law breach of fiduciary duties (Count VIII), common law bad faith

and fair dealings (Count IX), common law negligent misrepresentation (Count X), and common

law civil conspiracy (Count XI).  The Complaint should be dismissed with prejudice as to BANA

because it fails to state a cause of action.

**B.  STANDARD OF REVIEW**

　　　　Dismissal of a Complaint is proper under R. 4:6-2(e) when the allegations fail to state a

claim upon which relief can be granted.  Under New Jersey law, "the test for determining the

adequacy of the pleading is whether a cause of action is suggested by the facts."  *Banco Popular*

*N. Am. v. Gandi*, 184 N.J. 161, 166 (2005) (quoting *Glass, Molders, Pottery, Plastics & Allied*

---

[1] The Complaint refers to USI and its affiliates as "John Doe."  This Motion, however, will refer
to all of the parties grouped together under the name "John Doe" as USI.



*Workers Int'l Union v. Wickes Cos.*, 243 N.J. Super 44, 46 (Law. Div. 1990)).  When, as here, the complaint "states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy."  *Id*. (citations omitted).  Further, "[c]omplaints cannot survive a motion to dismiss where the claims are conclusory or vague and unsupported by particular overt acts." *Delbridge v. Office of Public Defender*, 238 N.J. Super. 288, 314 (App Div. 1989).

### C. ARGUMENT

#### a.  Plaintiff's UCC causes of action against BANA fail as a matter of law.

Plaintiff raises four counts under the Uniform Commercial Code ("UCC") against BANA, none of which state a claim for relief.

#### i.  UCC Terms Defined

Article 3 of the UCC governs "negotiable instruments," which term is defined as "an unconditional promise or order to pay a fixed amount of money" that meets certain other conditions.  N.J.S.A. § 12A:3-104(a). A negotiable instrument is a "draft" if it is an order to pay money.  N.J.S.A. § 12A:3-104(e).  A "check" is a draft that is "payable on demand and drawn on a bank."  N.J.S.A. § 12A:3-104(f).  In this case, the checks are negotiable instruments because they are drawn on BANA, a bank, and are unconditional orders for BANA to pay money to Plaintiff and USI.  Compl. at Ex. A.

#### ii.  Count I fails to state a cause of action under UCC 3-404 against BANA.

Count I alleges a claim under UCC 3-404, titled "Imposters; fictitious payees."  N.J.S.A. § 12A:3-404.  Pursuant to that section, Plaintiff claims that BANA "failed to exercise ordinary care and substantially contributed to loss resulting from the payment of the instrument."  Compl. ¶¶ 1, 2.



The allegations of the Complaint do not support an imposter or fictitious payee claim. UCC 3-404 applies in two scenarios.  First, the section applies where "an imposter . . . induces the issuer of an instrument to issue the instrument to the imposter . . . by impersonating the payee or a person authorized to act for the payee . . . ."  N.J.S.A. § 12A:3-404(a).  Second, the section applies where "a person whose intent determines to whom an instrument is payable (subsection a. or b. of 12A:3-110) does not intend the person identified as payee to have any interest in the instrument, or the person identified as payee of an instrument is a fictitious person . . . ." N.J.S.A § 12A:3-404(b).  Under section 12A:3-110, a "person whose intent determines to whom an instrument is payable" is the issuer of an instrument.  §12A:3-110(a), (b).  With respect to an instrument to which subsection (a) or (b) of UCC 3-404 applies:

> if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

N.J.S.A. § 12A:3-404(d).  As the Complaint does not allege facts falling under any of the circumstances set out in subsection (a) or (b), UCC 3-404 does not apply.  As to subsection (a), the Complaint alleges that USI and Plaintiff were the payees of the check rather than persons impersonating the payees of the check.  N.J.S.A. § 12A:3-404(a); Compl. ¶ 7.  As to subsection (b), the Complaint does not allege facts that BANA, the issuer of the checks, did not intend that USI or Plaintiff have any interest in the checks.  Additionally, there is no indication in the Complaint that either USI or Plaintiff were nonexistent "fictitious persons."  As neither subsection (a) or (b) applies to the allegations, Plaintiff is not entitled to rely on BANA's alleged failure to exercise ordinary care pursuant to subsection (d).



### iii. Count II fails to state a cause of action under UCC 3-406 against BANA.

Count II alleges a claim under UCC 3-406, titled "Negligence contributing to forged signature or alteration of instrument." According to that section:

> A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

N.J.S.A. § 12A:3-406(a). "If the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion . . . ." N.J.S.A. 12A:3-406(b). Accordingly, UCC 3-406 establishes a defense that a bank can assert against its customer when the negligence of its customer contributed to a forged signature on an instrument. *Life Ins. Co. v. Snyder*, 141 N.J. Super. 539, 544 (1976). UCC 3-406, however, does not establish an affirmative cause of action that the customer can raise. *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 655 (2004) ("We conclude that the trial court did not err in its holding that Code § 8.3A-406 does not create an affirmative cause of action and in awarding summary judgment to Wachovia with respect to that claim."); *Wachovia Bank, N.A. v. FRB*, 338 F.3d 318, 325 (4th Cir. 2003) ("We briefly address the FRB's third-party complaint against WalMart based upon U.C.C. § 3-406 . . . We note that this statute provides for a defense but does not expressly create a cause of action."). The UCC commentary to section 3-406 supports that the section does not create a cause of action, as it states that "[s]ection 3-406 does not make the negligent party liable in tort for damages resulting from the alteration." UCC Commentary Comment 1.



Because UCC 3-406 does not create an affirmative cause of action, this Court should dismiss Count II as to BANA with prejudice.

### iv.   Count IV fails to state a cause of action under UCC 3-420 against BANA.

Count IV alleges that BANA is liable under UCC 3-420 for converting the checks made payable to Plaintiff and USI.  Compl. ¶¶ 32-34.  That section provides:

> The law applicable to conversion of personal property applies to instruments.  An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment . . . .

§ 12A:3-420(a).  Plaintiff's conversion claim against BANA is based on the allegation that BANA "prepared a check and made it payable to [Plaintiff] and [USI]" and that BANA "did not have authorization from [Plaintiff] to create this instrument or us (sic) funds from the insurance proceeds as backing."  Compl. ¶¶ 31-32.  Thus, while Plaintiff brings this claim under UCC 3-420 pertaining to the conversion of *instruments*, Plaintiff's claim alleges a conversion of the funds—the insurance proceeds.  As UCC 3-420 only applies to the conversion of instruments, Count IV must be dismissed with prejudice as to BANA.

### v.   Count V fails to state a cause of action under UCC 4-401.

The Complaint alleges that the checks made payable to Plaintiff and USI were not properly payable under UCC 4-401.  Compl. ¶ 42.  Pursuant to that section:

> A bank may charge against <u>the account of a customer an item that is properly payable from that account</u> even though the charge creates an overdraft.  An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.



N.J.S.A. § 12A:4-401(a).  Plaintiff does not have standing to sue under UCC 4-401 because the Complaint does not indicate that Plaintiff was the owner of the account which was charged for the two checks.  *See McAuley v. Southington Sav. Bank*, 2000 Con. Super. LEXIS 3527, at *18 (Conn. Super. 2000) (holding that the plaintiff did not have standing to sue under UCC 4-401 because she was not the owner of the trust account that received the allegedly fraudulent charge). According to the Complaint, <u>BANA</u> held the insurance proceeds in an account owned by <u>BANA</u>. Compl. ¶ 78 ("Bank of America held said proceeds in trust within an account of their institution solely controlled by BOA"); Coml. at Ex. A.  Further, the Complaint asserts that BANA, rather than Plaintiff, was the drawer of the checks.  Compl ¶¶ 18-19.  Because Plaintiff was not the owner of the account which held the insurance proceeds, she does not have standing to sue under UCC 4-401 and Count V should be dismissed with prejudice.

> **b. Counts VI – XI fails as a matter of law because the UCC preempts Plaintiff's common law causes of action.**

Each of Plaintiff's common law claims are based, at least in part, on allegations that BANA improperly drew checks on the account holding the insurance proceeds.  *See* Count VI, ¶ 53 ("Defendant Bank of America never received written authorization from Plaintiff . . . to make a negotiable instrument at the sole request of [USI]"); Count VII, ¶ 56 ("Defendant Bank of America, was aware that [Plaintiff] gave no authorization for the making of checks numbered: 0001402188 and 0001433947 . . . ."); Count VIII, ¶ 78 ("Defendant subsequently, and without authorization breached fiduciary duties by paying out funds held in trust to an unauthorized third party."); Count IX, ¶ 95 (Bank of America infringed on [Plaintiff's] right to receive the fruits of good faith and fair dealing by . . . approving release of funds without prior authorization by [Plaintiff]."); Count X, ¶ 103 ("Defendant, Bank of America, falsely communicated to [Plaintiff]



that she gave BOA permission to release ongoing funds to [USI] . . . ."); Count XI, ¶ 113

("Defendants worked together to defraud [Plaintiff] from funds earmarked for the reconstruction

of her building.").

By raising common law claims the basis of which are BANA's alleged improper issuance

of the checks, Plaintiff is attempting to circumvent the UCC's "comprehensive framework for

allocating and apportioning the risks of handling checks." *City Check Cashing v. Mfrs. Hanover

Trust Co.*, 166 N.J. 49, 57 (2001). In *City Check Cashing*, the New Jersey Supreme Court

addressed whether the UCC was the sole remedy for resolving Plaintiff's claims regarding the

improper handling of a check. *Id*. The Court held in clear terms:

> In short, in the check collection arena, unless the facts establish a special
> relationship between the parties created by agreement, undertaking or contact, that
> give rise to a duty, <u>the sole remedies available are those provided in the Code</u>.

*Id*. at 62. As the Complaint lacks allegations evidencing that BANA and Plaintiff had a special

relationship which could give rise to a duty on the part of BANA outside of what is codified in

the UCC, Plaintiff's common law claims should be dismissed with prejudice.

### c.  Count VI fails to state a cause of action for breach of contract.

Count VI references two agreements between BANA and Plaintiff—the account opening

agreement for Plaintiff's deposit account and the mortgage. Compl. ¶¶ 47-48. The Complaint

appears to allege that BANA breached those agreements, without identifying which conduct

breached which agreement, in the following ways: (1) "Bank of America, on numerous

occasions denied [Plaintiff] an accounting for funds held in escrow, breaching its fiduciary duties

to its customers," (2) "Bank of America further breached by paying out on account funds held in

escrow, not properly payable," (3) "[Plaintiff], never requested nor authorized Bank of America

to release funds payable to Viola Moore & Universal Sales Consultants, INC," (4) "Defendant



Bank of America never received written authorization from Plaintiff to discuss details regarding the funds held in escrow, furthermore to make a negotiable instrument at the sole request of [USI]." Compl ¶¶ 49-53.

BANA's above alleged acts did not constitute a breach of the Deposit Agreement referenced in paragraph 47 of the Complaint and attached to the Fleming Certification as Exhibit 1.[2] Each of the above breach allegations pertains to BANA's own account which held the insurance proceeds. *See* Compl. ¶ 78 ("Bank of America held said proceeds in trust within an account of their institution solely controlled by BOA."). The first allegation is that BANA failed to provide Plaintiff with an accounting for the <u>BANA account</u>, the second allegation is that BANA improperly paid funds from the <u>BANA account</u>, the third allegation is BANA improperly released funds from the <u>BANA account</u>, and the fourth allegation is that Plaintiff never authorized BANA to discuss the funds held in the <u>BANA account</u> or draw checks on the account. Notably, none of the allegations concern Plaintiff's deposit account, which is the sole subject matter the Deposit Agreement governs:

> The deposit agreement and disclosures, the applicable schedule of fees, the signature card and other account opening documents **for your account** are part of the binding contract between you and us (this "Agreement") **for your deposit account and your deposit relationship with us**.[3]

Because the breach allegations do not pertain to Plaintiff's deposit account, the breach of contract claim based on the Deposit Agreement should be dismissed with prejudice.

Neither did BANA's alleged acts breach the mortgage, a copy of which is attached to the Fleming Certification as Exhibit 2. Plaintiff appears to allege that BANA violated the mortgage

---

[2] In reviewing a <u>Rule</u> 4:6-2(e) motion, the court may consider documents that underlie a claim without converting the motion to one for summary judgment. *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 183 (2005).
[3] Deposit Agreement, Fleming Certification Exhibit 1, pg. 1. (emphasis added).



by releasing the insurance proceeds to USI and Plaintiff. Compl. ¶ 51. Plaintiff claims that "[Plaintiff], never request nor authorized Bank of America to release funds made payable to Viola Moore & Universal Sales Consultants, INC." *Id*. Nothing in the mortgage required BANA to obtain Plaintiff's authorization before releasing the insurance proceeds. To the contrary, the mortgage provides that "All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender."[4] The mortgage includes within the definition of "miscellaneous proceeds" any "proceeds paid by any third party . . . for . . . damage to, or destruction of, the Property."[5] As the mortgage provides that insurance proceeds such as those alleged to have been paid to BANA in the Complaint are to be assigned to the Lender, and because there is no language in the mortgage requiring the Borrower's authorization before disbursing said proceeds, Plaintiff's breach of contract claim based on the mortgage fails.

Count VI should also dismissed because the Plaintiff fails to allege facts supporting the elements of a breach of contract cause of action. *Marinelli v. Mitts & Merrill*, 303 N.J. Super. 61, 80 (1997). The establish a breach of contract, the plaintiff must show: (1) the parties entered into a contract, containing certain terms; (2) plaintiff performed what was required under the contract, (3) defendant did not fulfill its obligation under the contract, and (4) defendant's breach caused a loss to plaintiffs. *Pollack v. Quick Quality Rests., Inc.*, 452 N.J. Super. 174, 188 (App. Div. 2017). As Plaintiff fails to allege the terms of the contracts that BANA allegedly breached and that Plaintiff performed her obligations under the contracts, Count VI must be dismissed for this reason as well.

---

[4] Mortgage, Fleming Certification Exhibit 2, pg. 9.
[5] Mortgage, Fleming Certification Exhibit 2, pg. 2.



### d. Counts VII and VIII fail to state a cause of action for common law fraud and breach of fiduciary duty, respectively.

Count VII asserts a claim against BANA for common-law fraud.  To state a cause of action for common-law fraud, the Plaintiff must establish:  (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity, (3) an intention that the other person rely on it, (4) the reasonable reliance thereon by the other person, and (5) resulting damages.  *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015).  Count VII fails to allege any of these elements.  Particularly, Plaintiff does not allege that BANA made a misrepresentation of present of past fact.  The Complaint alleges that "Defendant Bank of America intentionally reframed from communications with [Plaintiff] that would have uncovered their liability for turning over unauthorized checks" (¶ 57), that "BANA directed [Plaintiff] to file a fraud claim," (¶ 58), that BANA's "fraud department would close [Plaintiff's] file stating various reasons and instruct her to re-file a fraud claim" (¶ 59), and that BANA "ceased communications with [Plaintiff] on inquiries into her being refunded for the stolen monies" (¶ 61).  None of these actions constitute a misrepresentation made by BANA.  BANA's refusal to communicate with Plaintiff and decision to deny her fraud claim is not a misrepresentation of a presently existing or past fact.  Because Plaintiff does not allege a misrepresentation, she necessarily cannot satisfy the remaining elements and Count VII should be dismissed with prejudice as to BANA.

Count VII also raises against BANA a claim for "Fraudulent Concealment by a Fiduciary."  Compl. ¶¶ 64-68.  Plaintiff's claim is based on the allegation that BANA "was silent to the fact of the marking and distribution of the instrument at the request of [USI]."  Compl. ¶ 67.  Plaintiff's claim fails because BANA was not a fiduciary of Plaintiff.  Absent a special



relationship between a bank and its customer, no fiduciary relationship exists. *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 552 (App. Div. 1997)("The virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty."); Twp. *of West Deptford v. Fulton Bank N.A.*, 2013 N.J. Super. Unpub. LEXIS 3022, at *14 (App. Div. 2013); *Margulies v. Chase Manhattan Mortg. Corp.*, 2005 N.J. Super. Unpub. LEXIS 883, at *10 (App. Div. 2005); *Donleavy v. Casey*, 2006 N.J. Super. Unpub. LEXIS 1397, at *5 (App. Div. 2006):

> The relationship between plaintiff and the bank, was that of debtor and creditor, and they thus dealt with each (sic) at arms' length.  We have recognized that the interests of the parties on the opposite sides of a loan transaction are inherently adversarial:  the lender wishes to obtain the greatest security and the highest interest rate while the borrower seeks to obtain the greatest amount of money at the lowest cost.  '[I]t would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table because their respective positions are essentially adversarial.'

*Donleavy*, 2006 N.J. Super. Unpub LEXIS 1397, at *5 (quoting *United Jersey Bank*, 306 N.J. Super. at 552).  Because Plaintiff has failed to allege facts alleging a special relationship that could serve as an exception to the "virtually unanimous rule" that "creditor-debtor relationships rarely give rise to a fiduciary duty," Plaintiff's fraudulent concealment by a fiduciary claim should be dismissed with prejudice as well.  For this same reason, Count VIII does not state a cause of action for breach of fiduciary duty.

### e. Count IX fails to state a cause of action for common law bad faith and fair dealings against BANA.

Count IX appears to allege a cause of action for a breach of the implied covenant of good faith and fair dealings.  Plaintiff asserts that BANA acted in bad faith by: (1) not adequately investigating the fraud claims Plaintiff submitted, (2) misleading Plaintiff about why her fraud claims had been closed, (3) releasing the insurance proceeds without Plaintiff's prior



authorization, and (4) attempting to foreclose on the mortgage encumbering Plaintiff's property. Compl. ¶¶ 91-97.

A party breaches the implied covenant of good faith and fair dealings when it acts in a way to destroy or injure the right of the other party to receive the fruits of the contract. *Wade v. Kessler Inst.*, 172 N.J. 327, 340 (2002). "In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Noye v. Hoffmann-La Roche Inc.*, 238 N.J. Super 430, 434 (App Div. 1990). Even if there is a contract, a cause of action for a breach of the implied covenant of good faith and fair dealings will not arise where the alleged implied term conflicts with an express term of the contract. *Kas Oriental Rugs, Inc. v.* Ellman, 394 N.J. Super 278, 287 (App. Div. 2007). Importantly, to maintain a cause of action for a breach of the implied covenant of good faith and fair dealings, the plaintiff must show bad faith and improper motive on the part of the breaching party. *Woods v. Township of Irvington*, 2009 N.J. Super. Unpub. LEXIS 2231, at *23 (App. Div. 2009).

As an initial matter, Plaintiff's fails to state a cause of action for breaching the implied covenant of good faith and fair dealings because she does not identify the contract that was allegedly breached. *Noye.*, 238 N.J. Super 430 at 434. There can be no breach of the implied covenant of good faith and fair dealings without a contract. *Id.*

Even if Plaintiff had alleged a contract, her claim would still fail because she does not allege facts establishing BANA's alleged improper motive. *See Wade v Kessler Inst.*, 172 N.J., 327, 341 (2002) ("We have cautioned, however, that an allegation of bad faith or unfair dealings should not be permitted in the abstract and absent an improper motive") (citation omitted). The Complaint alleges in conclusory fashion that BANA acted "in bad faith" without ascribing a specific improper motive to BANA. Further, as to the Complaint's allegation that BANA



improperly released the insurance proceeds to USI without Plaintiff's authorization, the Complaint cannot demonstrate an improper motive because there is no allegation that BANA had knowledge that Plaintiff's endorsement on the checks were forged.

Lastly, Plaintiff's implied covenant of good faith and fair dealings claim based on BANA's alleged attempted foreclosure fails under the principle that an implied term cannot conflict with an express contract term. *Kas Oriental Rugs, Inc.*, 394 N.J. Super at 287. The Complaint indicates that Plaintiff defaulted on her mortgage payments. Compl. ¶ 97. Under this circumstance, the mortgage permitted BANA to foreclose on Plaintiff's property.[6]

### f. Count X fails to state a cause of action for negligent misrepresentation against BANA.

Count X alleges that BANA negligently misrepresented to Plaintiff that she gave BANA permission to release the insurance proceeds to USI. Compl. ¶ 103. In order to maintain a cause of action for negligent misrepresentation, the plaintiff must show that "defendant negligently made an incorrect statement of a past or existing fact, that the plaintiff justifiably relied on it and that his reliance caused a loss or injury." *Masone v. Levine*, 382 N.J. Super 181, 187 (App. Div. 2005).

Here, the Complaint's allegations contradict that Plaintiff could have relied on the alleged misrepresentation. Plaintiff claims that BANA misrepresented to her that she authorized the release of insurance proceeds to USI. Compl. ¶ 103. Plaintiff could not have relied on this statement because she allegedly did not authorize USI to receive the insurance proceeds. Compl. ¶¶ 4, 25, 33. A person cannot rely on a statement she knows to be untrue. Accordingly, Count X should be dismissed with prejudice as to BANA.

---

[6] *See* Fleming Certification Exhibit 2, at pgs. 7-8.

g.   **Count XI fails to state a cause of action for civil conspiracy against BANA.**

Count XI states that BANA and Chase "worked together to defraud [Plaintiff] from funds earmarked for the re-construction of her building."  Compl ¶ 113.  To state a claim for civil conspiracy, the plaintiff must demonstrate "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means."  *Portes v. Tan*, 2014 N.J. Super. Unpub LEXIS 224, at *27-28 (App. Div. 2014).  The principal element of conspiracy, however, is "an agreement between the parties to inflict a wrong against or an injury upon another."  *Id.*  Count XI fails to state a claim for civil conspiracy because Plaintiff does not allege that BANA and Chase entered into an agreement to inflict a wrong against Plaintiff. Count IX is also due to be dismissed because its bare allegations regarding a conspiracy between BANA and Chase are conclusory.  *Delbridge v. Office of Public Defender*, 238 N.J. Super. 288, 314 (App Div. 1989) ("Complaints cannot survive a motion to dismiss where the claims are conclusory or vague and unsupported by particular over acts.").

WHEREFORE, BANA respectfully requests that this Court dismiss the Complaint with prejudice as to BANA.


Respectfully submitted,

WONG FLEMING

By: _/s/ Daniel C. Fleming_____
      Daniel C. Fleming

Enclosure
DCF/ss
File No. 23120081
cc:     Adrian J. Johnson, Esq. (via *eCourts*)
          Anthony C. Valenziano, Esq. (via *eCourts*)

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE.<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: HUDSON COUNTY<br><br>DOCKET NO. HUD-L-531-18<br><br>CIVIL ACTION<br><br>**CERTIFICATION OF SERVICE** |

I, Daniel C. Fleming, of full age, hereby certify to the following:

1.      I am a Partner of Wong Fleming, P.C., counsel for Defendant Bank of America, N.A. in the above-captioned matter.

2.      This Certification of Service is being submitted to the Court in accordance with the Rules Governing the Courts of the State of New Jersey, and is made with regard to:

a.  Notice of Motion to Dismiss Plaintiff Viola Moore's Complaint  Pursuant to *R*: 4:6-2(e);

b.  Letter brief:

c.  Certification of Daniel C. Fleming with Exhibits;

d.  Proposed form of Order; and

e.  This Certification of Service.

3.     On July 30, 2018, I caused the aforementioned documents to be electronically filed with the Clerk of the Superior Court of New Jersey, Hudson, via New Jersey eCourts. I certify that the foregoing parties or their counsel of record are registered as eCourts filers and that a copy was served by the eCourts system and upon the following counsel of record:

> Adrian J. Johnson, Esq.
> JOHNSON & ASSOCIATES, P.C.
> 280 Amboy Avenue
> Suite 3
> Metuchen, New Jersey 08840
> *Attorneys for Plaintiff*
>
> Anthony C. Valenziano, Esq.
> SHERMAN WELLS SYLVESTER & STAMELMAN LLP
> 210 Park Avenue
> 2nd Floor
> Florham Park, New Jersey 07932
> *Attorneys for Defendant JPMorgan Chase Bank, N.A.*

I certify that the foregoing statements made by me are true and that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  July 30, 2018                          */s/ Daniel C. Fleming*
                                               Daniel C. Fleming

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION: HUDSON COUNTY |
| Plaintiff, | |
| v. | DOCKET NO. HUD-L-531-18 |
| | |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | CIVIL ACTION |
| | |
| Defendants. | **CERTIFICATION OF DEFENDANT, BANK OF AMERICA, N.A., IN SUPPORT OF MOTION TO DISMISS** |

I, Steven Woodside, an individual over the age of majority, certify the following under penalty of perjury of the laws of State of New Jersey:

1.      I am an AVP, Operations Consultant at Bank of America, N.A. I make this certification based on my personal knowledge and my review of Bank of America, N.A.'s business records.

2.      In support of Bank of America, N.A.'s Motion to Dismiss, I attach a true and correct copy of the following exhibits:

| Exh. | Name |
|---|---|
| 1 | Deposit Agreement and Disclosures |

| 2 | Mortgage |
|---|----------|
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

I certify that the forgoing statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Bank of America, N.A

Dated: 7/31/18

Affiant Name (Printed): Steven Daniel Woodside

Affiant Name (Signature):

Title: Assistant Vice President

2

# EXHIBIT 1

# Deposit Agreement and Disclosures

*Effective February 6, 2015*

**Bank of America**

bankofamerica.com

Bank of America, N.A. Member FDIC.

Applies in all states.

©2015 Bank of America Corporation

91-11-2000B (02/15)      29495



# Table of Contents

**Welcome to Bank of America** ........................................ 1
How to Get Started ........................................................... 1
How to Access Your Account............................................... 1

**The Agreement for Your Account** ............................... 1
Binding Contract ................................................................. 1
Changes to This Agreement.................................................. 2
Closing an Account............................................................... 2
Governing Law ................................................................... 2

**Explanation of Some Terms** ........................................ 3

**Information About You and Your Account** .................. 3
Information You Give Us...................................................... 3
Identification........................................................................ 3
Bank of America's Privacy Policy for Consumers................ 4
Sharing Information with Affiliates .................................... 4
Credit Reports and Other Inquiries ..................................... 4
Disclosing Information About You and Your Account ......... 5
Telephone Calls: Calling, Monitoring and Recording........... 5
Release of Information ......................................................... 5

**Account Ownership** ...................................................... 5
Some General Terms ........................................................... 5
Some Basic Terms for Joint Accounts.................................. 5
Some Basic Terms for "Payable on Death" Accounts.......... 6
Some Basic Terms for Business and Other Non-Personal
Accounts .............................................................................. 6
Transferring Ownership....................................................... 6

**Checking and Savings Accounts** ................................. 7
Types of Accounts .............................................................. 7
Eligibility for NOW Accounts ............................................ 7
Demand Deposit Accounts.................................................. 7
How We Calculate Interest on Interest Bearing Checking
and Savings Accounts ......................................................... 7
Combined Balance Service .................................................. 8
Limits on Linking Accounts ............................................... 8
Limits on Withdrawals and Transfers from Savings Accounts ... 8

**Time Deposit or CD Account** ...................................... 9
Types of CDs....................................................................... 9
How We Calculate Interest on CDs ..................................... 9
Disbursing Interest.............................................................. 9
CDs That Automatically Renew........................................ 10
CDs That Do Not Automatically Renew............................ 10

Grace Period .................................................................... 10
Deposits to a CD............................................................... 10
Early Withdrawals............................................................. 10
Closing or Redeeming a CD .............................................. 10

**Information About Fees and Charging Your
Account** ......................................................................... 11

**Insufficient Funds – Overdrafts and Returned
Items** ............................................................................. 12
Overdrafts and Declined or Returned Items....................... 12
Overdraft Protection Plans................................................. 14

**Processing and Posting Orders** ................................. 15
Processing Transactions and Posting Orders..................... 15
Posting Orders................................................................... 15
Changing Posting Orders ................................................... 15
Posting Order Determined at End of Day........................... 16
Overdraft Fees .................................................................. 16
Certain Transactions Made After Business Day Ends......... 16

**Processing Deposits and Cashed Items** ................... 17
Cashing Items or Accepting Items for Deposit ................... 17
Checks Lost in the Collection Process ............................... 17
Collection Items ................................................................ 18
Demand Drafts and Remotely Created Checks................... 18
Deposit Preparation and Acceptance.................................. 18
Deposit Error Correction ................................................... 18
Encoding Deposits ............................................................ 18
Endorsing Checks .............................................................. 19
Identifying the Account for Your Deposit........................... 19
Overpayments and Reversals.............................................. 19
Returned Items .................................................................. 19
Substitute Checks............................................................... 19
Third-Party Endorsements ................................................. 20

**When Funds are Available for Withdrawal and
Deposit Holds** ............................................................... 20
Your Ability to Withdraw Funds........................................ 20
Longer Delays May Apply ................................................. 20
Special Rules for New Accounts......................................... 21
Government Checks, Cashier's Checks and
Other Special Types of Checks........................................... 21
Cash Withdrawal Limitation.............................................. 21
Holds on Other Funds........................................................ 21

**Processing Withdrawals** ............................................ 21
Cashing Checks for You..................................................... 21
Cashing or Accepting Your Checks for Others ................... 22
Checks with Legends or Restrictions ................................. 22

Collection Items ............................................................... 22
Check Stock and Ink.......................................................... 22
Converting Checks to Electronic Debits............................. 22
Examining Checks.............................................................. 22
Items Resulting from Voluntary Disclosure........................ 23
Large Cash Withdrawals .................................................... 23
Paying Checks and Other Items.......................................... 23
Stale-Dated and Postdated Checks..................................... 23
Substitute Checks, Indemnified Copies, Images and Image
Replacement Copies .......................................................... 23
Unpaid Items .................................................................... 23

**Substitute Checks and Your Rights** ......................... 24

**Notices, Statements and Other
Communications** ........................................................... 25
General Terms for Notices, Statements and Other
Communications ................................................................ 25
Notices............................................................................... 25
Statements.......................................................................... 25
Check Image, Safekeeping and Enclosure Services ........... 26
Your Address and Change of Address................................. 26

**Actions You Can Take to Help Protect
Your Account** ............................................................... 27

**Reporting Problems** ................................................... 28
Your Responsibility........................................................... 28
What Are Problems and Unauthorized Transactions........... 28
Reviewing Your Account Statements.................................. 28
We Are Not Liable If You Fail To Report Promptly............ 29
When Confirmation and Other Assistance
Our Investigation and Maximum Liability .......................... 29
Business Insurance............................................................. 29
Opening a New Account..................................................... 29

**Foreign Items and Foreign Currency** ....................... 30
What is a Foreign Item ...................................................... 30
Be Cautious About Accepting Foreign Items ..................... 30
Processing Foreign Items................................................... 30
Wires Sent to a Foreign Currency Account......................... 30
You May Not Write Foreign Currency Checks ................... 30
Processing and Collecting Foreign Items............................ 30

**Other Terms and Services** ........................................ 31
Account Changes ............................................................... 31
Automatic Transfer Service ............................................... 31
Check and Deposit Slip Forms ........................................... 32
Check Copies...................................................................... 32
Compliance......................................................................... 32

Conflicting Demands and Disputes..................................... 32
Converting an Account....................................................... 33
Cutoff Time for Receipt of Orders ..................................... 33
Death or Incompetence ...................................................... 33
Facsimile Signature............................................................ 33
Deposit Insurance – Bank Assessment
for Business Accounts........................................................ 33
Fingerprint .......................................................................... 34
"Freezing" Your Account .................................................... 34
Indemnification and Limitation of Liability ...................... 34
Legal Process – Subpoena and Levy................................... 35
Multiple Signatures Not Required ...................................... 35
Notice of Withdrawal......................................................... 35
Powers of Attorney: Appointment and Payment to Agents ... 35
Records............................................................................... 36
Right of Setoff ................................................................... 36
Sample of Your Signature.................................................. 36
Stop Payment Orders and Postdating Orders...................... 36
Subaccounts....................................................................... 37
Unclaimed Property – Accounts Presumed Abandoned
or Inactive .......................................................................... 38
Verification of Transactions and Right to Reverse
Transactions........................................................................ 38
Waiver, Severability, and Change of Law by Agreement...... 38

**Electronic Banking Services** ...................................... 39
Types of Electronic Banking Services................................. 39
Access ID ........................................................................... 40
Electronic Banking Disclosures.......................................... 40

**ATM Safety Tips and Safeguarding Your
Account Information** ...................................................... 43

**Funds Transfer Services** ............................................ 43
Remittance Transfers ......................................................... 44
Sending Funds Transfers .................................................... 44
Receiving Funds Transfers.................................................. 45
ACH Debits and Credits..................................................... 45

**Tax Information** ........................................................... 45

**Resolving Claims** ........................................................ 46
What does "Claim" Mean?.................................................. 46
How Claims on Personal Accounts will be Resolved.......... 46
How Claims on Business Accounts will be Resolved.......... 46
Judicial Reference .............................................................. 47
Arbitration.......................................................................... 47
Limitation and Non-Severability........................................ 48
Rules of Interpretation....................................................... 48
Jurisdiction and Venue ....................................................... 48

TOC 1                                                                                    TOC 2

# Welcome to Bank of America

Thank you for opening and keeping an account with us.

Please read this entire agreement carefully so you understand your rights and obligations for your deposit account and deposit relationship with us and keep it in a convenient place for future reference.

In this agreement, "Bank of America", "Bank", "we", "us" and "our" means Bank of America, N.A. "You" and "Your" means each and every owner of the account and each and every other person with authority to withdraw funds from the account or otherwise operate the account.

Our accounts and services are generally available through all of our channels - in our banking centers, through telephone banking and online. However, some accounts and services may not be available at all times, in all locations, or through all channels.

## How to Get Started

After you open your account, please consider these optional services. They can help you manage your finances.

- **Debit card** – use your debit card to pay for purchases at merchants that accept debit cards, to make deposits at Bank of America ATMs, and to withdraw cash from ATMs.
- **Direct Deposit** – have your paycheck, retirement benefits, or other source of income deposited electronically into your checking or savings account.
- **Online Banking** – helps you manage and keep better track of your finances. Here are some of the things you can do using Online Banking:
  - Check your account balances and review transaction history.
  - Transfer funds between your accounts or to other Bank of America customers' accounts.
  - Receive your statements and posted checks online, then review or print them at your convenience.
  - Reorder checks and change your address.
- **Online Bill Pay service** – pay your bills electronically.
- **Online Alerts** – provide an electronic notice through email or text message about account activity, such as when a direct deposit posts or when your balance drops below an amount you set.
- **Scheduled Savings Transfers** – helps make saving easier

by automatically transferring money from your checking account to your savings account.
- **Keep the Change®** – helps you grow your savings by automatically transferring money from your personal checking to your savings with each eligible debit card purchase.
- **Overdraft Protection Service** from another linked account, such as your savings or credit card account – helps you avoid overdrafts and declined or returned checks and other items by automatically transferring available funds from your linked account to your checking account.

## How to Access Your Account

You can access your account and get information about our accounts and services:

- At our **banking centers** and at **Bank of America ATMs**.
- Through our **Online Banking Service** at: www.bankofamerica.com
- By calling **customer service** at the number on your account statement.

You can locate our nearest banking center or ATM on our website at www.bankofamerica.com

# The Agreement for Your Account

## Binding Contract

This Deposit Agreement and Disclosures, the applicable Schedule of Fees, the signature card and other account opening documents for your account are part of the binding contract between you and us (this "Agreement") for your deposit account and your deposit relationship with us. They contain the terms of our agreement with you. Please read all of these documents carefully.

This Deposit Agreement and Disclosures also summarizes certain laws and regulations that apply to common transactions, provides some disclosures for deposit accounts required by federal law, and establishes terms that cover some transactions or situations that the law either does not cover or allows us to change by this contract. The Schedule of Fees lists our accounts and account fees.

When you complete our account opening documents (as an example, you sign our signature card), request an account, or keep your account open, you acknowledge that you have

reviewed and understand the terms of this Agreement and you agree to be governed by these terms. You understand that these terms, as we may change or supplement them periodically, are a binding contract between you and us for your deposit account and your deposit relationship.

Our deposit relationship with you is that of debtor and creditor. This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary or special relationship between us. We owe you only a duty of ordinary care. Our internal policies and procedures are solely for our own purposes and do not impose on us a higher standard of care than otherwise would apply by law without such policies or procedures.

We give this Agreement to you when we open your account. You may obtain additional copies of this Agreement at a banking center or by calling the number on your statement.

## Changes to This Agreement

We may change this Agreement at any time. We may add new terms. We may delete or amend existing terms. We may add new accounts and services and discontinue existing accounts or services. We may convert existing accounts and services into new accounts and services.

We ordinarily send you advance notice of an adverse change to this agreement. However, we may make changes without prior notice unless otherwise required by law. We may, but do not have to, notify you of changes that we make for security reasons or that we believe are either beneficial or not adverse to you.

When we change this Agreement, the then-current version of this Agreement supersedes all prior versions and governs your account.

If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. If you do not agree with a change, you may close your account as provided in this Agreement.

See the Notices, Statements and Other Communications section for information about how we provide notice.

## Closing an Account

You or we may close your checking or savings account at any time without advance notice, except that we may require you to give us seven days advance notice when you intend to close your savings or interest bearing checking account by withdrawing your funds. See Notice of Withdrawal in the Other Terms and Services section. You or we may close your time deposit account at maturity without advance notice.

If your account reaches a zero balance, or you apply for an account but never deposit funds into it, we may either keep the account open or close the account without notice.

Sometimes after an account is closed, we receive a deposit for credit to the account or a check or other item for payment from the account. If this happens, we may at our option and without any liability to you: either return the deposit, check or other item; or we may reopen the account and accept the deposit, check or other item for you, even if this overdraws your account and causes you to incur overdraft fees.

Sometimes after an account which had funds in it is closed, and while we are still holding the funds from the account, we receive a withdrawal request, check or other item for payment from the account. We may refuse the withdrawal request and return the check or other item. We are not liable for any losses or damages that may result from refusing the withdrawal or dishonoring the check or other item, even if we are still holding funds that would cover the withdrawal, check or other item.

If your account is overdrawn when closed, you agree to pay immediately all amounts you owe us. If your account had funds in it when closed, we may:

- hold the funds for your pick up or to pay outstanding or expected items or claims;
- deposit the funds in another of your accounts with us; or
- mail the funds to any of you by check at the address in our records for the account.

If your account earned interest before it closed, your funds stop earning interest when the account is closed, even if we continue to hold the funds. As an example, if we mail funds from an interest bearing account to you by check, then your funds do not earn interest, even if the check is returned to us or is not cashed.

This Agreement continues to govern matters related to your account even after your account closes.

## Governing Law

This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state where your account is located. However, your rights and obligations for Remittance Transfers shall be governed by and interpreted as described in the Funds Transfer Services section. We ordinarily maintain your account at the banking center where we open your account. However, we may transfer your account to another banking center in the same state or in a different state. If state and federal law are inconsistent, or if state law is preempted by federal law, federal law governs.

# Explanation of Some Terms

## Definitions

Please keep in mind the following definitions as you review the Agreement.

**Annual Percentage Yield (APY)** is a percentage rate reflecting the total amount of interest paid on the account, based on the interest rate and frequency of compounding.

**Average daily balance** for a statement cycle – we take the balance that we determine is in the account for each day in the statement cycle, add those balances together, and then divide that sum by the number of days in the statement cycle.

**Bank of America, Bank, we, us** and **our** mean Bank of America, N.A.

**Banking Center** means a branch of Bank of America.

**Business days** – our business days are Monday through Friday, excluding bank holidays. Hours of the business day for a banking center are available at that banking center.

**Collected balance** is the ledger balance for the account minus that portion of funds deposited for which we have not received credit based on the availability schedule we apply to the account. We ordinarily apply the availability schedule provided to us by the Federal Reserve Bank to determine the time that we receive credit for deposited funds.

**Item** includes all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of an image, digital image or a photocopy of any of the foregoing. In certain cases it includes any document created or authorized in your name that would be a check or draft but for the fact that it has not been signed. Item may also include a cash-in ticket and a deposit adjustment. Item may also include a check, draft, warrant, or other item deposited to your account, including a deposited item that was returned unpaid.

**Minimum daily balance** – the lowest balance that we determine is in the account during a statement cycle.

**You** and **your** means each and every owner of the account and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account.

## Headings and Interpretation

We include section and paragraph headings in this Agreement to help you find terms and provisions. The headings are for convenience or reference only. They do not limit the term or provision.

Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

In some sections we give examples. The examples cover some, but not all, of the situations or items that are covered by the section.

# Information About You and Your Account

## Information You Give Us

When you open a deposit account with us, you give us information about yourself and confirm that it is correct. We enter the information into our records. We may rely on that information until you notify us of a change and we have had a reasonable time to act on the new information.

## Identification

Federal law, including the USA PATRIOT Act, requires all financial institutions to obtain, verify and record information that identifies each customer who opens an account with that financial institution.

When you apply for an account, we will ask for your legal name, address, date of birth and your Tax Identification Number (TIN). We may require one or more forms of unexpired photo identification. We may validate the information you provide to us to ensure we have a reasonable assurance of your identity. We may contact you for additional information. If your account is funded before we verify your information, you may not have access to your funds. If we are not able to verify your identity to our satisfaction, we will not open your account or we may close the account if it was previously funded.

## Bank of America's Privacy Policy for Consumers

Our privacy policy for consumers is described in our publication, *U.S. Consumer Privacy Notice*. We provide our privacy policy to consumers who open a personal account with us. The privacy policy describes our policy on handling customer information and describes the situations when we may disclose information, including some examples.

You can also review our privacy practices on our website at www.bankofamerica.com/privacy.

## Sharing Information with Affiliates

**Accounts Held by Consumers** We may share information that we have about you and your accounts among the Bank of America family of companies. Please refer to our publication, *U.S. Consumer Privacy Notice*, for information about the categories of information we may share among the Bank of America family of companies and how you may tell us not to share certain types of information among our family of companies.

**Accounts Held by Businesses** We may share information about our experiences with you with Bank of America Corporation and its subsidiaries and affiliated companies ("Bank of America Affiliates") and selected third parties. We may also share information that you have provided to us on applications or that we receive from outside sources among the Bank of America Affiliates. However, individuals may tell us not to share information about them from applications or outside sources compiled for purposes of determining eligibility for credit, insurance or other services by either calling us at 1.888.341.5000 or by notifying us at www.bankofamerica.com/privacy.

## Credit Reports and Other Inquiries

We may make any inquiries that we consider appropriate to help us verify your identity and determine if we should open, maintain, collect or close your account. This may include verification of employment and credit reports or other reports from account information services and credit reporting agencies.

If you ask, we will tell you whether we requested a credit report and, if we did request a report, we will tell you the name, address and telephone number of the reporting agency.

## Disclosing Information About You and Your Account

This section applies to both business and personal accounts. We may disclose information about your accounts to credit reporting agencies and to other persons or agencies who, in our judgment, have a legitimate purpose for obtaining information.

From time to time, subject to any applicable financial privacy laws or other laws or regulations, we may provide information on you and your accounts:

- where it is necessary for completing transactions;
- to account information services, such as ChexSystems, Inc.;
- to anyone who we reasonably believe is conducting a legitimate credit inquiry, including inquiries to verify the existence or condition of an account for a third party such as a lender, merchant or credit bureau;
- in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance;
- in connection with collection of indebtedness or to report losses incurred by us;
- in compliance with any agreement between us and a professional, regulatory or disciplinary body;
- in connection with potential sales of businesses;
- to service providers who help us meet your needs by assisting us in providing or offering our products or services; and
- to other third parties as is described in our publication *U.S. Consumer Privacy Notice* or as required under applicable law or regulation.

In the event of a conflict between the terms of this section and the terms of our *U.S. Consumer Privacy Notice*, the terms of our *U.S. Consumer Privacy Notice* governs.

**Account Information Services** If we close your account because of your unsatisfactory handling, we generally report to account information services such as ChexSystems, Inc. your name, address, Taxpayer Identification Number (TIN), driver's license number and the date and reason we closed the account. The account information service may supply this information to others. This may adversely impact your ability to establish an account at any financial institution for up to five years from the date of this report.

4

3

**Telephone Calls: Calling, Monitoring and Recording**

When you give a telephone number directly to us, or place a telephone call to us, you authorize us to place calls to you at that number. You understand that a "telephone number" includes a cell phone number and "calls" include both telephone calls and text messages to or from your phone or cell phone. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your account. When we place calls to you, we may use automatic dialers and artificial, text, or prerecorded messages.

You authorize us to monitor, and to record, telephone conversations and other electronic communications you have with us and with our representatives for reasonable business purposes, including security and quality assurance. We will not remind you that we may be monitoring or recording a call at the outset of the call unless required by law to do so.

You consent and agree to these terms and conditions.

**Release of Information**

You can obtain information about your account by many methods, including at a banking center, by telephone, by mail and through Online Banking. We believe we have added reasonable security measures for each method, but we cannot ensure against unauthorized inquiries or intrusions. You agree that we are not responsible for the release of information to anyone who has gained possession of your ATM card, debit card or other code or access device or who has learned your identifying characteristics such as personal identification number (PIN), account number or social security number, even if you have not authorized them to obtain the information.

## Account Ownership

**Some General Terms**

When you open an account, we may rely on information you give us and we maintain in our records. We determine the type and ownership of the account from this information. When you ask us to make a change to this information on your account, and we agree to the change, the change is not effective until we have had a reasonable time to act on the new information. As an example, if you ask us to change the signers on your account, your requested change is not effective until we have a reasonable time to act on it. If we ask you to give us additional documents or information, and you do not do so promptly, we may close your account.

When we accept a deposit to an account or permit a withdrawal or payment from an account, we may rely upon the form of the account and the terms of this Agreement at the time we process the transaction. We do not have to inquire about the source or ownership of any funds we receive for deposit or about the application of any withdrawal or payment from an account. When we permit a withdrawal or payment from an account, at the request of any signer, or the agent of any signer, in accordance with the terms of this Agreement, the withdrawal or payment is a complete release and discharge of the Bank from all claims regarding the withdrawal or payment.

If you instruct us to open an account in the names of two or more people, and we do so, but later determine that one or more of them have not completed our account opening documents or other requirements, you agree to hold us harmless for reliance on your instruction. We may in our discretion for all purposes and circumstances (including determining ownership of the account following the death of any person in whose name the account was opened) either treat the account as being owned by all persons in whose names the account was opened or treat the account as being owned solely by the persons who have signed or completed our account opening documents or other requirements. If we treat the account as owned by all persons in whose names the account was opened, we may permit the non-signing person to withdraw funds or take other action on the account without any liability to you.

We may open an account without regard to whether you are married and without regard to whether the funds on deposit are your community or separate property. We may require you to close the account in order to remove a co-owner, terminate a joint ownership or change a payable on death or trust designation.

**Some Basic Terms for Joint Accounts**

If more than one person's name appears in the title of an account without a fiduciary, beneficiary or other designation, then the account is a joint account. All persons whose names appear on the account are co-owners of the account, regardless of whose money is deposited in the account.

Each co-owner acts as the agent of each other co-owner. Each co-owner authorizes each other co-owner to operate the account without the consent or approval of any other co-owner. We may act and rely on the instructions of one co-owner without liability to any other co-owner. So as examples, one co-owner may without the consent or approval of the others:

- add additional persons as co-owners;

- deposit funds and withdraw or transfer part or all of the funds in the account;

- endorse for deposit to the joint account on behalf of any other co-owner an item payable to another co-owner;

- instruct us to stop payment on a check or other item that another co-owner wrote on the account;

- obtain an ATM card or a debit card;

- draw upon an overdraft or other line of credit connected to the account;

- obtain information about the account, including transactions conducted by other co-owners;

- pledge the account as security for any debts; and

- close the account.

Each co-owner is jointly and severally liable to us for all fees, charges and other amounts owed to us on, and all costs, losses and liabilities related to, this Agreement or the account.

All joint accounts are presumed to be joint accounts with the right of survivorship, unless the applicable state law does not permit this presumption or we have agreed with you in writing that the account is owned in another capacity. **Right of survivorship means that when a co-owner dies, the funds in the account belongs to the surviving co-owner(s)**, subject to our right to charge the account for any amount the deceased co-owner or a surviving co-owner owes us. The rights of survivorship continue between surviving co-owners. The applicable state law may impose requirements that must be met to create a joint account with right of survivorship. You are solely responsible for meeting these requirements.

**Some Basic Terms for "Payable on Death" Accounts**

For an individual or joint account, you may choose to make your account payable on your death to one or more payable on death ("POD") beneficiaries. You can make your account a POD account by instructing us to list each POD beneficiary on the account and complying with applicable state law. The applicable state law usually imposes requirements that must be met to create a POD account. As an example, you may have to include certain words or letters in the account title to create a POD account, such as: "payable on death," "POD," "in trust for," "ITF," "as trustee for," "ATF," "transfer on death," "TOD," or "Totten Trust." You are solely responsible for meeting these requirements. We may treat an account which names a POD beneficiary as a POD account. However, if the applicable requirements are not met, we may treat your account as though there is no POD beneficiary.

During your lifetime, a POD account belongs to you. You may close the account, remove or add one or more POD beneficiaries, change the account type or ownership, and withdraw all or part of the funds in the account. When the account owner or last co-owner dies, we may pay any funds remaining in the account to the then surviving (if any) POD beneficiary(ies), subject to our right to charge the account for any amount a deceased owner, co-owner or POD beneficiary owes us. We may distribute the account balance, subject to any bank claims, to such beneficiaries payable to one or all surviving beneficiaries jointly, or payable individually, in equal shares, to each surviving beneficiary. A POD beneficiary does not acquire an interest in the account until after the death of the account owner or the last co-owner. A POD beneficiary may acquire an interest in the account at that time but only if the POD beneficiary is alive.

**Some Basic Terms for Business and Other Non-Personal Accounts**

If the account owner is a corporation, unincorporated association, limited liability company, limited liability partnership, fiduciary, partnership, sole proprietorship or other entity holding an account in any capacity other than an individual capacity, each person signing the signature card or completing other account opening requirements represents and agrees that they:

- are fully authorized to execute all documents or otherwise complete our requirements in their stated capacity;

- have furnished all documents or other information necessary to demonstrate that authority; and

- will furnish other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any resolution affecting the account that is not on our form or that appears to us to be incomplete or improperly executed.

**Transferring Ownership**

Your account is for your use only. It is non-transferable and non-negotiable. Ownership of your account is transferable only on our records with our consent.

- You may not grant, transfer or assign any of your rights to your account without our written consent.

- Even if we consent, we may require that you close the account and that the new account owner open a new account in their name.

- We may refuse to acknowledge or accept your attempted pledge or assignment of your account or any interest in it, including a notice of security interest.

# Checking and Savings Accounts

## Types of Accounts

We offer several different types of checking and savings accounts for personal and business customers.

- The Personal Schedule of Fees describes our personal accounts and lists applicable fees.
- The Business Schedule of Fees describes our business accounts (other than Commercial accounts) and lists applicable fees. The Business Schedule of Fees does not apply to Commercial accounts.

## Eligibility for NOW Accounts

NOW accounts are commonly called interest checking accounts. Federal law provides that NOW accounts may only be opened and used by the following customers:

- individuals (including sole proprietors),
- certain nonprofit organizations,
- federal, state or local governmental entities, and
- fiduciaries (such as a bank trust department) where one or more individuals hold the entire beneficial interest in the funds.

If we believe that you are not eligible to own a NOW account, we may either close the account or convert it to another type of account. When we refer in this agreement to checking accounts, the reference includes NOW accounts.

## Demand Deposit Accounts

Demand deposit accounts are commonly called checking accounts. All types of customers can open a demand deposit account. Most demand deposit accounts do not earn interest. We do offer an interest bearing demand deposit account to business customers. Please ask us for details.

When we refer in this agreement to checking accounts, the reference includes demand deposit accounts.

## How We Calculate Interest on Interest Bearing Checking and Savings Accounts

If you have an interest bearing checking or savings account, then please note the following.

- Your funds earn a variable rate. Your interest rate and annual percentage yield ("APY") may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.

- We compound and credit interest to your account monthly.

- We use the daily balance method to calculate the interest on your account. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.

- For personal checking accounts and personal and business savings accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day.

- For business checking accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine applies for reserves applicable generally to transaction accounts under the rules of the Federal Reserve).

- For Public Service Trust Accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine is required to offset service charges).

- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item no later than the business day on which we receive credit for the non-cash item.

Some checking and savings accounts do not earn interest. The checking and savings accounts that earn interest are described in the Schedule of Fees as accounts bearing interest. Other checking and savings accounts do not earn interest. We pay interest only in whole cents.

We set interest rates at our discretion. The interest rate and APY we offer on the same type of account may be higher or lower based on the specific customer, account location or channel through which the account is opened. As an example, an account opened through our Online Banking channel may earn a different rate (either higher or lower) than the same type of account opened in a banking center or by mail. We may also consider your relationship with us in setting interest rates on your account, such as whether you have other accounts with us, your balances with us in your other accounts and how you use services that we offer with accounts.

We occasionally offer interest rate bonuses and other special promotions when a customer opens a new account or during other activities for customers, locations or methods of account opening.

You may obtain current interest rates for your account by calling us at the number for customer service on your statement or by asking a banking center associate.

**Balance Tiers** The daily interest rate we pay on some accounts depends on the tier into which the balance in the account falls. A tier is a range of account balances. If you have one of these accounts, your balance earns the interest rate and APY in effect that day for the balance tier associated with your end-of-day balance. We may set the rate for each tier in any amount. The interest rate for one tier may be the same rate, or a higher or lower rate, than the rate for a lower tier. We may change the tiers that apply to an account at any time without notice. Different tiers apply to different types of accounts.

## Combined Balance Service

With some checking accounts you can designate your checking account as your primary checking account and then link many of your other accounts to it for pricing. When you link another account for pricing, you can use the balance in the other account to help you meet the combined balance required to avoid the monthly maintenance fee on your primary checking account. The Schedule of Fees lists the required combined balance for each checking account to which the service applies and the types of accounts that can be linked for pricing.

You must tell us what other accounts you want us to link to your checking account for pricing. We do not link your other accounts for pricing unless you tell us to do so. An account can only be linked for pricing to one checking account at a time. To determine what accounts are linked for pricing, please call.

When an existing account is closed and a new account is opened to replace the existing account, we do not automatically link the new account to your checking account for pricing, even if the existing account was linked. You must tell us to link the new account for pricing.

When we calculate a balance or combined balance, we may ignore accrued interest, funds subject to a hold of any type, and each loan or line of credit that is in default. For each linked account, the period of time that we use as the basis for calculating the balance, including the way that we determine the balance, in the linked account may be different from the statement cycle for the primary checking account.

You still need to meet the balance requirements, if applicable, in each linked account to avoid the monthly maintenance fees on those accounts.

You understand that the statement for your primary checking account may include information about each linked account, including the account name, number and balance. We may make this information available to each owner and signer of any linked account. We may also send you a single combined statement that reports activity for your checking account and each deposit account linked to that account, instead of separate statements

for each account. See Combined Statements in the Statements and Notices section.

## Limits on Linking Accounts

Some restrictions apply to what accounts can be linked to checking for pricing, including the following. You can generally link accounts that are located in the same state as your checking account. In some states you can also link accounts located in different states. You may only link an account to one checking account at a time. At least one of the owners of the linked account must also be an owner of the checking account. You may not link personal and business accounts together. You may not link a loan or line of credit that is in default.

We may in our discretion place other restrictions on what accounts can be linked.

## Limits on Withdrawals and Transfers from Savings Accounts

This Agreement and federal law impose limits on the number of certain types of withdrawals and transfers you can make each month from a savings account. Please note that these limits do not apply to withdrawals and transfers you make at one of our banking centers, by mail or at an ATM.

You can make no more than a total of six transactions each monthly statement cycle (or each month if you have a quarterly statement cycle) from among the following:

- Preauthorized transfers from your savings account (including transfers for overdraft protection).
- Telephone transfers or other electronic transmissions from your savings account.
- Online banking transfers or bill payment transfers from your savings account.
- Transfers by check, draft or debit card, if allowed on your savings account.

We count a transaction on the date that we post it to your savings account. This date may be different from the date you authorize, transfer or write the transaction, which means a transaction made during one statement cycle may not be counted until a later statement cycle.

If you exceed the transaction limits on more than an occasional basis, we may review your privileges on that account or we may convert your savings account to another type of account, such as a checking account. Your funds may no longer earn interest after we convert your account.

When you use our Online Banking bill payment service, we recommend that you do not use a savings account as your bill payment account because of these limits on transfers.

Note: Even if you make no more than 6 transactions, a fee may still apply to some withdrawals or transfers. Please see the Schedule of Fees for your account.

## Time Deposit or CD Account

When you open a time deposit account, you agree to leave your funds in the account until the maturity date of the account. We often refer to a time deposit account as a "CD" or a "Certificate of Deposit", even though we do not issue a "certificate".

This Agreement applies to CDs you open under your Individual Retirement Account (IRA) or Coverdell Education Savings Account (CESA) plans. Please see the *Traditional/Roth Individual Retirement Custodial Accounts and Disclosure Statements* and the *Coverdell Education Savings Custodial Account and Disclosure Statement* for additional terms of these plans.

A time deposit account is neither transferable nor negotiable.

### Types of CDs

We offer several different types of CDs for personal and business customers.

The *Personal Schedule of Fees* describes our personal CDs.

The *Business Schedule of Fees* describes our business CDs.

### How we Calculate Interest on CDs

Your funds earn interest during the term of the time deposit account. We calculate interest as follows:

• Time deposits earn interest at a fixed rate except for Opt-Up® CDs and Variable Rate IRAs. Fixed rate means that the interest rate that we apply to your account on the day we open it will not change for the term of the account.

• For an Opt-Up CD, your interest rate and annual percentage yield may change. The interest rate that we apply to it on the day that we open your Opt-Up CD remains fixed throughout the term of your Opt-Up CD unless you exercise your one time option to reset the interest rate. This reset option is described in the Schedule of Fees.

• For a Variable Rate IRA, your funds earn a variable rate. Your interest rate and annual percentage yield may change. At our discretion, we may change the interest rate for your account at any time without notice or limit, based on market factors.

• For terms of 27 days or less, we credit interest to your account at maturity. For terms of 28 days or more, we compound interest monthly and we credit interest to your account monthly and at maturity or disburse it to you according to the interest disbursement option you select.

• We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the ledger balance that we determine is in the account each day. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.

• When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item on the business day the deposit is received. Deposits you give us on a weekend or bank holiday are treated as received the next business day.

• The annual percentage yield for your account assumes that interest will remain on deposit until maturity. A withdrawal will reduce earnings.

We generally set interest rates for new time deposit accounts based on the type of CD, the amount you deposit, and the term you select. Rates for new accounts may change daily. We pay interest only in whole cents.

We may also set interest rates based on a specific account or customer, or based on the location or channel through which we open the account. This means that the interest rate and APY we offer on the same type of CD may be higher or lower based on the specific customer, location or method of account opening. For example, a CD opened through our Online Banking channel, may earn a different rate (either higher or lower) than the same type of CD opened in a banking center or by mail. We may offer interest rate bonuses and other special promotions to specific customers or accounts. Interest rate bonuses and other special promotional offers may not apply to all customers, locations or methods of account opening.

You may obtain current rates by calling us at the number for customer service on your statement or by asking a banking center associate.

### Disbursing Interest

You may choose to have us credit your interest to your account. With this option, we reinvest the interest in your account monthly and at maturity.

Alternatively, you may have us regularly disburse the interest from your account by having us credit the interest to a Bank of America checking or savings account or by having us mail a check for the interest.

Depending on the term of your account, disbursement options include monthly, quarterly, semi-annually, annually on the anniversary date, and at maturity.

### CDs That Automatically Renew

Unless your account information states that your time deposit does not automatically renew, we automatically renew your account by reinvesting your funds. We reinvest both principal and interest, unless you elected to have your interest disbursed. (See *Disbursing Interest* in this chapter.)

When we automatically renew your CD, the term for the reinvested CD is the same length as the previous term of your account unless we notify you that we are changing the term of the CD. For time deposits with a fixed interest rate, the interest rate and APY for any renewal term is based on the rate we offer on the first day of the new term for the type of CD. The annual percentage yield for the reinvested deposit. Unless specifically stated otherwise, any bonus or special promotion we are offering will not apply to automatically renewing accounts.

If at any maturity date we no longer offer time deposit accounts of the same term and type, we may reinvest your funds in a time deposit that we believe offers similar features.

### CDs That Do Not Automatically Renew

Some time deposit accounts do not automatically renew. If your account information states that your time deposit does not automatically renew, then your account does not earn interest after its maturity date.

### Grace Period

The grace period begins on the first day after the maturity date. The grace period is one calendar day for terms of seven through 27 days and seven calendar days for terms of 28 days or more. You may make a deposit or withdrawal, or change the length of the term, once during the grace period and, if you take one of these actions, the grace period ends on that day. If the last day of the grace period is a non-business day (a week-end or bank holiday), then the grace period ends on the last business day before that non-business day. We may pay interest during the grace period based on the rate we offer on the first day of the new term for the type of CD, amount, and term of the deposit.

### Deposits to a CD

You may make an additional deposit to your account during its grace period. Otherwise, for all CDs except Variable Rate IRAs you may not make deposits during the term of the CD.

You may not make a deposit to a time deposit account by wire or automated clearinghouse (ACH) transfer.

### Early Withdrawals

You have contracted to keep your funds on deposit for the stated term. You may not withdraw all or part of a time deposit account except as provided in this Agreement.

At our discretion, we may allow you to withdraw all or part of your funds at times other than the grace period. We withdraw interest before principal. Each time we permit you to make an early withdrawal of principal, we may charge you an early withdrawal penalty. If your account has not earned enough interest to cover an early withdrawal penalty, we deduct any interest first and take the remainder of the penalty from your principal.

We calculate all early withdrawal penalties on the principal amount withdrawn at the interest rate in effect on the withdrawal date. The early withdrawal penalty is:

• For CDs with terms of less than 90 days, the greater of all interest earned on the amount withdrawn or an amount equal to seven days interest on the amount withdrawn;

• For CDs with terms of 90 days up to 12 months, the penalty is an amount equal to 90 days interest on the amount withdrawn;

• For CDs with terms of 12 months up to 60 months, the penalty is an amount equal to 180 days interest on the amount withdrawn; and

• For CDs with terms of 60 months or longer, the penalty is an amount equal to 365 days interest on the amount withdrawn.

Please note that the term of a CD is the specified period of time you agreed to leave your funds on deposit – not the time remaining until maturity of your CD.

We add to the early withdrawal penalty the amount of any cash bonuses we paid you when you opened or reinvested the account.

If we are required to pay an amount from your CD (e.g. levy or garnishment), we may charge you an early withdrawal penalty, calculated on the amount withdrawn from the CD.

An early withdrawal from an IRA may also be subject to additional federal tax (and possibly additional state and local taxes) if you are under age 59 1/2.

### Closing or Redeeming a CD

We may close or redeem an automatically renewable account at the end of the term. You may close or redeem your account during its grace period.

# Information About Fees and Charging Your Account

## Fees

You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.

**Account Fees.** Your account is subject to the fees described in the Schedule of Fees that applies to your account.

- The Personal Schedule of Fees lists account fees that apply to our personal deposit accounts.

- The Business Schedule of Fees lists account fees that apply to our business deposit accounts except for Commercial accounts (the Business Schedule of Fees does not apply to Commercial accounts).

- The schedule that applies to your account is part of the binding contract between you and us.

The fees for many of our products and services may vary from state to state or between regions within a state. We charge account fees to you based on the state or region in which the banking center where we maintain your account is located. Account fees are not based on your state of residence or the state where you use or purchase the service. Your account fees and terms may differ from those of other customers with the same type of account, based on our assessment of your overall relationship with us.

**Fees for Other Services.** In addition to checking, savings and CD accounts we also offer many other services, such as wire transfers, cashier's checks and bond redemption. You can get current information shown on your account statement. We may occasionally list fees for some of these services in the Schedule of Fees. Fees for these services may vary from state to state. The fees you pay for these services are those charged by us in the state where we sell you the service. We may charge these fees at any time without notice.

**How We Set Fees.** We set our fees based on many factors, including the value we offer, our competitive position, deterrence of misuse of an account by our customers, consideration of profit and the safety and soundness of the Bank. We may also consider costs in setting fees, but we do not set our fees based only or primarily on the direct or overall costs and expenses associated with providing the particular product or service involved.

**Calculating Balances.** When we calculate an account balance or combined balance to determine whether a fee applies to

your account, we may use the balance that we determine is in each account. We may ignore any accrued interest and funds subject to a hold of any type. For a balance in an account linked to a checking account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account. If a loan or line of credit is linked, we may ignore each loan or line of credit that we determine is in default.

## Charging an Account

We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or our affiliates, except that this provision does not apply to any consumer credit covered by the Federal Truth in Lending law. We may make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts and other amounts you owe us.

We may use deposits you or others make to your account (including deposits of payroll and government benefits) to pay fees, overdrafts and other amounts you owe us.

Some government payments (such as Social Security, Supplemental Security Income, Veterans and other federal or state benefits) may be protected from attachment, levy, garnishment or other legal process under federal or state law. If such protections would otherwise apply to deductions we make for amounts you owe us, to the extent that you may do so by contract, you waive these protections and agree that we may use these funds to pay fees, overdrafts and other amounts you owe us under this Agreement.

# Insufficient Funds – Overdrafts and Returned Items

You can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions. We offer services that you can use to help you manage your account and help you avoid overdrafts, such as our Online Banking service and Online Alerts. Please see How to Get Started section in the Introduction.

We recommend that you enroll in one of the optional Overdraft Protection plans described below. These plans can help you avoid overdrafts and declined or returned items. While fees apply when you use an Overdraft Protection plan, the fees under the plan may be less expensive than the fees for overdrafts and declined or returned items.

## Overdrafts and Declined or Returned Items

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).

We pay overdrafts at our discretion, which means we do not guarantee that we will always, or even, authorize and pay them. If we overdraw your account to pay items on one or more occasions, we are not obligated to continue paying future insufficient funds items. We may pay all, some, or none of your overdrafts, without notice to you. If we do not authorize and pay an overdraft, then we decline or return the transaction unpaid.

The Schedule of Fees for your account explains when we charge you fees for overdrafts and for declined or returned items and the dollar amount of the fees. Please review the Schedule of Fees for your account carefully.

If an overdraw your account, you agree to repay us immediately, without notice or demand from us. We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.

Sometimes funds in your account are not available to cover your checks and other items. When we determine that funds in your account are subject to a hold, dispute, or legal process,

then these funds are not available to cover your checks and other items. We usually make this determination once at the end of the day when we process items. As examples of holds, holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions.

We may also treat as an insufficient funds item each fee that creates an overdraft and each deposited item returned to us unpaid that creates an overdraft.

For some business accounts, when your account is overdrawn, we also charge you interest on the overdraft amount. Please see the Schedule of Fees for your account.

What are "items"? Items include all orders and instructions for the payment, transfer, or withdrawal of funds from your account. As examples, items include a check, draft, image, substitute check, everyday non-recurring debit card transaction, recurring debit card transaction, ACH transaction, ATM transaction, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, and in-person payment, transfer or withdrawal instruction. For more examples, please review the definition of items in the Explanation of Some Terms section.

What are everyday non-recurring debit card transactions and what are recurring debit card transactions? Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

## Extended Overdrawn Balance Charge

The Extended Overdrawn Balance Charge is an overdraft fee. This fee is in addition to Overdraft Item and NSF: Returned Item fees that may apply to your account when an overdraft or returned item. This additional charge applies to your account when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by promptly covering your overdraft – deposit or transfer enough available funds to cover your overdraft, plus any fees we assessed, within the first 5 consecutive business days that your account is overdrawn.

Please see the Schedule of Fees for your account for more information about this fee.

## Personal Accounts - Overdraft Practices and Settings

We automatically apply our standard overdraft practices to personal accounts. We refer to this as our Standard Overdraft Setting. We also offer an optional Decline All Transactions overdraft setting.

With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. There is an exception for some ATM withdrawals. We may occasionally give you the opportunity to opt at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal. Please note that overdraft fees can apply to these withdrawals. We tell you at our ATM when this is available. With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments. For more examples of other transactions, please review the definition of items.

Optional Decline All Transactions Overdraft Setting. This is an optional overdraft setting that you can ask us to apply to your account. With this overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that we decline or return these transactions regardless of whether they could occur. Please note that returned item fees can apply to declined or returned transactions.

With either overdraft setting, your account might still become overdrawn. Here is an example of how that could occur. You want to use your debit card to make a purchase and a merchant asks us to authorize the transaction. We authorize the transaction because we determine you have enough available funds in your account at this time. However, we do not receive the debit card transaction from the merchant for processing and posting to your account that day. We do receive another transaction (such as a check you previously wrote) that we process and post that day and that other transaction reduces the available funds in your account below the amount of the debit card transaction. This means, unless you promptly trans-

fer or deposit enough available funds, when we receive the debit card transaction, it will overdraw your account.

With either overdraft setting, you may still incur fees for overdrafts and declined or returned items. Please review the Schedule of Fees for your account carefully.

## Business Accounts - Overdraft Practices and Settings

We automatically apply our standard business overdraft setting to business accounts. With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. For some business accounts, we offer an optional Decline All Transactions overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions.

With either overdraft setting, you may still incur overdrafts and fees for overdrafts and declined or returned items.

## Posting Orders

We determine the order in which we process and post deposits and other credits and checks and other items to your account. We may pay or authorize some items, and decline or return others, in any order we deem appropriate. When you do not have enough available funds to cover all of the items presented that day, some processing and posting orders can result in more insufficient funds items and more overdraft and returned item fees than other orders. We may choose our processing and posting orders regardless of whether additional fees result. Please see the Processing and Posting Orders section for more information.

## Occurrences

An "occurrence" is a day during which your account has at least one overdraft item or returned item. The fee for each overdraft item and each returned item may vary based on the number of occurrences for your account during the current monthly statement cycle and preceding 12 monthly statement cycles. If we transfer your account to another banking center or convert it to a different type of account, your record of overdraft items and returned items continues to apply.

## Overdraft Protection Plans

We recommend that you enroll in one of the optional Overdraft Protection plans described below to help protect your account from overdrafts and declined or returned items. You can enroll most checking accounts and money market savings accounts in these plans. Please ask us whether your account is eligible. The fees under these plans may be less expensive than the fees for overdrafts and returned items.

The Schedule of Fees for your account explains the fees and other charges that apply to Overdraft Protection plans. Please review the Schedule of Fees for your account carefully.

Please note the following. Some of these Overdraft Protection plans are not available in all states. Only one plan can be linked to an account at a time. Some accounts are not eligible for these plans. Under some plans we make transfers in a minimum amount so we might not make a transfer if you do not have at least the minimum transfer amount available under the plan. To link accounts under these plans, at least one of the owner(s) of the account must usually be an owner of the other account. Certain other restrictions apply.

Overdraft Protection from Another Deposit Account. This plan links your account to another Bank of America deposit account for overdraft protection. The other deposit account can be a second checking account or a savings account.

When you do not have enough available funds in your account to cover an item, we may automatically transfer funds from the available balance in your other deposit account to your account. We generally charge an overdraft protection transfer fee for each transfer. Funds you deposit into your other deposit account may not be available immediately for overdraft protection transfers. If you use your savings account for this service, each transfer counts as one of the six limited transactions you are allowed each month from your savings account. We cancel this Overdraft Protection plan if your account or the other deposit account is closed.

Please see the Schedule of Fees for your account for more information about overdraft protection from another deposit account.

Overdraft Protection from Your Credit Card. This plan links an eligible Bank of America credit card to your account for overdraft protection.

When you do not have enough available funds in your account to cover an item, we may automatically advance available funds from your linked credit card account and transfer the funds to your account. An advance is made under, and is subject to, the terms and conditions described in the applicable credit card agreement. We ordinarily do not make an advance if you are

in default under your credit card agreement or if the advance would cause you to exceed the amount of credit available for that type of transaction. As examples, we may decide not to advance funds from your credit card account if you fail to make a credit card payment by its due date or if you exceed any credit card limit on your credit card account. The funds advanced are subject to fees and finance charges under your credit card agreement. For some business accounts, we may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your credit card agreement for more information about overdraft protection from your credit card account.

Overdraft Protection from Your Line of Credit. This plan links an eligible Bank of America line of credit to your account for overdraft protection.

When you do not have enough available funds in your account to cover a check or other item, we may automatically advance funds from your linked line of credit and transfer the funds to your account. The advance is made under, and is subject to, the terms and conditions described in the line of credit agreement. We ordinarily make the advance as long as you are not in default under the line of credit agreement and as long as the advance does not cause you to exceed the amount of your available credit on your line of credit. The funds advanced are subject to fees and finance charges under the line of credit agreement. We may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your line of credit agreement for more information about overdraft protection from your line of credit.

# Processing and Posting Orders

## Processing Transactions and Posting Orders

Posting transactions to your account impacts your account balance. Posting a credit increases your balance, while a debit or hold reduces your balance. Credits include teller deposits, direct deposits and credits we make. Holds include deposit holds, debit card authorizations, and holds related to cash withdrawals and electronic transfers. Debits include withdrawals, transfers, payments, checks, one-time and recurring debit card transactions, and fees.

We use automated systems to process transactions and then to post transactions to accounts. When we process multiple transactions for your account on the same day, you agree that we may in our discretion determine our posting orders for the transactions and that we may elect which are not cashed at our option.

## Posting Orders

This section summarizes how we generally post some common transactions to your account.

We group the different types of transactions into categories. We use several different categories for holds, credits, and debits. Most categories include more than one transaction type.

After the end of the business day, our automated systems assign each transaction received for that day to a category. We generally post all transactions within a category, using the posting order or orders that apply to that category, before we post any transactions assigned to the next category.

We start with the balance in your account at the beginning of the business day, subtract holds from your balance, and make any adjustments from prior days. Next, we generally add credits to your balance and then subtract debits from your balance. Some, but not all, of our categories are shown below. For each debit category shown below, we list some common types of debits that we assign to the category and generally post them within the category.

- We add deposits and other credits to your balance.
- Then, we subtract from your balance in date and time order the types of debits listed in this paragraph, when our systems receive date and time information. If our systems do not receive date and time information, then we subtract the remaining debits in this category from your balance in order from the highest to lowest dollar amount.

Common debits in this category include:
- one-time and recurring debit card transactions;
- withdrawals made at our tellers and ATMs;
- transfers made at ATMs, through our tellers, by telephone, and through Online Banking and Mobile Banking;
- checks you wrote that are cashed at our tellers; and
- wire transfers.

- Then, for other checks you wrote, we subtract from your balance checks with check numbers in check number order when our systems can read the check number. Checks without a check number that our systems can read are subtracted in order from highest to lowest dollar amount.

As an example, on the same business day we receive five checks that you wrote and were not cashed at a teller. Our systems can read three of the check numbers, which are #105, #112, and #115. The other two checks do not have check numbers that our systems can read. We subtract check #105 first, then #112, and then #115. Then, we subtract the two remaining checks in order from the highest to lowest dollar amount.

- Then, we subtract from your balance many other types of electronic debits in order from the highest to lowest dollar amount. These debits include: scheduled transfers, preauthorized or automatic payments that use your deposit account number (generally referred to as automated clearing house (ACH) debits), and Online Banking and Mobile Banking bill payments.

- Then, we subtract from your balance certain fees (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

## Changing Posting Orders

You agree that we may determine in our discretion the orders in which we post transactions to your account.

You agree that we may determine our categories, the transactions within a category, the order among categories, and the posting orders within a category. We sometimes add or delete categories, change posting orders within categories and move transaction types among categories. You agree that we may in our discretion make these changes at any time without notice to you.

## Posting Orders Determined at End of Day

We receive credits, debits and holds throughout the day. Regardless of when during the day we receive transactions for your account, you agree that we may treat them as if we received all transactions at the same time at the end of the business day.

During the day, we show some transactions as processing. As an example, we show some transactions as processing on the Account Details screen in Online Banking. Please note that transactions shown as processing have not been posted yet. The posting order for these transactions is determined at the end of the day, with the other transactions we receive for that day.

You should note that often we do not receive debits on the same day that you conduct them. As an example, when you use your debit card to pay for a purchase at a merchant and sign for the transaction, we usually receive an authorization request from the merchant the same day, but we might not receive the final debit card transaction for payment and posting until several days later.

We generally post credits and debits to your account, and report them on your statement, in a different order than the order in which you conduct them or we receive them.

## Overdraft Fees

We generally determine at the time we post a debit to your account whether it creates an overdraft and whether an overdraft or returned item fee applies. You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your balance, the transaction creates an overdraft when we post it to your account. You can avoid fees for overdrafts and returned items by making sure that your account always contains enough available funds to cover all of your transactions. When your account balance includes some funds that are subject to a hold, dispute or legal process, you should note that those funds are not immediately available to cover your transactions.

We offer services to help you manage and keep track of your finances, such as Online Banking and Online Alerts. Please see "How to Get Started" at the beginning of this agreement.

Our posting orders can impact the number of overdraft fees we charge you when you do not have enough available funds to cover all of your transactions. When several debits arrive the same business day for payment from your account and you do not have enough available funds in your account to cover all of the debits we receive for that day, you understand that same posting orders can result in more overdrafts, and more fees for overdraft items and related items, than if we had used other

posting orders. You agree that we may in our discretion choose our posting orders, and also change them from time to time, regardless of whether additional fees may result.

When your account balance includes some funds that we do not make available at the time that we post a debit, and you do not have enough available funds in your account to cover the debit, the debit results in an overdraft and we generally charge you an overdraft item fee or returned item fee for the debit. You should note that we do not show holds, or distinguish between available and unavailable funds in your account balance, on your statement so when you review your statement later, it might appear that you had enough available funds in your account to cover a debit for which we charged you a fee.

## Certain Transactions Made After Business Day Ends

During processing, we generally include in your account balance some transactions that you make after the business day cuts off, but before the end of the calendar day. These transactions are described below. This can impact fees that apply to your account. The credits can help you avoid overdrafts, returned items, and related fees. However, the debits can cause you to incur overdrafts, returned items, and related fees. You should note that we show these transactions on our statement as posting to your account on our next business day.

Credits.  We generally add to your account balance the following credits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash deposited at one of our ATMs or banking centers; and
- Transfers to your account from another deposit account with us made at one of our ATMs or banking centers, through Online Banking, Mobile Banking, or by calling customer service.

Debits.  We generally subtract from your account balance the following debits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash withdrawals made at one of our ATMs or banking centers, through Online Banking, Mobile Banking, or by calling customer service.

- Transfers from your account made at one of our ATMs or banking centers, through Online Banking, Mobile Banking, or by calling customer service.

# Processing Deposits and Cashed Items

We may forward deposits, cashed items and other transaction requests for an account to one of our processing centers. We may use the date that our processing center receives the transaction as the effective date of the transaction.

## Cashing Items or Accepting Items for Deposit

We may accept, for collection only, refuse, or return all or part of any deposit. If we accept checks or other items for deposit to your account or cash them, you are responsible for the checks and other items if there is a subsequent problem with them.

- If we cash a check or other item for you or credit it to your account and it is not paid for any reason, we may charge your account for the amount of the check or other item, even if this causes your account to become overdrawn.

- We may accept a check or other item for deposit to your account from anyone. We do not have to question the authority of the person making the deposit.

- If your account is overdrawn, we may use the deposit to pay the overdraft and any fees you owe us.

- All deposits are subject to our subsequent verification and adjustment, even if you have already withdrawn all or part of the deposit unless you can prove our determination was erroneous.

- We may refuse to accept for deposit to your account items payable to another person.

- In receiving checks or other items for deposit or collection, we act only as your collecting agent and assume no responsibility beyond the exercise of ordinary care. We are not responsible for errors and delays made by others in the collection process.

- We may assess a charge for processing cash in a deposit.

- If we give you cash that we later determine to be counterfeit, we may charge your account for the amount we determine to be counterfeit.

- You will not knowingly deposit items into your account that do not have either a true original signature of the person on whose account it is drawn or an authorized mechanical reproduction of that person's signature.

**Deposit Slips** You should always use our personalized deposit slips with your preprinted name and account number. If you use a blank deposit slip from one of our banking centers, rather

than your personalized deposit slip, we are not liable to you for errors that may result from your or our hand encoding the account information.

**Checks, Cashier's Checks, and Similar Items** We cannot generally verify that checks, money orders, cashier's checks or similar items are authentic and valid at the time you ask us to cash them or accept them for deposit. If we cash, or accept for deposit, a check, money order, cashier's check or similar item and we later learn that the item is fraudulent, counterfeit or invalid for some other reason, we may charge your account for the amount of the item, This may occur even if items for deposit were previously made, the funds available to you, or this causes your account to become overdrawn.

**Foreign Items** You should be especially cautious about accepting items drawn on banks located outside of the United States. See Foreign Items and Foreign Currency.

### Checks Lost in the Collection Process

When we cash a check for you or accept a check for deposit to your account, we are acting as your agent in collecting the check. We are not responsible if the check is lost or delayed in the collection process. We may charge your account for the amount of the check, even if this causes your account to become overdrawn, if a check is lost during the collection process or if the financial institution on which the check is drawn gives us a photocopy of the check or a debit slip representing the check.

A check that was lost may not be returned to us for some time. Despite any delay, we may charge your account when we receive either the returned check, a copy of the check, or a notice of return.

### Collection Items

We may accept certain items — such as certain securities and checks payable in foreign currencies or at foreign locations — on a collection basis only. We route and process collection items separately. We normally credit your account for collection items, only after receiving payment for them. But if we do credit your account and then do not receive payment, we may debit your account for the amount of the item, even if this causes your account to become overdrawn.

We charge fees for processing collection items. Financial institutions in the collection process and the financial institution on which the collection item is drawn may also charge fees. If a financial institution requires payment of a fee before that institution will process the collection item, we may pay the fee and charge your account. A financial institution may subtract its fee from the amount of the payment we receive. You have to pay these fees even if the collection item is returned unpaid.

For our current collection fees, call us at the number for customer service shown on your statement, or ask a banking center associate.

### Demand Drafts and Remotely Created Checks

If you deposit a demand draft or remotely created check (an unsigned draft or a preauthorized draft) into your account, you warrant and guarantee that the draft or remotely created check is authorized according to the terms on its face by the person identified as drawer. You agree to indemnify us from all loss, expense and liability related to a claim that such draft or check was not authorized by the persons on whose accounts it was drawn.

### Deposit Preparation and Acceptance

When you make deposits through our banking centers, including lobby boxes, ATMs, night depositories and other automated depositories, or by mail, we may use the method of delivery to our branch or processing center to determine when we accept the deposit, when you receive credit for the deposit, and whether deposit fees apply.

If we credit your account for a deposit and provide you with a receipt, we may use the amount shown on the deposit slip or otherwise specified by you. The amount of the credit is subject to subsequent verification by us and, after review, we may adjust your account for any errors.

Any of our employees or authorized agents may open and count any deposit that a teller did not count in front of you, including coin deposits, cash deposits, and cash deposit made thru the mail, a lobby box, a night depository, or other automated depository. You agree not to dispute that employee or agent's determination of the amount you delivered. We may treat these funds as not accepted by us for deposit until we have verified the amount.

If you make your deposit through a mechanical or automated depository such as an ATM or night depository, you agree to exercise due care in opening, closing and properly securing the depository.

If your deposit includes items that we do not accept for deposit, we may hold those items until claimed by you.

### Deposit Error Correction

When we accept your deposits, we may provisionally credit your account for the amount declared on the deposit slip, subject to later verification by us. You must ensure that the amount declared on the deposit slip is correct even if you did not prepare the deposit slip. If later we determine that the amount declared on the deposit slip are incorrect, we may adjust (debit or credit) your account. We report adjustments on your account

statement. However, if the error in completing the deposit slip was inadvertent and is less than our standard adjustment amount, we will not adjust the deposit unless you notify us of the error within one year of the date of your periodic statement that shows the deposit. After this notice period has passed without your bringing an error to our attention, the deposit amount indicated on the statement will be considered finally settled. That is, if the actual amount deposited was less than the amount declared on the deposit slip, the difference will become your property and if the actual amount was more than the amount declared on the deposit slip, the difference will become our property. We may change our standard adjustment amount from time to time without notice to you.

### Encoding Deposits

If you are a business client, you may ask us for permission to encode the MICR (Magnetic Ink Character Recognition) line of an item you deposit with us. If we permit this, you agree to follow the instructions we give you for preparing and encoding your deposits. If you make an encoding mistake that results in costs, losses or damages to us, you agree to reimburse us for our costs, losses and damages, including attorneys' fees. We may charge them to your account. We are not liable for any error, losses, or damages you may incur when you encode your own items.

If our equipment is unable to read what we consider a significant number of your encoded items, we may refuse to accept some or all of your items and we may charge you fees for each item we do accept.

You must provide us with a replacement or a copy of each original check if the deposit is lost or destroyed. We are not liable to you if you are unable to do so.

### Endorsing Checks

We may endorse and/or collect items deposited to your account without your endorsement but may, at our option, require your personal endorsement prior to accepting an item for deposit. If you deposit items which bear the endorsement of more than one person or of persons who are not signers on the account, we may refuse the item or may require you to have their endorsement guaranteed before we accept an item.

We may accept for deposit checks payable to any signer on your account when endorsed by any other signer.

When you endorse checks that you ask us to cash or deposit, you must endorse within 1-1/2 inches, which extends 1-1/2 inches from the trailing edge of the back of the check. You must also confine information that you place or have preprinted on the back of your checks to the same area. Otherwise, it may overlap into the area reserved for the banks' endorsements. The

17

18

trailing edge is the left side of the check when you look at it from the front.

If you endorse a check outside of that area, mark or otherwise obscure the other area or a prior endorsement or make an endorsement that is illegible or incomplete, we may refuse the item or we may accept it. Such nonconforming endorsement and you agree to hold us harmless from any loss, delay, liability, claim or damage which may arise as a result.

It it becomes necessary for us to return one of your checks, your endorsement or information placed on the back of the check may interfere with the bank endorsements and cause delays in returning the item. You are liable for and agree to reimburse us for all claims, losses and damages that result from late return of a check due to material entered on the back of the check that obscured or interfered with the depositary or another bank's endorsement.

**Identifying the Account for Your Deposit**

You must correctly identify the account to which you want funds deposited. We may credit a deposit to an account based solely on the account number listed on the deposit slip or other instruction to credit an account, even if the name on the deposit slip or other instruction differs from the name on the account.

You are responsible for any claim, loss or damage caused by your failure to properly identify the account to which a deposit is made or intended to be made.

**Overpayments and Reversals**

If funds to which you are not entitled are deposited to your account by mistake or otherwise, we may deduct these funds from your account, even if this causes your account to become overdrawn. If the funds were transferred from your account, we may reverse the transfer. We can do this without giving any prior notice or demand.

**Returned Items**

This section applies to items that you deposit or that we cash for you (a "cashed or deposited item") and includes items drawn on us as well as items drawn on other financial institutions. You are responsible for returned items.

If a cashed or deposited item is returned to us at any time for any reason by the bank on which it is drawn or any collecting bank, we may accept that return, pay the claiming party, and charge the item to your account without regard to whether the item or the other bank finally paid the item or returned the item in accordance with any applicable midnight deadline or clearing-house rule. We may also deduct from your account any interest you may have provisionally earned on the item. We may charge you a fee for each returned item. Different fees may apply to domestic and foreign items. We may debit your account for a returned item at any time on or after the day it is returned to us by electronic, automated clearinghouse ("ACH") or other means or on the day we receive notice that the item is being returned to us - whichever is earlier.

As an example: If an item deposited in your account has been paid by the bank on which it is drawn (including on us) and that item is later returned to us with a claim that the item was altered, forged, unauthorized, bears a forged or missing endorsement or should not have been paid for any reason, we may at our discretion charge the item against your account, or place a hold on the amount of that item against your account until the claim is finally resolved. We may take these actions without prior notice to you and regardless of whether settlement with respect to such item is considered final.

We are not obligated to question the truth of the facts that are asserted, to assess the timeliness of the claim, to take any action to recover payment of a returned item, or to assert any defense. We do not need to notify you in advance of our actions related to the claim. If you do not have sufficient available funds to cover a returned item, we may overdraw your account. We are not liable to you if there are insufficient funds to pay your items because we withdraw funds from your account or in any way restrict your access to funds due to a hold or debit to your account in connection with a returned item. You agree to repay immediately an overdraft caused by a return of a cashed or deposited item.

In some cases, the financial institution on which the returned check or other item is drawn may send us an electronic notice of return, an indemnified copy of the original, an image replacement document ("IRD") or an image, instead of returning the item. We may act on, and you agree to be bound by, the electronic notice of return, or indemnified copy or IRD just as if the original item had been returned.

We may send the unpaid item back for collection a second time before notifying you, but we are not obligated to do so. You waive notice of dishonor and protest. You agree that we will have no obligation to notify you of any item that is being returned. However, if we receive an electronic notice of return from the financial institution that it is returning to us unpaid a check of $2,500 or more, we may send you a notice. We do not send a notice about returned checks of less than $2,500.

**Substitute Checks**

You agree that you will not cash or deposit "substitute checks" as defined by federal law or Image Replacement Documents ("IRD") that purport to be substitute checks unless they have been previously endorsed by a bank. If you cash or deposit such an item, you give us the same warranties and indemnities that we, as a reconverting bank, would give under applicable law or regulation and you agree to reimburse us for claims, losses, costs and damages we may incur. If you provide us with an electronic representation of a substitute check for deposit into your account, instead of an original check, you agree to reimburse us for all claims, losses, costs and damages we incur because the substitute check resulting from the electronic representation does not meet applicable substitute check standards or causes duplicate payments.

**Third-Party Endorsements**

We may require that checks and other items you want to deposit or cash be endorsed by all parties to whom the items are payable. We may require verification of any endorsement through either an endorsement guarantee or personal identification.

# When Funds are Available for Withdrawal and Deposit Holds

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day of your deposit. However, in some cases we place a hold on funds that you deposit by check. A hold results in a delay in the availability of those funds. When we place a hold, you will have to wait a few days before being able to use the funds. When we decide to place a hold at the time you make your deposit, the teller or ATM gives you a notice that lets you know funds are on hold. For ATM deposits, the hold notice is usually included on the ATM receipt. The hold notice will let you know the date and the time when the funds will be available for you to use. In some cases, you will not get the hold notice from the teller or ATM, but later by mail. You can avoid funds by using direct deposit or wire transfers.

In many cases, we make funds from your deposit available to you even sooner than are able to collect the checks. This means that, from time to time, a deposited check may be returned unpaid after we made the funds available to you. Please keep in mind that even though we make funds from a deposited check available to you and you withdraw the funds, you are still responsible for problems with the deposit. If a check you deposited is returned to us unpaid for any reason, you will have to repay us and we may charge your account for the amount of the check, even if doing so overdraws your account.

While we generally apply our funds availability policy to deposits you make to savings accounts (including money market savings accounts), and to deposits you make using a mobile device, please note that our funds availability policy does not apply to these deposits, and we may delay availability of funds from these deposits.

**Your Ability to Withdraw Funds**

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day we receive your deposit. Our policy is to make funds from electronic direct deposits available through the automated clearing house (ACH) and incoming wire transfers available to you on the day of the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit on a business day that we are open as one of our banking centers before 2:00 p.m. local time, or at one of our ATMs before 5:00 p.m. local time in the state where we maintain your account, we consider that day to be the day of your deposit. However, if you make a deposit after such times, or on a day when we are not open or that is not a business day, we consider that the deposit was made on the next business day we are open. Some locations have different cutoff times.

**Longer Delays May Apply**

In some cases, we will not make all of the funds that you deposit by check available to you by the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, may be available no later than the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available to you at the times we have stated, or if we decide to take this action after you have left the premises, we mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, we may delay the availability of funds you deposit by check for a longer period under the following circumstances:

- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last six months.

- There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

### Special Rules for New Accounts

If you are a new customer, the following special rules may apply during the first 30 days the account is open. Funds from electronic direct deposits to your account are available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks are available no later than the first business day after the day of your deposit. If the deposit meets certain conditions. For example, the checks must be payable to you and deposited in person to one of our employees. The excess over $5,000 is available by the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of deposit. Funds from all other check deposits are generally available by the fifth business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see Longer Delays May Apply above).

### Government Checks, Cashier's Checks and Other Special Types of Checks

Our policy is to make funds from U.S. Treasury checks that are payable to you available no later than the first business day after the day of the deposit.

If you make the deposit in person to one of our employees, and meet the other conditions noted below, our policy is to make funds from the following types of deposits available no later than the first business day after the day of your deposit:

- State and local government checks that are payable to you and are deposited in an account in the same jurisdiction that issued the check.
- Cashier's, certified and teller's checks that are payable to you.
- Federal Reserve Bank checks, Federal Home Loan Bank checks and U.S. Postal Service money orders that are payable to you.

If you do not make your deposit of these checks in person to one of our employees (for example, if you mail the deposit), our

---

policy is to make funds from these deposits available no later than the second business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see Longer Delays May Apply above).

### Cash-Withdrawal Limitation

If we delay availability of your deposit, we place certain limitations on withdrawals in cash or by similar means. In general, $200 of a deposit is available for withdrawal in cash or by similar means no later than the first business day after the day of deposit. In addition, a total of $400 of other funds becoming available on a given day is available for withdrawal in cash or by similar means at or after 5:00 p.m. on that day. Any remaining funds will be available for withdrawal in cash or by similar means on the following business day.

Similar means includes electronic payment, issuance of a cashier's or teller's check, certification of a check, or other irrevocable commitment to pay, such as a debit card transaction.

### Holds on Other Funds

If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. In either case, we make these funds available in accordance with our policy described above for the type of check that was cashed or deposited.

## Processing Withdrawals

We may forward withdrawals and other transaction requests for an account to one of our processing centers. We may use the date that the processing center receives the transaction as the effective date of the transaction.

### Cashing Checks for You

Check cashing services may not be available at some banking centers. We may occasionally refuse to cash a check written to you. If we do cash such a check and it is returned to us unpaid for any reason at any time, we may deduct the amount of the check from your account, even if this causes your account to become overdrawn, and we may charge you a fee.

We may cash checks payable to any signer on your account when endorsed by any other signer.

---

If you ask us to cash a check or other items for you, we may apply the proceeds of the check or other item to fees, overdrafts and other amounts you owe us.

### Cashing or Accepting Your Checks for Others

When a person with a check or other item drawn on your account asks us to cash it or accept it for deposit, we may require identification satisfactory to us; charge them a fee for cashing the check; and require their fingerprint. We may also impose additional requirements. We may refuse to cash a check for a person who is not our loan or deposit customer.

If the person with your check fails or refuses to satisfy our requirements, we may refuse to cash the check or accept it for deposit. We are not liable to you for refusing to cash or accept the check, or for charging a check cashing fee.

When we cash your check, or accept it for deposit, we may do so without reviewing your account at that time to see whether you have enough available funds to cover the check.

### Checks with Legends or Restrictions

Some customers print or write legends or restrictions on their checks. Sometimes the person to whom the check is payable prints or writes a legend or restriction on the check. Legends and restrictions include conditions, special or restrictive instructions, and other notations. Some examples are: "not valid after 90 days", "not valid over $1,000" or "paid in full". We may disregard legends and restrictions. We may pay the item even if the legend or restriction has not been met. We are not liable to you for any claims, costs, losses or damages that result from the placement of these legends or restrictions on your checks, or from our failure to abide by them.

### Collection Items

When another financial institution submits to us for collection an item drawn on your account, we may charge the other financial institution a fee. When you do not have enough funds in your account for us to process a collection item drawn on your account, we may charge you an overdraft or returned item fee.

### Check Stock and Ink

You agree to bear the risk of loss if you use check stock that contains defects, such as printing inaccuracies, faulty magnetic ink, faulty encoding, or duplicate serial numbers.

Checks you write may be converted into electronic images (truncated) during the check collection and return process. You also agree to bear the risk of loss if you elect to have your checks printed by a vendor that has not been approved by us; you use check stock or features (such as security features)

---

that cause critical data to disappear or be obscured upon truncation; or you make your check out in a way (such as, using a lightly colored ink) that causes critical data to disappear or be obscured upon truncation.

### Converting Checks to Electronic Debits

Some businesses convert checks that you give them into electronic debits (sometimes referred to as an electronic check) and then sends us an electronic debit for the transaction amount. When we receive the electronic debit, we charge it to your account. We may receive the electronic debit to your account immediately after the business enters the transaction, so you may have a reduced right to stop payment and you may incur an overdraft if you do not have sufficient funds in your account to cover the amount of the check at the time you write the check or authorize the transaction. Since the check is not sent to us, we do not have a copy of your check. We list these electronic debits on your account statement. If the business uses your check to initiate an electronic debit, at the point of sale, the business should give you notice of the conversion and return the voided check to you. You should treat the voided check with care because someone else who obtains possession of it could use the information to initiate additional debits against your account. A business that receives your check by mail and converts it to an electronic debit may give you notice of the conversion and destroy the original check.

### Examining Checks

We receive checks in great volume. This and compliance with expected funds availability laws require us to use automated check processing procedures. Although we may visually review a sample of checks and other items from time to time, reasonable commercial standards do not require us to do so.

We select some checks for review based on certain criteria that change from time to time. This means that most checks are processed on the basis of the MICR (Magnetic Ink Character Recognition) line printed along the bottom edge of the check, and are not individually examined for dates, maker signatures, legends or endorsements. You agree that we will have exercised ordinary care if we examine only those items that we have identified according to the criteria that we may establish in our discretion for inspection.

If we do visually review any check or other item, we may disregard any restrictive instructions or notations, such as an instruction to permit withdrawals only upon more than one signature. We may return the item unpaid if, in our opinion, it does not bear a signature matching any specimen signature we have on file for your account. You agree, however, that we will not be

22

liable to you for honoring any check or other item bearing a signature that, in our sole opinion, resembles the specimen signature on file with us.

Since we do not individually examine most checks, it is critical for you to take care of your checks, promptly review your account statements, and immediately report any suspicious or unauthorized activity to us. You agree that automated processing of your checks is reasonable and that you accept responsibility for preventing and reporting forgeries, alterations, and other unauthorized uses of your checks or accounts. You agree that the exercise of ordinary care will not require us to detect forgeries or alterations that could not be detected by a person observing reasonable commercial standards.

Since some types of check fraud have become more difficult to detect, we may elect in some cases to make further inquiries about certain checks or other items that are presented for payment against your account. If we are unable to contact you, or take other steps, to determine with reasonable certainty that you authorized these payments, we may either pay the checks and other items or return them unpaid without any liability to you.

## Items Resulting from Voluntary Disclosure

If you voluntarily disclose your account number to another person orally, electronically, in writing or by other means, you are deemed to authorize each item, including electronic debits, which result from your disclosure. We may pay these items and charge your account.

## Large Cash Withdrawals

We may require reasonable advance notice for large cash withdrawals. We may also refuse to honor a request to withdraw funds in cash from your account or to cash a check (including a cashier's check or official item) at a banking center if we believe that the amount is unreasonably large or that honoring the request would cause us an undue hardship or security risk. We may require that such withdrawals be made at one of our cash vaults by an armored courier, acceptable to us and at your sole risk and expense. We are not responsible for providing for your security in such transactions.

## Paying Checks and Other Items

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, or on the day we receive notice that the item has been deposited for collection at another financial institution — whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item. We are required to determine your account balance only once during this time period.

When you deposit checks or other items that are drawn on another account with us, we may treat such items as presented to us for payment on the business day that they are received by our office that processes checks drawn on the other account.

## Stale-Dated and Postdated Checks

If a stale-dated check — that is, a check dated more than six months in the past — is presented for payment against your account, we may pay the check and charge it to your account. If a postdated check — a check dated in the future — is presented for payment, we may pay the check and charge it to your account even if it is presented for payment before the date stated on the check. If you do not want us to pay a stale-dated or postdated check, you must place a stop payment order on it. See the Stop Payment Orders and Postdating Orders section.

## Substitute Checks, Indemnified Copies, Images and Image Replacement Copies

In some cases, we may be sent an indemnified copy of your original check, an image replacement document (IRD), a substitute check or an image of your check. Instead of the original item, we may act upon presentment of an IRD, indemnified copy, substitute check, or image of your check and pay these items against your account, just as if the original item had been presented.

## Unpaid Items

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic image or copy of the item in our records. If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

## Substitute Checks and Your Rights

The following provisions help explain some of the rights a consumer has under a federal law commonly referred to as Check 21. Check 21 was enacted to increase the efficiency of the U.S. check clearing system. The clearing system relies heavily on the physical transport of checks between banks. Check 21 allows banks to create substitute checks and present them to other banks instead of the original check. This reduces the transport of checks among banks and helps enable the electronic collection of checks.

## What is a substitute check?

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

## What are my rights regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

## How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at the telephone number listed on your account statement, or write to us at:

Bank of America
Attn: Research and Adjustments
P. O. Box 31500
Tampa, FL 33631-3590

You must contact us within 40 calendar days of the date the we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include—

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: your account number, the check number, the name of the person to whom you wrote the check, the amount of the check and the date of the check.

23

24

# Notices, Statements and Other Communications

## General Terms for Notices, Statements and Other Communications

Please review promptly all notices, statements and other communications we send you. In this section "communications" means all notices, statements and other communications we send you.

We may provide communications in English. Many communications will be notices of change affecting your rights and obligations. If you have questions about any of them or difficulty reading English, please call us at the number for customer service on your statement.

We may:

- address communications to one account owner;

- provide communications in English, even though we may have given you account opening documents and disclosures in a language other than English;

- destroy communications that are sent to you and returned to us as being undeliverable, along with any accompanying checks and other items;

- authorize the Post Office or an agent to destroy communications, along with accompanying checks and other items, that the Post Office informs us are undeliverable; and

- stop sending communications to you until a new address is provided to us if one or more communications that we mail to you are returned to us as being undeliverable.

We are not responsible for communications, or for any checks or other accompanying items, lost while not in our possession. If we receive communications that we send you at a banking center, they are deemed to have been delivered to you at the time that they are available to you at the banking center.

**Electronic delivery of communications** We recommend that you use our Online Banking service and receive your communications electronically. When you use electronic or paperless delivery, we deliver communications by placing them in Online Banking. You can find your account statements, notices, and other eligible documents in Online Banking within the statements and documents area of your account details page. Communications currently available for electronic delivery are listed in the statements and documents area of Online Banking.

## Notices

When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you. In some cases, we may post a notice of a change in our banking offices or on our website. Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically. We may provide a notice as a message on your statement or as an insert with your statement.

If a notice of a change to this Agreement is returned to us as being undeliverable or if we stop sending notices to you because notices or statements we previously sent you were returned to us as being undeliverable, you understand that the notices are available to you through our banking centers. You agree to that method of delivery and that changes covered in these notices are still effective and binding on you.

A notice sent to any one owner is deemed notice to all account owners and is effective for all account owners.

## Statements

We provide you with a single statement when there is activity on your checking or savings account. When there is no activity on your account, we may choose not to provide a statement. You may generally obtain an additional copy of your statement for a fee.

We recommend that you use our Online Banking service and receive your statements electronically.

If your statement is received at one of our offices, we may mail it to you or destroy it, along with any accompanying checks and other items.

**For checking, money market savings and business savings accounts,** we provide you with a monthly statement. Statement cycles generally vary from 28 to 33 days and may end on different days during the month. A statement cycle can be shorter than monthly. As examples, a statement cycle may only be a few days in length for the first statement cycle after an account is opened or when a statement date is changed to link accounts for combined statements. If you want to review the history and current cycle activity, you can view images of your checks up to 10 images on a page. We do not return your canceled checks. In some states and for some business accounts we provide an image of the front and back of your canceled checks. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

**For Regular Savings accounts,** we provide you with a quarterly statement. If you have an electronic fund transfer (such as a direct deposit or an ATM withdrawal) to or from your account during any month, we provide a statement for that month.

**For analyzed business checking accounts,** you can elect to receive an additional monthly account analysis statement. This statement includes balance and float information, quantity of

services used during the period, fees and charges for these services and the earnings allowance, if any.

For IRAs, we provide you with a quarterly statement.

**Combined Statements** With combined statement service we provide a single statement that reports activity for all accounts linked for this service, instead of separate statements for each linked account.

Accounts with at least one common owner may be linked and reported on a combined statement, either automatically or at your request. When accounts are reported on a combined statement, you understand and agree that each owner and each signer of any linked account can review information about all linked accounts. As an example: If you own a checking account jointly with others and you link your individual savings account to this checking account for combined statement service, then each of the other owners and signers of the joint checking account can review information about both the checking account and your individual savings account. You should not link accounts for combined statement service that you do not want others to see.

You must generally request combined statement service and tell us what accounts you want us to link and report on a combined statement. In some cases, however, we may automatically send you a combined statement. As an example: we may automatically link accounts that have the same owners and provide a combined statement for those accounts.

We may restrict what accounts can be linked for a combined statement. Please note that combining accounts on a single statement does not mean they are also linked for pricing. To determine which accounts can be linked, or to link accounts, for combined statements or for combined balances (pricing), please call us.

## Check Image, Safekeeping and Enclosure Services

For most accounts, we offer the following options regarding your canceled checks.

**Check Image Service** We provide you with your statement an image of the front of each of your canceled checks that we post to your account during the statement cycle. We provide images of your checks up to 10 images on a page. We do not return your canceled checks. In some states and for some business accounts we provide an image of the front and back of your canceled checks. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

We store copies of your canceled checks (usually on microfilm or as a digital image) and then destroy the checks. Copies of checks are generally available for seven years from the date

the checks are paid. See Check Copies in Other Terms and Services.

**Check Safekeeping Service** We report on your statement information about canceled checks (check number, amount and date posted) that posted to your account during the statement cycle. You do not receive your canceled checks with your account statement. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

If your canceled checks are returned to us, you automatically receive check safekeeping service. If you usually receive your checks with your statement but we are unable to return them because of circumstances beyond our reasonable control, we may convert your account to check safekeeping service.

We store copies of your canceled checks (usually on microfilm or digital image) and destroy the checks. Copies of the checks are generally available for seven years from the date the checks are paid. See Check Copies in Other Terms and Services.

If you use our check safekeeping service, we cannot provide a copy of a check that posted to your account, and you lose money as a result, we may cover the loss up to the amount of the check. However, we are not liable to you for consequential loss or damage of any kind.

**Check Enclosure Service** This service is no longer available for most accounts. We return with your statement canceled checks that we received and posted to your account during the statement cycle. We may also provide you with images of your canceled checks.

We may not return some of your canceled checks. For example, if a check that you write is converted into an image or electronic debit during the check collection process, your check is not sent to us and, as a result, we cannot return the check to you. In some cases, we may receive a substitute check (also called an image replacement check) instead of your check. We do not return substitute checks with your statement.

## Your Address and Change of Address

We may send notices, statements and other communications regarding your account to you at the electronic or street address we have in our records for your account.

You agree to notify us if you change your address. If the United States Post Office or one of its agents tells us that your address has changed:

- we may change your address on our records to the address specified by the Post Office; and

- we may send notices, statements and other communications regarding your account to that new address.

25

26

## Actions You Can Take to Help Protect Your Account

Your use is extremely important in helping to prevent the wrongful use of your account. Please consider the measures below to help you protect your account.

**Stay Informed.** We offer several services you can use to help you keep track of your account on a daily basis. You can use our Online Banking service to review your accounts and Online Alerts to receive notice of account balances and activity. Please see the information about these services in How to Get Started.

**Be Cautious about Giving Out Your Personal Information.** We will not send you emails requesting personal information. If you receive an email that seems to come from us and requests personal information, do not answer it. Instead, please contact us immediately at the number on your statement.

**Be Cautious about Accepting Checks, Money Orders and Cashier's Checks, especially from Strangers.** You should be cautious about accepting checks, money orders and cashier's checks (especially, foreign checks) from strangers. Sometimes they are fraudulent or counterfeit. We cannot verify that a check, money order or cashier's check that purports to be issued by another company or financial institution is authentic, or has any value at all, when you give it to us and ask us to cash or deposit it.

We ordinarily make funds from a check you deposit (or we cash for you) available to you sooner than we are able to collect the check or determine whether the check is any good. If the check is returned to us unpaid for any reason, you are still responsible for the check. We charge your account for, and you will have to repay us, the full amount of the returned check. A check may be returned because it "bounces" or because the check is fraudulent, counterfeit or invalid for some other reason.

One way to help protect yourself is to take the check to the bank, company or other means (such as Western Union or service (such as the U.S. Postal Service) that issued it and redeem the check for cash. For more information on how to avoid being a victim of fraud, visit bankofamerica.com, or consult trusted organizations such as your local Better Business Bureau or the Federal Citizen Information Center. The following website is also a good resource — www.fakechecks.org.

**Review Statements and Report Suspected Problems Immediately.** You must promptly review the notices, statements and other communications, along with any accompanying checks and other items, we send you. You must also report

problems or unauthorized transactions to us immediately, by calling the number for customer service on your statement. See *Reporting Problems.*

**Identity Theft.** Identity theft occurs when someone uses your personal information without your permission to take over your existing account, or to open new accounts in your name. Identity theft often begins with the loss or theft of a wallet or purse. Criminals can also obtain your personal information by stealing records from your trash or sending fraudulent e-mails to you requesting your information.

You should destroy or shred account statements, checks, deposit slips and other documents with your personal information before you throw them away.

**Other Actions You Can Take**

Here are some other actions you can take to help control your risk. This is by no means a complete list of preventive measures. You may want to take other or additional actions.

• Do not share your passwords, user numbers or Personal Identification Number (PIN) for Online Banking or your ATM or debit card.

• Call us if your new check order or debit card does not arrive within 14 business days.

• Be cautious about giving someone your account number. If you give your account number to a third person and authorize that third person to initiate one or more transactions on your account, you may be liable for all transactions initiated by the third person even if you did not intend to authorize a particular transaction.

• Do not give anyone a pre-signed blank check. Do not give anyone permission to sign your name on a check.

• Do not preprint your driver's license or Social Security Number on your checks.

• Write checks in a dark colored permanent ink and fill in all blanks. Make sure the written and numeric amounts match, and begin on the far left of the line so additional numbers or words cannot be added.

• Write and sign your checks clearly, because illegible checks are easier to forge.

• Use tamper resistant checks. If you do not order checks through us, ask your check vendor about tamper resistant checks.

• Store blank checks, deposit slips and statements in a safe place and audit your check stock frequently. When discarding, destroy them by shredding or other means

so they cannot be copied or used. Call us immediately if any of these items are lost, stolen or missing.

• Use the same precautions that apply to your checks to your endorsement and signature stamps.

• Do not leave outgoing mail in an unlocked collection box or in your residence mailbox. Deposit outgoing mail in a locked Postal Service mail deposit box.

• Keep accurate records of your transactions and reconcile your statements as soon as they are made available to you. Pick up your mail everyday. When reviewing your statements, watch for:

– Checks cashed out of sequence or made payable to cash

– Use of a check number from a previously cleared item

– Balance discrepancies or unexpected fluctuations

• Reconcile your account yourself. If you have authorized someone else to transact on your account and you do not reconcile your account yourself, someone other than an authorized signer should reconcile your accounts.

• Business customers should assign to different individuals responsibilities for: opening mail, reconciling bank statements, endorsing incoming checks, making deposits, reconciling accounts payable checks with vendor invoices, reconciling incoming checks against outstanding receivables and issuing checks.

## Reporting Problems

If you find that your records and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement. If you fail to notify us in a timely manner, your rights may be limited. This section does not apply to electronic fund transfers that are subject to Regulation E. If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the Funds Transfer Services section), these provisions supplement the specific agreement and provisions to the extent they are inconsistent.

**Your Responsibility**

You must exercise reasonable control over your statements, checks, deposit slips, endorsement and signature stamps, debit and ATM cards, Personal Identification Numbers and other access devices. It is your responsibility to keep them safe and

secure and to promptly discover and report if any of them are missing in time to prevent misuse. You assume full responsibility for monitoring and reviewing the activity of your account, the work of your employees, agents and accountants, and any use they make of your account.

We may deny a claim for losses due to forged, altered or unauthorized transactions, items or signatures if you do not guard against improper access to your checks, statements, deposit slips, endorsement and signature stamps, and account information. We may also deny your claim if you do not monitor your account and report problems as provided in this section. Please review this *Reporting Problems* section carefully.

In some states we offer certain fraud prevention and detection products and services to business customers. If we have offered you one or more of these services, and you decline to use them or fail to implement them, or you fail to follow the procedures necessary for proper use of these products or services, or you fail to follow other precautions reasonable for your particular circumstances, you are precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

**What Are Problems and Unauthorized Transactions**

Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

**Reviewing Your Account Statements**

Your review of your statements, checks and other items and one of the best ways to help prevent the wrongful use of your account. You agree:

• to review your statements, checks and other items and reconcile them as soon as they are made available to you;

• that our statements provide sufficient information to determine the identification and authenticity of any transaction including, without limit, whether any are forged, altered or unauthorized if the statement includes the item number, amount and the date the item posted to your account;

• to report any problems or unauthorized transactions as soon as possible; and

- that 60 days after we send a statement and any accompanying items (or otherwise make them available) is the maximum reasonable amount of time for you to review your statement or items and report any problem or unauthorized transaction related to a matter shown on the statement or items. There are exceptions to this 60-day period. For forged, unauthorized or missing endorsements, you must notify us within the period specified by the state law applicable to your account. For substitute checks, you must notify us within 40 days to qualify for an expedited recredit. See section titled *Substitute Checks and Your Rights.*

## We Are Not Liable If You Fail To Report Promptly

Except as otherwise expressly provided elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:

- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and

- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

Except as otherwise expressly provided elsewhere in this agreement, we are not liable to you for subsequent unauthorized transactions on your account by the same person if you fail to report an unauthorized transaction on your account within 30 days (or such shorter period as is specified in the state law applicable to your account) following the closing date of the statement containing information about the first unauthorized transaction.

## Written Confirmation and Other Assistance

If you report to us that an unauthorized transaction has occurred on your account, we may require you to confirm your report in writing. We may also require that you give us a statement, under penalty of perjury, about the facts and circumstances relating to your report and provide such other information and proof as we may reasonably request.

If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with appropriate law enforcement authorities.

If you fail or refuse to do these things, we will consider your failure or refusal to be your notification of the defect in the statement or item, unauthorized transaction or other problem and your agreement that we can change the full amount to your account.

## Our Investigation and Maximum Liability

We may take a reasonable period of time to investigate the facts and circumstances surrounding any claimed loss. We do not have to provisionally credit your account while we investigate.

Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit or the forgery, alteration or other unauthorized withdrawal, reduced in all cases by the amount of the loss that could have been avoided by your use of ordinary care.

We are not liable for any special or consequential losses or damages of any kind, including loss of profits and opportunity or for attorneys' fees incurred by you.

## Business Insurance

If your claim relates to a business account, you agree to purchase all rights you may have under any insurance coverage you maintain before making a claim against us in connection with any unauthorized transactions. You will provide us with all reasonable information about your coverage, including the name of your insurance carrier, policy number, policy limits and applicable deductibles. Our liability is reduced by the amount of all insurance proceeds you receive or are entitled to receive. At our request, you agree to assign to us your rights under your insurance policy.

## Opening a New Account

If you or we suspect that your account is or may be compromised, we may recommend that you close your account and open a new account. If there are any unauthorized transactions on your account, we recommend that you close your account and open a new one. If we recommend that you close your account and you do not do so, we are not liable to you for subsequent losses or damages on the account due to unauthorized transactions. When you open a new account, you are responsible for notifying any third parties that need to know your new account number.

29

## Foreign Items and Foreign Currency

### What Is a Foreign Item?

A foreign item is a check or other item in any currency (including United States dollars) that is drawn on a bank or branch of a bank located outside of the United States. A foreign currency is any currency other than United States dollars. Some foreign items are payable in United States dollars. Some are payable in a foreign currency.

### Be Cautious About Accepting Foreign Items

You should be cautious about accepting foreign items because foreign items are not subject to United States laws or regulations. A foreign item may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the United States. If a foreign item is returned to us unpaid or there is some other problem with the foreign item, you are responsible for the item and you may incur a loss.

### Currency Exchange Rates

We may receive transactions related to your account or relationship with us for which we determine that it is appropriate to convert the transaction from a foreign currency to United States dollars or from United States dollars to a foreign currency. As an example, we receive a wire denominated in a foreign currency for credit to your account. When we decide to convert a transaction, we may determine in our discretion the currency exchange rate and then assign that currency exchange rate to your transaction without notice to you. You agree to this procedure and accept our determination of the currency exchange rate.

We may consider many factors in setting our currency exchange rates. Some of these factors are exchange rates set by others, our desired rates of return, market risk and credit risk. We are not liable to you if our currency exchange rates are different from rates: offered or reported by third parties; offered by us at a different time, at a different location or for a different transaction amount; or which involve different payment media (such as banknotes, checks and wire transfers). You acknowledge that:

- our currency exchange rates for retail and commercial transactions, and for transactions effected after our regular business hours or on weekends, are different (and usually less favorable to you) from the exchange rates for large inter-bank transactions effected during a business day (the rates reported in *The Wall Street Journal* or elsewhere are usually for large inter-bank transactions); ;

- currency exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from our rates; and

- currency exchange rates can be highly volatile and may change frequently during a day.

You assume all risks relating to or arising from fluctuations in the exchange rates between currencies.

### Wires Sent to a Foreign Currency Account

When you send a wire denominated in United States dollars to an account denominated in a foreign currency, an intermediary bank or the receiving bank may convert your wire into the applicable foreign currency and we may receive compensation in connection with such conversion. When this occurs, the intermediary bank or the receiving bank determines in their discretion the currency exchange rate. We are not responsible for the exchange rate set by an intermediary bank or the receiving bank.

### You May Not Write Foreign Currency Checks

You may not write checks or give other withdrawal orders on your account, which order payment in a foreign currency. If we receive such a check or order, we may refuse to accept or process it without any liability to you.

### Processing and Collecting Foreign Items

We may refuse to accept a foreign item for deposit or collection. If we accept a foreign item for deposit or collection, we assume all the risks relating to or arising from: the collection process, a late return and changes in currency exchange rates.

If we accept a foreign item for deposit or collection, we may decide not to credit the value of the foreign item to your account until we receive the proceeds in cleared funds from the paying bank. However, if we do credit your account, the credit is provisional and we may reverse the credit at any time.

If we accept an item for deposit which we later determine to be a foreign item, we may decide that the item needs to be sent for collection. If so, we may reverse any credit given for the item and mail the foreign item to your account at the address we have for your account statement. You may ask us to send the item for collection.

When we send a foreign item for collection, you understand that the foreign item is sent solely for you and at your risk and that we are not liable for any event in the collection process which is beyond our control. As examples, we are not liable for a default by any bank or agent involved in the collection

30

process or for the loss of the foreign item in transit. We may send the foreign item through a correspondent bank or directly to the paying bank. We may deduct our fees and the fees and charges assessed by the paying bank and any agents involved in the collection process from any amount collected or from your account.

If you request, we will try to determine the status of a collection. You agree to pay all fees and charges related to such a request. We may refuse your request if less than 30 business days have passed since we first processed the collection.

If a foreign item is returned to us unpaid for any reason at any time or is initially paid but then subsequently returned unpaid, we may charge your account for the foreign item and mail the foreign item to you at the address we have for your account statement. Even though the item is returned unpaid, we may charge you for our collection fees and for fees and charges assessed by the paying bank and any agents involved in the collection process.

When we credit your account for a foreign item, we use our applicable currency exchange rate on the day we credit the item to determine the amount of the credit. When we reverse a credit for a foreign item, we use our applicable currency exchange rate on the day we reverse the credit to determine the amount of the debit. Currency exchange rates are highly volatile and our rate on the day of the credit is likely to be different (sometimes very different) than our rate on the day of the debit. You understand and agree that this may result in a currency exchange loss to you.

# Other Terms and Services

## Account Changes

You must notify us of any change to your name or address. If you do not provide notice of change of address, we may send notices, statements and other correspondence to you at the address maintained on our records for your account and you agree to indemnify us and hold us harmless for doing so.

You agree to notify us in writing of any change in ownership or authorized signers of your account or if an owner or authorized signer on the account dies or is adjudicated incompetent.

If there is more than one owner and/or authorized signer on the account, any one account holder or authorized signer may request the account be closed without consent of any other account holder or authorized signer. Further, any one account holder may request, and we may, at our option, permit removal of any account holder or authorized signer without consent of any other account holder or authorized signer on the account.

You acknowledge that we may, but need not, require a new signature card to be completed before any change in ownership or authorized signers becomes effective and each time you open a new account, we may require a Taxpayer Identification Number certification. You also acknowledge that we may require you to close your account in the event of any change in ownership or change in the authorized signers.

After we receive notice of a change and all documents we require regarding the change, we may take a reasonable period of time to act on and implement the change to your account.

## Automatic Transfer Service

You may have funds transferred automatically from most Bank of America checking or savings accounts to another Bank of America checking or savings account or to pay a Bank of America loan or credit card account or safe deposit rental fee.

Federal regulation and this Agreement place limits on the number of automated transfers you may make from savings accounts each month. Please see "Limits on Withdrawals and Transfers from Savings Accounts". Certain other restrictions apply.

You must schedule transfers to pay a Bank of America loan for the due date each month. In most other cases, you may schedule transfers periodically on the dates and for the amounts that you specify. Transfers can only be made on a business day. If a scheduled transfer date falls on a weekend or bank holiday, we may make the transfer on the next business day. If we are unable to complete a transfer because you do not have enough available funds in your account, we may cancel this service.

## Check and Deposit Slip Forms

We offer checks, withdrawal forms and deposit slips in a number of styles and at various prices. We recommend that you use checks and other forms that we provide.

You are responsible for verifying the accuracy of all information on your checks and other forms, whether obtained through us or others or us. Our liability, if any, for any printing errors on checks or other forms obtained through us is limited to the cost of replacing the forms. We are not liable for any claims, costs, losses or damages you may incur when you use checks or other forms not obtained through us.

We may refuse to accept checks or other forms that you create or someone else provides that do not meet our then current specifications, even if they met our specifications at the time they were initially drawn. You may obtain a copy of our printing specifications by calling the telephone number on your statement or asking your account representative. These specifications include the magnetically encoded numbers, the size of the check and the weight, color and type of paper. If you create or obtain checks or other forms from someone else and our automated check processing systems are unable to read or process them, we may refuse to accept them and we may charge you a fee for each check or other item that we are unable to read or process through our automated systems.

## Check Copies

We generally keep a copy of each check we post to your account for seven years from the date the check posts to your account. We have no obligation to retain the original check.

We typically keep the copies on microfilm or as a digital image. If a copy is unavailable or of poor quality, we are not liable to you for any claim, cost, loss or damage of any kind. After seven years, we may destroy the copies.

**Requesting Copies** You may request a copy of a canceled check by calling us at the number for customer service on your statement. To produce a copy, we need the account number, check number, exact amount of the check, and the date the check was paid. This information is on your statement. Generally, we mail or make a copy available within seven business days. If we need more time, we tell you. A fee may apply to each check copy. Please see the Schedule of Fees for your account.

If a check that you wrote was converted to an electronic debit, then the check was not sent to us for processing so we do not have a copy. We list these electronic debits on your account statement.

## Compliance

You agree to comply with applicable laws and regulations. You may not use your account or related services for any illegal transactions or activity, for example those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et. seq. You agree to indemnify us from every action, proceeding, claim, loss, cost and expense (including attorney's fees) suffered or incurred by us due to any U.S. or foreign government entity seizing, freezing or otherwise asserting or causing us to assert control over any account or funds in an account of yours (or ours) when purportedly caused by, or arising out of, your action or inaction. This will apply whether or not such action is ultimately determined to be authorized under the laws of the U.S. or its territories, or of any foreign jurisdiction. We are not required to inquire or determine the authority of any action taken by the U.S. or foreign government entity prior to acceding to any legal process initiated by it.

Please note that your agreement to comply with applicable laws and regulations includes United States economic sanctions laws and regulations, including regulations issued by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury, and Executive Orders issued by the President of the United States.

## Conflicting Demands and Disputes

We are not required to make payment from an account to a signer, a payee, a beneficiary of a trust account or Payable on Death (POD) account, or to any other person claiming an interest in any funds in the account:

* if we have actual knowledge of, or otherwise believe in good faith that there may be a bona fide dispute between the signers, beneficiaries, payees, or other persons concerning their rights to the account proceeds or

* if we are otherwise uncertain as to who is entitled to the account funds.

We may notify all signers, beneficiaries, payees, and other persons claiming an interest in the account of the dispute or uncertainty without liability to you.

We also may, at our option and without liability to you, take one or more of these actions:

* continue to hold the funds on current signature cards and other account documents;

* honor the competing claim upon receipt of evidence we deem satisfactory to justify such claim;

* freeze all or part of the funds until the dispute is resolved to our satisfaction.

- close the account and distribute the account balance, subject to any bank claims, to each claimant payable jointly, or payable individually in equal shares to each claimant;
- pay the funds into an appropriate court for resolution; or
- refuse to disburse any funds in the account to any person until such time as: all persons claiming an interest in the account consent in writing to a resolution of the dispute; or a court of proper jurisdiction authorizes or directs the payment; or the person with a conflicting claim withdraws his or her claim in writing.

You are liable for all expenses and fees we incur, including attorneys' fees, and we may charge them to your account.

### Converting an Account

We may convert your account to another type of account, revoke privileges or close your account:

- If you make frequent transactions on a savings account;
- If your account frequently has debits against uncollected funds;
- If your account has excessive deposit activity;
- If you use a personal account for business purposes; or
- when we consider it appropriate or necessary to do so.

If we discontinue your type of account, we may convert your account to another type of account based on our evaluation how you use the account. If we convert your account, we will send you information about your new account.

### Cutoff Time for Receipt of Orders

Our cutoff time for receipt at a banking center of an order relating to your account is 10:00 a.m. local time or, if later, one hour after the banking center opens each business day. Orders include a stop payment order or postdating order, restraining order, writ of attachment or execution, levy, garnishment and any similar order.

The cutoff time relates to our obligation to pay or return checks and other items. If we receive an order before this cutoff time, we may review items presented for payment against your account on the previous business day to determine whether we need to return any of them to comply with the order. If we receive the order after the cutoff time, we may not review items presented on the previous business day.

For example, if you give us a stop payment order after our cutoff time and the item you want to stop was previously presented for payment or otherwise before we have the opportunity to act on your order, your order comes too late to stop payment on the item. Or, if we receive a levy before the cutoff time and you do not have enough funds in your account to cover both the levy and all items presented against your account the previous business day, we may return one or more items and apply the funds to the levy.

### Death or Incompetence

You agree to notify us promptly if any owner or authorized signer on your account dies or is declared incompetent by a court. Until we receive a notice of death or incompetency, we may act with respect to any account or service as if all owners, signers or other persons are alive and competent and we will not be liable for any actions or inactions taken on that basis.

If you give us instructions regarding your account, and you or another owner of the account subsequently dies or is declared incompetent, we may act on the instructions unless we receive written notice of death or incompetency prior to honoring such instructions.

When we receive a notice that an owner has died or been declared incompetent, we may place a hold on your account and refuse to accept deposits or permit withdrawals. We may hold any funds in your account until we know the identity of the successor.

If a deposit — including salary, pension, Social Security and Supplemental Security Income (SSI) — payable to the deceased owner is credited to the account after the date the deceased owner died, we may debit the account for the deposit and return it to the payer.

We may accept and comply with court orders, and take direction from court appointed personal representatives, guardians, or conservators from states other than where your account was opened or where the account, property or records are held. We reserve the right to require U.S. court documents for customers who reside outside of the U.S. at time of incompetence or death.

### Facsimile Signature

A facsimile signature can be a convenient method for signing or endorsing documents and other items. If you use a facsimile signature, you are responsible for any withdrawal from your account that bears or appears to us to bear a facsimile signature that resembles or purports to be the signature of a person authorized to withdraw funds. We will not be liable to you if use of the facsimile device or similar device utilized to affix your signature) was unauthorized. You are responsible even if the size, or color of the facsimile signature is different from that of any signature previously presented to us. We may pay the withdrawal and may charge your account for it. You agree to reimburse us (and we may charge your account) for all claims, costs, losses and damages, including attorneys' fees, that result from our payment of a withdrawal bearing either a facsimile that resembles or purports to bear your signature or a facsimile that we believe you authorized.

### Deposit Insurance — Bank Assessment for Business Accounts

For some business accounts, we may charge you an assessment related to deposit insurance, based in part on the assessment rate the FDIC charges us. The assessment may include deposit insurance charges, Financing Corporation (FICO) assessments and other fees, charges and assessments provided by law. The assessment rate is variable. We may change it in our discretion at any time without notice. The amount of the assessment will appear on your statement.

### Fingerprint

If a person to whom you present your check asks us to cash the check, we may require them to place their fingerprint on the check. If they refuse to provide their fingerprint, we may refuse to cash the check. We have no liability to you for refusing to cash the check.

### "Freezing" Your Account

If we decide to close your account, we may freeze it. If we do this, we may in our discretion either accept or return deposits, checks and other items that we receive after we freeze your account without being liable to you.

If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze the funds in the account and in other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. If we do freeze your account funds, we will provide notice to you as soon as reasonably practicable. We may not provide this notice to you prior to freezing the account if we believe that such notice could result in a security risk to us or to the owner of the funds in the account.

### Indemnification and Limitation of Liability

You agree to reimburse us for all claims, costs, losses and damages (including fees paid for collection) we may incur with respect to overdrafts or returned deposits in connection with your account.

We are not liable to you for errors that do not result in a financial loss to you. We may take any action authorized or permitted by this Agreement without being liable to you, even if such action causes you to incur fees, expenses or damages.

We are not liable to you for any claim, cost, loss or damage caused by an event that is beyond our reasonable control. In particular, we are not liable to you if circumstances beyond our reasonable control prevent us from, or delay us in, performing our obligations for a service, including acting on a payment order, crediting a funds transfer to your account, processing a transaction or crediting your account. Circumstances beyond our reasonable control include: a natural disaster; emergency conditions, such as fire, theft or labor dispute; a legal constraint or governmental action or inaction; the breakdown or failure of our equipment for any reason, including a loss of electric power; the breakdown of any private or common carrier communication or transmission facilities, any time-sharing supplier or any mail or courier services; the potential violation of any guideline, rule or regulation of any government authority; suspension of payments by another bank; or your act, omission, negligence or fault.

Except as limited by applicable law, we are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind.

Our liability for a claim will be limited to the face value of an item or transaction improperly dishonored or paid or the actual value of any deposits not properly credited or withdrawals not properly debited.

You agree that the amount of any claim you have against us in connection with any account or transaction with us, whether brought us as warranty, negligence, wrongful dishonor or other action, is subject to reduction to the extent that: 1) negligence or failure to use reasonable care on your part, or on the part of any of your agents or employees, contributed to the loss which is the basis of your claim; and 2) damages could not be avoided by the use of ordinary care.

Any loss recovery you obtain from third parties on a particular claim will reduce the amount of any obligations we may have to you on that claim and you will immediately notify us of any such recovery. You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss and to provide us information regarding coverage. Our liability to you will be reduced by the amount of any insurance proceeds you receive or are entitled to receive in connection with the loss. If we reimburse you for a loss covered by insurance, you agree to assign us your rights under the insurance to the extent of your reimbursement.

## Legal Process – Subpoena and Levy

"Legal process" includes a writ of attachment, execution, garnishment, tax withholding order, levy, restraining order, subpoena, warrant, injunction, government agency request for information, search warrant, forfeiture or other similar order.

We may accept and comply with legal process: served in person, by mail, by facsimile transmission, or by other means; or served at locations other than the location where the account, property or records are held. You direct us not to contest the legal process. We may, but are not required to, send a notice to you of the legal process. We do not send a notice if we believe the law prohibits us from doing so.

We may hold and turn over either property to the court or creditor as directed by the legal process, subject to our right of setoff and any security interest we have in the funds or other property. We do not pay interest on the funds during the period we hold them pursuant to legal process. If we hold or turn over funds, we may without any liability to you return checks and other items unpaid and refuse to permit withdrawals from your account. If the legal process applies to a time deposit account, we may charge the applicable early withdrawal penalty for funds taken from the time deposit.

We may charge your account a fee for each legal process. You agree to pay us for fees and expenses (including administrative expenses) that we incur in responding to any legal process related to your account, such as expenses for research and copying of documents. The fees and expenses may include attorneys' fees. We may deduct these fees and expenses from any of your accounts without prior notice to you.

If the legal process directs us to release information about one or more, but not all, accounts that are reported on a combined statement, we may release the entire combined statement, even though other accounts reported on the combined statement are not covered by the legal process. If the legal process requests information about one or more, but not all, account owners or signers, we may release information about all co-owners or signers, even though only some of the other co-owners or signers are not covered by the legal process.

We may produce documents held at, or provide access to property that is located in, any of our facilities or any facility operated by third party on our behalf, even if the facility is not designated as the place to be searched in the legal process.

We have no liability to you if we accept and comply with legal process as provided in this section or by law.

## Multiple Signatures Not Required

We may act on the oral or written instructions of any one signer on the account. Each signer may make withdrawals, write checks, transfer funds, stop payments, obtain ancillary services (e.g., electronic fund transfer services or wire transfers), and otherwise give us instructions regarding your account. We may require written authorization for some actions.

We do not assume a duty to enforce multiple signature requirements that you may agree upon among yourselves. If you indicate on your checks or signature card or other account documents that more than one signature is required for withdrawal, this indication is for your own internal procedures and is not binding on us.

We may disregard any instructions to permit withdrawals only upon more than one signature with respect to checks, electronic fund transfers or other debit/withdrawal requests. We may pay out funds from your account if the check, item, or other withdrawal or transfer instruction is signed or approved by any one of the persons authorized to sign on the account. We are not liable to you if we do this.

## Notice of Withdrawal

Federal regulations require us to retain the right to require all savings and all NOW account depositors to give seven days' written notice before making a withdrawal. It is unlikely, however, that we would require this notice.

## Powers of Attorney/Appointment and Payment to Agents

You may decide to appoint someone to act for you as your agent or attorney-in-fact ("agent") under a power of attorney. Please note that the form must be satisfactory to us in our discretion and unless prohibited by law, we may refuse, with or without cause, to honor powers of attorney that you grant to others.

For our customers' convenience we have a banking power of attorney form, which is available at many of our banking centers. If your state has a statutory form power of attorney, we also generally accept that form. We may, however, accept any form that we believe was executed by you and are an instructions we receive under that form without any liability to you. You agree to reimburse us for all claims, costs, losses and damages that we incur in accepting and acting on any power of attorney form that we believe you executed.

We may pay any funds deposited in your account to your agent or upon the order of your agent. When we accept a power, we may continue to recognize the authority of your agent to act on your behalf without question until we receive written notice of

revocation from you or notice of your death or incapacity and have had a reasonable time to act upon it. We will not be liable for action in accordance with the most current documentation if we have not received such notice.

We may require a separate form for each agent and for each account for which you want to grant power of attorney. We may require your agent to present the original form and refuse to act on a copy. In some cases, we may require that your agent confirm in an affidavit that the power has not been revoked or terminated or that you register the power with the appropriate recording authorities. We may restrict the types or sizes of transactions we permit your agent to conduct.

The authority of your agent to receive payments, transact on or otherwise make changes to your account generally terminates with your death or incapacity, unless the document creating such agency provides, in accordance with applicable law, that the agent's powers continue in spite of your incapacity.

## Records

We may, in our discretion retain records in any form including, without limit, paper, film, fiche, digitalized or other electronic medium. If we are not able to produce the original or a copy of your signature card or any other document relating to your account or service, our records (including our electronic records) will be deemed conclusive. If there is a discrepancy between your records and our records, our records will be deemed conclusive.

## Right of Setoff

We may take or setoff funds in any or all of your accounts with us and with our affiliates for direct, indirect and acquired obligations that you owe us, regardless of the source of funds in an account. This provision does not apply to IRA or tax-qualified retirement accounts, to consumer credit card obligations or where otherwise prohibited by law. Your accounts include both accounts you own individually and accounts you own jointly with others. Our setoff rights are in addition to other rights we have under this Agreement to take or charge funds in your account for obligations you owe us.

If the law imposes conditions or limits on our ability to take or setoff funds in your accounts, to the extent that you may do so by contract, you waive those conditions and limits and you authorize us to apply funds in any or all of your accounts with us and with our affiliates to obligations you owe us.

If you are a sole proprietor, we may charge any of your personal or business accounts. We may use funds held in your joint accounts to repay obligations on which any account owner is liable, whether jointly with another or individually. We may use

funds held in your individual accounts to repay your obligations to us, whether owed by you individually or jointly with another, including obligations owed by you arising out of another joint account of which you are a joint owner, even if the obligations are not directly incurred by you; obligations on which you are secondarily liable; and any amounts for which we become liable to any governmental agency or department or any company as a result of recurring payments credited to any of your accounts after the death, legal incapacity or other termination of entitlement of the intended recipient of such funds.

If we take or setoff funds from a time deposit account, we may charge an early withdrawal penalty on the funds withdrawn.

We may take or setoff funds from your account before we pay checks or other items drawn on the account. We are not liable to you for dishonoring items where our action results in insufficient funds in your account to pay your checks and other items.

Some government payments may be protected from attachment, levy or other legal process under federal or state law. If such protections may apply, to the extent that you may do so by contract, you waive these protections and agree that we may take or setoff funds, including federal and state benefit payments, from your accounts to pay overdrafts, fees and other obligations you owe us.

This section does not limit or reduce our rights under applicable law to charge or setoff funds in your accounts with us for direct, indirect and acquired obligations you owe us.

## Sample of Your Signature

To determine the authenticity of your signature, we may refer to the signature card or to a check or other document upon which your signature appears. We may use an automated process to reproduce and retain your signature from a check upon which your signature appears.

If you create your own checks, obtain them from someone else, or we send you a personalized verify your signature on a check by comparing it with a check that posted to your account, you are responsible for any losses that may result from our inability to use that check to verify your signature.

## Stop Payment Orders and Postdating Orders

**Stop Payment Orders.** If we have not already paid a check or other item drawn on your account, then at your request and risk we may accept a stop payment order on it. You may not stop payment on a check if you use as identification for the check your Bank of America ATM card or debit card. You may not stop payment on a point of sale transaction or an ATM withdrawal or transfer.

35

36

**Postdating Orders** If you write and postdate a check (that is — you put a future date on the check), you may ask us not to pay the check before its date by giving us a stop payment order. Otherwise, we may pay it and charge it to your account even if it is presented for payment before its date.

If we receive a postdated check that is subject to a stop payment order, we may return the check with the designation "payment stopped" or "refer to maker."

**Placing Stop Payment Orders** We may accept a written or oral stop payment order from any person who has a right to stop payment order from the account. You may require you to complete a form authorizing the order. You must give us sufficient notice so that we have a reasonable opportunity both to verify that the item is unpaid and to not pay it and each. We may charge you a fee for each stop payment order and each renewal of the order.

We use a computer system to identify items. Therefore, to place a stop payment order, we need the account number, the item number and the exact amount of the item — in dollars and cents. If you give us the wrong amount (even one penny off, or the wrong item number), we may pay the item. We may also require the date of the item, the name of the person who signed or authorized the item, and the name of the party to whom the item was made payable. We may only use a portion of the required information to identify an item.

In some cases, we may pay an item even if an order is in effect. For example, if one of our banking centers, without notice of your request, pays a check that you have asked us to stop, we will pay the check.

A stop payment order generally expires after six months. However, we may, in our sole discretion, elect to honor a stop payment order for a longer period of time without notice to you. If you want the order to continue after six months, you must ask us to renew the order. Each request for a renewal is treated as a new order. If you want the order to expire in less than six months, you must cancel the order on or after the date you want it to expire. We may accept a written or oral instruction to cancel the order, but if you cancel it verbally, we may ask you to put it in writing. We will have a reasonable opportunity to act on it. We cancel the order automatically when the account on which the item is drawn is closed. Please see **Preauthorized Payments** in the section entitled **Electronic Banking Services** for information about stopping a preauthorized (recurring) payment on a personal account.

If the item is presented to us for payment after the order expires, we may pay the item. If we pay an item subject to a valid and timely stop payment order, we may be liable to you

if you had a legal right to stop payment and you establish that you suffered a loss because of the payment. Our liability, if any, is limited to the actual loss suffered, up to the amount of the item. You must prove the loss to our satisfaction. We are not liable to you for any special, incidental or consequential loss or damage of any kind.

**Additional Information about Automated Clearing House (ACH) Stop Payment Orders** If we have not already paid an ACH debit from your account, then at your request and risk we may accept a stop payment order (an 1). The stop payment order takes effect within three business days. If you give us oral instructions, we may require you to confirm them in writing. If you do not, we may require you to stop payment order after 14 days. For recurring ACH debits on personal accounts, we treat an order you place on a recurring ACH debit in effect, indefinitely.

To place a stop payment order on an ACH debit, we may require you to provide your name and telephone number, the type of account (checking or savings), and the exact company name used by the sender of the ACH debit, and the other information listed above under **Placing Stop Payment Orders**. You can obtain the company name used by your sender from your statement by looking at a prior ACH debit from that sender that posted to your account.

If you do not know the amount of the ACH debit, we may still be able to place the stop payment order based on the company name of the sender, but this may stop all ACH items from this sender. If you give us the wrong company name of the sender changes the company name, we may pay the item.

You are responsible for notifying the sender of the ACH debit that you have revoked your previous authorization for ACH debits.

For more information on stopping a preauthorized payment on a personal account, see the section based on the section titled **Electronic Banking Services**.

**Subaccounts**

For regulatory accounting purposes, we may classify checking accounts into a checking subaccount and a savings subaccount. For interest bearing checking accounts, we calculate and pay interest at the same rate and in the same way on both subaccounts. For non-interest bearing checking accounts, we do not pay interest on either subaccount. We may transfer funds between these subaccounts. We record the subaccounts and any transfers between them on our internal accounting records only. Otherwise, the subaccounts are subject to the same terms as the checking and savings accounts described in this Agreement.

**Unclaimed Property – Accounts Presumed Abandoned or Inactive**

State and federal law and our policy govern when accounts are considered abandoned. The applicable state law is generally the state listed in the address for your account statement.

Your account is usually considered abandoned if you have not performed at least one of the following activities for the period of time specified in the applicable state's unclaimed property law: made a deposit or withdrawal, written to us about the account, or otherwise shown an interest in the account, such as asking us to keep the account active. You usually need to perform the activity. Therefore, bank charges and interest payments, and automatic deposits and withdrawals, are usually not considered activity.

We are required by the unclaimed property laws to turn over accounts considered abandoned to the applicable state. Before we turn over an abandoned account, we may send a notice to the address we are currently show for the account statement. We may not send this notice if mail is returned as undeliverable or if the address was previously sent to this address was returned. Unless prohibited by the applicable state law, we may charge to the account our costs and expenses of any notice, advertisement, payment and delivery of the account to the applicable state agency.

After we turn the funds over to the state, we have no further liability for the funds and you must apply to the appropriate state agency to reclaim your funds.

If we consider your account inactive, then (unless prohibited by federal law or the law of the state where we maintain your account) we may:

• charge dormant account fees on the account in addition to regular monthly maintenance and other fees;

• stop sending statements;

• if the account received interest, stop paying interest on the account; and

• refuse to pay items drawn on or payable out of the account.

If you re-establish contact with us, we do not have to reimburse you for these fees and we are not liable to you for any interest that would otherwise have accrued on your account.

**Verification of Transactions and Right to Reverse Transactions**

All transactions, including those for which we provide a receipt, are subject to subsequent verification and correction within our discretion. We do not verify all deposits at the teller window so the receipt that you receive at the time of your deposit is not evidence that your deposit has been verified. We may reverse

or otherwise adjust any transaction (both credit and debit) that we believe we erroneously made to your account at any time without prior notice to you.

**Waiver, Severability, and Change of Law by Agreement**

**Waiver** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right, or any other right. No delay in enforcing our rights will affect your obligation to pay us fees and other amounts you owe us under this Agreement. If we waive a provision of this Agreement, the waiver applies only in the specific instance in which we decide to waive the provision and not to future situations or other provisions regardless of how similar they may be.

**Severability** A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

**Change of Law by Agreement** If any part of this Agreement is inconsistent with any applicable law, then to the extent the law can be amended or waived by contract, you and we agree that this Agreement governs and that this law is amended or waived by this Agreement.

# Electronic Banking Services

We offer a variety of electronic banking services for use with your deposit accounts. We describe some in this section and also provide certain disclosures that apply to use of an electronic banking service with personal deposit accounts. We provide separate agreements to you that govern the terms of some services, including separate agreements for ATM and debit cards and Online and Mobile Banking services. Please review the following provisions and the separate agreement for the service.

## Types of Electronic Banking Services

### ATM and Debit Cards

We may issue you an ATM or debit card (either is called a "card") and a personal identification number (PIN) when you open your account. The terms that govern this service are in a separate agreement that you receive with your card. Please review that agreement carefully.

There are daily dollar limits for withdrawals and purchases. We provide your card limits to you as part of the separate agreement for card services. We may occasionally decide not to issue a card or code to a customer. We may suspend or terminate a card or code at any time without cause or notice.

The following information is a summary of how you can use your card. Some of these uses may not be available with every card or at every ATM or other terminal.

**At ATMs**   You can use your card with linked accounts at participating ATMs to withdraw cash, transfer funds, and find out balances. At most ATMs that are prominently branded with the Bank of America name and logo, you can also use your card and PIN with linked accounts to make deposits and make payments to qualifying Bank of America credit cards and loans.

**At participating merchants**   You can use your card with linked accounts at participating merchants to purchase goods and services. Some merchants may permit you to withdraw cash from your checking account while making a purchase.

**At participating financial institutions**   You can use your card with linked accounts at participating financial institutions to obtain a cash withdrawal from a teller.

**Payments, Credits, and Transfers**   You can send or receive electronic transfers from or to your accounts. We may do this by ACH (as a member of a national or local automated clearing house association) or other similar networks. Electronic transfers may take various forms, such as:

• Automatic electronic deposits to your account, such as payroll or benefits payments;

• Automatic onetime or repeating charges to your account for bill payments, sent by a merchant or other payee with your authorization. The merchant or payee may ask you for bank routing and account information from your check or a cancelled check to create these orders; and

• A "check conversion" transfer, where a merchant or other payee uses a check that you have written to create an electronic transfer from your account. The merchant may either keep the check you wrote or return it to you.

**Online and Mobile Banking**   Online and Mobile Banking services are governed by a separate agreement. You receive the agreement for the service at the time you enroll. You can use these services with linked accounts to view your account information, make deposits, transfer funds between your accounts and to the accounts of others, pay qualifying loans or credit cards, and make payments from your account to third parties. You can enroll for these services on our website www.bankofamerica.com.

**Telephone Banking**   You may use our automated customer service system with linked accounts to or speak to a telephone banker to get your account information, transfer funds between your accounts with us, and pay qualifying loans or credit cards.

## Access ID

An Access ID is a numeric code which, when used with a separate PIN number or passcode (plus, in some circumstances, another piece of identifying information called a "verbal verification code"), enables consumer and small business customers to do the following through our automated telephone system or in person at a banking center:

• obtain information about deposit and credit accounts that are linked to the Access ID

• transfer funds and make payments between linked accounts, and

• obtain other services such as stop payments, check reorders, and copies of checks and statements

You may request an Access ID and related security codes by calling customer service or at any banking center. Please note that Access IDs may not be available to customers in all states. In some states, individual account numbers, combined with additional security codes, may be required to obtain account information and transact other business.

Two activity levels are available for most accounts linked to your Access ID:

(1) Inquiry: Allows you to obtain account balances and transaction information.

(2) Financial: Allows you to obtain account information, transfer funds among accounts linked to the Access ID, and obtain certain other banking services.

When you first choose your Access ID, and when you subsequently open new accounts, we will link all your Bank of America accounts that are eligible, and assign the financial activity level to all accounts for which that activity level is available, unless you tell us otherwise. We may establish certain limits on the accounts that can be linked to your Access ID and that can have the financial activity level.

If you permit another person to use your Access ID or account number(s) and related code(s), you are responsible for all transactions conducted by that person (even if he or she exceeds your authorization), until you notify us that the person is no longer authorized so that we may block the codes and issue new ones.

You must review your periodic statements and promptly report to us any unauthorized funds transfers initiated through the use of your security codes or otherwise. You must also promptly notify us of any suspected loss or theft of your security codes. Failure to take these actions may affect the extent of your liability for any unauthorized transfers under federal banking regulations or other applicable laws.

**Small Business Access IDs**   If you are a small business customer, to uniquely identify each person who initiates a request for banking services, you should establish a separate Access ID and related security codes for each person who you determine needs access to your accounts. Your authorization (whether express or implied) for any individual to establish an Access ID shall constitute your authorization for the bank to provide account information to such individual and (unless Inquiry only access is selected) to transfer funds and conduct other banking transactions upon that person's request. Such authorization supersedes any resolution, signature card or other document filed with the bank that purports to limit authority over any of your accounts, whether currently on file or submitted or modified in the future, unless the Access ID authorization is expressly modified or revoked.

## Electronic Banking Disclosures

**Personal deposit accounts**   Our Personal Schedule of Fees describes your personal deposit accounts. The following provisions apply to electronic fund transfers to or from personal deposit accounts (sometimes referred to as "consumer deposit

accounts") that are governed by Regulation E of the U.S. Federal Reserve Board. A personal deposit account is an account that is owned by a natural person and that is established primarily for personal, family, or household purposes.

**Business deposit accounts**   Our Business Schedule of Fees describes our business deposit accounts. Business deposit accounts are accounts that are established primarily for business purposes. When you open one of our business deposit accounts, you represent and agree to that you are establishing it primarily for business purposes. The following provisions do not apply to business deposit accounts, although as a matter of practice we generally follow the error resolution procedures described below for business deposit accounts. Please note that we are not required to follow these procedures for business accounts and that we may change our practice at any time without notice.

### Consumer's Liability for Unauthorized Transfers

Tell us AT ONCE if you believe your card or your personal identification number (PIN) or other code has been lost or stolen. Also, tell us AT ONCE if you believe that an electronic fund transfer has been made without your permission using information from your check. The best way to keep your possible losses down is to call us immediately.

Your losses could include all of the money in your account plus, if you have an overdraft protection plan linked to your account, any transfers from another account or any advances on a credit line. If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission.

If you do NOT tell us within two business days after you learn of the loss or theft of your card or code, and we can prove we could have stopped someone from using your card or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us in writing within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

**Note:** These liability rules are established by Regulation E. For personal deposit accounts, our liability policy regarding unauthorized debit card or ATM card transactions, and unauthorized Online Banking transactions may give you more protection, provided you report the transactions promptly. Please see the agreement you receive with your ATM or debit card and the Online Banking agreement.

You should never write your PIN on your card or carry the PIN with you. This reduces the possibility of someone using your card without your permission if it is lost or stolen.

If you give, or make reasonably available, your card, PIN or other access device or code to anyone, you may be liable for any use made of such until you advise us that such person is not authorized to use them.

Also, the state law applicable to your account may give you more time to report an unauthorized transaction or may give you more protection. For example, in Massachusetts, the two day and 60 day time limits for reporting unauthorized transactions do not apply and the $500 limit does not apply.

**Contact in Event of Unauthorized Transfer, and Lost or Stolen Card, PIN or Other Code**

If you believe your card, PIN or other code is lost or stolen, or learned by an unauthorized person, or that someone has transferred or may transfer money from your account without your permission, notify us immediately by calling the number listed below.

*Telephone:* 1.800.432.1000

You can also write to us: Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85077-3137

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

If unauthorized activity occurs, you agree to cooperate during the investigation and to complete a Lost/Stolen Card and Fraud Claims Report or similar affidavit.

**Business Days** For purposes of these electronic banking disclosures, our business days are Monday through Friday. Weekends and bank holidays are not included.

**Documentation of Transfers**

*Receipts* You can usually get a receipt at the time you make any transfer to or from your account at an ATM or point of sale terminal. You may not get a receipt for small dollar transactions. Each transaction is subject to verification by us so the receipt is not final and our records will control if there is a conflict.

*Preauthorized Credits* If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at 1.800.432.1000 to find out whether or not the deposit has been made.

*Periodic Statements* We send you a monthly account statement unless there are no electronic fund transfers in a particular month. In any case, we send you a statement at least quarterly unless your account is inactive.

**Preauthorized Payments**

*Right to Stop Payment and Procedure for Doing So* If you have told us in advance to make regular payments out of your account or you have authorized someone to debit your account through the ACH system, you can stop any of these payments.

Here's how: Call us at 1.800.432.1000 or write to us at Bank of America Customer Service, P. O. Box 25118, Tampa, FL 33622.

You must notify us in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. We may charge you a fee for each stop payment order you give.

You must give us the identifying information we request.

You must notify the payee that you have withdrawn your authorization for the repeating electronic payments. If you authorized someone to debit your account through the ACH system, see *Stop Payment Orders and Postdating Orders* in the *Other Terms and Services* section for more information about ACH Stop Payment Orders. Stop payment orders for preauthorized (recurring) debit card transactions. You may be able to give us a specific expiration date for certain stop payment orders for preauthorized recurring transactions if you choose to do so.

*Notice of Varying Amounts* If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

*Liability for Failure to Stop Payment* If you order us to stop a preauthorized payment three business days or more before the transfer is scheduled, and we have given us all of the information we requested, and we do not stop the payment, we will be liable for your losses or damages directly caused by our failure to stop the payment.

**Liability for Failure to Make Transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

- If, through no fault of ours, you do not have enough money in your account to make the transfer.
- If the transfer would go over the credit limit on your overdraft line.

- If the ATM where you are making the transfer does not have enough cash.
- If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transfer.
- If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
- If the funds are subject to legal process or other encumbrance restricting the transfer.
- If we consider your account to be inactive or dormant.
- If your card or code has been revoked due to inactivity or at our discretion.

There may be other exceptions stated in our agreement with you or permitted by law.

**Confidentiality – Account Information Disclosure** We will disclose information to third parties about your account or transfers you make as stated in the *Information about You and Your Account* section near the front of this Agreement.

**Fees**

*ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

*Other Fees* For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

**In Case of Errors or Questions about your Electronic Transfers** Call or write us at the telephone number or address below, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt.

Call us at 1.800.432.1000 or write us at Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85077-3137.

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error or problem appeared. Please provide us with the following:

- Tell us your name and account number;
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information;

- Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point of sale, or foreign-initiated transactions, we may take up to 90 days (instead of 45) to investigate your complaint or question. For new accounts we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. If you ask, we will provide you with copies of the documents that we used in our investigation.

**Notice:** As part of the security system to help protect your card and PIN, we may use hidden cameras and other security devices to determine who is using a card at an ATM. You consent to this.

*Additional Information for Massachusetts customers:* Any documentation provided to you which indicates that an electronic fund transfer was made shall be admissible as evidence of the transfer and shall constitute prima facie proof that the transfer was made. Amount or amounts transferred from your account or your fund transfers from your account will effectively eliminate your ability to stop payment of the transfer. **UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, YOU MAY NOT STOP PAYMENT OF ELECTRONIC FUND TRANSFERS, THEREFORE, YOU SHOULD NOT EMPLOY ELECTRONIC ACCESS FOR PURCHASES OR SERVICES UNLESS YOU ARE SATISFIED THAT YOU WILL NOT NEED TO STOP PAYMENT.**

## ATM Safety Tips and Safeguarding Your Account Information

The suggestions that follow offer some simple tips on exercising care when using an ATM and on protecting your card and PIN. We advise you to begin and remain aware of your surroundings before, during and after any ATM use.

### Be Aware of Your Surroundings at ATMs

- Look around when you walk up to the ATM or exit the ATM. If you notice anyone or anything suspicious or that you deem unsafe, such as the lighting around the ATM not working, use another ATM or return later.
- When you enter or exit an ATM in an enclosed area, be sure you close the entry door completely. Do not open locked ATM vestibule doors for others or allow any unknown persons to enter the ATM area when you are making your transaction. Authorized customers should have their own access.
- When you use a drive-up ATM, be sure your passenger windows are closed and your doors are locked.
- If you must use an ATM at night, consider taking someone with you.
- The activity around Bank of America ATMs may be monitored or recorded by surveillance cameras.
- Contact the police or a security officer if you see any suspicious activity at the ATM.

### Protect Your Privacy

- While at the ATM, enter your PIN discreetly, shield the keypad with your hand or body. After completing your transaction, be sure to put away your card, cash and transaction record before exiting the ATM area. Count the cash later in your locked car or home.
- Do not leave your transaction record at the ATM. Keep your transaction record in a safe place, so you can compare it to your statement.

### Request Emergency Assistance

- If you need emergency assistance, call 911 from the nearest telephone. If you have a complaint about the security of a Bank of America ATM, call our Corporate Security Department at 1.800.622.7511.
- Report all crimes immediately to law enforcement. If you think you're being followed from an ATM, go to a busy area and immediately contact the police.

### Protect Your Card and PIN

- Always protect your card by keeping it in a safe place. If your card is lost or stolen, contact us immediately.
- Always protect your PIN. You should never write your PIN to anyone and you should never write your PIN anywhere, especially on your card. If you choose your own PIN, avoid using obvious numbers such as telephone numbers, addresses, or birth dates.
- Never give information about your card or PIN over the telephone. If someone is asking for this information, refuse and immediately contact us.
- Report a lost or stolen card immediately.

## Funds Transfer Services

The following provisions apply to funds transfers you send or receive through us, but do not apply to electronic fund transfers governed by Regulation E, Subpart A of the U.S. Federal Reserve Board and the Consumer Financial Protection Bureau. We provide separate agreements to you that govern the terms of some funds transfer services, including separate agreements for Online and Mobile Banking, telephone transfers, and funds transfers in the banking centers. If you have a specific agreement with us for these services, these provisions supplement that agreement to the extent these provisions are not inconsistent with the specific agreement.

The Uniform Commercial Code includes provisions relating to funds transfers. These provisions define the following terms: funds transfer; payment order and beneficiary. These terms are used here as they are defined in Article 4A of the Uniform Commercial Code – Funds Transfers as adopted by the state whose law applies to the account for which the funds transfer service is provided. In general: A funds transfer is the process of carrying out payment orders that lead to paying a beneficiary. The payment order is the set of instructions given to us to transfer funds. The beneficiary is the person or business who receives the final payment.

In addition, funds transfers sent outside of the United States that are initiated by consumers primarily for personal, family or household purposes are governed by federal law (Remittance Transfers) (see below). Effective as of the date set forth in the final rules implementing EFTA (defined below), these may provide rights with respect to Remittance Transfers that may vary in certain ways from the terms and conditions set forth herein. Your rights with respect to Remittance Transfers, including disclosure, error resolution and cancellation rights, will be explained to you separately with each Remittance Transfer transaction you initiate, either orally or in writing.

In general, your and our rights and obligations under this Agreement are governed by and interpreted according to federal law and the law of the state where your account is located. However, Remittance Transfers shall be governed by federal law and, as applicable, the law of the State of New York. Funds transfers to your account or funded from your account or otherwise funded by you may involve one or more funds transfer systems, including, without limitation, Fedwire or Clearing House Interbank Payments System (CHIPS). Accordingly, notwithstanding any provisions that may be provided elsewhere in this agreement, such transfers will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, Fedwire, the National Automated Clearing House Association, any regional association (each an "ACH"), and CHIPS. Funds transfers through Fedwire will be governed by and, subject to, Regulation J, Subpart B, and Uniform Commercial Code Article 4A incorporated by reference thereunder. Funds transfers through CHIPS are governed by and subject to, CHIPS Rules and Administrative Procedures and by the laws of the State of New York, including Article 4A of the New York Uniform Commercial Code, regardless of whether the payment message is part of a transfer that is a Remittance Transfer, except that in the case of an inconsistency between New York law and EFTA, EFTA shall govern.

We may charge fees for sending or receiving a funds transfer. We may deduct our fees from your account or from the amount of the transfer. Other financial institutions involved in the funds transfer may also charge fees. For current fees, call us at the number for customer service on your statement or ask a banking center associate.

### Remittance Transfers

The Bank may execute certain payment orders for you known as Remittance Transfers. A Remittance Transfer is a wire transfer initiated by a consumer primarily for personal, family or household purposes in a designated country to a designated country. Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide certain rights and obligations related to Remittance Transfers that may differ from rights and obligations that apply to other types of payment orders, including disclosure, cancellation and error resolution rights. To the extent the provisions of this Agreement are inconsistent with the oral or written disclosures provided to you for a Remittance Transfer governed by Section 919 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. section 1693o-1, the terms of the disclosures provided at the time of the Remittance Transfer shall govern. Notwithstanding anything to the contrary contained herein, rights and obligations

that apply to Remittance Transfers are as set forth in EFTA and, as applicable, are as set forth in New York law.

### Sending Funds Transfers

You may subscribe to certain services we offer or you may give us other instructions to pay money or have another bank pay money to a beneficiary. This Sending Funds Transfers section applies to wire transfers and transfers we make between Bank of America accounts, transfers to and from accounts at other banks, including automated clearing house (ACH) system funds transfer services.

You may give us payment orders for ACH system funds transfers only if you have a separate agreement with us for those services.

**Cutoff Times for Payment Orders** We have cutoff times for processing payment orders. Cutoff times vary depending on the particular office of our bank and the type of payment order. We may treat payment orders we receive after a cutoff time as if we received them the next day. We tell you our cutoff times upon request.

**Amending or Canceling Payment Orders** You may not amend or cancel a payment order after we receive it. If you ask us to do this, we may make a reasonable effort to act on your request. But we are not liable to you if, for any reason, a payment order is not amended or canceled. You agree to reimburse us for any costs, losses or damages that we incur in connection with your request to amend or cancel a payment order.

**Inconsistency of Name or Number** The beneficiary's bank may make payment to the beneficiary based solely on the account or other identifying number, even if the name on the payment order differs from the name on the account. We or an intermediary bank may send a payment order to an intermediary bank or beneficiary's bank based solely on the bank identifying number, even if the payment order indicates a different bank name.

**Sending Payment Orders** We may select any intermediary bank, funds transfer system or means of transmittal to send your payment orders. Our selection may differ from that indicated in your instructions.

**Notice of Rejection** We may reject payment orders. We notify you of any rejection orally, electronically or in writing. If we send written notices by mail, we do so by the end of the next business day.

We are not liable for the rejection or obligated to pay you interest for the period before you receive timely notice of rejection.

**Errors or Questions About Your Payment Orders** We notify you about certain funds transfers by listing them on your account statement. In some cases, we may also notify you electroni-

44

43

cally, in writing or by a report produced through use of our information reporting services.

You must notify us as soon as if you think a funds transfer shown on your statement or notice is incorrect. You must send us written notice, including a statement of relevant facts, no later than 14 days after the date you receive the first notice or statement on which the problem or error appears.

If you fail to notify us within this 14-day period, we are not liable for any loss of interest because of an unauthorized or erroneous debit or because your statement or notice is incorrect. We are not required to compensate you, and we are not required to recredit or adjust your account for any loss of interest or interest equivalent.

**Calculations** Unless otherwise prohibited by law, if we are obligated to pay for loss of interest that results from our error or delay regarding your payment order, we calculate compensation as follows. To reflect the applicable value date of your transaction to the account under our account analysis procedure, to recalculate earnings credits for the period involved. With a non-earnings-bearing account, we use a rate equal to the average of the Federal Funds rates set by the Federal Reserve Bank of New York, less a reserve factor. With a non-earnings-bearing account, we use the rate applicable to the account. If we have a separate agreement with you specifying a different calculation method, we use that method instead.

**Receiving Funds Transfers**

We may receive instructions to pay funds to your account. We may receive funds transfers directly from the sender, through a funds transfer system or through some other communications system. This includes wire transfers, ACH transfers that may be sent through an ACH system or processed directly to an account with us, and transfers between Bank of America accounts.

**ACH Provisional Payment Rule** Under ACH rules, funds transfers sent through an ACH are provisional and may be transferred through its sender. You agree to these rules. If the funds transfer is revoked before final settlement, we may charge your account for the amount credited. The person who sent the payment order is considered not to have paid you. If this happens, we do not send you a separate notice; we report the information on your account statement.

**Notice of Funds Transfer** We notify you that we have received funds transfers by listing them on your account statement. We provide statements to you by mail or through Online Banking. If you selected paperless delivery through Online Banking for your deposit account documents. If you use one of our information reporting services, you may receive notice through that service.

We are not obligated to send you a separate notice of each incoming funds transfer. While we generally do not provide such separate notices, we may do so on occasion, in which case we send the notice within two business days after we credit your account.

We are not obligated to pay you interest for the period before you receive notice.

If you are expecting a funds transfer and want to find out if it has been credited to your account, call us at the number for customer service on your statement.

**Posting Your Customers' Payments** We credit your account for electronic payments (such as bill payments) that we receive from your customers. If you do not, apply a payment to an account of your customer, you must promptly return the payment to us.

**ACH Debits and Credits**

From time to time, originators that you authorize may send automated clearing house (ACH) credits or debits for your account. For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect. You agree that we may rely on the representations and warranties contained in these operating rules and either credit or debit your account, as instructed by the originator of the ACH transaction.

You should be careful about giving someone your account number to help prevent unauthorized transactions on your account. You must notify us immediately of unauthorized activity.

For information about stopping payment of an ACH transaction, see *Stop Payment Orders and Postdating Orders* in the *Other Terms and Services* section.

## Tax Information

In most instances we are required to report annually to you and to the Internal Revenue Service (IRS) interest payments that total $10 or more during the year on your deposit account with us. We may also be required to report this information to the appropriate state revenue authority.

When you open an account, we are required to obtain — and each U.S. citizen or resident alien must give us — a certified U.S. Taxpayer Identification Number (TIN) and information regarding your backup withholding status. When you apply for an account, you certify that you have provided the correct TIN for the account holder and the correct backup withholding status.

For individual accounts, the TIN is your Social Security Number (SSN). For individual accounts with more than one owner, we report taxpayer information for the person listed first in our records. Resident aliens who do not qualify for Social Security should provide their Individual Taxpayer Identification Number (ITIN). For other accounts, the TIN is the owner's Employer Identification Number (EIN). If you do not give us a certified name and TIN, if the IRS notifies us that the name and TIN you give us is incorrect, or if the IRS notifies us that you failed to report all your interest and dividends on your tax return, we are required to backup withhold at the current backup withholding rate on interest paid to your account and pay it to the IRS. In some cases, a state and local tax authority may also require that we pay state and local backup withholding on interest paid to your account when we are required to pay backup withholding to the IRS. Backup withholding is not an additional tax. You may claim amounts withheld and paid to the IRS as a credit on your federal income tax return.

If you are a nonresident alien individual or entity, you are generally exempt from information reporting and backup withholding, with some exceptions (including Canadian residents and interest income effectively connected with the conduct of a trade or business in the United States). As an exempt foreign person or entity, you must provide the address of your permanent foreign residence or the entity's principal foreign office on the Form W8 that you give to us. For accounts with multiple owners, all owners must certify their status as foreign persons.

You must renew your status as an exempt foreign person or entity prior to the end of the third calendar year following the year in which you last certified your status. If you fail to renew your status by the last day of the fourth calendar year, your interest payments are subject to backup withholding. Some limited exemptions from this renewal process exist. If you become a U.S. citizen or resident after opening your account, you must notify us within 30 days and provide us with your certified name and TIN.

We comply with Foreign Account Tax Compliance Act (FATCA) as mandated by U.S. federal tax law. We will withhold on certain payments when required by such law.

For more information or to determine how this information applies to you, consult your U.S. tax advisor.

# Resolving Claims

If you and we are not able to resolve a claim ourselves, then you and we agree that the claim will be resolved as provided in this Resolving Claims section. This is a dispute resolution provision. Please read it carefully.

## What does "Claim" Mean?

Claim means any claim, dispute or controversy (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) by either you or us against the other, or against the employees or agents of the other, arising from or relating, in any way to the deposit agreement (including any renewals, extensions or modifications) or the deposit relationship between us.

Claim does not include provisional or ancillary remedies from a court of competent jurisdiction, which either you or we may exercise without waiving the right to arbitration or reference.

## How Claims on Personal Accounts will be Resolved

You and we both agree that all Claims relating to a personal account will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a personal account is brought in a California state court, either you or we can elect to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below.

**JURY TRIAL WAIVER FOR PERSONAL ACCOUNTS FOR PERSONAL ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY. THIS IS A JURY TRIAL WAIVER.**

## How Claims on Business Accounts will be Resolved

You have the right to compel you at our option, and we have the right to compel you at our option, to resolve a Claim relating to a business account by binding arbitration. If neither you nor we decide to compel arbitration, then the Claim will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a business account is brought in a California state court, either you or we can elect to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below. The arbitration, judicial reference or trial by a judge will take place on an individual basis without resort to any form of class or representative action.

## CLASS ACTION AND JURY TRIAL WAIVER FOR BUSINESS ACCOUNTS

**FOR BUSINESS ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND: (1) THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY, AND (2) THAT THIS SECTION PRECLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS. THIS IS A CLASS ACTION WAIVER AND JURY TRIAL WAIVER.**

### Judicial Reference

A case sent to judicial reference is heard by a neutral individual (a "judicial referee"), but remains in the court system subject to the same rules of procedure, discovery and evidence and appeal as any court case. The judicial referee will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on a judicial referee, then the judicial referee will be appointed according to the procedure for appointment of a referee under California C.C.P. Section 640.

The judicial referee, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this Resolving Claims section and the validity of the deposit agreement.

Judicial reference will be governed by California C.C.P. Section 638 et seq. and the judicial referee will determine all issues in accordance with federal and California law and the California rules of evidence. The referee is empowered to provide all temporary or provisional remedies and to rule on any motion that would be authorized in pretrial or trial proceedings in court, including motions for summary judgment, or summary adjudication. The award that results from the decision of the referee will be entered as a judgment in the court that appointed the referee, in accordance with the provisions of California C.C.P. Sections 644(a) and 645. You and we both reserve the right to seek appellate review of any judgment or order to the same extent permitted in a court of law.

### Arbitration

This section on arbitration applies to business accounts and is subject to the provisions of the Limitation and Non-Severability section below.

Arbitration is a method of resolving disputes in front of one or more neutral individuals, instead of having a trial in court, in front of a judge and/or jury. The arbitrator will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on an arbitrator, then you agree to choose one of the following Administrators within 10 days of our written notice that an agreement cannot be reached.

- JAMS Resolution Center
  1920 Main St., Suite 300
  Irvine, CA 92614
  www.jamsadr.com (800) 352-5267

- American Arbitration Association ("AAA")
  1633 Broadway, 10th Floor
  New York, NY 10019
  www.adr.org (212) 716-5800

If you do not choose the Administrator on a timely basis, we will select the Administrator and the Administrator will select the arbitrator using the Administrator's rules. If an Administrator cannot hear or refuses to hear the arbitration, then the arbitration will be handled by the alternative Administrator.

The arbitrator, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this Resolving Claims section and the validity of the deposit agreement, except that the arbitrator may not decide or resolve any Claim challenging the validity of the class action and jury trial waiver. The validity of the class action and jury trial waiver will be decided only by a judicial referee or a court.

After a decision is given by an arbitrator, and where the amount of the Claim exceeds $200,000, either you or we can appeal the arbitrator's decision to another arbitrator. If the amount of the Claim exceeds $1,000,000, either you or we can appeal the arbitrator's decision to a panel of three arbitrators. No decision may be appealed under this paragraph, unless the arbitrator that heard the matter first makes a finding that the Claim could reasonably have exceeded either $200,000 or $1,000,000. Any arbitrator who hears an appeal under this paragraph will be selected according to the rules of the Administrator.

The arbitration of any matter involves interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). The arbitrator will follow applicable substantive law to the extent consistent with the FAA. The arbitrator will give effect to the applicable statutes of limitation and will dismiss barred claims. Arbitrations will be governed by the rules of the Administrator to the extent those rules do not conflict with this Resolving Claims section. In addition, you or we may submit a written request to the arbitrator to expand the scope of discovery normally allowable. At the timely request of either you or us, the arbitrator must provide a brief written explanation of the basis for the award.

Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA or under this Agreement.

### Limitation and Non-Severability

**For both personal and business accounts.** Regardless of anything else in this Resolving Claims section, you and we both acknowledge and agree that the validity and effect of the class action and jury trial waiver for business accounts and the jury trial waiver for personal accounts may be determined only by a court or judicial referee and not by an arbitrator. You and we both have the right to appeal the limitation or invalidation of the waiver.

**For business accounts.** Regardless of anything else in this Resolving Claims section, you and we both acknowledge and agree that the class action and jury trial waiver is material and essential to the arbitration of any disputes between you and us and is non-severable from the agreement to arbitrate Claims. If the class action and jury trial waiver is limited, voided or found unenforceable, then the agreement to arbitrate (except for that sentence) will be null and void with respect to such proceeding and this Resolving Claims section will be read as if the provisions regarding arbitration were not present. You and we both have the right to appeal the limitation or invalidation of the class action and jury trial waiver. You and we acknowledge and agree that under no circumstances will a class action be arbitrated.

### Rules of Interpretation

Except as provided in the Limitation and Non-Severability section above, if any portion of this Resolving Claims section is determined to be invalid or unenforceable, it will not invalidate the remaining portions of this section. If there is a conflict or inconsistency between this Resolving Claims section and other terms of this deposit agreement or the applicable rules of the Administrator, this Resolving Claims section will govern. If there is any conflict between this Resolving Claims section and any other dispute provision (whether it be for arbitration, reference or any other form of dispute resolution), this Resolving Claims section will prevail for Claims arising out of this deposit agreement or transactions contemplated by this deposit agreement.

### Jurisdiction and Venue

Any action or proceeding regarding your account or this deposit agreement must be brought in the state in which the banking center that maintains your account is located. You submit to the personal jurisdiction of that state. Note that any action or proceeding will be governed by and interpreted in accordance with the Governing Law section of this agreement.

If a Claim is submitted to arbitration and the state where that banking center is located is not reasonably convenient for you, then you and we will attempt to agree on another location. If you and we are unable to agree on a location, then the location will be determined by the Administrator or arbitrator.

*This panel intentionally left blank.*                    *This panel intentionally left blank.*

49

# EXHIBIT 2

Return To:
FIRST NATIONAL BANK OF ARIZONA
P. O. BOX 56604
PHOENIX, AZ 85082

Record & Return To
Independence Abstract & Title Agency
1040 Kings Highway North
Suite 700
Cherry Hill, NJ 08034
(856) 779-0098

2005-38398

Prepared By:
LEON RIDDICK
1760 OLD MEADOW RD. 3RD FLR
MCLEAN, VA 22102

000042237          04/21/2005 11:01A
RECEIVED           BARBARA A. DONNELLY
AND                HUDSON COUNTY
RECORDED           REGISTER OF DEEDS
MTG                Receipt No. 248843

————————— [Space Above This Line For Recording Data] —————————

# MORTGAGE

MIN 1001355-4000021188-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated          MARCH 11, 2005
together with all Riders to this document.
(B) **"Borrower"** is VIOLA MOORE.

Borrower is the mortgagor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS

4000021188                     3274025440
NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3031 1/01

-6A(NJ) (0005)
Page 1 of 15          VMP MORTGAGE FORMS - (800)521-7291

810  091707007  D2  001  002

(D) "Lender" is FIRST NATIONAL BANK OF ARIZONA

Lender is a CORPORATION
organized and existing under the laws of         UNITED STATES OF AMERICA
Lender's address is 1750 OLD MEADOW ROAD, 3RD FLR, MCLEAN, VA 22102.

(E) "Note" means the promissory note signed by Borrower and dated       MARCH 11, 2005
The Note states that Borrower owes Lender THREE HUNDRED FIFTY THOUSAND AND NO/100
                                                                            Dollars
(U.S. $350,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       APRIL 1, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider        [ ] Second Home Rider
[ ] Balloon Rider            [ ] Planned Unit Development Rider  [X] 1-4 Family Rider
[ ] VA Rider                 [ ] Biweekly Payment Rider   [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

4000021188                          3274025440                  VM

-6A(NJ) (0005)              Page 2 of 12                         Form 3031 1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                of              HUDSON

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]
SEE ATTACHED LEGAL DESCRIPTION

Property Account Number: 090100209 00014                    which currently has the address of
77 EAST 21ST STREET                                                                    [Street]
BAYONNE                                          [City], New Jersey      07002      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

4000021188                          3274025440                          Form 3031 1/01

-6A(NJ) (0811)                          Page 5 of 15

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

4000023188                                    3276025440              Initials _VM_

-6A(NJ) (oson)                                Page 4 of 16                        Form 3031 1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

4000021188                    3274025440                    _____ /ml/

(LOAN) 6A(NJ) (0905)                    Page 5 of 11                    Form 3031 1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

4000021180                                3374025440

-6A(NJ) (0405)                 Page 6 of 15                      Form 3031 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

4008021188                    3271025440

*Independence Abstract & Title Agency*

6712 Washington Ave. Suite 201
Egg Harbor Twp., NJ 08234
Telephone: 609-645-8881 Fax: 609-645-7765
www.independenceabstract.com

Agents for

## *Fidelity National Title Insurance Company*

# SCHEDULE C
# LEGAL DESCRIPTION

**File Number:**   2005-38398IMR

ALL that certain lot, parcel or tract of land, situate and lying in the City of Bayonne, County of Hudson, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point in the northerly line of East 21st Street, distant 126.00 feet easterly from the intersection formed by the easterly line of Prospect Avenue with the northerly line of East 21st Street and running thence:

(1) N-42 degrees 20'East and parallel to Prospect Avenue a distance of 100.00 feet to a point, thence

(2) S-47 degrees 12'East and parallel to East 21st Street a distance of 24.77 feet to a point, thence

(3) S-42 degrees 20'West and parallel to Prospect Avenue a distance of 100.00 feet to a point in the northerly line of East 21st Street, thence

(4) N-47 degrees 12'West and along the northerly line of East 21st Street a distance of 24.77 feet to a point, said point being the point or place of beginning.

FOR INFORMATIONAL PURPOSES ONLY:  Commonly known as: 77 East 21st Street, Bayonne, NJ 07002.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 28 in Block 456 on the City of Bayonne Tax Map.

BB

BK=12754   PG=00042

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

4000021188                    3274025440                    _____ VM

SAINA (0001)                    Form 3031 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

4000021188                          3274025440                   Initials: U MC

[logo] -6A(NJ) (0005)                Page 10 of 15                Form 3031 1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any Forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

4000021186                    3274025440                    Initials: _____

GA(NJ)                        Page 12 of 16                 Form 3031 1/01

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

4000021188                     3274075440

@ÐD -6A(NJ)                    (one 1 + 1 +)                                    Form 3031 1/01

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

4000021188                       3274025440                       ____ V M

-6A(NJ) (page)                   Page 12 of 16                     Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

4000023108

-6A(N.J) (00017)

3270025440

Initials:

Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____   _____ (Seal)
Salvatore Carollo          VIOLA MOORE          -Borrower

_____   _____ (Seal)
                                                -Borrower

_____ (Seal)   _____ (Seal)
-Borrower                        -Borrower

_____ (Seal)   _____ (Seal)
-Borrower                        -Borrower

_____ (Seal)   _____ (Seal)
-Borrower                        -Borrower

4000021188                 3274025440

BMG -6A(NJ) (0005)         Page 14 of 15            Form 3031 1/01

STATE OF NEW JERSEY,                                    Hudson   County ss:

On this      11    day of    March 2005                    before me, the subscriber,
personally appeared    VIOLA MOORE

who, I am satisfied,

the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____
Notary Public

SALVATORE CAROLLO, ESQUIRE
ATTORNEY AT LAW
STATE OF NEW JERSEY

4000021188                      3274025440

-GA(NJ) (9905)                  Page 15 of 15        Initials _____        Form 3031 1/01

# ADJUSTABLE RATE RIDER

## (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this      11th      day of 03/2005      , and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed
(the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's
Adjustable Rate Note (the "Note") to ("Lender") of the same date and covering the property described in the
Security Instrument and located at:

### 77 EAST 21ST STREET, BAYONNE, NJ 07002

[Property Address]

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND
THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE
MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT
TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED,
BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

**2.      INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay
interest at a yearly rate of    2.1250    %. The interest rate will pay may change

The interest rate required by this Section 2 is the rate I will pay both before and after any default described
in Section 7(B) of the Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the 1st      day of    07/2005    , and on that
day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change
Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may
change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities
adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal

PayOption MTA ARM Rider
FE-5315 (0412)                              Page 1 of 5                                  10/04

4000021188

BK=12754   PG=00051

Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three and 9/20 percentage point(s) 3.4500 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.95 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3.  PAYMENTS

#### (A)  Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on May 2005 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768 PHOENIX, AZ 85082-2768

or at a different place if required by the Note Holder.

#### (B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,315.66 unless adjusted under Section 3 (F).

#### (C)  Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of 05/2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

PayOption MTA ARM Rider
FE-5315 (0412)

Page 2 of 5

10/04

4000021188

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to  115.00  Percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current

**(G)  Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

PayOption MTA ARM Rider                          Page 3 of 5                                    10/04
FE-5315 (0412)

4000021188

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable **if** they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if:

(a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider                    Page 4 of 5                                        10/04
FE-5315 (0412)

4000021188

VM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable

_____  (Seal)
VIOLA MOORE

_____  (Seal)

_____  (Seal)

_____  (Seal)

4000021188

PayOption MTA ARM Rider                 Page 5 of 5
FE-5315 (0412)                                                         10/04

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this        11TH    day of    MARCH, 2005
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to
FIRST NATIONAL BANK OF ARIZONA

(the

"Lender") of the same date and covering the Property described in the Security Instrument and located at:

77 EAST 21ST STREET, BAYONNE, NJ 07002
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

4000021188                          3274025440

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials: 
Page 1 of 4                                                         Form 3170 1/01
57R (0008)         MW 08/00        VMP MORTGAGE FORMS - (800)521-7291

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

4000021188                          3274025440

MMD-57R (0008)                       Page 2 of 4                     Initials: _____     Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

4000021188                    3274025440

57R (0008)                    Page 3 of 4                    Initials: _____   Form 3170 1/01

By: Te Dan Smith, Esq. (229812017)
Johnson & Associates, P.C.
581 Main St Ste 640
Woodbridge, NJ 07095
P: 848-229-2254
Attorney for Plaintiff, *Viola Moore*

---

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | DOCKET NO.: HUD-L-531-18 |
| vs. | CIVIL ACTION |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | **PLAINTIFF'S RESPONSE TO DEFENANDT BANK OF AMERICA, N.A. MOTION TO DISMISS** |
| Defendants. | |

---

## A. SUMMARY OF FACTS

1. Ms. Moore (hereinafter referenced as "Plaintiff" or "Moore"), is the owner of a property that consisted of land and an erected building located at 77 EAST 21ST STREET, BAYONNE, NJ. 07002.

2. This building was destroyed by fire on July 11, 2015

3. On or around July 12, 2015 the city required the building remains demolished to protect community safety.

4. Moore's property was insured through The Philadelphia Contributionship insurance policy, which Ms. Moore is the named policy owner.

5. A claim for the destroyed property was submitted, and Moore's insurance paid out the sum amount of $295,000.00

1

6.  Moore's destroyed building was subject to a mortgage held by Bank of America, NA (hereinafter referenced as "BOA").

7.  Bank of America instructed Moore that the insurance funds would be placed in an escrow account to insure the monies use for reconstruction of the destroyed building.

8.  It has always been Moore's intention and desire to have her building rebuilt.

9.  Bank of America issued two checks totaling $177,000.00. One for $152,000.00 issued on September 16, 2015 and a second for $25,000.00 issued on October 28, 2015.

10. Both checks were issued and delivered without Moore's knowledge or consent to Universal Sale Consultant, and titled "pay to order of" Viola Moore and Universal Sale Consultant, INC.

11. Each check had been cashed with JPMorgan Chase Bank, NA (hereinafter referenced as "Chase"). Each check also contained a forgery of Ms. Moore's signature on the endorsement line.

12. These actions are the basis for this brought lawsuit.

## B.  STANDARD OF REVIEW

New Jersey court rule 4:6-2(e) provides dismissal of a claim on the pleading when the allegations fail to state a claim upon which relied can be granted. The rule further elaborates and states, if, on a motion to dismiss based on the defense numbered (e), matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by R. 4:46, and all parties shall be given reasonable opportunity to present

all material pertinent to such a motion. Rule 4:46 states a judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

Motions to dismiss should be granted in "only the rarest of instances." Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76, 79 (1993) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772 (1989). The complaint should be searched "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned from an obscure statement of claim, opportunity being given to amend if necessary." Printing Mart, supra 116 N.J. at 746. See also Glass, Molders, Pottery, Plastics, & Allied Workers Int'l Union v. Wickes Cos., 243 N.J. Super. 44, 46 (Law Div. 1990) ("The test for determining the adequacy of a pleading is whether a cause of action is suggested by the facts."). Courts must "assume the facts as asserted by plaintiff are true and give her the benefit of all inferences that may be drawn in her favor."

Printing MartMorristown v. Sharp Elec. Corp., 116 N.J. 739, 746 (1989). After a thorough examination, should the Court determine that such allegations fail to state a claim upon which relief can be granted, the Court must dismiss the claim. Id. Under the New Jersey Court Rules, a Complaint may only be dismissed for failure to state a claim if, after an in-depth and liberal search of its allegations, a cause of action cannot be gleaned from even an obscure statement in the Complaint, particularly if

additional discovery is permitted. R. 4:6-2(e); see Pressler, Current N.J. Court Rules,

Comment 4.1.1. to Rule 4:6-2(e), at 1513 (2016) (citing Printing Mart, 116 N.J. at

746). Thus, a Court must give the non-moving party every inference in evaluating

whether to dismiss a Complaint. See NCP Litigation Trust v. KPMG, LLP, 187 N.J.

353, 365 (2006); Banco Popular No. America v. Gandi, 184 N.J. 161, 165-66 (2005);

Fazilat v. Feldstein, 180 N.J. 74, 78 (2004). The "test for determining the adequacy of

a pleading is whether a cause of action is suggested by the facts." Printing Mart, 116

N.J. at 746. However, "a court must dismiss the plaintiff's complaint if it has failed to

articulate a legal basis entitling plaintiff to relief." Sickles v. Carbot Corp., 379 N.J.

Super. 100, 106 (App. Div. 2005).

## C. <u>ARGUMENT</u>

a. **Plaintiff's Complaint Properly States Claims Against Defendants For Violation of The UCC Article 3, New Jersey State Law and Common Law Claims.**

 i. **UCC Terms Defined In Defendants Motions Are Uncontested.**

 ii. **Plaintiff's allegations as raised in count I of the Complaint properly state that Defendant, Bank of America, N.A. "BOA" failed to exercise ordinary care and substantially contributed to loss resulting from the payment of an instrument when BOA, without authorization paid out funds to a person fictitiously acting on behalf of Viola Moore. (UCC 3-404)**

  Plaintiff claims is brought under UCC 3-404 (d) as stated "(d) With respect to

an instrument to which subsection (a) or (b) applies, if a person paying the instrument

or taking it for value or for collection fails to exercise ordinary care in paying or

taking the instrument and that failure substantially contributes to loss resulting from

payment of the instrument, the person bearing the loss may recover from the person

failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss."

Here the imposter rule applies as Defendant Universal portrayed to BOA they were an authorized person to act for the payee Viola Moore. UCC 3-404 applies when the imposter induces the issuer of an instrument to issue the instrument to the imposter by impersonating the payee or a person authorized to act for the payee. At best, Universal could have acted on its own behalf but certainly not on behalf of Ms. Moore. BOA failed to verify with Ms. Moore through any means of authentication thereby failing to exercise ordinary that lead to Plaintiff's loss of funds and no building reconstructed.

As to UCC 3-404 (b), BOA has admitted its intent to pay funds to Universal, an unauthorized payee, whereby inessentially conceding to fault as Defendant Chase paid out those funds on a forged signature, the authenticity of said signature on each check is an essential element of claims raised and thus a genuine issue of material fact appropriately to be presented to the trier of facts. Plaintiff has demonstrated BOA's breach of ordinary care, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.

iii.     **Plaintiff's allegation as raised in count II of the Complaint properly states that Defendant negligently contributed to an alteration of an instrument.**

Defendant is not permitted to you this claim as a defense, as they have failed to establish any negligent act on behalf of Ms. Moore. UCC 3-406 establishes a defense that a bank can assert against its customer when the negligence of its customer contributed to a forged signature on an instrument.

5

Defendant's allegation as to Ms. Moore;s negligent contribution is conclusory and unfounded. Defendant has offered no supporting evidence or facts that demonstrates any negligence on behalf of the Plaintiff. Defendant's raising of this defense is grounded in Plaintiffs breach of some duty, a duty that Defendant has not established in its motion. The existence of said duty is a material fact to Defendant's defense and must be allowed further investigation. As such Ms. Moore's alleged duty is an essential element of claims raised and thus a genuine issue of material fact appropriately to be presented to the trier of facts.

### iv.    Plaintiff's allegation as raised in count IV of the Complaint properly states that Defendant Converted funds. (UCC 3-420)

As correctly defined in Defendants "i. UCC Terms Defined" an instrument is an unconditional promise or order to pay a fixed amount of money. The instrument would have no value to confer if not for the funds/value transferred through the drawing of an instrument. BOA cannot state the funds held in the escrow were not released and paid out through an instrument. As such the making of the instrument was within the chain of events leading to the conversion. In Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772 (1989). The courts state that The complaint should be searched "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned from an obscure statement of claim, opportunity being given to amend if necessary." Thus the rule in UCC 3-420 need not be so strictly read as to ignore the policy behind the rule whose purpose is consumer protection. Plaintiff has demonstrated a conversion on behalf of BOA, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.

v. **Plaintiff's allegation as raised in count V of the Complaint properly states that Defendant did not disburse funds that were Properly Payable. (UCC 4-401)**

Plaintiff in accordance to the mortgage agreement was required to maintain insurance on the property in questions. Ms. Moore had the duty to pay the insurance and in the event of a claim payout, she would receive the proceeds from the insurance claim. The mortgage further requires that any third-party payout resulting from casualty shall be paid to BOA and held in escrow.

Defendant bases it argument from the *McAuley v. Southington Saving* case, which is a Connecticut state court case and holds no binding authority on this court. BOA admits to holding Ms. Moore's insurance proceeds in a trust account within the there banking institution. The New Jersey Uniform Trust Code at 3B:31-54. Duty to Administer Trust. States upon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with this act and other applicable law. NJS 3B:31-57. Duty of Prudent Administration. A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution. BOA accepted trusteeship by the terms of is mortgage agreement, where it states that third party payout must be transferred to the mortgagee (*BOA Mortgage Clauses 4&5*). This is required of the mortgagor to ensure that funds paid via casualty will be used to reconstruct the mortgaged property or satisfy the loan amount of the mortgage. The rule states to look to the intent and purpose of the trust. Here, the trust was created to insure funds would be used for the reconstruction of Plaintiff's building, in addition the purpose of the

trust was to insure that BOA would have a reconstructed collateral with increased value. Although a beneficiary does not own the trust as a structure, they do however have a vested interested in the proceeds and can sue a trustee for breach of its fiduciary duties. Mishandling funds and paying out proceeds to a non-beneficiary is a clear breach of said duties. Plaintiff has demonstrated standing by right of a beneficiary suing a trustee, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.

**b.  Plaintiff's claim in count VI-XI of the Complaint properly states when a special relationship is present, common law claims can be asserted separate and apart from the UCC.**

The New Jersey Supreme Court has held that "in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC]." ADS Associates Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, 517 (2014) (citing City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 62 (2001)). That case differs from the case at hand as the Plaintiff in *City Check Cashing* was a non-customer suing, in our case Ms. Moore is a customer of Bank of America, thereby satisfying the special relationship prong as a customer who frequents Bank of America and utilizes their banking offerings. Additionally, BOA changed its role from the role the court established in *City Check Cashing* from that of a "check collection arena" to that of a trustee-beneficiary relationship once BOA enforced its mortgage clause requiring proceeds from Ms. Moore's insurance claim to be turned over to BOA and held in escrow. Because the special relationship exists in our case, Plaintiff has demonstrated common law claims separate and apart from the UCC, as such this claim in the

interest of justice must continue forward to discovery and be presented before the trier of facts.

**c. Plaintiff's claim in count VI of the Complaint properly identifies breach of contract of trust and duties on behalf of trustee Bank of America is a genuine issue of material fact.**

Both parties agree that BOA is holding Ms. Moore's insurance proceeds in escrow. What is not clear, are the rules governing BOA's action and duties as it relates to their position as trustee over the funds in trust for the benefit of Ms. Moore. The Defendants centers its argument around not having breached the mortgage agreement, however the mortgage agreement as stated in (*BOA Mortgage Clauses 4&5*) expressly states, "the creation of a trustee/beneficiary relationship if insurance proceeds are paid to the mortgagee resulting from the destruction of the mortgaged property, and said proceeds are to be released to the mortgagor and held in trust." Because the mortgage agreement is silent as to the terms and conditions of this trust, we must default to the state law rules and principles that govern trust. As such, a trustee owes the beneficiary duties of loyalty and care. One such duty as established by the (New Jersey Uniformed Trust Code) N.J.S. 3B:31-57, -74, is the trustee's duty to report. Had BOA abided by their duties, Ms. Moore could have prevented this entire matter by informing BOA she did not consent to Universal's request for funds. However, absent BOA meeting such reporting standard Universal was able to unilaterally request funds it was not entitled to receive.

The standard of review for motions to dismiss must fall in accordance with Glass, Molders, Pottery, Plastics, & Allied Workers Int'l Union v. Wickes Cos., 243 N.J. Super. 44, 46 (Law Div. 1990) ("The test for determining the adequacy of a pleading is whether a cause of action is suggested by the facts."). Courts must "assume the

facts as asserted by plaintiff are true and give her the benefit of all inferences that may be drawn in her favor." The inference to be drawn here is that BOA has breached its duties as a trustee absent the disclosure of the trust agreement implied within Defendants mortgage agreement. The interpretation of the mortgage clause (*BOA Mortgage Clauses 4&5*) alone creates a genuine issue that must be vetted through further litigation. Plaintiff has demonstrated common law claims separate and apart from the UCC, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.  Here we have a question of fact as to whether BOA actions amounted to creating a trustee relationship.  Taking it one step further, the trier of fact must determine whether Ms. Moore was under the impression or understanding that such relationship had been created by BOA's control of the funds in question.

**d.  Plaintiff's claim in counts VII and VIII of the Complaint properly state Defendants violation of common law fraud and breach of fiduciary duties.**

New Jersey Rule 4:5-8 (a) Fraud; Mistake; Condition of Mind. In all allegations of misrepresentation, fraud, mistake, breach of trust, willful default or undue influence, particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable. Malice, intent, knowledge, and other condition of mind of a person may be alleged generally. In Baldasarre v. Butler, 254 N.J.Super. 502, 604 A.2d 112 (App.Div.1992), aff'd in part, rev'd in part, 132 N.J. 278, 625 A.2d 458 (1993). The court explained that the mere non-disclosure of material facts can be a form of misrepresentation where the defendant has concealed a known fact that is material to the transaction, and there is a duty to disclose likely material contingencies. As stated in Ms. Moore's certification, several BOA fraud claims were made and subsequently provided no valuable information. Ms. Moore was not

informed of the intimate details of the case until she filed a complaint against Chase Bank, which disclosed the dates of the drawn checks and amounts. BOA at all time relevant would have had access to such information, but refused to disclose, as the Defendant stated in this motion, it was the owner of the trust account and was not required to release information pertaining to the funds therein or its disbursement. Furthermore, BOA failed to comply with Ms. Moore's previous attorney's request for discovery (SEE Prior Counsel Letter to BOA)

As such, BOA charges there is no fiduciary relationship to be breached. As Plaintiff has previously established, BOA and Ms. Moore are in a trustee/beneficiary relationship as Ms. Moore's insurance proceeds are held in trust within the BOA institution. The de facto creation of this trust establishes the special relationship affording Ms. Moore to be the beneficiary of fiduciary duties owed by BOA.

Fraudulent concealment is established where such a relationship of trustee/beneficiary exists and there is a withholding or failure to disclose material information.  *See* Strawn v. Canuso, 140 N.J. 43, 56 (1995) (quoting Weintraub v. Krobatsch, 64 N.J. 445, 449 (1974)). The question of whether a duty exists is a matter of law. Carter Lincoln-Mercury, Inc. v. Emar Group, Inc., 135 N.J. 182, 194 (1994) (quoting Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991)). The question is one of fairness and policy that "involves identifying, weighing, and balancing several factors - the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993) (citing Goldberg v. Housing Auth., 38 N.J. 578, 583 (1962)). There are three general classes of transactions in which a duty to disclose arises. Berman v. Gurwicz, 189 N.J. Super. 89, 93 (Ch. Div. 1981), aff'd, 189 N.J. Super. 49 (App. Div.), certif. denied, 94 N.J. 549 (1983). The first involves

fiduciary relationships such as principal and agent or attorney and client. Ibid. The second embraces situations in which "`either one or each of the parties, in entering . . . [the] transaction, expressly reposes . . . a trust and confidence in the other . . . or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence . . . is necessarily implied.'" Id. at 93-94 (quoting 3 J. Pomeroy, A Treatise on Equity Jurisprudence at 552-54). The third includes contracts or transactions which in their essential nature, are "intrinsically fiduciary," and "necessarily call for perfect good faith and full disclosure, without regard to any particular intention of the parties."

The mortgage agreement in question, expressly establishes a trust to be created upon the condition of the mortgaged property's destruction and insurance proceeds are paid.  BOA held these proceeds to ensure the reconstruction of the destroyed building. BOA concedes Ms. Moore had no access to this account thus forcing her to extend a trust and confidence to BOA's handling of the funds to her benefit.

This implied trust relationship, between BOA and Ms. Moore, creates a genuine issue that must be vetted through further litigation. Plaintiff has demonstrated common law claims separate and apart from the UCC, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.

e. **Plaintiff's claim in count IX of the Complaint properly states Defendant BOA's mortgage agreement terms and condition establish the implied covenant of good faith and fair dealings.**

Defendant BOA cannot stand behind the proclamation that the mortgage does not conflict with the terms of the expressly implied creation of a trust found within the mortgage agreement. Defendant BOA has not offered any proof of a lack of contradictions in terms, and as such should not be permitted to rely on documents not yet presented. Plaintiff must be granted the opportunity to investigate and verify the procedures and practices governing BOA when it receives insurance funds from casualty, as in the matter at hand. The additional examination needed to determine any contradictions, creates a genuine issue that must be vetted through further litigation and presented to the trier of facts. Plaintiff has demonstrated common law claims separate and apart from the UCC, as such this claim in the interest of justice must continue forward to discovery and be presented before to the trier of facts.

f.  **Plaintiff's claim in count X of the Complaint properly states negligent misrepresentation against BOA.**

The standard of review for motions to dismiss must be in accordance with Glass, Molders, Pottery, Plastics, & Allied Workers Int'l Union v. Wickes Cos., 243 N.J. Super. 44, 46 (Law Div. 1990) ("The test for determining the adequacy of a pleading is whether a cause of action is suggested by the facts."). Courts must "assume the facts as asserted by plaintiff are true and give her the benefit of all inferences that may be drawn in her favor." As asserted in Plaintiff's Certification, BOA employees went back and forth with Ms. Moore as to whom she was in regard to resolving her matter. BOA instructed Ms. Moore to contact JPMorgan Chase's fraud department to file a claim. BOA knew that non-costumers are not given the same remedies of resolution as a costumer. Thus, Plaintiff has raised a genuine issue that must be vetted through further litigation. Plaintiff has demonstrated common law

13

claims separate and apart from the UCC, as such this claim in the interest of justice must continue forward to discovery and be presented before the trier of facts.

**g.  Plaintiff's claim in count XI of the Complaint properly states a claim for civil conspiracy.**

Morgan v. Union Cnty Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993), certif. denied, 135 N.J. 468 (1994)). A plaintiff need not prove there was an express unlawful agreement, rather, it may be enough to establish the conspirators shared "the general conspiratorial objective," accepted them, and furthered them, either explicitly or implicitly. A civil conspiracy is not the gravamen of the action and only serves to establish joint liability between the defendants. Morgan, supra, 268 N.J. Super. at 364; Landriani v. Lake Mohawk Country Club, 26 N.J. Super. 157, 159 (App. Div. 1953).

In our case both banks would bare a duty to discover the fraudulent actions of Universal, and both would be found liable if the fraud came to light. Thus, either bank can be held liable to Ms. Moore jointly and severally. The existence of an agreement between the parties is a genuine issue of material fact that must be vetted through further litigation.

## D.  CONCLUSION

WHEREFORE, Plaintiff request the courts to dismiss Defendants motion with prejudice and to allow the continuance of discovery as this case proceeds forward to be determined by the trier of facts.

By: Te Dan Smith, Esq. (229812017)
Johnson & Associates, PC
581 Main St Ste 640
Woodbridge, NJ 07095
P:848-229-2254

/s/Te D. Smith, Esq.
TE D. SMITH, ESQ

By: Te Dan Smith, Esq. (229812017)
Johnson & Associates, P.C.
581 Main St Ste 640
Woodbridge, NJ 07095
P: 848-229-2254
Attorney for Plaintiff, *Viola Moore*

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | |
| | DOCKET NO.: HUD-L-531-18 |
| vs. | |
| | CIVIL ACTION |
| BANK OF AMERICA, NA; | |
| JPMORGAN CHASE BANK, NA; and | **VERIFICATION OF** |
| JOHN DOE | **VIOLA MOORE** |
| Defendants. | |

**VIOLA MOORE,** deposes and says:

That she is the Plaintiff, in the within action; that she has read the foregoing Motion and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters said to be upon information and belief, and as to those matters, deponent believes same to be true.

DATED: August 20, 2018

/s/ Viola Moore_____
Viola Moore, Plaintiff

16

By: Te Dan Smith, Esq. (229812017)
Johnson & Associates, P.C.
581 Main St Ste 640
Woodbridge, NJ 07095
P: 848-229-2254
Attorney for Plaintiff, *Viola Moore*

---

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | |
| | DOCKET NO.: HUD-L-531-18 |
| vs. | |
| | CIVIL ACTION |
| BANK OF AMERICA, NA; | |
| JPMORGAN CHASE BANK, NA; and | **VERIFICATION OF** |
| JOHN DOE | **TE D. SMITH, ESQ** |
| Defendants. | |

---

**TE D. SMITH, ESQ,** deposes and says:


That he is the attorney for the Plaintiff in the within action; that he has read the foregoing Complaint and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters said to be upon information and belief, and as to those matters, deponent believes same to be true.


DATED: August 20, 2018

/s/TE D. SMITH. ESQ.
TE D. SMITH, ESQ.
ATTORNEY for PLAINTIFF

#3274025440

MAR/05

Return To:
FIRST NATIONAL BANK OF ARIZONA
P.O. BOX 56604
PHOENIX, AZ 85082

Prepared By:
LEON RIDDICK
1760 OLD MEADOW RD. 3RD FLR
MCLEAN, VA 22102

Record & Return To
Independence Abstract & Title Agency
1040 Kings Highway North
Suite 700
Cherry Hill, NJ 08034
(856) 779-0090
2005- 38398

000042337          04/21/2005 11:01A
RECEIVED           BARBARA A. DONNELLY
AND                HUDSON COUNTY
RECORDED           REGISTER OF DEEDS
MTG                Receipt No. 248843

——————[Space Above This Line For Recording Data]——————

# MORTGAGE

MIN 1001355-4000021188-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    MARCH 11, 2005 , together with all Riders to this document.

(B) "Borrower" is VIOLA MOORE

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

4000021188                              3274025440

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**          Form 3031 1/01

-6A(NJ) (0005)
Page 1 of 15        VMP 6598        Initials: VM

VMP MORTGAGE FORMS - (800)521-7291

610  091707007   D2  001  002

BK:12754  PG:00035

(D) "Lender" is FIRST NATIONAL BANK OF ARIZONA

Lender is a CORPORATION
organized and existing under the laws of            UNITED STATES OF AMERICA
Lender's address is 1760 OLD MEADOW ROAD, 3RD FLR, MCLEAN, VA 22102

(E) "Note" means the promissory note signed by Borrower and dated            MARCH 11, 2005
The Note states that Borrower owes Lender THREE HUNDRED FIFTY THOUSAND AND NO/100
                                                                                        Dollars
(U.S. $350,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than            APRIL 1, 2035 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider        [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider                [ ] Planned Unit Development Rider  [X] 1-4 Family Rider
[ ] VA Rider                     [ ] Biweekly Payment Rider      [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

4000021188                          3274025440

-6A(NJ) (0005)                      Page 2 of 15            Form 3031 1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY of HUDSON
[Type of Recording Jurisdiction]   [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION

Property Account Number: 090100209 00014      which currently has the address of
77 EAST 21ST STREET                                                      [Street]
BAYONNE                               [City], New Jersey      07002   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

4000021188                         3274025440                      Initials: U.M.   Form 3031 1/01
-6A(NJ) (0505)                        Page 3 of 15

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

{000023188                              3274025440                    Initials: VM

-6A(NJ) (0000)                           Page 4 of 15                 Form 3031 1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

4000021188                          3274025440

-6A(NJ) (0305)                      Page 5 of 15              Initials: _VM_       Form 3531 1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

4000021188                          3274025440

-6A(NJ) (0505)                   Page 5 of 15                        Form 3031 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

4000021188                        3274025440                        _initials_  UM

-6A(NJ) (0009)                    Page 7 of 18                      Form 3031 1/01

*Independence Abstract & Title Agency*

**6712 Washington Ave. Suite 201**
**Egg Harbor Twp., NJ 08234**
Telephone: 609-645-8881 Fax: 609-645-7765
www.independenceabstract.com

Agents for

*Fidelity National Title Insurance Company*

## SCHEDULE C
## LEGAL DESCRIPTION

**File Number:** 2005-38398IMR

ALL that certain lot, parcel or tract of land, situate and lying in the City of Bayonne, County of Hudson, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point in the northerly line of East 21st Street, distant 126.00 feet easterly from the intersection formed by the easterly line of Prospect Avenue with the northerly line of East 21st Street and running thence:

(1) N-42 degrees 20'East and parallel to Prospect Avenue a distance of 100.00 feet to a point, thence

(2) S-47 degrees 12'East and parallel to East 21st Street a distance of 24.77 feet to a point, thence

(3) S-42 degrees 20'West and parallel to Prospect Avenue a distance of 100.00 feet to a point in the northerly line of East 21st Street, thence

(4) N-47 degrees 12'West and along the northerly line of East 21st Street a distance of 24.77 feet to a point, said point being the point or place of beginning.

FOR INFORMATIONAL PURPOSES ONLY:  Commonly known as: 77 East 21st Street, Bayonne, NJ 07002.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 28 in Block 456 on the City of Bayonne Tax Map.

BB

BK=12754   PG=00042

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender for any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

4000021188                                    3274025440

(logo) -6A(NJ) (0001)                          Page 8 of 15              Initials VPL          Form 3031 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

1000021189                    3274025440

-6A(NJ) (0005)                Page 6 of 16        Initials    Form 3031 1/01

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

4000021189                                3274025440

-6A(NJ)                    Page 12 of 15                    Form 3031 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

4000021188                                    3274025440

noty Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

4000021188                    3274025440              Initials VM

-6A(NJ) (0811)              Page 12 of 16                    Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

4000021188                    3274025440                    Initials: JM

-6A(NJ) (0005)                Page 15 of 15                  Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ 
Salvatore Carollo

_____ 3/11/0 (Seal)
VIOLA MOORE                              -Borrower

_____ 

_____ (Seal)
                                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                                         -Borrower

4000021188                          3274025440

GMD -6A(NJ) (0005)          Page 14 of 16                     Form 3031 1/01

STATE OF NEW JERSEY,  Hudson County ss:

On this 11 day of March 2005 before me, the subscriber,
personally appeared VIOLA MOORE

who, I am satisfied,

are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

SALVATORE CARCOLLO, ESQUIRE
ATTORNEY AT LAW
STATE OF NEW JERSEY

4000021188

-6A(NJ) (0000)

3274025440

Page 15 of 15

Initials

Form 2031 1/01

# ADJUSTABLE RATE RIDER

## (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this      11th      day of 03/2005      , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ("Lender") of the same date and covering the property described in the Security Instrument and located at.

### 77 EAST 21ST STREET, BAYONNE, NJ 07002

[Property Address]

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

2.      INTEREST

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      2.1250      %. The interest rate will pay may change

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

(B) Interest Rate Change Dates

The interest rate I will pay may change on the 1st      day of      07/2005      , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal

PayOption MTA ARM Rider
FE-5315 (0412)                          Page 1 of 5                          10/04

4000021188

BK=12754   PG=00051

Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice

### (D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three and 9/20 percentage point(s) 3.4500 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.95 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.  PAYMENTS**

### (A)  Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on May 2005 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768 PHOENIX, AZ 85082-2768

or at a different place if required by the Note Holder.

### (B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,315.66 unless adjusted under Section 3 (F).

### (C)  Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of 05/2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the Interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

PayOption MTA ARM Rider
FE-5315 (0412)                    Page 2 of 5                                        10/04

4000021188

**(D)   Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)   Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to   115.00   Percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current

**(G)   Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)   Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

4000021188

BK=12754    PG=00053

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if:

(a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider
FE-5315 (0412)

Page 4 of 5

10/04

4000021188

VM

BK=12754    PG=00054

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable

_____ (Seal)
VIOLA MOORE

_____ (Seal)

_____ (Seal)

_____ (Seal)

4000021188

PayOption MTA ARM Rider
FE-5315 (0412)

Page 5 of 5

10/04

# 1-4 FAMILY RIDER
(Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this   11TH   day of   MARCH, 2005
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to
FIRST NATIONAL BANK OF ARIZONA

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:

77 EAST 21ST STREET, BAYONNE, NJ 07002
(Property Address)

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

4000021188                                    3274025440

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Initials ____
Page 1 of 4                                                                          Form 3170 1/01
( ) -57R (0005)        VMP 05/00        VMP MORTGAGE FORMS - (800)521-7291



**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

4000021188                          3274025440

-57R (0008)                    Page 2 of 4          Initials: [signature]    Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

4000021188                          3274025440

Initials: _____

By: Te Dan Smith, Esq. (229812017)
Johnson & Associates, P.C.
581 Main St Ste 640
Woodbridge, NJ 07095
P: 848-229-2254
Attorney for Plaintiff, *Viola Moore*

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | DOCKET NO.: HUD-L-531-18 |
| vs. | CIVIL ACTION |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | **ORDER DISMISSING DEFENANDT BANK OF AMERICA, N.A. MOTION TO DISMISS** |
| Defendants. | |

**THIS MATTER** having been

Pursuant to Rule 4:46, dismissing Defendant's motion to dismiss, with prejudice; and

the court having considered the papers submitted in support of Plaintiff's response to

motion to dismiss, having determined that genuine issues of material facts exist and

must proceed forward with discovery and or trial;

**IT IS**  on this _____ day of _____, 2018,

**ORDERED** as follows:

1. That Defendants Bank of America, N.A.'s Motion to Dismiss is denied
   and dismissed with prejudice.

2. Plaintiff's response to Defendant's motion be granted pursuant to Rule
   4:46.

3. That the case proceeds forward with discovery and trial by jury

4.  A copy of this Order shall be served upon counsel of record with seven (7)

days of receipt thereof by respondents counsel.


_____

, J.S.C.

By: Adrian J. Johnson, Esq. (00592012)
Johnson & Associates, P.C.
280 Amboy Ave., Ste. 3
Metuchen, NJ 08840
P: 848-229-2254
Attorney for Plaintiff, *VIOLA MOORE*

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | DOCKET NO.: |
| vs. | CIVIL ACTION |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | **VERIFIED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiff, **VIOLA MOORE,** through her attorney, Johnson & Associates, P.C. complaining

of the Defendants sets forth and alleges as follows:

## THE PARTIES

1.      Plaintiff, Viola Moore ("Viola" or "Ms. Moore" or "Payee"), is a natural

person domiciled in the State of New Jersey.

2.      At all times relevant thereto, Defendant, Bank of America, NA. referred to as

["BOA" or "Drawer Bank"] is a corporation incorporated under the laws of the State of

Delaware with banking branches located across the State of New Jersey with Mr. Robert

Doherty, NJ State President/SVP located at 750 Walnut Avenue NJ6-50203-01 Cranford, NJ

07016 as registered agent.

3.      At all times relevant thereto, Defendant, JP Morgan Chase Bank, NA. referred

to as ["Chase Bank" or "Depository"] is a corporation incorporated under the laws of the State

of Ohio with banking branches located across the State of New Jersey with Ms. Ellen

1

Cunningham, Corporate Compliance, located at 1 Chase Manhattan Plaza 25th Floor New York, New York 10081 as registered agent.

At all times relevant thereto, JOHN DOE shall be inserted to represent the following parties: Universal Renovation Consultants A Division of, Universal Sales Consultants, INC.; Universal Sales Consultants, INC.; Edmour Giguera /aka/ Ed Armand or Edward Armand, Home Improvement Contractor License/Registration/Certification # 13VH08277400.; and Alexander Duque, Are natural persons or corporations incorporated under the laws of the State of New Jersey with principal places of business located at 66 Laguna Dr. Wayne, New Jersey 07470, County of Passaic. and 1123A Route 23 South, Wayne, New Jersey 07474, County of Passaic. We are preserving space in this caption if the courts determine these Defendants are indispensable parties. The courts should be made aware of a foregoing State court case Docket # HUD-L-2103-16 where the Plaintiff in this matter is the Defendant in the above provided docket numbered case. Pursuant to New Jersey Court Rules 4:7-1, Ms. Moore is required to raise counterclaims in her answer or risk wavier of such claims. In this matter we preserve the space to add said defendants should the State court claim fail or be dismissed.

**FIRST COUNT**

**UCC §3-404 IMPOSTORS; FICTITIOUS PAYEES**
**(BANK OF AMERICA & CHASE BANK)**

1. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

2. Defendants failed to exercise ordinary care and substantially contributed to loss resulting from the payment of the instrument.

3. Defendant Bank of America, never received authorization or instruction from Ms. Moore to make or draw checks from said escrow payable to Viola Moore & Universal Sales Consultants, INC. (See Exhibit "A" BOA Checks)

4. Ms. Moore never gave Universal Sales Consultants, INC. authorization to draw or create drafts on her behalf. (See Exhibit "A" Moore Certification)

5. Defendant John Doe requested payment disbursement from Bank of America on or about September 3, 2015.

6. Defendant Bank of America honored Defendant John Doe's request and drew a check on September 16, 2015 in the amount of $152,000.00 from account number ending 6756

7. Defendant Bank of America yet again honored Defendants John Doe's request and drew a check on October 28, 2015 in the amount of $25,000.00 payable to Viola Moore and Universal Sale Consultants, INC. (See Exhibit "A" BOA Checks)

8. Ms. Moore's signature on both drafts had been forged and presented to the depository Bank.

9. Defendant Chase accepted and paid out the above sums to John Doe in a total amount of $177,000.00. (See Exhibit "A" BOA Check)

10. Both Defendants failed to exercise ordinary care by refusing to properly investigate many Ms. Moore's filed fraud complaints with the various bank's fraud department.

11. As a result, Ms. Moore never received funds from the forged check nor did she receive the benefit of a completed building because of the funds being paid to Universal Sales Consultants, INC. (See Exhibit "B" Moore Certification)

  **WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, treble damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

**SECOND COUNT**

## UCC §3-406 NEGLIGENT CONTRIBUTING TO FORGED SIGNATURE OR ALTERATION OF A INSTRUMENT
### (BANK OF AMERICA & CHASE BANK)

12. Plaintiff repeats and re-alleges all allegations contained in all prior Causes of Action, inclusive.

13. Defendants failed to exercise ordinary care and substantially contributed to an alteration of an instrument.

14. Plaintiff has an account and mortgage held by Bank of America.

15. Bank of America holds plaintiff's insurance proceeds in escrow to ensure that said monies would be used towards reconstruction of Plaintiff's building.

16. Defendant Bank of America, never received authorization or instruction from Moore to make or draw checks from said escrow payable to Viola Moore & Universal Sales Consultants, INC. (See Exhibit "A" BOA Checks)

17. Defendant John Doe requested payment disbursement from Bank of America on or about September 3, 2015.

18. Defendant Bank of America honored Defendant John Doe's request and drew a check on September 16, 2015 in the amount of $152,000.00 from account number ending 6756

19. Defendant Bank of America then again honored Defendants John Doe's request and drew a check on October 28, 2015 in the amount of $25,000.00 payable to Viola Moore and Universal Sale Consultants, INC. (See Exhibit "A" BOA Checks)

20. Defendant John Doe forged the signature of Ms. Moore and presented the altered instrument to Chase Bank on or about September 18, 2015.

21. Defendant Chase accepted and paid out the above sum to John Doe on or about September 21, 2015.

22. Defendant Chase, was in the best position to identify the forgery or alteration of the instrument but failed to do so.

23. Defendant Chase again accepted a second check on or about November 2, 2015 and paid out a sum of $25,000.00 on or about November 3, 2015.

      **WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

**THIRD COUNT**

**UCC §3-417 BREACH OF PRESENTMENT WARRANTIES**
**(CHASE BANK)**

24. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

25. At no point was Universal Sale Consultants, INC. and authorized party to receive the funds cashed by Chase Bank. (See Exhibit "B" Moore Certification)

26. The instrument presented to Chase Bank had been altered. (See Exhibit "C" Chase Fraud Notice)

27. Ms. Moore had no knowledge of the creation of the draft at time of presentment. (See Exhibit "A" Moore Certification)

28. Ms. Moore never authorized issuance for the draw on her account.

29. Chase Bank failed to exercise ordinary care and permitted payment on a forged draft.

30. Whereby Ms. Moore is entitled to compensation for expenses and loss of interest resulting from the breach.

      **WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

## FOURTH COUNT

### UCC §3-420 CONVERSION
### (BANK OF AMERICA & CHASE BANK)

31. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

32. Bank of America prepared a check and made it payable to Viola Moore and Universal Sales Consultants INC. (See Exhibit "A" BOA Checks)

33. Bank of America did not have authorization from Ms. Moore to create this instrument or us funds from the insurance proceeds as backing.

34. Bank of America converted funds from Ms. Moore account without claim of right or proper authorization.

35. Chase Bank failed to obtain proper endorsements on the instrument.

36. At no point did Ms. Moore communicate to either bank, she consented to this course of action resulting in the paying out of her funds.

37. Ms. Moore was not aware of the forgery on the instrument until her communication with the City Planning Commissioner. (See Exhibit "B" Moore Certification)

38. Chase Bank improperly paid out funds on a forged check, effectively converting $177,000.00 of Ms. Moore's funds. (See Exhibit "A" BOA Checks)

39. Ms. Moore never received funds from the forged check nor did she receive the benefit of a completed building because of the funds being paid to Universal Sales Consultants, INC. (See Exhibit "B" Moore Certification)

**WHEREFORE,** Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly,

severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and

proper relief.

**FIFTH COUNT**

**UCC §4-401 IMPROPER PAYMENT FROM ACCOUNT**
**(BANK OF AMERICA)**

40.   Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if

   fully set forth herein.

41. Bank of America never received authorization from Ms. Moore to create the checks in

   question. (See Exhibit "B" Moore Certification)

42. The checks made payable to Viola Moore and Universal Sale Consultants INC., were not

   properly payable.

43. Ms. Moore and Bank of America did not come to agreeance for the debiting of her

   account and the payment of checks using funds from her insurance proceeds.

44. Bank of America in no way paid out these unauthorized funds in good faith.

45.  As a result, Ms. Moore has suffered harm and is entitled to damage for remediation of

   said harm.

   **WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF**

**AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly,

severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and

proper relief.

**SIXTH COUNT**

**BREACH OF CONTRACT**
**(BANK OF AMERICA)**

7

46. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

47. Viola Moore signed and executed a contract to open an account with Bank of America, for which she deposited funds therein.

48. Bank of America also is the holder of a mortgage on the Ms. Moore's property destroyed by fire, and thus holds the insurance funds in escrow.

49. Bank of America, on numerous occasions denied Ms. Moore an accounting for funds held in escrow, breaching its fiduciary duties to its customers.

50. Bank of America further breached by paying out on account funds held in escrow, not properly payable.

51. Moore, never request nor authorized Bank of America to release funds made payable to Viola Moore & Universal Sales Consultants, INC. (See Exhibit "A" BOA Check)

52. Unbeknownst to Moore and without her consent, Defendants, John Doe obtained funding from her account with Bank of America in the total amount of $177,000.00.

53. Defendant Bank of America never received written authorization from Plaintiff to discuss details regarding the funds held in escrow, furthermore to make a negotiable instrument at the sole request of John Doe.

54. Plaintiff has demonstrated that Bank of America has breached its duties under contract and has caused Plaintiff harm in the form of consequential, lost profits, and actual damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

## SEVENTH COUNT

## COMMON LAW FRAUD
### (BANK OF AMERICA & CHASE BANK)

55. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

56. Defendant Bank of America, was aware that Ms. Moore gave no authorization for the making of checks numbered: 0001402188 and 0001433947 nor did she have knowledge the checks were made payable to Viola Moore & Universal Sales Consultants, INC. (See Exhibit "A" BOA Checks)

57. Upon Ms. Moore's discovery of these fraudulent acts, Defendant Bank of America intentionally reframed from communications with Ms. Moore that would have uncovered their liability for turning over unauthorized checks.

58. Instead, Bank of America directed Ms. Moore to file a fraud claim with their fraud department.

59. After several weeks, the fraud department would close Ms. Moore's file stating various reasons and instruct her to re-file a fraud claim. (See Exhibit "B" Moore Certification)

60. Moore's last fraud claim was dismissed due to Bank of America citing lack of cooperation from Chase Bank, who was the presenting bank that accepted and made payment on the forged instruments. (See Exhibit "A" BOA Checks)

61. Furthermore, Bank of America ceased communications with Ms. Moore on inquiries into her being refunded for the stolen monies, but Bank of America refused to communicate citing that Ms. Moore retained counsel and they would no long speak with her.

62. However, Bank of America refused to communicate with counsel, even after providing documentation of representation. (See Exhibit "D" Attorney Letter of Representation)

63.  As a result, Ms. Moore lost money earmarked for the reconstruction of her building, and

lost profits from rent as the building still has not be constructed. Plaintiff is entitled to

treble damages because of Defendants fraudulent acts and concealment.

WHEREFORE, Plaintiff demands judgment against Defendants, **BANK OF**

**AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly,

severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and

proper relief.

### i.    Fraudulent Concealment by a Fiduciary

64. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if

fully set forth herein.

65. Here, Bank of America owes fiduciary duties to Ms. Moore as they held insurance

proceeds in trust to insure its use for re-construction of Ms. Moore's building.

66. Bank of America was silent to the fact of the marking and distribution of the instrument

at the request of John Doe.

67. Bank of America Failed to inform Ms. Moore of this material facts leading to the

misappropriation of funds.

68. Ms. Moore suffered harm as she was deprived of the insurance proceeds, no building has

been constructed, resulting in her inability to collect rent or provide a living for herself.

WHEREFORE, Plaintiff demands judgment against Defendants, **BANK OF**

**AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly,

severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and

proper relief.

### ii.     Fraudulent Negotiable Instrument Paid or Taken

69. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

70. Chase, after being presented with two forged checks for substantial funds paid the sum to John Doe. (See Exhibit "A" BOA Checks)

71. Chase, being the depository bank, was in the best position to identify a forged check but failed on two separate occasions to do so.

72. Ms. Moore never ratified or gave consent to the paying out of said funds. (See Exhibit "B" Moore Certification)

73. As a result, Ms. Moore has suffered harm by not being afforded a re-constructed building; lost profits from rental income; facing default on her mortgage; adverse credit reporting; and court cost and attorney's fees.

**WHEREFORE,** Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; UNIVERSAL SALES CONSULTANTS; EDWARD ARMAND; and ALEXANDER DUQUE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

### EIGHTH COUNT

### COMMON LAW BREACH OF FIDUCIARY DUTIES
### (BANK OF AMERICA)

74. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

75. At the time of the breach, Bank of America is/was the holder of a mortgage on the Premises in question.

76. As such, BOA had an interest in the insurance proceeds to ensure its use for re-construction of the destroyed Premise.

77. Plaintiff's insurance policy paid out a check (Check # 0148046) to the order of: Viola Moore and Bank of America N.A.

78. Bank of America held said proceeds in trust within an account of their institution solely controlled by BOA.

79. Defendant subsequently, and without authorization breached fiduciary duties by paying out funds held in trust to an unauthorized third party. (See Exhibit "A" BOA Checks)

80. Said funds were never used for re-construction of the Premise and in fact were embezzled by Defendant John Doe.

81. Defendant failed to uphold the duty to exercise reasonable skill and care, causing Plaintiff harm; Plaintiff is out of funds and still has no erected building, entitling her to damages because of Defendant's breach and careless actions.

 **WHEREFORE,** Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

### i. Lender's Breach of Fiduciary Duties Owed to a Borrower

82. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

83. At the time of the breach, Bank of America is/was the holder of a mortgage on the Premises in question.

84. As such, BOA had an interest in the insurance proceeds to ensure its use for re-construction of the destroyed Premise.

85. Plaintiff's insurance policy paid out a check (Check # 0148046) to the order of: Viola Moore and Bank of America N.A.

86. Bank of America held said proceeds in trust within an account of their institution solely controlled by BOA.

87. Defendant subsequently, and without authorization breached fiduciary duties by paying out funds held in trust to an unauthorized third party. (See Exhibit "A" BOA Checks)

88. Said funds were never used for re-construction of the Premise and in fact were embezzled by Defendant John Doe.

89. These actions caused Plaintiff harm, Plaintiff still has no erected building and she is entitled to damages because of Defendant's breach and careless actions.

**WHEREFORE,** Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

### NINTH COUNT

### COMMON LAW BAD FAITH AND FAIR DEALINGS
### (BANK OF AMERICA)

90. Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

91. Defendants Bank of America and Chase Bank have acted in bad faith by not adequately cooperating with investigation into fraud claims submitted by Ms. Moore.

92. Both defendants pointed the finger at the other, and neither put fourth any reasonable efforts to help Ms. Moore recover information relating to the disbursement of her funds.

93. Both parties refused further communications with Ms. Moore after she retained counsel.

94. Additionally, both parties refused communication with counsel, even after being provided with official notice of representation. (See Exhibit "D" Attorney Letter of Representation)

95. Bank of America infringed on Ms. Moore's right to receive the fruits of good faith and fair dealings by intentionally misleading Ms. Moore as to why her fraud claims had been closed, and by approving the release of funds without prior authorization by Ms. Moore.

96. Furthermore, Chase Bank admitted to fraudulent practices regarding this transaction, evidenced by their action of tendering a refund on September 21, 2017. citing the forged endorsement signature as the cause for the return of funds to Bank of America.

97. To further add insult to injury, Bank of America has tried to foreclose on the mortgage encumbering the premises, stating that Ms. Moore has defaulted on payments owed and due. (See Exhibit "E" Loan Assistance)

98. Bank of America also denied Ms. Moore loan assistance, citing that additional documentation was needed.

99. The above needed documentation was to be supplied by Plaintiff's counsel Matt Sontz, who BOA would not permit to be added as an authorized person on the account. (See Exhibit "D" Attorney Letter of Representation)

100.    These acts lead to Ms. Moore's rejection for loan assistance creating an even greater financial burden on Plaintiff. (See Exhibit "E" Loan Assistance)

101.    Bank of America is more than aware of the present circumstances as to why Ms. Moore could not make payments. This is an additional bad act and tactic to persuade Ms. Moore from sought actions to hold Bank of America liable for its negligence.

   **WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF AMERICA; JP MORGAN CHASE BANK; and JOHN DOE**, individually, jointly, severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

14

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and proper relief.

## TENTH COUNT

### COMMON LAW NEGLIGENT MISREPRESENTATION
### (BANK OF AMERICA & CHASE BANK)

102.    Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as if fully set forth herein.

103.    Defendant, Bank of America falsely communicated to Ms. Moore that she gave BOA permission to release ongoing funds to Universal Sale Consultants, INC. (See Exhibit "F" Forged Formal Authorization)

104.    Referenced "Authorization Form" was also forged by John Doe and presented to Bank of America.

105.    Bank of America had in its possession a verifiable signature of Ms. Moore to compare and identify as false the signature on the Authorization form.

106.    Bank of America failed to perform due diligence as a safe guard to prevent fraud, by not requiring Ms. Moore to sign said authorization form in person.

107.    As a result, Bank of America negligently provided false information to Ms. Moore stating she gave authorization to release funds to John Doe.

108.    Furthermore, Bank of America terminated all of Ms. Moore's fraud claims on the grounds of lack of cooperation from Chase Bank, however upon Chase's notification of legal action, Chase tendered a refund of the forged checks to Ms. Moore's account.

109.    Had Bank of America attempted to remedy the situation earlier on; Chase Bank would have tendered a refund sooner and mitigated Plaintiff's incurred Damages.

110.    Chase Bank admitted no wrong doing even after being notified by Ms. Moore of the forged checks. (See Exhibit "B" Moore Certification)

15

111.    Chase Bank falsely communicated to Ms. Moore that no fraud had occurred on their

behalf, but later admitted to wrongdoings by tendering a refund to Ms. Moore's account

for the amounts of the forged checks.

**WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF**

**AMERICA; JP MORGAN CHASE BANK; and JOHN DOE,** individually, jointly,

severally, or in the alternative damages, together with lawful interest, plus Plaintiffs'

reasonable attorney's fees and litigation expenses as allowed by law, and for all other just and

proper relief.

## ELEVENTH COUNT

## COMMON LAW CIVIL CONSPIRACY
### (BANK OF AMERICA & CHASE BANK)

112.    Plaintiff repeats and re-alleges all allegations set forth in the preceding paragraphs as

if fully set forth herein.

113.    Defendants worked together to defraud Ms. Moore from funds earmarked for the re-

construction of her building.

114.    Defendants continued to mislead and divert Plaintiff from the truth regarding their

bad acts until they could no longer do so.

115.    As a result, Plaintiff suffered irreparable harm and is entitled to treble damages and all

other damages and awards that the courts deem just.

**WHEREFORE**, Plaintiff demands judgment against Defendants, **BANK OF**

**AMERICA; JP MORGAN CHASE BANK; and JOHN DOE,** individually, jointly,

severally, or in the alternative damages, treble damages, together with lawful interest, plus

Plaintiffs' reasonable attorney's fees and litigation expenses as allowed by law, and for all

other just and proper relief.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues raised in the various Counts of the Complaint.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Adrian J. Johnson, Esq., as trial counsel in this matter.

DATED:  FEBRUARY 6, 2018            **JOHNSON & ASSOCIATES AT LAW, P.C.**

                                     s/ADRIAN J. JOHNSON, ESQ.
                                     ADRIAN J. JOHNSON, ESQ
                                     ATTORNEYS for the PLAINTIFF

CERTIFICATION

Pursuant to R.4:5-1(b)(2), it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief.  Also, to the best of our belief, no other action or arbitration proceeding is contemplated.  Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action.  In addition, we recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

DATED:  FEBRUARY 6, 2018                **JOHNSON & ASSOCIATES AT LAW, P.C.**

                                        s/ADRIAN J. JOHNSON, ESQ._____
                                        ADRIAN J. JOHNSON, ESQ
                                        ATTORNEYS for the PLAINTIFF

By: Adrian J. Johnson, Esq. (00592012)
Johnson & Associates, P.C.
280 Amboy Ave., Ste. 3
Metuchen, NJ 08840
P: 848-229-2254
Attorney for Plaintiff, *Viola Moore*

| | |
|---|---|
| VIOLA MOORE., | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION MIDDLESEX COUNTY |
| Plaintiff, | |
| | DOCKET NO.: |
| vs. | |
| | CIVIL ACTION |
| BANK OF AMERICA, NA; | |
| JP MORGAN CHASE BANK, NA; and | **VERIFICATION OF** |
| JOHN DOE | **VIOLA MOORE** |
| Defendants. | |

**VIOLA MOORE,** deposes and says:

That she is the Plaintiff, in the within action; that she has read the foregoing Complaint

and knows the contents thereof; the same is true to deponent's own knowledge, except as to

the matters said to be upon information and belief, and as to those matters, deponent believes

same to be true.

DATED:        FEBRUARY 6, 2018

/s/VIOLA MOORE_____
VIOLA MOORE, PLAINTIFF

19

# EXHIBIT "A"

Amount:     $25,000.00           Sequence Number: 8992242066

Account:    3359866756           Capture Date:   11/03/2015

Bank Number: 06111278            Check Number:   1433947

THIS MULTITONE AREA OF THE DOCUMENT CHANGES COLOR GRADUALLY AND EVENLY FROM DARK TO LIGHT WITH DARKER AREAS BOTH TOP AND BOTTOM

**Bank of America**

BANK OF AMERICA CORP.          84-1278/811 GA  Check Date  Check Number
3400 Pawtucket Av. RI1-530-01-18                  10/28/2015  0001433947
East Providence RI 02915
888-550-6433

PAY    ** TWENTY-FIVE THOUSAND 00 / 100 DOLLARS          USD$*******25,000.00

PAY
TO      UNIVERSAL SALES CONSULTANTS INC
THE     & VIOLA MOORE                          Norman Daniel
ORDER   66 LAGUNA DR
OF      WAYNE NJ 07470 US
                                               Authorized Signature

                                               VOID AFTER 1 YEAR

⑆0001433947⑆ ⑆061112788⑆ 3359866756⑈

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

5312621

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 11/02/2015 | 1080045735 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 11/03/2015 | 008992242066 | 11300016 | Pay Bank | N | | |

Amount:      $152,000.00

Account:     3359866756

Bank Number: 06111278

Sequence Number: 8392378151

Capture Date:   09/21/2015

Check Number:   1402188

THIS MULTI-TONE AREA OF THE DOCUMENT CHANGES COLOR GRADUALLY AND EVENLY FROM DARK TO LIGHT WITH DARKER AREAS BOTH TOP AND BOTTOM

**Bank of America**

BANK OF AMERICA CORP.
125 Dupont Drive RI1-121-01-30
Providence RI 02907
888-550-8433

64-1278/611 GA  Check Date  Check Number
09/16/2015  0001402188

PAY   ** ONE HUNDRED FIFTY-TWO THOUSAND 00 / 100 DOLLARS

USD$*******152,000.00

PAY
TO
THE
ORDER
OF

UNIVERSAL SALES CONSULTANTS INC
& VIOLA MOORE
66 LAGUNA DR
WAYNE NJ 07470 US

Authorized Signature

VOID AFTER 1 YEAR

⑈0001402188⑈ ⑆0611127886⑆ 3359866756⑈

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK    HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

0993774

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 09/18/2015 | 9890621640 | 74909962 | Rtn Loc/BOFD | Y | | JPMORGAN CHASE BANK, |
| 09/21/2015 | 008392378151 | 11300016 | Pay Bank | N | | |

# EXHIBIT "B"

By: Adrian J. Johnson, Esq. (00592012)
Johnson & Associates, P.C.
280 Amboy Ave., Ste. 3
Metuchen, NJ 08840
P: 848-229-2254
Attorney for Plaintiff, *VIOLA MOORE*

---

| | |
|---|---|
| VIOLA MOORE, | SUPERIOR COURT OF NEW JERSEY |
| | CIVIL DIVISION HUDSON COUNTY |
| Plaintiff, | DOCKET NO.: |
| vs. | CIVIL ACTION |
| BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; and JOHN DOE. | **CERTIFICATION OF VIOLA MOORE IN SUPPORT OF COMPLAINT** |
| Defendants. | |

---

I, Viola Moore, of full age, hereby certifies as follows:

1. I am the Plaintiff in the above stated matter and as such, I have the authority and knowledge to make this certification in support of my Complaint filed against Defendants BANK OF AMERICA, NA; JP MORGAN CHASE BANK, NA; UNIVERSAL CONSULTANT, LLC and EDWARD ARMAND.

2. As the Plaintiff in this matter and owner of the real estate in question and personal property proceeds, I have personal knowledge regarding the events before and after my building's distraction by fire and subsequent negligent and fraudulent actions on behalf of the Defendants.

3. I am the owner of a property that consisted of land and an erected building located at 77 EAST 21ST STREET, BAYONNE, NJ. 07002.

4. This building was destroyed by fire on July 11, 2015

1

5. On or around July 12, 2015 the city required me to have what was left of my building demolished to protect community safety.

6. My property was insured through an insurance policy, which I am the named policy owner.

7. A claim for the destroyed property was submitted, and my insurance paid out the sum amount of $295,000.00

8. My destroyed building was subject to a mortgage held by Bank of America, NA.

9. Bank of America instructed me that the insurance funds would be placed in an escrow account to insure the monies use for rebuilding my destroyed building.

10. It has always been my intention and desire to have my building rebuild.

11. On or around July 14, 2015 I sought out the services of Universal Sale Consultant, INC. to rebuild my building.

12. I was under the impression that Universal Sale Consultant, INC was owned by Alex Duque, I later found out it was owned by a Edward Armand.

13. Edward (the owner of Unversal renovations Consultant Inc.) told me and the police his full name was Edward Armond, which was false.

14. His full name is Edward Armond Giguere.

15. My lawyer (Matt Sontz) told me he lied so I couldn't Google his name and find prior criminal and civil suits against him.

16. Alex is another contractor for the same company that I had contact with the whole time until I found out he was lying to me and forged my name on checks.

17. I threatened to report him to the cops, then Alex had Edward contact me. That would be the first time I had any knowledge that Edward Armond Giguere even existed

18. I later discovered that Edward Armand had prior convictions, including a similar case to mine where he stole $300,000 from a homeowner he was contracted to do work for.

19. Alex Informed me that the insurance company should have paid out more money, and that he needed to speak with Bank of America in order to have them pitch the insurance company for additional funds.

20. On occasion Alex would need to speak to the bank, so he would group call me in. Bank of America would ask if I gave them permission to speak with Alex, which I granted. Alex would then tell me I could hang up the phone.

21. I trusted Alex to speak with the bank on my behalf because he assured me he had experience with the insurance process because he was a former insurance adjuster.

22. He stated that the insurance company likely paid the bank more money than they disclosed to me and he would speak the lingo to get Bank of America to give me access to the entire policy funds they had in escrow.

23. Because Bank of America held the money in escrow. I did not have access to view the money.

3

24. Alex told me he needed to contact my bank, explaining to me that its the banks responsibility to get the most money possible from the insurance company, because they hold my mortgage and Bank of America has a team of lawyers to handle insurance companies for these type of situations.

25. Alex gained my confidence because he communicated so well with me. Every time I called or text, he would give me updates on the progress he made securing more insurance money and receiving city approval for the project to get the building rebuilt.

26. Five months pass without me hearing back about the city approval of the project.

27. At this point, I believed that Alex was working hard to gain city approval, as he wanted to get started on the project just as bad as I did.

28. However, I decided to call the city to try and plead for them to speed up the approval process.

29. To my surprise, when I called the city, they informed me that Universal Sale Consultant, INC. never contacted the city about any approvals or building projects.

30. Immediately after speaking with the city, I called Bank of America to see what information they had regarding this incident.

31. Bank of America then informs me that two checks had been paid from the escrow to Universal Sale Consultant, LLC.

32. At no point was I contacted before the issuance of these checks, nor did I sign any documents granting my consent for these checks to be issued to Universal Sale Consultant, INC.

33. Bank of America issued two checks totaling $177,000.00. One for $152,000.00 issued on September 16, 2015 and a second for $25,000.00 issued on October 28, 2015.

34. Both checks were issued and delivered without my knowledge or consent to Universal Sale Consultant, and titled "pay to order of" Viola Moore and Universal Sale Consultant, INC.

35. Each check had been cashed with JP Morgan Chase Bank, NA. Each check also contained a forgery of my signature on the endorsement line.

36. I later filed a police report with Detective Nikki Dias of the Bayonne Police Department.

37. I also filed three fraud claims with Bank of America's fraud department. Reference numbers: 16680400; 17093684; 17249885. Which they said could take 30-90 days for investigation.

38. Bank of America never followed up with me on the fraud claims.

39. When I attempted to get an update from Bank of America, they said they could no longer communicate with me because I hired legal counsel.

40. My former counsel attempted contact with Bank of America for updates on the fraud claims, and also never received a response from the bank.

41. On or around October 19, 2017 Bank of America sent me a letter denying any involvements in wrongdoing, and stating they could not add my former counsel to my accounts.

42. To this day, the Bank of America fraud case remains open.

43. Bank of America stated the case remains opens due to lack of cooperation from JP Morgan Chase Bank.

44. I believe the defendant has an account with JP Morgan Chase Bank and is a regular customer at the branch where the checks were cashed.

45. I conducted some research on Universal Sale Consultants and found that Angie's List had deleted their account due to complaints made.

46. I then discovered that Edward Armond Giguere had previously been convicted of fraud in a case similar to mine.

47. Because of the fraud claim delay with Bank of America, I no longer have money to pay my mortgage held by Bank of America.

48. If my building had been completed I would have a monthly income of around $14,400.00.

49. On March 1, 2017 I defaulted on my mortgage as a result of no income.

50. I am now seeking this suit in efforts to be made whole and to finally get my building rebuilt.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


DATED:  FEBRUARY 6, 2018

_/s/ Viola Moore_____
Viola Moore, Plaintiff

# EXHIBIT "C"

LETTER

Page 1 of 1

## LETTER

**Cantos, Leidvincent B**
**Sent:** Thursday, March 17, 2016 2:44 PM
**To:** Johnson, Zakiya

March 16, 2016

UNIVERSAL SALES CONSULTANTS INC.
DBA UNIVERSAL RENOVATION CONSULTANTS
66 LAGUNA DR
WAYNE, NJ 07470

Important Information Regarding Your Account: XXXX5097

Dear Customer:

We are writing to inform you of an important matter. Chase has been notified that a checks negotiated by you was returned.

Deposit Date: 09/18/2015 and 11/02/2015
Total Amount of Checks: $177,000.00
Serial Numbers: 1402188 and 1433947
Return Reason: Forged endorsement
As a result of this activity your account has been restricted

The depository agreement covering the Account provides that checks negotiated, may be charged back, without regard to whether such return is timely. Even if we verify a deposited or cashed check and tell you that the item has been paid, that will not release your liability as an endorser. This right shall extend to any item negotiated by you that is finally paid and then is returned because a claim is made that the item is altered, forged, unauthorized, has a missing signature or should not have been paid for any reason.

Please respond immediately with any information you may have on this claim that could help us with the investigation. If no response is received we will assume that you agree the funds belong to the claimant and you authorize us to charge your account to pay the claim.

We can be reached at the 1-866-564-2262. Representatives are available Monday - Friday 8 a.m. - 9 p.m. E.S.T. to assist you.

Sincerely,
Charity



# EXHIBIT "D"

The Law Office of

# MATTHEW H. SONTZ, LLC

220 Saint Paul Street
Westfield, NJ 07090
T: 908-389-1330
F: 908-543-1300
E-mail: mhs@sontzlaw.com

January 27, 2017

Bank of America
173 Elm Street
Westfield, NJ 07090

Re:   Viola Moore
      Bank of America Fraud Claim: 29 Jan. 2016 - 485483

Subj:  1. NOTICE OF REPRESENTATION

       2. DEMAND FOR REIMBURSEMENT OF FUNDS

       3. DEMAND FOR MORTGAGE FOREBEARANCE AND WAIVER
          OF FEES/COSTS

Dear Sir or Madam:

1.    NOTICE OF REPRESENTATION

      I represent Viola Moore.  Please direct all communications relating to this DEMAND to
this office.

2.    DEMAND FOR REIMBURSEMENTS OF FUNDS

      Ms. Moore is the owner of 77E 21st St in Bayonne, New Jersey.  This was a multi-
family, income producing asset.  Unfortunately, the home was destroyed by fire on July 11, 2015
through no fault of Ms. Moore.  Ms. Moore made an insurance claim and the insurance carrier,
The Philadelphia Contributionship, paid on the policy.  $25,000 was paid to the demolition
contractor.  Ms. Moore received $80,000 for lost rent.  The balance of the insurance proceeds,
$295,000, was sent to Ms. Moore in the form of a check made payable to both Ms. Moore and
Bank of America ("BOA").

      BOA refused to indorse the insurance check and release the insurance proceeds to Ms.
Moore.  Instead, BOA required Ms. Moore to deposit the insurance proceeds in an escrow
account with BOA.  BOA had sole and absolute control of this escrow account.  No bank
statements or other information about the escrow account was provided to Ms. Moore.  BOA
represented that it would hold the proceeds in trust for Ms. Moore to be distributed in the form of

1

progress payments as the premises was rebuilt. As a condition precedent for progress payments, BOA required that Ms. Moore hire a professional contractor, that the contract be provided to BOA, that Ms. Moore and the contractor make applications for payment, and that BOA verify that the claimed work was actually performed.

Ms. Moore hired Universal Sales Consultants ("Universal") as her contractor on or about July 31, 2015. Ms. Moore notified BOA that Universal was her contractor. In its contract, Universal promised to design and build the premises by February 28, 2016. Over the next several months, Ms. Moore sought to work with Universal to design the new building and handle land use issues with the City of Bayonne. The project stalled and delayed. Ms. Moore grew more concerned with each passing month. Universal represented to Ms. Moore that the Bayonne land use and building departments were causing the delay. Ms. Moore contacted the Bayonne land use and building departments and they informed her that they had never been contacted by Universal. Ms. Moore terminated Universal in late January, 2016.

Immediately thereafter, Ms. Moore contacted BOA to inquire about the status of the project. Universal's representatives were supposedly in frequent contact with BOA. To her shock, Ms. Moore was informed that BOA had released $177,000 to Universal months earlier. BOA gave Universal a check for $152,000 that was dated September 16, 2015. See Ex. A. It also gave Universal a check for $25,000 that was dated October 28, 2015. See Ex. B. Universal forged Ms. Moore's signature to enable it to cash these checks. These checks were never provided to Ms. Moore. No notice that these checks were sent to Universal was ever provided to Ms. Moore. Ms. Moore never signed any application for payment or other document requesting that these funds be released to Universal. Ms. Moore brought this forgery to BOA's attention. She signed a Fraud Statement of Claimant and demanded return of her $177,000. See Ex. C.

There was no basis for BOA to issue any checks to Universal. BOA never followed its own procedures for release of construction funds. A unilaterally drafted Universal pay schedule, which was not approved by Ms. Moore, states that "1st Distribution/Payment $177,000 60% (Architectural Services, Building Permit Fees, Construction at 40% complete)." See Ex. D. At a minimum, BOA should have:

    a.  notified Ms. Moore that a pay application had been made;
    b.  required Ms. Moore to sign and acknowledge the pay application;
    c.  confirmed that 60% of the project was complete;
    d.  confirmed that there was an architect hired and that drawings had been approved by the Bayonne land use and building departments;
    e.  confirmed that building permits were issued; and
    f.  confirmed that construction was 40% complete.

BOA represented that it would do a fraud investigation and provide Ms. Moore with the results. BOA has given Ms. Moore a myriad of excuses as to why the investigation was not complete and/or why it has not reimbursed Ms. Moore. Those excuses include but are not necessarily limited to:

    a.  fraud investigations take time;

2

3.  <u>DEMAND FOR MORTGAGE FORBEARANCE AND WAIVER OF FEES/COSTS</u>

Ms. Moore has been obligated to pay her mortgage on the premises even though the building was destroyed by fire. The building should have been rebuilt by now and would have been had BOA not wrongfully given $177,000 to Universal and failed to reimburse it. Equity dictates that Ms. Moore be granted a mortgage/foreclosure forbearance until such time as the building is complete. This should include waive of any and all costs, fees, and interests accrued to date.

Ms. Moore loan information is:

Ms. Viola Moore
77 E. 21st Street
Bayonne, NJ 07002
Loan No.: 091707007.

Please do not hesitate to contact me if you have any questions.

Very Truly Yours,

The Law Office of Matthew H. Sontz, LLC

By: _____
Matthew H. Sontz, Esq.

4

# EXHIBIT "E"

**Bank of America** ◢◢◢

5401 N. BEACH STREET
TX2-977-01-36
FORT WORTH, TX  76137

C3_12345 C312345H  18241  09/11/2014

**Notice Date:** November 18, 2015

**Account No.:** ███7007

VIOLA MOORE
443 AVENUE E
BAYONNE,NJ 7002

**Property Address:**
77 EAST 21ST STREET
BAYONNE,NJ  7002

Dear Viola Moore:

**We are no longer actively reviewing your application for loan assistance because we did not receive the requested documents.**

Our records indicate that there is a pending application for loan assistance on your account, but the application is incomplete because we have not received all required documents and information.  As a result, we are no longer actively processing the request at this time.  Please see below under the "What you need to know" section for further information.

**Please call 800.669.6650 to find out how to complete an application for assistance.**

## What you need to know

If you are interested in being evaluated for loan assistance options, please complete and return your application as soon as possible.

## Important Information about Foreclosure

Subject to applicable law and investor requirements until we have received a completed Borrower Response Package, we may continue to collect missing payments and may even proceed to a foreclosure sale.

**Therefore, you should not ignore any foreclosure notices, you should contact us immediately and be prepared to take steps to respond to any such notices and protect your interests.**

Once your loan enters the foreclosure process (or if it has already entered the foreclosure process), foreclosure activities may continue, unless you have provided your complete Borrower Response Package within the deadlines listed below, subject to applicable law and investor requirements.  That's why it is important that you continue to respond to any foreclosure notice and to any request for additional documentation required to complete your Borrower Response Package.

If you submit a complete Borrower Response Package 37 calendar days or less before a scheduled foreclosure sale, we may attempt to review your loan for a foreclosure alternative, but there is no guarantee we can stop the foreclosure sale.  Even if we are able to approve your loan for a foreclosure alternative prior to a sale, a court with jurisdiction over the foreclosure proceeding (if any) or public official charged with carrying out the sale may not stop the scheduled sale.

# EXHIBIT "F"

Viola Moore
Ref # 91707007
77 East 21ˢᵗ Street
Bayonne NJ 07002

Bank Of America
BAC Home Loans Servicing LP
Property Claim Department

Please Note this letter as formal Authorization for:

UNIVERSAL SALES CONSULTANTS INC. / ALEXANDER DUQUE.
1123A RT 23 SOUTH WAYNE NJ 07470
855-360-5750

Mention Company will be handling the current ongoing fire recovery process on named property and any Bank Related processes that should be require in order to successfully complete same project.

Regards,

Viola Moore

# Civil Case Information Statement

## Case Details: HUDSON | Civil Part Docket# L-000531-18

**Case Caption:** MOORE VIOLA  VS BANK OF AMERICAN, N. A.

**Case Initiation Date:** 02/06/2018

**Attorney Name:** ADRIAN JA WAUN JOHNSON

**Firm Name:** JOHNSON & ASSOCIATES AT LAW, PC

**Address:** 280 AMBOY AVE STE 3

METUCHEN NJ 08840

**Phone:**

**Name of Party:** PLAINTIFF : Moore, Viola

**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** YES

**If yes, list docket numbers:** HUD-L-2103-16

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

    **If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/06/2018

Dated

/s/ ADRIAN JA WAUN JOHNSON

Signed

Daniel C. Fleming (NJ Bar No. 18631986)
**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, NJ  08540
(609) 951-9520
dfleming@wongfleming.com
*Attorneys for Defendant Bank of America, N.A.*

| | |
|---|---|
| VIOLA MOORE,<br><br>                    Plaintiff,<br><br>        v.<br><br>BANK OF AMERICA, NA; JP MORGAN<br>CHASE BANK, NA; and JOHN DOE.<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: HUDSON COUNTY<br><br>DOCKET NO. HUD-L-531-18<br><br>CIVIL ACTION<br><br>**REPLY IN SUPPORT OF DEFENDANT,<br>BANK OF AMERICA, N.A.'S<br>MOTION TO DISMISS**<br><br>Return Date:  August 31, 2018 |

Defendant Bank of America, N.A. ("BANA") hereby submits this brief in reply to the opposition by Plaintiff Viola Moore to BANA's Motion to Dismiss.

**A. Count I (UCC 3-404):   The Complaint does not allege that USI impersonated Plaintiff.**

Plaintiff asserts that UCC 3-404's imposter rule applies because "Defendant Universal portrayed to BOA they were an authorized person to act for the payee Viola Moore."  Response pg. 5.  In so arguing, Plaintiff misunderstands the definition of an imposter under N.J.S.A. § 12A:3-404(a).  That section provides that an imposter is a person who "induces the issuer of an instrument to issue the instrument . . . <u>by impersonating the payee of the instrument or a person authorized to act for the payee</u> . . . ."  Thus, the rule would apply if USI *impersonated* Plaintiff—by pretending to be Plaintiff to induce BANA to issue USI the insurance proceeds checks, and if

BANA in turn issued the checks to USI believing that USI was Plaintiff.  The Complaint does not allege that this occurred.

**B.  Count II (UCC 3-406): Section 12A:3-406 does not create an affirmative cause of action.**

The Response misinterprets BANA's argument as to why the Complaint fails to state a claim under UCC 3-406.  Plaintiff reads the Motion to Dismiss to assert Plaintiff's contributory negligence as a defense under section § 12A:3-406.  Response pgs. 5-6.  BANA's argument in the Motion to Dismiss is not that Plaintiff's contributory negligence precludes her from raising a claim under UCC 3-406.  The argument is that Plaintiff cannot raise a claim under UCC 3-406 because that section does not create an affirmative cause of action.  MTD pgs. 5-6.  Caselaw throughout the country interpreting UCC 3-406 supports BANA's argument.  *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 655 (2004); *Wachovia Bank, N.A. v. FRB*, 338 F.3d 318, 325 (4th Cir. 2003).

**C.  Count IV (UCC 3-420):  Plaintiff does not allege the conversion of an instrument.**

The operation of N.J.S.A. § 12A:3-420, appropriately titled "Conversion of instrument," is clear.  The section applies to a conversion of an <u>instrument</u> and states that an <u>instrument</u> is converted "if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."  N.J.S.A. § 12A:3-420(a).  Count IV alleges that BANA converted the <u>insurance proceeds</u> by issuing the instruments in question, not that BANA converted the instruments themselves.  Compl. ¶¶ 31-32.

2

**D.  Count V (UCC 4-401):  Plaintiff lacks standing to assert a claim under UCC 4-401.**

BANA cites *McAuley v. Southington Sav. Bank*, 2000 Conn. Super. LEXIS 3527, at *18 (Conn Super. 2000) in support of its argument that Plaintiff lacks standing to assert a claim under UCC 4-401.  That case held that the plaintiff did not have standing to sue under UCC 4-401 because she was not the owner of the account that received the fraudulent charge.  Plaintiff responds that *McAuley* is an out-of-state case that is not binding on this Court.  *McAuley* is, however, persuasive because its holding is based on an interpretation of Conn. Gen. Stat. § 42a-4-401(a), Connecticut's version of UCC 4-401, which is identical to N.J.S.A. § 12A:4-401, New Jersey's version.  Further, although this Court is not bound by *McCauley*, it is bound by the unambiguous language of the statute that "[a] bank may charge against the account of a <u>customer</u> an item that is properly payable from that account."  N.J.S.A. §12A:4-401(a) (emphasis added).  As the Complaint indicates that Plaintiff was not the owner of the account which was charged for the two checks, she cannot bring her claim that the account was improperly charged.  Compl. ¶ 78.

**E.  The Mortgage does not establish a trust relationship with respect to the insurance proceeds in favor of Plaintiff.**

Plaintiff relies on the purported existence of a trust relationship as to the insurance proceeds to establish the sufficiency of many of the claims raised in the Complaint.  Specifically, with respect to Counts VI – XI (the common law claims), Plaintiff argues that a special relationship (that of trustee and beneficiary) exists between BANA and Plaintiff that places this case outside of the sweep of the UCC preemption for common law claims based on the mishandling of a check.  Response pg. 8; *City Check Cashing v. Mfrs. Hanover Trust Co.*, 166 N.J. 49, 57 (2001) (holding that, in the check collection area, unless the facts establish a special

3

relationship between the parties, the sole remedies are those available under the UCC).  With respect to Counts VII and VIII, Plaintiff argues that BANA owed Plaintiff a fiduciary duty by virtue of the purported trust relationship created by the Mortgage.  Response Pgs. 11-12.

As an initial matter, Plaintiff misrepresents that BANA admitted that the insurance proceeds were held in a trust account.  Response pgs. 7, 11.  BANA made no such admission.  It merely quoted the Complaint as alleging that BANA held the insurance proceeds in a trust account owned by BANA.  MTD pg. 7.  Additionally, Plaintiff is not permitted to raise a claim for breach of trust against BANA for the first time in the Response.  A motion to dismiss tests the legal sufficiency of a complaint.  As the Complaint does not assert a claim for breach of trust against BANA, any argument to that effect is procedurally improper.

On the merits, BANA was not Plaintiff's trustee with respect to the insurance proceeds.  Plaintiff's assertion that a trust relationship existed between the parties is based on "BOA Mortgage Clauses 4&5."  Response pg. 9.  According to the Response, the Mortgage "expressly states" "'the creation of a trustee/beneficiary relationship if insurance proceeds are paid to the mortgagee resulting from the destruction of the mortgaged property, and said proceeds are to be released to the mortgagor and held in trust.'"  Response pg. 9.  Counsel for BANA has examined the Mortgage agreement several times and has confirmed that the language to which Plaintiff refers is absent from the Mortgage.[1]  Accordingly, Plaintiff's argument as to existence of a trust relationship is based on a false premise.  If anything, the Mortgage establishes a trust relationship in favor of BANA.  *See First Federal Sav. & Loan Asso. v. Nieder*, 163 N.J. Super. 308, 311-321 (App. Div. 1978) (holding that the mortgagee had the right to the insurance proceeds under a trust theory pursuant to the mortgage's provisions that required the mortgagor to insure the property <u>for the mortgagee's benefit</u>).

---

[1] Motion to Dismiss, Exhibit 2.

Here, the Mortgage provides that "Borrower shall keep . . . the Property insured against loss by fire . . . and any other hazards . . . . <u>for which Lender requires insurance,</u>" that "the insurance shall be maintained in the amounts . . . and for the periods <u>that Lender requires,</u>" and that "[a]ll insurance policies required by Lender . . . <u>shall name Lender as</u> . . . <u>an additional loss payee.</u>"[2]  Moreover, the section titled "Preservation, Maintenance and Protection of the Property; Inspections," which concerns Plaintiff's obligation to protect the value of the property (BANA's collateral), states that "[i]f insurance . . . proceeds are paid in connection with damage to . . . the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes."[3]  Accordingly, the Mortgage required Plaintiff to acquire property insurance for BANA's benefit to secure to value of BANA's collateral in the event of a loss.  Any trust obligation under the Mortgage as to insurance proceeds would flow from Plaintiff to BANA, not in the opposite direction.

## CONCLUSION

For all of the reasons discussed within, Defendant Bank of America, N.A. respectfully requests that the Court grant Bank of America, N.A.'s motion and enter an order dismissing Plaintiff's Complaint with prejudice.


Wong Fleming, P.C.
*Attorneys for Defendant Bank of America, N.A.*


DATED:  August 27, 2018                    By: */s/ Daniel C. Fleming*_____
                                                    Daniel C. Fleming

---

[2] Motion to Dismiss, Exhibit 2, pg. 6, section 5 (emphasis added).
[3] Motion to Dismiss, Exhibit 2, pg. 7 section 7 (emphasis added).